**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

08 CV 02233

| | |
|---|---|
| MICHAEL RUBIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) **CIVIL ACTION NO.** ) ) |
| vs. | ) ) ) |
| MF GLOBAL, LTD., MAN GROUP PLC, KEVIN R. DAVIS, AMY S. BUTTE, ALISON J. CARNWATH, CHRISTOPHER J. SMITH, CHRISTOPHER BATES, HENRI J. STEENKAMP and EDWARD L. GOLDBERG, | ) **CLASS ACTION COMPLAINT** ) ) ) ) ) **JURY TRIAL DEMANDED** |
| Defendants. | ) ) |

RECEIVED MAR 06 2008 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff, for his complaint against the defendants, alleges the following:

**NATURE OF THE ACTION**

1.      This is a securities class action seeking redress under the strict liability provisions of the federal securities laws on behalf of all purchasers of MF Global, Ltd. ("MF" or the "Company") common stock pursuant or traceable to the Registration Statement and Prospectus issued in connection with the Company's Initial Public Offering on or about July 19, 2007 ("IPO") and through February 28, 2008 (the "Class" and the "Class Period" respectively).

2.      The Registration Statement and Prospectus issued in connection with the IPO were materially false and misleading, and/or omitted material information necessary to make the statements made, in light of such material omissions, not materially false and misleading.

**JURISDICTION AND VENUE**

3.      The claims asserted herein arise under and pursuant to Sections 11, 12(2) and 15 of the Securities Act of 1933, as amended (the "Securities Act"), 15 U.S.C. §§ 77k,77*l* and 77o.

4.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

5.     Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). Pursuant to 28 U.S.C. § 1391(d), MF and Man Group plc may properly be sued in any District in the United States, including the Southern District of New York. Moreover, MF's principal executive offices are located in New York City and its common stock trades on the New York Stock Exchange ("NYSE"), which is located in this District. Thus, venue is proper in this District.

6.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

**PARTIES**

7.     Plaintiff Michael Rubin, as set forth in the attached certification, purchased shares of MF pursuant to the false and misleading Registration Statement and Prospectus and was damaged thereby.

8.     Defendant MF is a Hamilton, Bermuda registered company with its principal executive offices in New York City, New York. The Company was formerly known as Man Financial, the brokerage arm of the British hedge fund Man Group plc, and was spun off to form its own publicly traded company via its IPO. MF, through its wholly owned subsidiaries, is the world's leading broker of exchange-listed futures and options. It provides execution and clearing services for exchange-traded and over-the-counter ("OTC") derivative products, as well as for

2

non-derivative foreign exchange products and securities in the cash market. MF is a "specialty" broker, whose focus is on providing both brokerage execution and clearing services to its clients. It does not engage in non-brokerage businesses, such as investment banking, asset management or principal investments.

9.      MF's common stock trades on the New York Stock Exchange under the ticker symbol "MF."

10.      Defendant Man Group plc ("Man") is the former parent of MF. Man received almost $3 billion of proceeds from the IPO and still retains a 20% stake in MF. Through its ownership and control of the Company, Man is a controlling person of MF within the meaning of the Securities Act.

11.      Defendant Kevin R. Davis ("Davis") was at all relevant times herein the Company's Chief Executive Officer and Director and in such capacity signed the Registration Statement.

12.      Defendant Amy S. Butte ("Butte") was at all relevant times herein the Company's Chief Financial Officer and Director and in such capacity signed the Registration Statement.

13.      Defendant Alison J. Carnwath ("Carnwath") was at all relevant times herein the Company's Non-Executive Chairman of the Board of Directors and in such capacity signed the Registration Statement.

14.      Defendant Christopher J. Smith ("Smith") was at all relevant times herein the Company's Chief Operating Officer, Deputy Chief Executive Officer and Director and in such capacity signed the Registration Statement.

3

15.     Defendant Christopher Bates ("Bates") was at all relevant times herein the Company's Group Controller and in such capacity signed the Registration Statement.

16.     Defendant Henri J. Steenkamp ("Steenkamp") was at all relevant times herein the Company's Vice President of Corporate Financial Reporting – MF's Principal Accounting Officer – and in such capacity signed the Registration Statement.

17.     Defendant Edward L. Goldberg ("Goldberg") was at all relevant times herein a member of the Company's Board of Directors and was listed in the Registration Statement and Prospectus in that capacity.

18.     Davis, Butte, Carnwath, Smith, Bates, Steenkamp and Goldberg are collectively referred to hereinafter as the "Individual Defendants."

### SUBSTANTIVE ALLEGATIONS

19.     On July 18, 2006, MF announced that the IPO of 97,379,765 shares of its common stock had been priced at $30 per share, for gross proceeds of more than $2.92 billion, and that the shares would begin trading the following day, July 19, 2007.  Prior to the IPO, no public market existed for trading of the Company's securities.

20.     The Registration Statement and Prospectus represented:

We are exposed to numerous risks in the ordinary course of our business. Management believes that effective risk management is critical to the success of our business.  We have a comprehensive risk management structure and processes to monitor, evaluate and manage the principal risks we assume in conducting our business.

21.     Similarly, the Registration Statement and Prospectus represented that "We have established a robust, globally integrated risk-management infrastructure to monitor, evaluate and manage the principal risks we assume in conducting our business around the world."

4

22.     The Registration Statement and Prospectus further represented in pertinent part:

Our risk-management methods focus on monitoring each client's potential exposure at default – that is, our potential exposure to loss in the event that the client defaults – and adjusting that client's margin requirements accordingly in an effort to ensure that their collateral is sufficient to secure their performance obligations on their open positions. This function requires, among other things, that we properly record and verify hundreds of thousands of transactions and events each day, and that we continuously monitor and evaluate the size and nature of our clients' positions and the associated risks . . . . Our risk-management methods are based on internally developed controls, observed historical market behavior and what we believe to be industry practices.

23.     The Registration Statement and Prospectus further represented that "Our clients are required to maintain margin accounts with collateral sufficient to support their open trading positions."

24.     Under the heading "***Disciplined Approach to Risk***," the Registration Statement and Prospectus further represented:

We actively manage risk on a global basis with a centralized, hands-on approach. Our senior executives play a leading role in managing our risk exposure on a day-to-day basis. We monitor our clients' open positions– which represent our principal risk exposure– and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight from our highly experienced risk managers. Client positions are reviewed and margin levels adjusted both during and at the end of each trading day. We do not rely primarily on conventional value-at-risk methodology to test our clients' exposures, as that methodology attempts to measure risk under relatively "normal" market conditions during a relatively brief period and may not always reflect significant "shock" events that may have occurred over a longer time frame. Rather, we stress-test client positions under hypothetical "worst-case" conditions that reflect actual historical data from periods extending back a decade or longer. We believe this approach enables us to measure risk in light of a broader range of historical experience that includes more extreme conditions.

25.     The Registration Statement and Prospectus further represented:

Overall, we believe that our exposure to market risk is substantially lower than it would be if we took positions for our own account primarily for directional purposes

rather than primarily to facilitate client trades on a matched basis and to hedge and manage our corporate assets.

26.     The Registration Statement and Prospectus further represented:

Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation.  We have an active program for monitoring and verifying that our employees and introducing brokers comply with specified procedures . . . .

27.     On August 14, 2007, less than a month after the IPO, MF issued a press release stating that:

As an organization, MF Global prides itself on its rigorous approach to risk management, an essential function that has allowed us to operate successfully for more than 200 years.  One of the key components of our risk management is daily assessments of credit and counter party risks, as well as general market trends.

28.     Unbeknownst to investors, however, the Registration Statement and Prospectus issued in connection with the IPO were materially false and misleading because, among other things, it materially misrepresented MF's risk management policies, procedures, and systems; falsely described them as disciplined, comprehensive and effective; falsely represented that it manages its exposure to risk with a centralized, hands-on approach; falsely represented that it monitors clients' open positions and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight by highly experienced risk managers; falsely represented that its risk management methods conform to industry practices; falsely represented that its clients are required to maintain margin accounts with collateral sufficient to support their open trading positions; failed to disclose that in an effort to speed trades and be "efficient," MF had suspended or eliminated its own internal risk management technical and human controls and supervision, and failed to disclose that it eliminated credit and risk analysis and buying power

6

limits and controls from its systems, effectively allowing any MF employee to place orders without regard to the account's satisfaction of margin requirements, collateral or ability to pay.

## THE TRUTH IS REVEALED

29.     On February 28, 2008, the end of the Class Period, MF issued a press release at approximately 8:30 A.M. announcing that it was taking a $141.5 million bad debt provision because in a period of only six or seven hours in the previous morning a day-trading MF broker logged on to his personal computer at home in Olive Branch, Mississippi and speculated in wheat futures in his personal account at MF, buying approximately 15,000 to 20,000 futures contracts (the equivalent of approximately 10% of the market for these contracts for any given month), in violation of his authorized trading limit and without having the necessary collateral or capital "to support even a fraction of his positions." The lack of risk management, technical controls and human oversight, and the elimination of credit and risk analysis and buying power limits and controls that were supposed to be part of the Company's order entry system enabled the broker to make more than 100 trades and place a massive bet on more than $800 million to $1 billion worth of wheat, "significant positions in his own account which were liquidated later that morning. The unauthorized activity resulted in him incurring a loss of $141.5 million, which the company, as a clearing member, is responsible to settle at the clearinghouse."

30.     The registered representative was later identified as Evan "Brent" Dooley ("Dooley"), who was quoted by The Wall Street Journal on February 28, 2008 as saying that "'The computer system failed on a lot of things,' adding that it had problems in 'setting limits.'"

31.     The Company hosted a conference call later that day for analysts and investors. As reported by The Wall Street Journal on February 29, 2008, in that call Defendant Davis

7

"acknowledged that existing internal controls could have stopped Mr. Dooley's trades from being processed – but were turned off in a few cases to allow for speedier transactions by brokers at the firm who traded for themselves or took customer orders by phone." The internal controls did not fail; rather, they were **deactivated**. During the call, Davis further stated that Dooley had just one "historic customer," who had not done any trading business in "some time."

32.     Davis, who observed that "this is an absolutely awful event," acknowledged that Dooley had not circumvented any risk management procedures that had been in place, and that in order to speed trades the Company had allowed some internal terminals "to not have the buying power control." He went on to say that the policy clearly was "a mistake." MF had sacrificed security for efficiency and in so doing placed all of MF's assets at risk.

33.     Following the Company's announcement, Fitch Ratings issued a Rating Watch Negative on MF, stating that the $141.5 million "loss questions the robustness of risk measurement systems [touted by MF in the Registration Statement and Prospectus (see ¶ 21 herein)] and represents a substantial portion of net income level." Eileen Fahey, a managing director at Fitch Ratings, observed: "This does open the view that their customers are taking more risk than we thought." In addition, numerous analysts expressed reservations and concerns regarding the company's Risk Management practices. Bank of America said "the questions raised around the company's risk-management practices are likely to keep the stock depressed for quite some time," and Credit Suisse analysts said the "magnitude of the loss is clearly disconcerting to us and calls into question the degree of risk taking and risk management at the franchise."

34.     MF's stock closed down 28% that day from previous trading levels.  However, the very next day, Friday February 28, MF's shares sank a further 17%, to close at $17.55, after trading as low as $14.27 per share, completing a two day plunge of approximately 40%, and representing a loss to shareholders of more than $1,142,000,000.

35.     The repercussions of MF's trading scandal will continue to reverberate.  As reported by The Wall Street Journal on March 1, 2008:

> Clients who make trades through MF Global because of its longtime reputation as a savvy player in the topsy-turvy futures industry might take that business elsewhere, though there is no sign of a customer exodus . . . . Analysts and investors are concerned that more bad trades could surface at MF Global, further depleting the firm's capital . . . . The trading loss also could complicate MF Global's plans to borrow money later this year. Standard & Poor's lowered its long-term counter-party credit rating on MF Global to triple-B, down one notch from triple-B-plus, noting that the brokerage firm had borrowed $150 million under its $1.5 billion, five-year revolving credit facility to bolster its regulatory capital.

36.     On March 2, 2008, MF wrote a letter to its clients concerning the "disappointing and embarrassing development in the history of MF Global."  The letter, written by Davis, said "We have always prided ourselves on our strong risk management approach, as it is at the heart of our business model. An occurrence such as this is not acceptable."

37.     On March 5, 2008, The Wall Street Journal reported that federal law-enforcement authorities are investigating the futures trades made by Dooley.  The probe is being conducted by the U.S. Attorney's office for the Northern District of Illinois in Chicago.  An investigation is also being conducted by the Chicago Mercantile Exchange and the Commodities Futures Trading Commission.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of himself and a class consisting of all persons who purchased shares of MF common stock pursuant to the Registration Statement and Prospectus issued in connection with MF's IPO through and including February 28, 2008. Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

39.     The members of the Class are so numerous that joinder of all members is impracticable. Over 97.37 million shares of MF common stock were sold to members of the investing public in the IPO. The precise number of class members is unknown to Plaintiff at this time but is believed to number at least in the hundreds. In addition, the names and addresses of the class members can be ascertained from the books and records of MF, its transfer agents or the underwriters for the IPO.

40.     The members of the Class are so numerous that joinder of all members is impracticable.

41.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to prosecute this action vigorously.

42.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all the class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants. Plaintiff does not have interests antagonistic to, or in conflict with, the Class.

43.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the Registration Statement and Prospectus omitted and/or misrepresented material information about MF and its risk management policies, procedures, and systems;

(b)     Whether defendants violated the Securities Act in connection with the offering and sale of MF securities;

(c)     Whether Man and the Individual Defendants are controlling persons of MF within the meaning of § 15 of the Securities Act;

(d)     Whether Man and the Individual Defendants exercised due diligence in connection with the IPO;

11

(e)      Whether the market price of the Company's securities was artificially inflated due to the material misrepresentations and/or nondisclosures complained of herein; and

(f)      The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## COUNT I

### Against Each Of The Defendants

### (Section 11)

45.      Plaintiff repeats and realleges each and every allegation contained above.

46.      This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against each of the defendants.

47.      The defendants issued, caused to be issued, participated in the issuance of and/or signed the Registration Statement and Prospectus and offered, sold, and/or solicited for financial gain the common stock sold in the IPO to Plaintiff and the Class.

48.      The Registration Statement and Prospectus for the IPO were inaccurate and misleading, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading in the context in which they were made.

49.      The Individual Defendants signed, either personally or through an attorney-in-fact, the Registration Statement and Prospectus and also served as senior executives and/or directors of the Company at the time of the IPO and as such were responsible for the contents and dissemination of the Registration Statement and Prospectus.

50.      The defendants failed to conduct reasonable investigation or possess reasonable grounds for believing that the statements contained in the Registration Statement and Prospectus

12

were true, did not omit any material facts and were not materially misleading. Had any of the material facts which were omitted been disclosed it would have been impossible to successfully complete the IPO or to do so at the price at which it was completed.

51.    The defendants issued, caused to be issued and participated in the issuance of materially false and misleading statements to the investing public which were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the facts set forth above. By reason of the conduct herein alleged, each defendant violated Section 11 of the Securities Act.

52.    Plaintiff and the Class acquired MF shares issued pursuant to, or traceable to, the Registration Statement and Prospectus.

53.    Plaintiff and the Class have sustained damages. The value of MF shares has declined dramatically subsequent to the IPO and due to defendants' violations.

54.    At the time they purchased MF shares, Plaintiff and the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not, in the exercise of reasonable diligence, have discovered those facts at that time. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed his Complaint. Less than three years elapsed from the time that the securities upon which this Count is brought were *bona fide* offered to the public to the time Plaintiff filed his Complaint.

## COUNT II

### Against Each Of The Defendants

### (Section 12(2))

55.     Plaintiff repeats and realleges each and every allegation contained above.

56.     This Count is being asserted under and pursuant to Section 12(2) of the Securities Act, 15 U.S.C. § 77*l*, on behalf of the Class, against all defendants.

57.     The defendants offered, sold, or solicited for financial gain the securities sold in the IPO to the Class.

58.     The Registration Statement and Prospectus included untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  The defendants' actions of solicitation included, *inter alia* participating in the preparation of the false and misleading Registration Statement and Prospectus.

59.     The defendants owed to the purchasers of MF common stock the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

60.     Class members did not know of any of the untruthful statements and omissions alleged and in the exercise of reasonable care could not have known of them.

61.     By reason of the conduct alleged herein, defendants violated Section 12(2) of the Securities Act.  As a direct and proximate result of the defendants' wrongful conduct, purchasers of MF securities suffered substantial damage in connection with the purchase thereof.

62.     This action is commenced within three years of the IPO and within one year of the time Plaintiff and the other Class member purchasers of the securities discovered or could have discovered the existence of untrue statements by exercising due diligence.

63.     By reason of the foregoing, the defendants have violated Section 12(2) of the Securities Act.

64.     Purchasers of MF securities pursuant to the IPO hereby tender their securities to the defendants and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT III

### Against Each Of The Individual Defendants

### (Section 15)

65.     Plaintiff repeats and realleges each and every allegation contained above.

66.     This Count is asserted against the Individual Defendants under and pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o. By reason of their ownership, senior management positions and/or directorships as alleged above, these defendants had the power to influence and exercised the same to cause MF to engage in the unlawful acts and conduct complained of herein.

67.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.      declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B.      appointing Plaintiff as lead plaintiff and class representative and his counsel as lead class counsel;

C.      awarding Plaintiff and other members of the Class damages together with pre-judgment interest thereon;

D.      awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.      awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:      March 6, 2008
            New York, New York

                              **WEISS & LURIE**

                              Joseph H. Weiss (JW-4534)
                              James E. Tullman (JT-9597)
                              Richard A. Acocelli (RA-2029)
                              551 Fifth Avenue
                              New York, New York  10176
                              (212) 682-3025
                              (212) 682-3010 (Fax)

                              **STULL, STULL & BRODY**
                              Jules Brody (JB-9151)
                              6 East 45th Street
                              New York, New York 10017
                              (212) 687-7230
                              (212) 490-2022 (Fax)

                              Attorneys for Plaintiff

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

MICHAEL RUBIN ("Plaintiff") certifies as follows:

1.      I have reviewed a draft complaint against MF Global Ltd. and others and authorize its filing.

2.      I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3.      I am willing to serve as the representative party, including providing testimony at deposition and trial, if necessary.

4.      On July 19, 2007, I purchased 1,800 shares individually (and an additional 500 shares in a joint account with my wife) of MF Global Ltd. in the IPO at a price of $30.00.  The following are the sales of my individually held shares:

10/26/07 – 100 shares – $30.66
10/26/07 – 100 shares – $30.50
11/02/07 – 100 shares – $30.34

I still retain 1,500 shares individually and 500 shares jointly of MF Global Ltd.

5.      I have not sought to serve as the representative party in any federal securities case in the last three years except in the following case:

Kim v. Lee et al., 06 cv 02951 (TPG) (S.D.N.Y.)

6.      I will not accept any payment for serving as the representative party beyond Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

7.      I hereby certify, under penalty of perjury, that the foregoing is true and correct to the best of my current knowledge, information and belief.

DATED:      March 5, 2008

_____
Michael Rubin