UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| MICHAEL RUBIN, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>MF GLOBAL, LTD., MAN GROUP PLC, KEVIN R. DAVIS, AMY S. BUTTE, ALISON J. CARNWATH, CHRISTOPHER J. SMITH, CHRISTOPHER BATES, HENRI J. STEENKAMP and EDWARD L. GOLDBERG, )<br><br>Defendants. ) | **08-CV-2233 (VM)** |

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
SOUTH SHORE INVESTMENT GROUP, CRL MANAGEMENT, LLC, KAL KOPLIN
AND MICHAEL RUBIN FOR APPOINTMENT AS LEAD PLAINTIFFS AND
APPROVAL OF THEIR SELECTION OF LEAD COUNSEL**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      POINT I -     MOVANTS SHOULD BE APPOINTED LEAD PLAINTIFFS . . . . . . . . 8

      A.    The Procedure Required By The PSLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.    Movants Satisfy The "Lead Plaintiff" Requirements of the PSLRA . . . . . . . . . . 9

          1.    Movants Have Complied With The PSLRA
              And Should Be Appointed Lead Plaintiffs . . . . . . . . . . . . . . . . . . . . . . 9

          2.    Movants Have The Largest Financial Interest
              In The Relief Sought By The Class . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          3.    Movants Otherwise Satisfy Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      POINT II -    MOVANTS' CHOICE OF COUNSEL SHOULD BE APPROVED . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## TABLE OF AUTHORITIES

### FEDERAL CASES

Avagliano v. Sumitomo Shoji America, Inc.,
    103 F.R.D. 562 (S.D.N.Y. 1984) ........................................................................ 12

Bishop v. New York City Department of Housing Preservation and Development,
    141 F.R.D. 229 (2d Cir. 1992) .......................................................................... 12

In re Drexel Burnham Lambert Group, Inc.,
    960 F.2d 285 (2d Cir. 1992), cert. dismissed sub nom., 506 U.S. 1088
    (1993) .................................................................................................................. 11

Fischler v. Amsouth Bancorporation,
    1997 U.S. Dist. LEXIS 2875 (M.D. Fla. Feb. 6, 1997) ...................................... 11

Garfinkel v. Memory Metals, Inc.,
    695 F. Supp. 1397 (D. Conn. 1988) .................................................................. 12

Greebel v. FTP Software,
    939 F. Supp. 57 (D. Mass. 1996) ...................................................................... 9

Lax v. First Merchants Acceptance Corp.,
    1997 U.S. Dist. LEXIS 11866 (N.D. Ill. Aug. 6, 1997) ................................. 8, 11

Walsh v. Northrop Grumman Corp.,
    162 F.R.D. 440 (E.D.N.Y. 1995) ..................................................................... 12

### FEDERAL STATUTES

15 U.S.C. § 77z-1(a)(1) ............................................................................................ 8

15 U.S.C. § 77z-1 (a)(3)(A) ...................................................................................... 8

15 U.S.C. § 77z-1 (a)(3)(B) ........................................................................ 9, 10, 11, 13

Proposed Lead Plaintiffs South Shore Investment Group ("South Shore"), CRL Management, LLC ("CRL Management"), Kal Koplin ("Koplin") and Michael Rubin ("Rubin") (collectively, the "South Shore Investment Group" or "Movants") hereby respectfully submit this memorandum of law in support of their motion for: (i) appointment as Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); and (ii) approval of their selection of Weiss & Lurie as Lead Counsel.

## INTRODUCTION

South Shore purchased 128,950 shares of the common stock of MF Global, Ltd. ("MF" or the "Company") directly in the IPO and suffered estimated losses of approximately $343,416.89 as a result of defendants' misconduct. CRL Management purchased 129,200 shares of MF common stock directly in the IPO and suffered estimated losses of approximately $457,032.13 as a result of defendants' misconduct. Koplin purchased 32,000 shares of MF common stock directly in the IPO and suffered estimated losses of approximately $100,365 as a result of defendant's misconduct. Rubin purchased 2,300 shares of MF common stock directly in the IPO and suffered estimated losses of approximately $33,862 as a result of defendants' misconduct. Collectively, the South Shore Management Group purchased 292,450 shares of MF common stock directly in the IPO and suffered estimated losses of approximately $934,563.22 as a result of defendants' misconduct. Accordingly, Movants believe they are the investors with the largest financial interest in the outcome of the litigation and, therefore, seek to be appointed Lead Plaintiffs. Additionally, Movants seek Court approval of their selection of Weiss & Lurie as Lead Counsel.

As discussed more fully below, Movants satisfy each of the requirements of the PSLRA and, therefore, are qualified for appointment as Lead Plaintiff. More importantly, they have the

largest losses in the litigation of any filed plaintiff, and upon information and belief, are the most

adequate representatives of the class on this score.  Furthermore, Movants' counsel is qualified to

serve as lead counsel, filed the first case against MF and the other defendants, and should be

approved by this Court as lead counsel for the Class.

## PROCEDURAL BACKGROUND

On Thursday, March 6, 2008, Rubin filed the first action in this Court, <u>Rubin v. MF</u>

<u>Global, Ltd., et al.</u>, Case No. 08-cv-2233.  Thereafter, on Monday March 10, 2008, notice of the

pendency of the <u>Rubin</u> action was published over <u>BusinessWire</u>, advising members of the

proposed class of their right to move the Court to serve as lead plaintiff no later than sixty (60)

days from the date of publication of the Notice, <u>i.e.</u>, by May 9, 2008.  The <u>Rubin</u> action pled

claims for violations of Sections 11, 12 and 15 of the Securities Act against the Company, certain

of its officers and directors, and its former parent, Man Group PLC.

## STATEMENT OF FACTS

Defendant MF is a Hamilton, Bermuda registered company with its principal executive

offices in New York City.  MF, through its wholly owned subsidiaries, is the world's leading

broker of exchange-listed futures and options.  It provides execution and clearing services for

exchange-traded and over-the-counter ("OTC") derivative products, as well as for non-derivative

foreign exchange products and securities in the cash market.  MF's common stock trades on the

New York Stock Exchange under the ticker symbol "MF." ¶¶ 8-9.[1]

---

[1]    References to "¶__" are to the complaint filed in the captioned action.

On July 18, 2007, MF went public via its global IPO of 97,379,765 shares, for gross proceeds of approximately $2.92 billion. Prior to the IPO, no public market existed for trading of the Company's securities. ¶ 19.

The Registration Statement and Prospectus issued in connection with the IPO represented to investors that MF had true and tried risk controls in place to protect itself from rogue traders and other transactions by clients that could significantly negatively impact the Company's financial condition. It represented:

> We are exposed to numerous risks in the ordinary course of our business. Management believes that effective risk management is critical to the success of our business. We have a comprehensive risk management structure and processes to monitor, evaluate and manage the principal risks we assume in conducting our business.

¶ 20.

Similarly, the Registration Statement and Prospectus represented that the Company has established a "robust, globally integrated risk-management infrastructure to monitor, evaluate and manage the principal risks we assume in conducting our business around the world." ¶ 21.

The Registration Statement and Prospectus further represented in pertinent part:

> Our risk-management methods focus on monitoring each client's potential exposure at default – that is, our potential exposure to loss in the event that the client defaults – and adjusting that client's margin requirements accordingly in an effort to ensure that their collateral is sufficient to secure their performance obligations on their open positions. This function requires, among other things, that we properly record and verify hundreds of thousands of transactions and events each day, and that we continuously monitor and evaluate the size and nature of our clients' positions and the associated risks . . . . Our risk-management methods are based on internally developed controls, observed historical market behavior and what we believe to be industry practices.

¶ 22.

3

The Registration Statement and Prospectus further represented that "Our clients are required to maintain margin accounts with collateral sufficient to support their open trading positions." ¶ 23.

Under the heading *"Disciplined Approach to Risk,"* the Registration Statement and Prospectus further represented:

> We actively manage risk on a global basis with a centralized, hands-on approach. Our senior executives play a leading role in managing our risk exposure on a day-to-day basis. We monitor our clients' open positions– which represent our principal risk exposure– and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight from our highly experienced risk managers. Client positions are reviewed and margin levels adjusted both during and at the end of each trading day. We do not rely primarily on conventional value-at-risk methodology to test our clients' exposures, as that methodology attempts to measure risk under relatively "normal" market conditions during a relatively brief period and may not always reflect significant "shock" events that may have occurred over a longer time frame. Rather, we stress-test client positions under hypothetical "worst-case" conditions that reflect actual historical data from periods extending back a decade or longer. We believe this approach enables us to measure risk in light of a broader range of historical experience that includes more extreme conditions.

¶ 24.

The Registration Statement and Prospectus further represented:

> Overall, we believe that our exposure to market risk is substantially lower than it would be if we took positions for our own account primarily for directional purposes rather than primarily to facilitate client trades on a matched basis and to hedge and manage our corporate assets.

¶ 25

The Registration Statement and Prospectus further represented:

> Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation. We have an active program for monitoring and verifying that our employees and introducing brokers comply with specified procedures . . . .

¶ 26.

On August 14, 2007, less than a month after the IPO, MF issued a press release reiterating its risk control capacity, stating that:

> As an organization, MF Global prides itself on its rigorous approach to risk management, an essential function that has allowed us to operate successfully for more than 200 years. One of the key components of our risk management is daily assessments of credit and counter party risks, as well as general market trends.

¶ 27.

Unbeknownst to investors, however, the Registration Statement and Prospectus issued in connection with the IPO was materially false and misleading because, among other things, it materially misrepresented MF's risk management policies, procedures, and systems; falsely described them as disciplined, comprehensive and effective; falsely represented that it manages its exposure to risk with a centralized, hands-on approach; falsely represented that it monitors clients' open positions and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight by highly experienced risk managers; falsely represented that its risk management methods conform to industry practices; falsely represented that its clients are required to maintain margin accounts with collateral sufficient to support their open trading positions; failed to disclose that in an effort to speed trades and be "efficient," MF had suspended or eliminated its own internal risk management technical and human controls and supervision; and failed to disclose that it eliminated credit and risk analysis and buying power limits and controls from its systems, effectively allowing any MF employee to place orders without regard to the account's satisfaction of margin requirements, collateral or ability to pay.

¶ 28.

Specifically, on February 28, 2008, the end of the Class Period, MF issued a press release disclosing that it was taking a $141.5 million bad debt provision because in a period of only six

or seven hours in the previous morning, a day-trading MF broker, later identified as Evan "Brent" Dooley ("Dooley"), logged on to his personal computer at home in Olive Branch, Mississippi and speculated in wheat futures in his personal account at MF, buying approximately 15,000 to 20,000 futures contracts (the equivalent of approximately 10% of the market for these contracts for any given month), in violation of his authorized trading limit and without having the necessary collateral or capital "to support even a fraction of his positions." The absence of risk management, technical controls and human oversight, and the elimination of credit and risk analysis and buying power limits and controls that were supposed to be part of the Company's order entry system enabled the broker to make more than 100 trades and place a massive bet on more than $800 million to $1 billion worth of wheat, "significant positions in his own account which were liquidated later that morning. The unauthorized activity resulted in him incurring a loss of $141.5 million, which the company, as a clearing member, is responsible to settle at the clearinghouse." ¶¶ 29-30.

During a conference call on February 29, 2008, Defendant Davis "acknowledged that existing internal controls could have stopped Mr. Dooley's trades from being processed – but were turned off in a few cases to allow for speedier transactions by brokers at the firm who traded for themselves or took customer orders by phone." The internal controls did not fail; rather, they were **deactivated**. During the call, Davis further stated that Dooley had just one "historic customer," who had not done any trading business in "some time." Davis further acknowledged that Dooley had not circumvented any risk management procedures that had been in place, and that in order to speed trades the Company had allowed some internal terminals "to

not have the buying power control." He went on to say that the policy clearly was "a mistake." MF had sacrificed security for efficiency and in so doing placed all of MF's assets at risk. ¶¶ 31-32.

Following the Company's announcement, Fitch Ratings issued a Rating Watch Negative on MF, stating that the $141.5 million "loss questions the robustness of risk measurement systems [touted by MF in the Registration Statement and Prospectus (see ¶ 21 herein)] and represents a substantial portion of net income level." Eileen Fahey, a managing director at Fitch Ratings, observed: "This does open the view that their customers are taking more risk than we thought." In addition, numerous analysts expressed reservations and concerns regarding the company's Risk Management practices. Bank of America said "the questions raised around the company's risk-management practices are likely to keep the stock depressed for quite some time," and Credit Suisse analysts said the "magnitude of the loss is clearly disconcerting to us and calls into question the degree of risk taking and risk management at the franchise." ¶ 33.

MF's stock plunged of approximately 40% on February 28 and 29 and representing a loss to shareholders of more than $1,142,000,000. ¶ 34.

Finally, on March 5, 2008, The Wall Street Journal reported that federal law-enforcement authorities are investigating the futures trades made by Dooley. The probe is being conducted by the U.S. Attorney's office for the Northern District of Illinois in Chicago. An investigation is also being conducted by the Chicago Mercantile Exchange and the Commodities Futures Trading Commission. ¶ 37.

In the wake of the revelations of MF's true condition at the time of the IPO, the captioned action was the first filed federal securities class action seeking relief under the strict liability provisions of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k,77*l* and 77o,

which provides liability for securities sold pursuant to a materially false and misleading

Registration Statement and/or Prospectus.

## ARGUMENT

## POINT I

## MOVANTS SHOULD BE APPOINTED LEAD PLAINTIFFS

### A.     The Procedure Required By The PSLRA

The PSLRA has established a procedure that governs the appointment of a lead plaintiff

in "each private action arising under [the Securities Act] that is brought as a plaintiff class action

pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 77z-1(a)(1).

First, the plaintiff who files the initial action must publish a notice to the class within 20

days of filing the action informing class members of their right to file a motion for appointment

as lead plaintiff. 15 U.S.C. § 77z-1(a)(3)(A)(i). Plaintiff in the Rubin Action caused notice to be

published on BusinessWire on March 10, 2008.[2] See Declaration of Joseph H. Weiss ("Weiss

Decl."), Exhibit A. Within 60 days after publication of the notice, any person or group of

persons who are members of the proposed class may apply to the Court to be appointed as lead

plaintiff, whether or not they have previously filed a complaint in the action. 15 U.S.C. § 77z-1

(a)(3)(A) and (B).

Second, the PSLRA provides that within 90 days after publication of the notice the Court

shall consider any motion made by a class member and shall appoint as lead plaintiff the member

or members of the class that the Court determines to be most capable of adequately representing

---

[2] Wire services have consistently been recognized as a suitable vehicle for meeting the statutory requirement that notice be published "in a widely circulated national business-oriented publication or wire service." See Lax v. First Merchants Acceptance Corp., 1997 U.S. Dist. LEXIS 11866 at *2 (N.D. Ill. Aug. 6, 1997).

the interests of class members.  15 U.S.C. § 77z-1 (a)(3)(B).  In determining the "most adequate

plaintiff," the PSLRA provides that:

> [T]he court shall adopt a presumption that the most adequate
> plaintiff in any private action arising under this title is the person or
> group of persons that - -
>
> (aa)    has either filed the complaint or made a motion in response
> to a notice . . .;
>
> (bb)    in the determination of the court, has the largest financial
> interest in the relief sought by the class; and
>
> (cc)    otherwise satisfies the requirements of Rule 23 of the
> Federal Rules of Civil Procedure.

15 U.S.C. § 77z-1 (a)(3)(B)(iii).  See generally Greebel v. FTP Software, 939 F. Supp. 57, 64 (D.

Mass. 1996).

### B.    Movants Satisfy The "Lead Plaintiff" Requirements of the PSLRA

#### 1.    Movants Have Complied With The PSLRA And Should Be Appointed Lead Plaintiffs

The time period in which class members may move to be appointed lead plaintiff under

15 U.S.C. § 77z-1 (a)(3)(A) and (B) expires on May 9, 2008.  Pursuant to the provisions of the

PSLRA and within the requisite time frame after publication of the required notice (published on

March 10, 2008), Movants herein timely move to be appointed Lead Plaintiffs on behalf of all

members of the class.

Rubin filed the initial complaint and South Shore, CRL Management, Koplin and Rubin

are together willing to serve as representative parties on behalf of the Class, as evidenced by their

duly executed certifications. See Weiss Decl., Exhibit B.  In addition, Movants have selected and

retained experienced and competent counsel to represent them and the Class. See Weiss Decl.,

Exhibit C.

Accordingly, Movants satisfy the individual requirements of 15 U.S.C. § 77z-1 (a)(3)(B) and are entitled to have their application for appointment as Lead Plaintiffs and their selection of Lead Counsel, as set forth herein, considered and approved by the Court.

**2.      Movants Have The Largest Financial Interest
In The Relief Sought By The Class**

According to 15 U.S.C. § 77z-1(a)(3)(B)(iii), the court shall appoint as lead plaintiff the class member or members who represent the largest financial interest in the relief sought by the class.

During the Class Period, as evidenced by, among other things, the accompanying signed certifications, South Shore purchased 128,950 shares of the Company's common stock and suffered estimated losses of $343,416.89 as a result of defendants' misconduct; CRL Management purchased 129,200 shares of the Company's common stock and suffered estimated losses of $457,032.13 as a result of defendants' misconduct; Koplin purchased 32,000 shares of the Company's common stock and has suffered estimated losses of $100,365 as a result of defendants' misconduct; and Rubin purchased 2,300 shares of the Company's common stock and has suffered estimated losses of $33,862 as a result of defendants' misconduct.  In total, the South Shore Investment Group purchased 292,450 shares of MF stock and suffered estimated losses of $934,563.22 as a result of defendants' misconduct.  See Weiss Decl., Exhibit B.

Movants are unaware of any other plaintiff or lead plaintiff applicant who has a larger loss.  As such, Movants have the greatest financial interest in the relief sought by the class in this litigation.  Movants satisfy all of the PSLRA's prerequisites for appointment as Lead Plaintiffs and should be appointed Lead Plaintiffs pursuant to 15 U.S.C. § 77z-1 (a)(3)(B).

### 3.    Movants Otherwise Satisfy Rule 23

According to 15 U.S.C. § 77z-1(a)(3)(B), in addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Of the four prerequisites to class certification, only two -- typicality and adequacy -- directly address the personal characteristics of the class representatives. Consequently, in deciding a motion to serve as lead plaintiff, the Court should focus its inquiry on the typicality and adequacy prongs of Rule 23(a). Lax v. First Merchants Acceptance Corp., 1997 U.S. Dist. LEXIS 11866, at *20; Fischler v. Amsouth Bancorporation, 1997 U.S. Dist. LEXIS 2875, at *7-8 (M.D. Fla. Feb. 6, 1997).

Here, the Movants satisfy both the typicality and adequacy requirements of Rule 23, thereby justifying their appointment as Lead Plaintiffs. Typicality exists if claims "arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992), cert. dismissed sub nom., 506 U.S. 1088 (1993). However, the claims of the class representatives need not be identical to the claims of the class to satisfy typicality. Instead, the courts have recognized that:

> [T]he typicality requirement may be satisfied even if there are factual dissimilarities or variations between the claims of the

11

named plaintiffs and those of other class members, including distinctions in the qualifications of the class members.

Bishop v. New York City Dept. of Housing Preservation and Development, 141 F.R.D. 229, 238 (2d Cir. 1992); See also Avagliano v. Sumitomo Shoji America, Inc., 103 F.R.D 562, 582 (S.D.N.Y. 1984).

As set forth above, Movants seek to represent a class of purchasers of MF's common stock pursuant and/or traceable to the false and misleading Registration Statement and Prospectus. Thus, typicality is satisfied since the claims asserted by Movant arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." Walsh v. Northrop Grumman Corp., 162 F.R.D. 440, 445 (E.D.N.Y. 1995).

Under Rule 23(a)(4), the representative party must also "fairly and adequately protect the interests of the class." The standard for adequacy of representation under Rule 23(a)(4) is met by: (1) the absence of potential conflicts between the named plaintiff and the class members, and (2) the class representative's choice of counsel who is qualified, experienced and able to vigorously conduct the proposed litigation. Garfinkel v. Memory Metals, Inc., 695 F. Supp. 1397, 1405 (D. Conn. 1988).

Here, Movants are the most adequate representatives of the Class. The interests of Movants are clearly aligned with the members of the Class and there is no evidence of any antagonism between Movants' interests and those of the other members of the Class they seek to represent. In addition, as shown below, the Movants' proposed Lead Counsel is highly qualified, experienced and able to conduct this complex litigation in a professional manner. Thus, Movants prima facie satisfy the commonality, typicality and adequacy requirements of Rule 23.

12

## POINT II

## MOVANTS' CHOICE OF COUNSEL SHOULD BE APPROVED

Pursuant to 15 U.S.C. § 77z-1 (a)(3)(B)(v), the lead plaintiff shall, subject to Court

approval, select and retain counsel to represent the class he seeks to represent.  In that regard,

Movants have selected Weiss & Lurie to serve as Lead Counsel.   Weiss & Lurie has extensive

experience in successfully prosecuting shareholder and securities class actions, and has

frequently appeared in major actions in this and other courts.  See Weiss Decl., Exhibit C.

Accordingly, Movants' selection of Weiss & Lurie as counsel for the class should be approved.

## CONCLUSION

For all the foregoing reasons, Movants respectfully request that the Court grant their

request for appointment as Lead Plaintiffs and approve their selection of Lead Counsel.

Dated: May 9, 2008

Respectfully submitted,

**WEISS & LURIE**

By: /s/ Joseph H. Weiss
Joseph H. Weiss  (JW-4534)
James E. Tullman  (JT-9597)
Mark D. Smilow (MS-2809)
551 Fifth Avenue
New York, New York 10176
(212) 682-3025
(212) 682-3010 (Fax)

Attorneys for Movants
South Shore Investment Group, CRL
Management, LLC, Kal Koplin and
Michael Rubin