**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL RUBIN, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | **08-CV-2233 (VM)** |
| vs. ) ) | |
| MF GLOBAL, LTD., MAN GROUP PLC, KEVIN R. DAVIS, AMY S. BUTTE, ALISON J. CARNWATH, CHRISTOPHER J. SMITH, CHRISTOPHER BATES, HENRI J. STEENKAMP and EDWARD L. GOLDBERG, ) ) ) ) ) ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE
SOUTH SHORE INVESTMENT GROUP FOR APPOINTMENT AS LEAD PLAINTIFF
AND APPROVAL OF ITS SELECTION OF LEAD COUNSEL AND
IN OPPOSITION TO ALL COMPETING MOTIONS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    POINT I -     THE PRESUMPTION THAT THE LARGEST
                    MOVANT IS THE MOST ADEQUATE IS REBUTTED . . . . . . . . . . . 3

         1.     The Investor Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

              (a)     Central States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

              (b)     Boston . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              (c)     PABF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              (d)     IPERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    POINT II -    SOUTH SHORE INVESTMENT GROUP IS THE MOST
                  ADEQUATE PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    POINT III-    ALL OTHER MOTIONS SHOULD BE DENIED . . . . . . . . . . . . . . . 13

         1.     Detroit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

         2.     All Remaining Movants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aronson v. McKesson HBOC, Inc.*,
    79 F. Supp. 2d 1146 (N.D. Cal. 1999) ................................................................ 5, 16, 18, 19

*Cavanaugh v. U.S. Dist. Ct. for the Northern Dist. of Cal.*,
    306 F.3d 726 (9th Cir. 2002) ........................................................................ 17, 20

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001) ................................................................................. 6

*Casden v. HPL Techs., Inc.*,
    2003 U.S. Dist. LEXIS 19606 (N.D. Cal. 2003) ................................................ 18

*Chao v. Estate of Fitzsimmons*,
    349 F. Supp. 2d 1082 (N.D. Ill. 2004) ................................................................ 8

*In re Cable & Wireless, PLC Sec. Litig.*,
    217 F.R.D. 372 (E.D. Va. 2003) ......................................................................... 4

*Connecticut National Bank v. Germain*,
    503 U.S. 249 (1992) ......................................................................................... 17

*In re Donnkenny Inc. Sec. Litig.*,
    171 F.R.D. 156 (S.D.N.Y. 1997) ....................................................................... 6

*In re Enron Corp. Sec. Litig.*,
    206 F.R.D. 427 (S.D. Tex. 2002) .......................................................... 10, 19, 20

*Ezra Charitable Trust v. Rent-Way, Inc.*,
    136 F. Supp. 2d 435 (W.D. Pa. 2001) ............................................................... 19

*Landry v. Price Waterhouse Chartered Accountants*,
    123 F.R.D. 474 (S.D.N.Y. 1989) ...................................................................... 10

*In re MicroStrategy Inc. Sec. Litig.*,
    110 F. Supp. 2d 427 (E.D. Va. 2000) ................................................................. 5

*In re Network Associates, Inc. Sec. Litig.*,
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ........................................................... 9, 10

*Newman v. Eagle Building Techs.*,
    209 F.R.D. 499 (S.D. Fla. 2002) ........................................................................ 6

*In re Pfizer Inc. Sec. Litig.*,
    233 F.R.D. 334 (S.D.N.Y. 2005) ............................................................ 6

*In re Razorfish, Inc. Sec. Litig.*,
    143 F. Supp. 2d 304 (S.D.N.Y. 2001) ..................................................... 6

*In re Royal Ahold NV Sec. & ERISA Litig.*,
    219 F.R.D. 343 (D. Md. 2003) ............................................................. 10

*Rozenboom v. Van Der Moolen Holdings, N.V.*,
    No. 03 Civ. 8284, 2004 U.S. Dist. LEXIS 6382 (S.D.N.Y. Apr. 14, 2004) ........... 6

*Stengle v. America Italian Pasta Co*,
    2005 U.S. Dist. LEXIS 43816 (W.D. Mo. 2005) ...................................... 5, 15, 16

*In re Telxon Corp. Sec. Litig.*,
    67 F. Supp. 2d 803 (N.D. Ohio 1999) .................................................. 17, 19, 20

*Thompson v. Shaw Group, Inc.*,
    2004 U.S. Dist. LEXIS 25641 (E.D. La. 2004) ........................................ 15, 19

*In re Unumprovident Corp. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 24633 (E.D. La. 2003) ................................... 17, 18, 19, 20

*In re Veeco Instruments, Inc. Sec. Litig.*,
    233 F.R.D. 330 (S.D.N.Y. 2005) ............................................................ 6

*In re Versata, Inc. Sec. Litig.*,
    2001 U.S. Dist. LEXIS 24270 (N.D. Cal. 2001) ........................................ 20

*Vincelli v. National Home Health Care Corp.*,
    112 F. Supp. 2d 1309 (M.D. Fla. 2000) .................................................... 4

## FEDERAL STATUTES

15 U.S.C. § 77k(e) ....................................................................... 14

15 U.S.C. §77z-1(a)(2)(A) ............................................................ 19

15 U.S.C. §77z-1(a)(3)(B) ....................................................... 4, 5, 15, 17

15 U.S.C. § 77(e) ........................................................................ 3

This Memorandum of Law is respectfully submitted by the South Shore Investment Group in further support of its motion for appointment as lead plaintiff and in opposition to the competing motions.

## PRELIMINARY STATEMENT

Presently pending before the Court are six motions for appointment of lead plaintiff and for approval of lead counsel.[1] The motions were filed by:

(1)     the self-styled MF Global Institutional Investor Group (the "Investor Group") which, as set forth below, is an unrelated lawyer-assembled and lawyer-driven group of four investors who, collectively, have sought to be appointed lead plaintiff in 30 or more securities class actions over the past three years. The members of the group are (a) the Central States, Southeast and Southwest Areas Pension Fund ("Central States"), which claims losses of $1,276,576.01; (b) the State-Boston Retirement System ("Boston"), which claims losses of $894,688.17; (c) the Policemen's Annuity and Benefit Fund of Chicago ("PABF"), which claims losses of $1,287,447; and (d) the Iowa Public Employees' Retirement System ("IPERS"), which claims losses of $1,630,918. In the aggregate, the Investor Group claims losses of $5,089,629.

(2)     The South Shore Investment Group ("South Shore"), which, as set forth below, has suffered the second largest loss of any of the movants. The members of the group are (a) Michael Rubin, who filed the first action against MF Global and whose losses are

---

[1]     The motion by Ira Ziedman and Roslyn Fabian was withdrawn on May 14, 2008. The motion by The Sheet Metal Workers Pension Plan of Northern California was withdrawn on May 21, 2008.

1

$23,070.00;[2] (b) South Shore Investment Group, with losses of $343,416.89; (c) CRL Management LLC, with losses of $457,032.13; and (d) Kal Koplin, with losses of $100,365. In the aggregate, South Shore has losses of $923,884.02. The members of the group, other than Mr. Rubin, share business offices or have pre-existing business relationships separate and apart from this litigation.

(3)    The Detroit General Retirement System ("Detroit"), which has sought to be appointed lead plaintiff in more than 18 securities class actions over the past three years and is currently serving as lead plaintiff in at least ten actions. As set forth below, its correct losses pursuant to the Securities Act are $728,092, the third largest losses of any of the movants.

(4)    The Massachusetts Laborers' Pension Fund ("Mass Laborers"), which claims losses of $324,161.

(5)    The Building Trades United Pension Trust Fund ("Building Trades"), which claims losses of $265,000.

(6)    Jose Betancourt ("Betancourt"), who claims losses of $7,696.

---

[2]    Michael Rubin's estimated damages have been recalculated for shares still held. Pursuant to the provisions of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(e), the damages have been recalculated using the closing price of MF Global stock on March 6, 2008, the date the complaint in this action was filed. (*See* Declaration of Joseph H. Weiss in Support of the Memorandum of Law in Further Support of the Motion of the South Shore Investment Group for Appointment as Lead Plaintiff and Approval of Its Selection of Lead Counsel and in Opposition to all Competing Motions ("Weiss Decl.") Ex. A).

2

**ARGUMENT**

**POINT I**

**THE PRESUMPTION THAT THE LARGEST
MOVANT IS THE MOST ADEQUATE IS REBUTTED**

1.     **The Investor Group**

South Shore does not dispute that the Investor Group claims the largest losses before the

Court.  However, as Central States, a member of the Investor Group, urged just a few months ago

in another litigation concerning Wellcare Health Plans:  "Pursuant to the PSLRA, however, 'a

movant's financial interest is *just a beginning point,* and courts acknowledge that they must also

consider the movant's ability and willingness to adequately represent the class.'"  *Citing In re*

*Cable & Wireless, PLC Sec. Litig,* 217 F.R.D. 372, 377 (E.D. Va. 2003).

Here, it is clear that the Investor Group cannot "fairly and adequately protect the interests

of the class," 15 U.S.C. §77z-1(a)(3)(B), because of the way it was composed, its lack of

oversight, and the unique defenses and collateral issues to which it is and will be subject

(including the "checkered past" and "critical" condition of one of its constituents and pay-to-play

concerns).  As an initial matter, the Investor Group is represented by at least *fifteen* lawyers in

*three* law firms, operating out of *six* locations.[3]  *See Vincelli v. Nat'l Home Health Care Corp.,*

112 F. Supp. 2d 1309, 1316 (M.D. Fla. 2000) ("where more than one lead counsel is appointed,

there is the potential they may ultimately seize control of the litigation, *an occurrence the PSLRA*

*intended to foreclose").*  The indifference of the Investor Group to how many and which lawyers

---

[3]     Central States is represented by five lawyers in the Cohen Milstein firm.  Boston
is represented by three lawyers in the Labaton Sucharow firm and the five lawyers in Cohen
Milstein.  IPERS and PABF are represented by seven lawyers in the Barrack Rodos firm.

3

represent them, to how many and which other investors they are paired with by the lawyers, and to the unique defenses to which members of the group are subject is the only credible explanation regarding (i) why so many lawyers, from Philadelphia, Washington, D.C., Chicago and New York are necessary to prosecute this case on their behalf; or (ii) how it came to pass that investors from Illinois, Massachusetts and Iowa — represented by separate law firms — found themselves cobbled together here. *See Stengle v. Am. Italian Pasta Co*, 2005 U.S. Dist. LEXIS 43816, at * 15 (W.D. Mo. 2005) ("Organizing disparate combinations of shareholders for the purpose of aggregating the 'most damage' is contrary to the spirit and purposes of the Act.").[4] Indeed, from the Certifications it appears that each of the members of the Investor Group, other than Boston, chose only one law firm to represent it and then abdicated to counsel the decision to join it with any other lawyers counsel saw fit.  Such abdication of the manner in which shareholder litigation is prosecuted is certainly not what the PSLRA contemplates. *In re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 437 (E.D. Va. 2000).

The willingness of the members of the Investment Group to permit lawyers to use their names in filing 30 or more applications for lead plaintiff status in the past three years and their indifference to how and with whom the lawyers proceed, and the unique defenses to which they will be subject, demonstrates that the group does not have the "willingness and ability to vigorously prosecute the action" and will not fairly and adequately protect the interests of the

---

[4]      One of the tasks assigned to a lead plaintiff is selecting and retaining counsel. *See* 15 U.S.C. §77z-1(a)(3)(B)(v). Here, it appears that something else occurred.  *See Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1154 (N.D. Cal. 1999) (requiring that the members of the group themselves initiated the representation, *rather than the other way around.*").

4

class and should be disqualified. *In re Cendant Corp. Litig,* 264 F.3d 201, 266-67 (3d Cir.

2001); *Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 503 (S.D. Fla. 2002) (adopting *Cendant*).

Moreover, because the members of the Investor Group are unrelated, and because the

"Group" was created for the sole purpose of making the lead plaintiff motion, they do not

constitute a real group, they have not and will not be able to exercise real control over counsel,

and are not entitled to appointment as lead plaintiff. *See In re Pfizer Inc. Sec. Litig.*, 233 F.R.D.

334, 336 (S.D.N.Y. 2005) (Owen, J.) ("Several of the putative plaintiffs are aggregated into

artificial 'groups.' Nothing before the Court indicates that this aggregation is anything other than

an attempt to create the highest possible 'financial interest' figure under the PSLRA. . .and I

reject it."); *In re Veeco Instruments, Inc. Sec. Litig.*, 233 F.R.D. 330, 334 (S.D.N.Y. 2005)

(McMahon, J.) ("Courts (including this one) view such aggregations of individual shareholders

with disapproval."); *see In re Tarragon Corp. Sec. Litig.*, No. 07 civ 7972(PKC), 2007 U.S. Dist.

LEXIS 91418 at **3-4 (S.D.N.Y. Dec. 6, 2007) (Castel, J.) (denying motion by unrelated

institutional investors); *Rozenboom v. Van Der Moolen Holdings, N.V.*, No. 03 Civ. 8284, 2004

U.S. Dist. LEXIS 6382 at *4 (S.D.N.Y. Apr. 14, 2004) (Sweet, J.) (denying motion by unrelated

investors on the "ground that unrelated class members are more likely to abdicate their

responsibility to coordinate the litigation to their attorneys, in contravention of the PSLRA's goal

to eliminate lawyer driven litigation"); *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 309

(S.D.N.Y. 2001) (Rakoff, J.); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157-58

(S.D.N.Y. 1997) (Cedarbaum, J.) (rejecting the appointment of two unrelated institutional

investors and four individuals despite the acquiescence by all other named plaintiffs). Judge

McMahon has gone so far as to disqualify a lead plaintiff movant who moved as part of a group,

5

even when the movant had the largest single loss of any movant. *Bhojwani v. Pistiolis*, 06-cv-13761, Slip op. at 4 (S.D.N.Y. July 31, 2007) (Weiss Decl. Ex. B).

Indeed, the only prior relationship that the members of the Investor Group have is one of antagonism and opposition, not cooperation. *See Eastwood Enterprises v. Farha et al.*, 07-cv-1940-T-24 MSS (M.D.Fla.) (Central States and PABF *opposed* each other. Central States argued against appointing a group that included PABF and against numerous counsel, while PABF opposed Central States arguing that Central States, is inadequate as a result of its checkered past.) (Weiss Decl. Ex. C); *Police and Fire Retirement Sys. of the City of Detroit v. SafeNet, Inc.*, 06-cv-5797 (S.D.N.Y.) (Crotty, J.) (Boston [in a group including Detroit] and Central States opposed each other for the same reasons described *infra*.) (Weiss Decl. Ex. D).

The unique defenses to which the Investor Group is subject are truly extraordinary, as set forth below.

### (a)    Central States

Central States is in no position to manage this litigation. As contended by Boston and Detroit in opposition to a motion by Central States to be appointed lead counsel in the *SafeNet* securities litigation (the same Boston which is now marching down the aisle with Central States) and as observed by Judge Crotty: "given the checkered past of the Central States' behavior; and the fact that at least some portion of Central States is still subject to a court appointed monitor's oversight, there are reasonable doubts as to whether Central States . . . can be an adequate representative." *SafeNet*, 06-cv-5797 slip op. at 6-7 (Weiss Decl. Ex. D). Judge Crotty was referring to the fact that Central States, which was a wellspring of corruption, operates under a "Consent Decree," which mandates that "special counsel [is] to overlook future management of

the Fund," and "set[s] forth detailed requirements for the continued professional management of

the Fund," including "continuing oversight of the Fund by both the Secretary of Labor and this

court." *Chao v. Estate of Fitzsimmons,* 349 F.Supp. 2d 1082, 1083 (N.D. Ill. 2004). The

oversight duties of the Northern District of Illinois "include[] the appointment of an Independent

Special Counsel (ISC), with broad powers to examine the future activities of the Fund and to

oversee and report to the court on compliance with the Consent Decree." *Id.*

This extraordinary situation, in which Central States is and has been unable to control its

own operations for more than 20 years, came about because of charges by the United States

Department of Labor that Central States was involved in corruption, including: loaning "tens of

millions of dollars" to racketeers who controlled Las Vegas casinos, where the loan approval

process "involved kickbacks, threats and, in at least one case, a kidnapping;" awarding

administrative jobs "to favored insiders who paid themselves big fees;" and attempting to bribe a

United States Senator. Accordingly, Central States lacks complete authority and autonomy over

even itself. As explained by the Northern District of Illinois:

> With some frequency the court has been called upon to approve some decision
> requiring judicial approval under the Consent Decree. These include approval of
> new trustees, *changes in investment policies,* minor modifications to the Consent
> Decree, *reallocation of assets,* and changes in named fiduciaries, investment
> managers and real estate investment managers.

*Chao*, 349 F.Supp.2d at 1084 (emphasis added). In short, major decisions made by Central

States involve professional management, oversight by the Secretary of Labor, reporting by the

ISC, and, potentially, judicial approval. A fund that the court system neither trusts nor permits to

act as a fiduciary and independently manage the assets and pension funds of its own beneficiaries

7

should not be put in a position to manage this litigation, where the interests of an entire class hang in the balance.

It was for this reason that another federal court took the position taken by Judge Crotty and held that Central States is not an adequate Lead Plaintiff under the PSLRA. *See Baker v. Arnold*, 03-cv-05642 (JF), Order Consolidating Related Actions, Appointing Lead Plaintiff And Denying Other Motions (N.D. Cal. May 17, 2004) (Weiss Decl. Ex. E). The *Baker* court concluded that, because Central States is not a "free agent," "the best interest of the class may not be served adequately by a Lead Plaintiff operating under such circumstances." *(Id.* at 6). Thus, the court declined to appoint Central States as Lead Plaintiff, even though it was the movant with the largest loss. *(Id.* at 7-8).[5]

Moreover, as set forth in a May 1, 2008 report to the Court by the Independent Special Counsel to Central States, "on March 24, 2008, the Fund's actuary certified the Pension Fund to be in critical status." (Weiss Decl. Ex. F). Accordingly, Central States stands in jeopardy of violating the Consent Decree, which would occur if it became insolvent.

Clearly, Central States has a lot on its plate - from federal and judicial oversight to concerns raised by the Teamsters union regarding fund management. Given the fact that the

---

[5]      A judge in the Northern District of California adopted a similar view when declining to grant Lead Plaintiff status to an entity that was under investigation for criminal fraud violations, stating:

> Even if this evidence [of criminal fraud by the proposed Lead Plaintiff] were excluded at trial in this case ... the Court is unwilling to install an enterprise under such a cloud in a position of trust and confidence. [The proposed Lead Plaintiff] is otherwise preoccupied with its own legal problems.

*In re Network Assocs, Inc. Sec. Litig,* 76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999).

federal government does not permit Central States to manage its own affairs, not to mention the substantial pressures and distractions presently facing Central States on other fronts, Central States would not be an adequate representative of the interests of the class in this case. After all, "[t]he whole point of the [PSLRA's Lead Plaintiff provisions] was to install a Lead Plaintiff with substantive decisionmaking ability and authority " *In re Network Assocs.,* 76 F.Supp. 2d at 1024. If Central States were appointed Lead Plaintiff, its own unique legal situation may well become a focus of the defendants' attention, which would distract Central States from important class-wide issues. Under the circumstances, any presumption in favor of Central States should be found to be rebutted. *See Landry v. Price Waterhouse Chartered Accountants,* 123 F.R.D. 474, 476 (S.D.N.Y. 1989) (Court indicated that where unique defenses are asserted by a class representative, "whether these defenses will be successful is of no matter. The fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members."); *In re Royal Ahold NV Sec. & ERISA Litig.* 219 F.R.D. 343, 352-53 (D. Md. 2003) (presumption in favor of proposed Lead Plaintiff was rebutted where it was subject to unique defenses and issues that threatened to consume a large portion of its time and efforts in the case); *In re Enron Corp. Sec. Litig.,* 206 F.R.D. 427, 455-56 (S.D. Tex. 2002) (court was unwilling to "endanger th[e] litigation" by appointing a presumptive Lead Plaintiff with unique defenses that were likely to distract it from the duties of Lead Plaintiff).

### (b) **Boston**

Inasmuch as Central States and Boston are represented by the same counsel, the Cohen Milstein firm (with the Labaton Sucharow firm being added for Boston), and because of the history of Boston opposing Central States in the *SafeNet* litigation and vigorously contending that

9

it was inadequate to be lead plaintiff, Boston obviously knew that it was being cobbled together with Central States, that Central States has a checkered past, is in critical condition, is subject to unique defenses, and has had its applications to serve as lead plaintiff rejected by other courts. Boston did not care, just as it did not care that it was being represented by three lawyers in the Labaton Sucharow firm, five lawyers in the Cohen Milstein firm, and numerous additional lawyers in the Barrack Rodos firm. This cynical indifference by Boston, and by the other members of the Investor Group, itself demonstrates its and their inadequacy to serve as fiduciaries for the Class.

In addition, if the Investor Group were appointed as lead counsel, the defendants, at the appropriate time, would surely point out to the jury that, as set forth in Boston's Certification, this is the *eleventh* case in the past three years in which Boston has charged others with being responsible for its investment losses and sought to serve as lead plaintiff or class representative.

Boston would also be subject to discovery as to its reason for having the Labaton Sucharow firm serving as counsel when the Investor Group has members with larger losses and is already represented by two other experienced firms. In this regard, public records show that the attorneys of Labaton Sucharow -- a **New York** firm -- and their spouses, have made significant, coordinated campaign contributions to **Massachusetts** politicians who select or can influence the selection of counsel. (Weiss Decl. Ex. G). On October 20, 2004, *eighteen* of the firm's attorneys and/or their spouses contributed $500 each to Timothy Cahill, the Treasurer of Massachusetts. On March 25, 2005, *thirty-one* of the firm's attorneys and/or their spouses contributed $500 each to Mr. Cahill. On March 29, 2006, *thirty* of the firm's attorneys and/or their spouses contributed $500 each to Mr. Cahill. On November 19, 2007, *twenty-four* of the

10

firm's attorneys and/or their spouses contributed $500 each to Mr. Cahill.  Similarly, on

December 5, 2005, *twenty-four* of the firm's attorneys and/or their spouses contributed $500 each

to Garrett J. Bradley, a Massachusetts State Representative.  In May 2006, *twenty* of the firm's

attorneys and/or their spouses contributed $500 each to Mr. Bradley.  On August 10, 2007,

*nineteen* of the firm's attorneys and/or their spouses contributed $500 each to Mr. Bradley.

Similarly, on October 23, 2006, *ten* of the firm's attorneys and/or their spouses contributed $500

each to Thomas J. O'Brien, Treasurer of Plymouth County, Massachusetts.  On May 22, 2007,

*twenty-four* of the firm's attorneys and/or their spouses contributed $500 each to Mr. O'Brien.

On May 15, 2008, *nineteen* of the firm's attorneys and/or their spouses contributed $500 each to

Mr. O'Brien.  Similarly, on June 1, 2006, *ten* of the firms attorneys and/or their spouses

contributed $500 each to Joseph A. Connolly, the Treasurer of Norfolk County and Chairman of

its Retirement Board.  On June 25, 2007, *fifteen* of the firm's attorneys and/or their spouses

contributed $500 each to Mr. Connolly.  Accordingly, it is likely that Boston's serving as a lead

plaintiff would subject it to unique defenses and discovery concerning whether its service has

been influenced by pay-to-play contributions made by its lawyers.  This will serve as a distraction

and will endanger the interests of the class.

       **(c)**    **PABF**

Like Boston, the PABF is indifferent to the issues and unique defenses which its co-

applicants face.  In *Eastwood Enterprises*, PABF opposed Central States' motion to be appointed

lead plaintiff on the ground that it was inadequate.  In this action, PABF, along with the other

members of the Investor Group, knew that it was being cobbled together with Central States and

knew Central States' inadequacies. PABF did not care, just as the other members of the Investor

11

Group did not care. Rather, they allowed themselves to be controlled by the lawyers they are supposed to control, in order that they could stitch together a group with the greatest losses – the epitome of lawyer driven litigation – and the antithesis of what the PSLRA provides for.

In addition, the PABF suffers from a severe conflict of interest in that its investment managers include JP Morgan, Morgan Stanley, and UBS (Weiss Decl. Ex. H), who served as lead underwriters of the MF Global public offering (Weiss Decl. Ex. I), and who have been named as defendants in the *Matassa* action (08-cv-2895), which was consolidated by the Court on April 7, 2008 into the *Rubin* action.[6] As such, the PABF has divided loyalties and cannot preserve the claims against the underwriters on behalf of the class.

> **(d)    IPERS**

The Iowa retirement system in, knowingly or unknowingly, joining or being joined with a band of professional, bickering and otherwise inadequate plaintiffs, has demonstrated its inadequacy to serve as a lead plaintiff. Like people, institutions may be judged by the company they keep. IPERS, an experienced plaintiff, knew or should have known better than to place itself in the stable of serial and cynical suers amassed by counsel to hike the purse and drive the litigation. Iowa's retirees and the class deserve better than this.

**POINT II**

**SOUTH SHORE INVESTMENT GROUP IS THE MOST ADEQUATE PLAINTIFF**

As set forth above, the South Shore Investment Group has suffered losses of $923,884.02, the second largest of any movant. Michael Rubin, a member of the group, filed the first

---

[6]    In addition, Mr. Rubin has outstanding a request to counsel for the underwriters to consent to a tolling agreement.

complaint, upon which the other complaints are based. He also demonstrated leadership by

requesting a tolling agreement from the underwriters of MF's offering. The other members of

the group share offices or have pre-existing business relationships separate and apart from this

litigation. Unlike the Investor Group, they have not been cobbled together by lawyers at multiple

firms. They have selected a single, experienced law firm to represent them, and they are not

professional plaintiffs. Accordingly, they are the most adequate movant to serve as lead plaintiff.

**POINT III**

**ALL OTHER MOTIONS SHOULD BE DENIED**

1.    **Detroit**

Detroit has the third largest losses of any of the movants in this litigation. Although it

claimed to have losses of $1,100,398, its actual losses are $728,024. The discrepancy is the

result of Detroit using a section 10(b) measure of damages, rather than the section 11 measure

which is required in this action. 15 U.S.C. § 77k(e) (Weiss Decl. Ex. J). Detroit's damages have

been recalculated using the closing price of MF Global stock on March 6, 2008, the date the

complaint in this action was filed. Although Detroit's financial interest in this litigation is thus

less than that of the South Shore Investment Group, set forth below is an analysis of Detroit for

the Court's review in the event that Detroit's claimed losses are taken at face value.

13

Detroit is a professional plaintiff, barred by the PSLRA from serving as lead plaintiff.[7]

Indeed, at least two district courts have barred Detroit from serving as lead plaintiff under 15

U.S.C. §77z-1(a)(3)(B)(vi).  *See, e.g., Thompson v. Shaw Group, Inc.,* 2004 U.S. Dist. LEXIS

25641, at *21-*23 (E.D. La. 2004) (denying Detroit's motion); *In re CNL Hotels & Resorts, Inc.*

*Sec. Litig.,* No. 6:04-cv-1231-0r1-31KRS, slip op. at 3 (M.D. Fla. Nov. 10, 2004) (same) (Weiss

Decl. Ex. K).

Detroit and its officers, directors and fiduciaries have served or sought to serve as a lead

plaintiff in at least 30 class actions.[8]  In the past three years, Detroit and its officers, directors and

fiduciaries have sought to be appointed lead plaintiff in more than 18 securities class actions and

currently serve as a lead plaintiff in 10 cases.[9]  It has previously served as a lead plaintiff in at

---

[7]      Except as the court may otherwise permit, consistent with the
purposes of this section, a person may be a lead plaintiff, <u>or</u> an
officer, director, or, fiduciary of a lead plaintiff, in *no more than 5*
securities class actions brought as plaintiff class actions pursuant to
the Federal Rules of Civil Procedure *during any 3-year period.*

15 U.S.C. §77z-1(a)(3)(B)(vi); *see Stengle v. American Italian Pasta Co.,* 2005 U.S. Dist. LEXIS
43816, at *19-*20 (W.D. Mo. 2005) ("Teachers' Retirement is currently serving as lead plaintiff
in at least ten actions and is therefore defined as a 'professional plaintiff' whose application to be
lead plaintiff is disfavored by the statute.").

[8]      The Retirement Systems of the City of Detroit are comprised of the General
Retirement System and the Police and Fire Retirement System.  The chief executive of the
Systems is Walter Stampor, who signed the Certification in this action and in other actions in
which the General Retirement System or the Police and Fire Retirement System moved to serve
as lead plaintiff.  Mr. Stampor's title is Executive Secretary of the Systems.  The Systems share
the same website, address, and staff.  (Weiss Decl. Ex. L).

[9]      Detroit serves as a lead plaintiff in the following cases:

- *In re Dot Hill Sys. Sec. Litig.,* No. 06-cv-0228 (S.D. Cal.);
- *In re Marvell Tech. Group Ltd. Sec. Litig.,* No. 06-cv-06286 (N.D. Cal.);
- *In re Medtronic Inc. Sec. Litig.,* No. 07-4564 (D. Minn.);

14

least 7 other cases.[10]  It has also sought to serve as a lead plaintiff in at least 13 other cases.[11]  *See*

*Stengle,* 2005 U.S. Dist. LEXIS 43816, at * 19 *20 (rejecting institution that had been appointed

in 10 cases in three years); *McKesson,* 79 F. Supp. 2d 1156-57 (same).  Despite this undeniable

fact, there will likely be considerable disagreement between the parties concerning whether the

---

- *In re SafeNet Inc. Sec. Litig.*, No. 06-cv-5797 (S.D.N.Y.);
- *In re Bausch & Lomb Sec. Litig.*, No. 06-cv-06296 (W.D.N.Y.);
- *In re KLA-Tencor Corp. Sec. Litig.*, No. 06-cv-4065 (N.D. Cal.);
- *In re Levi Strauss & Co. Sec. Litig.*, No. C-03-05605 (N.D. Cal.);
- *McLain v. WSB Fin. Group Inc.*, No. 07-cv-1747 (W.D. Wash.);
- *In re R&G Fin. Corp. Sec. Litig.*, No. 05-cv-04186 (S.D.N.Y.); and
- *In re Int'l Rectifier Corp.* Sec. Litig., No. 07-2544 (C.D. Cal.).

[10]    The cases in which Detroit previously served as a lead plaintiff are:

- *In re Gemstar-TV Guide Int'l Inc. Sec. Litig.*, No. CV 02-2775 (C.D. Cal.);
- *Gaines v. Bristol-Myers Squibb Co.*, No. 02-CV-2251 (S.D.N.Y.);
- *Sheth v. OM Group, Inc.*, No. 02-CV-2163 (N.D. Ohio);
- *In re King Pharms., Inc. Sec. Litig.*, No. 03-CV-0077 (E.D. Tenn.);
- *In re Advanced Marketing Services*, No. 04cv0121 (S.D. Cal.);
- *Weisz v. Calpine Corp.*, No. 02 CV 1200 (N.D. Cal.) (bonds); and
- *Campbell v. CNL Hotels & Resorts,* No. 04-cv-1231 (M.D. Fla.).

[11]    The cases in which Detroit previously sought to serve as a lead plaintiff are:

- *Southern Elec. Ret. Fund v. Providian Fin. Corp.*, No. 01-CV-03952 (N.D. Cal.);
- *Simpson v. Homestore.com, Inc.*, No. 01-CV-11115 (C.D. Cal.);
- *Weisz v. Calpine Corp.*, No. 02 CV 1200 (N.D. Cal.) (stock);
- *Pierelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Dynergy, Inc.*, No. H--02-1571 (S.D. Tex.);
- *Marshall v. Peregrine Sys., Inc.*, No. 02-CV-0870 (S.D. Cal.);
- *In re AOL Time Warner Sec. Litig.*, MDL No. 1500 (S.D.N.Y.);
- *Slutsky v. Endocare, Inc.*, No. 02-8429 (C.D. Cal.);
- *Rush v. Footstar, Inc.*, No. 02-cv-9130 (S.D.N.Y.);
- *Schnall v. Annuity & Life Re (Holdings) Ltd.*, No. 02-cv 2133 (D. Conn.);
- *In re Royal Ahold NV Sec. and ERISA Litig.*, No. 03-md-01539 (D. Md.);
- *In re CM Hotels & Resorts, Inc. Sec. Litig.,* No. 6:04-cv-1231-0r1-3 (M.D. Fla.);
- *Thompson v. Shaw Group, Inc.*, No. 04-1685 (E.D. La.); and
- *Rosen v. BISYS Group, Inc.*, No. 04-CV-3840 (S.D.N.Y.).

PSLRA's restrictions of professional plaintiffs applies to institutional investors like Detroit .[12]

The PSLRA, however, explicitly states that a lead plaintiff or an "an officer, director or

fiduciary" of a lead plaintiff cannot serve in that capacity more than 5 times in 3 years.[13] *See In*

*re Unumprovident Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 24633, at *19- *22 (E.D. La. 2003).

If Congress meant to exempt institutions from its restrictions on professional plaintiffs, Congress

would *not* have included words "officer, director or fiduciary" in its prohibition. *See, e.g., In re*

*Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 820-21 (N.D. Ohio 1999) (declining to "accept the

suggestion that that preference [for institutional investors in the PSLRA's Conference Report]

requires, or even encourages, the Court to disregard the *expressly stated* limitations [against

professional plaintiffs] in the statute itself) (emphasis in original). "[O]fficers [and] directors" do

not serve as representatives of individuals, they serve as representatives of institutions. *See*

*Offshore Logistics v. Tallentire*, 477 U.S. 207, 220-22 (1986) ("Normal principles of statutory

construction require that we give effect to the subtleties of language that Congress chose to

employ" in enacting a statute).

In *McKesson,* Judge Whyte found that an institutional professional plaintiff who had

already been appointed in six cases in three years (like Detroit here) was presumptively barred

from serving as lead plaintiff, reasoning:

---

[12]     Congress both said what it meant and meant what it said in 15 U.S.C.
§77z-1(a)(3)(B)(vi). *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992)
("courts must presume that a legislature says in a statute what it means and means in a statute
what it says").

[13]     In *Cavanaugh,* the Ninth Circuit reasoned that the *"the prohibition against*
*professional plaintiffs . . . will diminish the risk of lawyer-driven lawsuits." Cavanaugh v. U.S.*
*Dist. Ct. for the Northern Dist. of Cal.*, 306 F.3d 726, 737-38 (9th Cir. 2002).

> Florida disputes that the professional plaintiff provision is even
> applicable, because it is an institutional investor, and Congress
> sought to encourage institutional investors to become lead
> plaintiffs.  Citing the House Conference Report, Florida asserts that
> the drafters of the Reform Act fully expected institutional investors
> to exceed the five suits-in-three years provision of the Act . . . .
> Florida's arguments do not persuade the court to lift the
> presumptive bar.  *The text of the statute contains no flat exemption
> for institutional investors.*  Indeed, looking at the section as a
> whole (and the statute commands consideration of "the purposes of
> this section"), institutional investors are already heavily favored by
> the requirement that the lead plaintiff have the "largest financial
> interest" in the litigation.  Moreover, Congress also desired to
> increase client control over plaintiff's counsel, and allowing
> simultaneous *prosecution of six securities actions is inconsistent
> with that goal.*

*McKesson,* 79 F. Supp. 2d at 1156-57.[14]  Similarly, in *Unumprovident,* the court barred another

institutional professional plaintiff like Detroit from serving as lead plaintiff, reasoning:

> Congress hoped to cure perceived abuses of securities class actions
> by wresting control of such actions from professional plaintiffs and
> *overly-aggressive attorneys* and giving it to institutional investors
> and other large shareholders who would presumably have greater
> incentive to monitor counsel and insure the interest of all
> shareholders were protected.  The larger the number of cases being
> directed by a single institutional investor, the less likely it is these
> purposes are being served.  *Simultaneous prosecution of nine
> different securities class actions would stretch the resources of
> even the largest institutional investors.*

2003 U.S. Dist. LEXIS 24633, at *20-*21 (footnote omitted).

More to the point, in *Shaw Group,* Detroit's lead plaintiff motion was denied on this

basis, the court reasoning:

> Any speculation aside, the Court rules simply that there is a risk of
> overstretch where Detroit P&[F] would be directing a total of eight
> concurrent lawsuits were Detroit P&[F] selected as Lead Plaintiff

---

[14]    *Cf. Casden v. HPL Techs., Inc.,* 2003 U.S. Dist. LEXIS 19606 (N.D. Cal. 2003).

17

> here as well. . . . Although the legislative history appears to favor
> institutional investors, *a policy of equal force is the general
> prevention of over-representation regardless of the plaintiff's
> status.*

2004 U.S. Dist. LEXIS 25641, at *22.[15]

Where a presumptively barred applicant like Detroit seeks to be appointed lead plaintiff,

the burden is placed on that applicant to demonstrate why the bar should be lifted. *See Mixon*, 67

F. Supp. 2d at 820; *McKesson*, 79 F. Supp. 2d at 1156 (5-in-3 rule creates "a rebuttable

presumption that the same plaintiff should not direct more than five securities class actions in

three years"); *Unumprovident*, 2003 U.S. Dist. LEXIS 24633, at *20 ("the burden is upon the

presumptively barred candidate to demonstrate why the bar should not be applied in a given

case").

Here, Detroit has not demonstrated any special circumstances that would warrant lifting

the presumptive bar. *See Shaw Group*, 2004 U.S. Dist. LEXIS 25641, at *21-*22. Instead,

Detroit has demonstrated just the opposite. For instance, the PSLRA requires each lead plaintiff

applicant to provide a sworn certification identifying all actions in which it has sought or is

seeking to serve as a representative party on behalf of a class during the previous three years. 15

U.S.C. §77z-1(a)(2)(A). The PSLRA' s lead plaintiff certification requirements must be met, and

---

[15]    Similarly, in *Enron*, Judge Harmon denied the lead plaintiff application of an
institutional investor with the largest loss because it exceeded the PSLRA's presumptive bar,
reasoning that "the purposes of the provision would be lost if the Court granted [FSBA's]
application." *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 457 (S.D. Tex. 2002). Although the
professional plaintiff in *Enron* had suffered losses of $181 million more than the lead plaintiff
ultimately appointed, Judge Harmon appointed another movant as lead plaintiff because of its
commitment, focus and attention to the case at bar. *Id.; McKesson*, 79 F. Supp. 2d at 1156; *Ezra
Charitable Trust v. Rent-Way, Inc.*, 136 F. Supp. 2d 435, 441 (W.D. Pa. 2001); *Telxon*, 67 F.
Supp. 2d at 820-21.

any party may point out the failure of another party to meet those requirements. *See Cavanaugh,* 306 F.3d at 737-38 (certification requirement is *"among the most important"* under the PSLRA).

Detroit's certification in this case neglected to advise the Court of the ten cases in which it is currently serving as a lead plaintiff and of its intention to seek lead plaintiff appointment in yet another (enormously complex) securities class action involving Société Générale merely one business day after their motion in the instant case. (Weiss Decl. Ex. M).[16] This "oversight" indicates a lead plaintiff who may be simply *incapable* of adequately overseeing yet another complex securities class action such as this. *See, e.g., In re Versata, Inc. Sec. Litig.,* 2001 U.S. Dist. LEXIS 24270, at *7 (N.D. Cal. 2001) (Congress enacted the PSLRA to eliminate "mere 'figureheads' with no actual control or desire to supervise the litigation"); *Unumprovident,* 2003 U.S. Dist. LEXIS 24633, at *23.

Ultimately, when examined in conjunction with its status as a professional plaintiff, Detroit's filing oversight at this early stage of the litigation evidences its inability to adequately prosecute and monitor this litigation — and hence its inadequacy to represent the class. *See Enron,* 206 F.R.D. at 457-58 (reasoning that professional plaintiffs should not be appointed lead plaintiffs due to their "fractured attention and resources with respect to [the present] suit" ); *Telxon,* 67 F. Supp. 2d at 822 ("[A]n institutional investor that is *simultaneously* involved in one or more other securities class actions would have fewer resources available and be less able to police its attorney's conduct."). Detroit's motion should be denied.

---

[16]     In addition to the Société Générale lead plaintiff motion that Detroit made on May 12, 2008, Detroit is also currently serving as a plaintiff responsible for directing on behalf of the shareholder class the highly-publicized, complex multi-billion dollar cases involving the attempted purchase of Yahoo! by Microsoft and the sale of Bear Stearns to JP Morgan Chase. (Weiss Decl. Ex. N and O).

2.    **All Remaining Movants**

Because all of the remaining movants suffered smaller losses than the South Shore

Investment Group, all other motions should be denied.

## CONCLUSION

For the foregoing reasons, the South Shore Investment Group should be appointed as lead

plaintiff, its selection of Weiss & Lurie as lead counsel should be approved, and all other motions

should be denied.

Dated: May 27, 2008

Respectfully submitted,

**WEISS & LURIE**

By: /s/ Joseph H. Weiss
Joseph H. Weiss  (JW-4534)
James E. Tullman  (JT-9597)
Mark D. Smilow (MS-2809)
551 Fifth Avenue
New York, New York 10176
(212) 682-3025
(212) 682-3010 (Fax)

Attorneys for Movants
South Shore Investment Group, CRL
Management, LLC, Kal Koplin and
Michael Rubin

## CERTIFICATE OF SERVICE

I hereby declare that a copy of the foregoing was mailed, postage prepaid, on the 27th day

of May, 2008 to the following:


Steven J. Toll
S. Douglas Bunch
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C.  20005
(202) 408-4600
(202) 408-4699 (Fax)

Lewis Kahn
650 Poydras Street, Suite 2150
New Orleans, LA 70130
(504) 455-1400
(504) 455-1498 (Fax)

                                        **WEISS & LURIE**

                                        By: /s/ Joseph H. Weiss
                                        Joseph H. Weiss  (JW-4534)
                                        James E. Tullman  (JT-9597)
                                        Mark D. Smilow (MS-2809)
                                        551 Fifth Avenue
                                        New York, New York 10176
                                        (212) 682-3025
                                        (212) 682-3010 (Fax)