UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MICHAEL RUBIN, | : | **08 Civ. 02233 (VM)** |
| | : | |
| Plaintiff, | : | **MEMORANDUM OF LAW** |
| | : | |
| v. | : | |
| | : | <u>**ELECTRONICALLY FILED**</u> |
| MF GLOBAL, LTD., ET AL., | : | |
| | : | |
| Defendants. | : | |

**REPLY DECLARATION OF S. DOUGLAS BUNCH IN SUPPORT OF THE
MOTION OF THE MF GLOBAL INSTITUTIONAL INVESTOR GROUP
AND IN OPPOSITION TO COMPETING MOTIONS FOR APPOINTMENT
AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL
<u>PURSUANT TO SECTION 27(a)(3)(B) OF THE SECURITIES ACT OF 1933</u>**

S. Douglas Bunch, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am admitted to and a member in good standing of the bars of the State of New

York, the District of Columbia, and the United States Court of Appeals for the Second Circuit.

I submit this declaration in support of the motion filed by the MF Global Institutional Investor

Group, consisting of the Iowa Public Employees' Retirement System ("IPERS"), the

Policeman's Annuity & Benefit Fund of Chicago ("PABF"), the Central States, Southeast and

Southwest Areas Pension Fund, and the State-Boston Retirement System, to appoint it as the lead

plaintiff for these consolidated actions and approve its selection of lead counsel.  Attached as

exhibits are true and correct copies of the following:

Exhibit A:      Joint Declaration of Gregg A. Schochenmaier, John J. Gallagher,
Jr., James P. Condon and Robert E. Tierney in Further Support of
Motion of the MF Global Institutional Investor Group and in
Opposition to Competing Motions for Appointment as Lead
Plaintiff and Approval of Lead Counsel Pursuant to Section
27(a)(3)(B) of the Securities Act of 1933, dated June 6, 2008;

Exhibit B:      Consent Decree, *Donovan v. Fitzsimmons*, No. 78 C 342 (N.D. Ill. Sept. 22, 1982);

Exhibit C:      Agreed Order Amending September 22, 1982 Consent Decree, *Whitfield v. Fitzsimmons*, No. 78 C 342 (N.D. Ill. Nov. 10, 1987);

Exhibit D:      Declaration of James P. Condon in Further Support of the Motion of the MF Global Institutional Investor Group for Appointment as Lead Plaintiff;

Exhibit E:      *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-BE-1500-S, slip op. (N.D. Ala. July 8, 2005);

Exhibit F:      *Selbst v. McDonald's Corp.*, No. 4 C 2422, slip op. (N.D. Ill. July 21, 2004);

Exhibit G:      Public Fund Survey Summary of Findings for FY 2006 (October 2007);

Exhibit H:      Letter from Frank J. McGarr, Independent Special Counsel, to the Honorable James B. Moran, dated May 1, 2008; and

Exhibit I:      State-Boston Retirement Board Information.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Dated: June 6, 2008

_____
S. Douglas Bunch

2

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MICHAEL RUBIN, | : | 08 Civ. 02233 (VM) |
| | : | |
| Plaintiff(s), | : | **JOINT DECLARATION** |
| | : | |
| v. | : | |
| | : | **ELECTRONICALLY FILED** |
| MF GLOBAL, LTD., ET AL., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**JOINT DECLARATION OF GREGG A. SCHOCHENMAIER, JOHN J.**
**GALLAGHER, JR., JAMES P. CONDON AND ROBERT E. TIERNEY IN**
**FURTHER SUPPORT OF MOTION OF THE MF GLOBAL INSTITUTIONAL**
**INVESTOR GROUP AND IN OPPOSITION TO COMPETING MOTIONS FOR**
**APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL**
**PURSUANT TO SECTION 27(a)(3)(B) OF THE SECURITIES ACT OF 1933**

Gregg A. Schochenmaier, John J. Gallagher, Jr., James P. Condon and Robert E. Tierney, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    We respectfully submit this joint declaration in support of the motion of the MF Global Institutional Investor Group, consisting of the Iowa Public Employees' Retirement System ("IPERS"), the Policemen's Annuity & Benefit Fund of Chicago ("PABF"), the Central States, Southeast and Southwest Areas Pension Fund ("Central States") and the State-Boston Retirement System ("State-Boston"), for appointment as lead plaintiff and approval of its selection of counsel as lead counsel for the class. Each of us has personal knowledge about the information in this joint declaration relating to the pension fund with which he is associated.

2.    I, Gregg A. Schochenmaier, am general counsel of IPERS, a pension fund with assets totaling over $23 billion for the benefit of public employees in Iowa's schools, state

agencies, counties, cities, and townships, and other public entities. IPERS has over 250,000 active members and retirees, and is the 62nd-largest public- or private-sector pension fund in the United States. As reflected in its certification, IPERS purchased a significant number of shares of MF Global, Ltd. ("MF Global" or the "Company") during the period from July 19, 2007 to February 28, 2008 (the "Class Period") and suffered a substantial loss as a result of the violations of the federal securities laws alleged in this action.

3.      I, John J. Gallagher, Jr., am the executive director of PABF, a pension fund organized to provide retirement benefits to the members of the Chicago Police Department and their spouses, with assets totaling approximately $4.19 billion. As of December 31, 2006, PABF serviced 26,370 members, including active employees and retirees. As reflected in its certification, PABF purchased a significant number of shares of MF Global during the Class Period and suffered a substantial loss as a result of the violations of the federal securities laws alleged in this action.

4.      I, James P. Condon, am the deputy general counsel of Central States, a multiemployer, collectively bargained pension fund that administers benefits for hundreds of thousands of participants, dependents and retirees, with assets totaling over $26 billion. As reflected in its certification, Central States purchased a significant number of shares of MF Global during the Class Period and suffered a substantial loss as a result of the violations of the federal securities laws alleged in this action.

5.      I, Robert E. Tierney, am the executive officer of Boston Retirement Board, an institutional investor that provides retirement benefits for the employees of the City of Boston, Massachusetts, with assets totaling over $3.1 billion. State-Boston has more than 34,000 active and retired members, representing 106 mandatory retirement systems. As reflected in its

certification, State-Boston purchased a significant number of shares of MF Global during the Class Period and suffered a substantial loss as a result of the violations of the federal securities laws alleged in this action.

6.      IPERS, PABF, Central States and State-Boston – four retirement systems with experience in class action litigation and in serving as fiduciaries – are dedicated to maximizing the recovery to the class members in this action. This mutual interest prompted the four funds to join together to seek to prosecute this case as a lead plaintiff group. The MF Global Institutional Investor Group believes that it is the most adequate plaintiff to represent the interests of the entire class.

7.      The MF Global Institutional Investor Group timely filed its motion for appointment as lead plaintiff and for the approval of its selection of lead counsel. Before filing that motion, we discussed joining together to seek appointment as a lead plaintiff group. IPERS, PABF, Central States and State-Boston elected to seek joint appointment as a lead plaintiff group because they are each transparent, sophisticated institutional investors with large financial interests in the outcome of the case and the capability and experience to oversee this complex litigation to a successful conclusion.

8.      As a reflection of the seriousness of their commitment to their duties, members of the MF Global Institutional Investor Group have a history of membership in one or more associations committed to the protection of investor interests. PABF, IPERS and Central States have common membership in the International Foundation of Employee Benefit Plans. PABF and State-Boston are represented on the National Conference of Public Employee Retirement Systems, and PABF and IPERS are also represented in Government Finance Officers Association. IPERS is a founding member of the Council of Institutional Investors and also a

member of the National Association of State Investment Officers, the National Council for Teachers Retirement, and the National Association of State Retirement Administrators. The Executive Director of Central States is a member of the Department of Labor's ERISA Advisory Council.

9.     IPERS, PABF, Central States and State-Boston believe that the Court should appoint the MF Global Institutional Investor Group as lead plaintiff because it has ample resources, and its members have common interests and are committed to working closely with one another as well as with class counsel to obtain the best possible recovery for the class. IPERS, PABF, Central States and State-Boston will continue to remain informed at all times of the status and progress of this action, the strengths and weaknesses of the case, and the prospects for any resolution. Further, representatives of IPERS, PABF, Central States and State-Boston are prepared to personally travel when their presence will be of benefit to the class.

10.     Further, we understand that one of the lead plaintiff's duties under the Private Securities Litigation Reform Act is the duty to select and retain lead counsel and to supervise the prosecution of the case. We believe that it is essential to the satisfaction of our fiduciary responsibility to the class to select and retain lead counsel that have a proven track record of handling these types of cases and that will operate pursuant to our direction and authority. IPERS, PABF, Central States and State-Boston are familiar with the law firms that handle this type of litigation and believe that Barrack, Rodos & Bacine and Cohen, Milstein, Hausfeld & Toll, P.L.L.C., who have worked together in the past, are highly experienced and qualified to represent the class as lead counsel in this action.

11.     We also understand that one of the primary responsibilities of the lead plaintiff in overseeing the work of co-lead counsel is to ensure that the litigation is handled efficiently, and

that the resulting fees and expenses are fair and reasonable, relative to the size, complexity and risk of the litigation. Accordingly, we have coordinated our actions herein and have communicated with each other to discuss strategy and procedures for directing this litigation and monitoring counsel. In fact, one reason we seek joint appointment as lead plaintiff is our desire to ensure that our chosen counsel are appointed lead counsel and empowered to prosecute this action for the benefit of the class and that we are able to monitor their work and ensure that they litigate the action efficiently, cost-effectively, and without duplication of effort or expenses.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge.

Executed this ___ day of June, 2008.

_____
Gregg A. Schochenmaier
General Counsel
Iowa Public Employees' Retirement System


_____
John J. Gallagher, Jr.
Executive Director
Policemen's Annuity & Benefit Fund of Chicago


_____
James P. Condon
Deputy General Counsel
Central States, Southeast and Southwest Areas Pension Fund


_____
Robert E. Tierney
Executive Officer
Boston Retirement Board

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge.

Executed this ___ day of June, 2008.

_____
Gregg A. Schochenmaier
General Counsel
Iowa Public Employees' Retirement System

_____
John J. Gallagher, Jr.
Executive Director
Policemen's Annuity & Benefit Fund of Chicago

_____
James P. Condon
Deputy General Counsel
Central States, Southeast and Southwest Areas Pension Fund

_____
Robert E. Tierney
Executive Officer
Boston Retirement Board

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge.

Executed this _5th_ day of June, 2008.

_____  _____

Gregg A. Schochenmaier
General Counsel
Iowa Public Employees' Retirement System


_____

John J. Gallagher, Jr.
Executive Director
Policemen's Annuity & Benefit Fund of Chicago


_____  _____

James P. Condon
Deputy General Counsel
Central States, Southeast and Southwest Areas Pension Fund


_____  _____

Robert F. Tierney
Executive Officer
Boston Retirement Board

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge.

Executed this ___ day of June, 2008.

_____
Gregg A. Schochenmaier
General Counsel
Iowa Public Employees' Retirement System


_____
John J. Gallagher, Jr.
Executive Director
Policemen's Annuity & Benefit Fund of Chicago


_____
James P. Condon
Deputy General Counsel
Central States, Southeast and Southwest Areas Pension Fund


_____
Robert E. Tierney
Executive Officer
Boston Retirement Board

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAYMOND J. DONOVAN, Secretary )
of Labor, )
 )
 )
        Plaintiff, )
 )
v. ) Civil Action No.
 ) 78 C.342
 )
FRANK FITZSIMMONS, et al., )
 )
        Defendants. )

CONSENT DECREE

    Plaintiff Raymond J. Donovan, Secretary of Labor ("the

Secretary") has filed a complaint in this matter against the

named individual defendants, former trustees of the Central

States, Southeast and Southwest Areas Pension Fund ("the

individual defendants"), pursuant to the Employee Retirement

Income Security Act of 1974 as amended ("ERISA"), alleging,

inter alia, that the individual defendants violated section

404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1) (1976), and sec-

tion 405 of ERISA, 29 U.S.C. § 1105 (1976). The Secretary

moved this Court for leave to amend the complaint, inter

alia, to include the Central States, Southeast and Southwest

Areas Pension Fund ("the Pension Fund") as a party to the

litigation and has filed with this Court an amended

complaint. This motion was previously denied by the Court
insofar as it sought to join the Pension Fund and is pre-
sently under advisement with the Court pursuant to the Sec-
retary's motion for reconsideration.

The Pension Fund consents to the filing of the amended
complaint insofar as it seeks to join the Pension Fund as a
party defendant, acknowledges service of the amended com-
plaint, and admits the jurisdiction of this Court.

The Pension Fund expressly waives Findings of Fact and
Conclusions of Law and consents to the entry of this Consent
Decree as a full and complete resolution of the issues
raised in the amended complaint with respect to the
Pension Fund.

Neither the Secretary nor the Pension Fund waives
any claims against the individual defendants, and this
Consent Decree in no way affects the liability of the
individual defendants with respect to the allegations
set forth in the complaint and the amended complaint.
Nothing in this Consent Decree shall constitute or be
deemed an admission of any fact alleged in the com-
plaint or the amended complaint in this case.

The Court has jurisdiction over the Pension Fund
and the subject matter of this action, and the Court is

-2-

empowered to provide the equitable and remedial relief
following.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED
that the Secretary's motion for leave to file an amended
complaint, insofar as it relates to the Pension Fund,
is hereby granted and further that the Pension Fund
shall perform the following undertakings:

### I.    COMPLIANCE

The Pension Fund shall operate in full compliance
with ERISA and with any conditions contained in deter-
mination letters issued by the Internal Revenue Service
as to the qualification of the Pension Fund under sec-
tion 401 of the Internal Revenue Code and as to the
exemption of the trust to which the Pension Fund relates
under section 501 of the Internal Revenue Code ("the
determination letters").

The Pension Fund shall require that its admini-
strators, fiduciaries, officers, trustees, custodians,
counsel, agents, employees, advisers, providers of goods
or services, consultants, representatives in any capa-
city, and all persons who serve in any capacity that
involves decisionmaking authority or custody or control
of the moneys, funds, or assets of the Pension Fund, as

-3-

a condition of maintaining their respective relation-
ships with the Pension Fund, discharge their duties to
the Pension Fund in full compliance with ERISA and not
take any action in the discharge of such duties that is
inconsistent with the Pension Fund's full compliance
with ERISA or with the conditions of the determination
letters or with the Pension Fund's performance of the
undertakings in this Consent Decree.

The Pension Fund shall provide a copy of this Con-
sent Decree to the individuals and entities described
above within 30 days after its entry and to all such
new individuals and entities at the beginning of their
respective relationships with the Pension Fund, which-
ever is later.

## II.  ASSET MANAGEMENT

### A.  Appointment of a Named Fiduciary

The Court understands that The Equitable Life Assur-
ance Society of the United States ("Equitable") is the
named fiduciary of the Pension Fund under contractual
arrangements which expire on October 3, 1982 ("the Equit-
able Contract").  At the expiration or termination of
the Equitable Contract, all assets of the Pension Fund,
except for those liquid assets held in reserve for pay-
ment of benefits and administrative expenses, which

-4-

liquid assets shall be defined and managed in
accordance with section III of this Consent Decree,
shall continue to be managed for the duration of this
Consent Decree by a named fiduciary, as defined in
section 402(a)(2) of ERISA, 29 U.S.C. § 1102(a)(2)
(1976), in accordance with section II of this Consent
Decree.  At least 60 days before the expiration of any
named fiduciary's appointment, the Pension Fund shall
request the Court's approval of a successor named
fiduciary and give the Secretary notice of the request
for approval.  The Secretary shall present any
objection to the appointment of the successor named
fiduciary within 30 days of the filing of the Pension
Fund's request for approval.  The succcessor named
fiduciary's appointment shall not become effective
until the Court expressly approves the appointment of
the successor named fiduciary.  To be eligible for
appointment, a successor named fiduciary must meet the
qualifications for the named fiduciary set forth in
section II.C. of this Consent Decree.

     B.   Authority of the Named Fiduciary

        1.  Authority Over Fund Assets

The named fiduciary shall have exclusive responsibility
and authority to control and manage all assets of the

-5-

Pension Fund identified in section II.A. of this Consent
Decree.

### 2. Authority Over Appointment of Investment Managers

The named fiduciary shall have exclusive authority
to appoint, replace, and remove such investment managers
and real estate investment managers as it shall in its
sole discretion determine are necessary to manage the
assets of the Pension Fund. These appointments, replace-
ments, and removals need not be approved by the Court.

### 3. Authority and Responsibility Over Investment Managers

The named fiduciary shall have exclusive responsibility
and authority to allocate available investment assets of the
Pension Fund among different types of investments and differ-
ent investment managers and to allocate available real estate
investment assets among different types of real estate invest-
ments and different real estate investment managers. The
named fiduciary shall also have responsibility and authority
to monitor the performance of all investment managers and
real estate investment managers. This monitoring function
of the named fiduciary shall not diminish the obligation of
the board of trustees of the Pension Fund under ERISA to
monitor such performance or relieve any trustee of any liabil-

-6-

ity under part 4 of title I of ERISA for any act of such

trustee.

    4.  <u>Authority to Set Investment</u>
        <u>Objectives and Policies</u>

The short-term and long-term investment objectives

and policies of the Pension Fund shall be developed by

the named fiduciary, after consultation with the board

of trustees of the Pension Fund, with appropriate regard

for the actuarial requirements of the Pension Fund.

Attached hereto as an Exhibit is the investment policy

statement setting forth the current short-term and

long-term investment objectives and policies of the

Pension Fund, including objectives and policies

governing the acquisition of new securities-related

assets and new real estate-related assets. The board

of trustees of the Pension Fund and Equitable have

represented that this investment policy statement has

been developed with appropriate regard for the actuar-

ial requirements of the Pension Fund. The attached

investment policy may only be changed by the named

fiduciary, after consultation with the board of

trustees of the Pension Fund, and such change shall be

reported immediately to the Independent Special Counsel

-7-

established by section V of this Consent Decree and to
the Secretary.  Any such change shall not remain in
effect more than 90 days except with leave of Court for
good cause shown after 60 days' notice to the
Independent Special Counsel and to the Secretary.
Neither the board of trustees of the Pension Fund nor
any administrator, officer, trustee, agent, or employee
of the Pension Fund shall authorize or recommend any
future acquisitions, investments, or dispositions of
Pension Fund assets on a direct or indirect basis.  All
present and future investments of Pension Fund assets
shall be managed solely by the named fiduciary or such
other independent investment managers or real estate
investment managers as defined in section II.C. of this
Consent Decree as the named fiduciary shall appoint.

     C.    Qualifications of Named Fiduciary
            and Appointed Investment Managers
            and Real Estate Investment Managers

        1.   Named Fiduciary

The named fiduciary must qualify as an investment mana-
ger under ERISA section 3(38), 29 U.S.C. § 1102(38) (1976),
and accept appointment as such in writing.  If the named
fiduciary is a bank, it shall be a bank as defined in
section 202(a)(2) of the Investment Advisors Act of 1940,

-8-

15 U.S.C. § 80a-2 (1976), and shall rank, on the basis of its equity capital on the last day of its most recent fiscal year, among the twenty-five largest banks in the United States.  If the named fiduciary is an insurance company, it shall be qualified to do business in and be subject to regulation in at least six states and shall rank, on the basis of assets on the last day of its most recent fiscal year, among the twenty-five largest insurance companies in the United States.  If the named fiduciary is an investment adviser registered under section 202(a)(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80a-2 (1976), it shall rank, on the basis of total client assets under its management and control at the close of its most recent fiscal year, among the twenty-five largest investment advisers in the United States that have either (1) shareholders' or partners' equity in excess of $50,000,000 or (2) all of their obligations and liabilities assumed or guaranteed by a bank or insurance company having the characteristics described above, or by a broker or dealer registered under section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a) (1976), that has a net worth in excess of $50,000,000 as of the last day of its most recent fiscal year.  In addition, the named fiduciary must

-9-

meet the qualifications set forth below for appointed
investment managers and real estate investment managers.

2.  Investment Managers

To be eligible for appointment as an investment manager
by the named fiduciary under section II.B.2. of this Consent
Decree, an investment manager must:

    a.    Have at least 10 years of experience in operations
as an investment management organization managing
portfolios of, or providing investment advice with
respect to, stock or other securities, and have
demonstrated results of performance which are au-
dited and a matter of public record;

    b.    Excluding any Pension Fund assets, have at least
$500 million of assets under management, with the
Pension Fund's assets allocated to the investment
manager constituting not more than 25% of the
total of all assets under management;

    c.    Have previously served or be serving as an invest-
ment manager to employee benefit plans or other
tax-exempt trusts with assets exceeding $100
million subject to its control or advice;

    d.    Charge a fee that shall be no more than is reason-
able and shall not exceed the fees charged by the
manager for comparable services to comparable cli-
ents;

e.   Not be affiliated with any administrator, officer,
     trustee, agent, or employee of the Pension Fund;
     and

f.   Review and agree to abide by the investment policy
     statement set forth in the Exhibit to this Consent
     Decree or such modification of it as may occur as
     provided in section II.B.4. of this Consent
     Decree.

3.   Real Estate Investment Managers

To be eligible for appointment as a real estate invest-
ment manager by the named fiduciary under section II.B.2. of
this Consent Decree, a real estate investment manager must:

a.   Have at least 10 years of experience in operations
     as a real estate investment management
     organization;

b.   Excluding any Pension Fund assets, have at least
     $100 million of real estate assets under
     management, with the Pension Fund's assets
     allocated to the real estate investment manager
     constituting not more than 25% of the total of all
     assets under management; and

c.   Meet all the qualifications set forth in sections
     II.C.2.d., e., & f. of this Consent Decree.

-11-

### 4. Current Investment Managers and Real Estate Investment Manager

The qualifications set forth in sections II.C.2. and II.C.3. need not be met by any investment manager or real estate investment manager serving under the Equitable Contract.

### D. Termination of the Named Fiduciary

A named fiduciary appointed pursuant to this Consent Decree shall be subject to removal without cause shown on six months' written notice from the Pension Fund, a copy of which shall immediately be provided to the Secretary, and at any time by the Court for good cause shown after 60 days' notice to the named fiduciary and the Secretary. Before the removal of a named fiduciary, there shall be appointed a successor named fiduciary under the procedure provided in section II.A. of this Consent Decree, which appointment shall become effective immediately upon the removal of the then current named fiduciary.

### III. ASSETS HELD FOR BENEFITS AND ADMINISTRATIVE EXPENSES AND MAINTENANCE OF QUALIFIED INTERNAL AUDIT STAFF

A.   All assets received by the Pension Fund shall be transferred to the named fiduciary in accordance with section II of this Consent Decree, except as provided in sections III.B. through III.E. below.

-12-

B.   The Pension Fund may retain assets that it has determined are reasonably necessary for the payment of benefits and administrative expenses in a particular month.  The Pension Fund's determination shall take into account sums that could be made available to the Pension Fund by the named fiduciary and the investment managers and may include a reserve for benefits or administrative expenses that might become payable during the month.  Assets retained for the payment of benefits and administrative expenses must be used exclusively for those purposes.  The Pension Fund's determination for each month shall be made during the last 10 days of the preceding month and shall include a report setting forth the reasons for the determinations with supporting computations.  Copies of the report shall be made available to the Independent Special Counsel and on request to the Secretary and the Court.

C.   Notwithstanding the preceding section III.B., for each month the average daily balance of all assets retained by the Pension Fund, including assets held pending transfer to the named fiduciary (determined as of the close of business each day) shall not exceed 2 1/2 times the sum of the benefits and administrative expenses paid in the preceding month.  In no event will the disbursements for admin-

-13-

istrative expenses for any month exceed 2 1/2 times the ad-
ministrative expenses in the previous month.

     D.  Funds held for benefits and administrative expenses
shall be managed and invested in accordance with the advice
of a qualified independent investment adviser having the
characteristics of the named fiduciary described in section
II.C.1. of this Consent Decree, which investment adviser's
appointment shall be subject to the approval of the Court
after notice to the Secretary.

     E.  The Pension Fund shall maintain a qualified In-
ternal Audit Staff to monitor its affairs.  Responsibilities
of the staff shall include the review of benefit administra-
tion, administrative expenditures, and the allocation of
Pension Fund receipts as to investments and administration.
The Internal Audit Staff, in cooperation with the Executive
Director of the Pension Fund, shall prepare monthly reports
setting forth its findings and recommendations, copies of
which shall be made available to the Independent Special
Counsel and on request to the Secretary and the Court.

IV. REMOVAL OF CONVICTED PERSONS

     Within 30 days after the entry of this Consent Decree,
the trust agreement and other appropriate instruments under
which the Pension Fund is maintained shall be amended to
provide that:

-14-

A.    No person shall serve, or be permitted to serve, as
an administrator, fiduciary, officer, trustee, custodian,
counsel, agent, employee, adviser, provider of goods or ser-
vices, consultant, representative in any capacity, or in any
capacity that involves decisionmaking authority or custody
or control of the moneys, funds, or assets of the Pension
Fund if such person has been convicted of:

> robbery, bribery, extortion, embezzle-
> ment, fraud, grand larceny, burglary,
> arson, a felony violation of Federal or
> State law involving substances defined
> in section 802(6) of title 21, murder,
> rape, kidnaping, perjury, assault with
> intent to kill, any crime described in
> section 80a-9(a)(1) of title 15, a vio-
> lation of any provision of ERISA, a vio-
> lation of section 186 of title 29, a
> violation of chapter 63 of title 18, a
> violation of sections 874, 1027, 1503,
> 1505, 1506, 1510, 1951, or 1954 of title
> 18, a violation of the Labor-Management
> Reporting and Disclosure Act of 1959, or
> any felony involving abuse or misuse of
> such person's labor organization or em-
> ployee benefit plan position or employ-
> ment; or conspiracy to commit any such
> crimes; or attempt to commit any such
> crimes, or a crime in which any of the
> foregoing crimes is an element; or a
> misdemeanor involving a breach of fidu-
> ciary responsibility.

B.    Upon conviction for any of the crimes set forth in
section IV.A. of this Consent Decree, such person shall im-
mediately be removed from and disqualified from serving in

any capacity set forth in section IV.A. of this Consent De-
cree, provided that upon final reversal of such conviction,
such person, unless otherwise ineligible, shall thereafter
be eligible to serve; and provided further that this dis-
qualification shall cease to be operative ten years after
such conviction or after the end of imprisonment on such
conviction, whichever is the later, unless prior to the end
of such ten-year period, in the case of a person so
convicted or imprisoned, (a) his citizenship rights, having
been revoked as a result of such conviction, have been fully
restored, or (b) the United States Parole Commission,
pursuant to applicable law, determines that such person's
service would not be contrary to the best interests of the
Pension Fund.

### V.   INDEPENDENT SPECIAL COUNSEL

Due to the scope and complexity of this Consent Decree,
the parties agree that the Court should appoint an Independ-
ent Special Counsel to further the objectives of this
Consent Decree.  The parties believe that the appointment of
an Independent Special Counsel will serve the Court by
assisting in identifying and resolving any problems or
issues that may arise in connection with the Pension Fund's
performance of the undertakings in this Consent Decree.

-16-

The parties anticipate that the Independent Special Counsel will give special attention in the conduct of his office to compliance with the fiduciary responsibility provisions in part 4 of title I of ERISA and with conditions contained in determination letters issued by the Internal Revenue Service. The parties further anticipate that the Independent Special Counsel ordinarily will not find it necessary or appropriate to examine, oversee, or report on matters relating to the establishment of contribution rates or benefit levels or to benefit determinations with respect to individual participants and beneficiaries of the Pension Fund, although the parties recognize that occasions may arise in which the Independent Special Counsel, in his discretion, will find it necessary or appropriate to exercise such powers, duties, and responsibilities.

Accordingly, within 30 days after the entry of this Consent Decree, the Court shall appoint an Independent Special Counsel from a list of three individuals recommended by the Pension Fund and agreeable to the Secretary. Such Independent Special Counsel, in the conduct of his office as generally described above, shall have the following powers, duties, and responsibilities.

-17-

A.   The Independent Special Counsel shall have full authority to examine the future activities of the Pension Fund and to oversee and report on performance of the undertakings in this Consent Decree, giving special attention to compliance with the fiduciary responsibility provisions in part 4 of title I of ERISA and with conditions contained in determination letters issued by the Internal Revenue Service.

B.   The Independent Special Counsel may, with leave of Court for good cause shown, employ attorneys, accountants, investigators, and others reasonably necessary and appropriate to aid him in the exercise of his powers, duties, and responsibilities.

C.   The Independent Special Counsel shall have full access to all documents, books, records, personnel, files, and information of whatever type or description in the possession, custody, or control of the Pension Fund.  In addition, the administrators, fiduciaries, officers, trustees, custodians, counsel, agents, employees, advisers, providers of goods or services, consultants, representatives in any capacity, and all persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund shall be required, as a condition of maintaining their respective

-18-

relationships with the Pension Fund, to cooperate fully with the Independent Special Counsel in the performance of his duties and responsibilities. The Independent Special Counsel may attend meetings of the board of trustees of the Pension Fund, of any committees thereof (including closed or executive sessions), and any meetings of any attorneys' or review committees. He shall receive notice in advance of and agenda of such meetings in the same manner and to the same extent as the other participants in the meetings. In addition, the Independent Special Counsel may attend any other meetings of any type whatsoever at which Pension Fund related matters are discussed or considered including conferences with counsel to the Pension Fund and meetings attended by administrators, fiduciaries, officers, trustees, employees, custodians, counsel, agents, advisers, providers of goods or services, consultants, representatives in any capacity, and all persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund.

D.  The Independent Special Counsel shall be free to consult with the Department of Labor, the Internal Revenue Service, and other federal, state, and local governmental agencies concerning any activities which he performs.

E.   The Independent Special Counsel shall provide access to the Department of Labor upon its request to any documents, books, interview notes, or records of any type reviewed, compiled, or prepared by the Independent Special Counsel in the exercise of his powers, duties, and responsibilities.

F.   After not less than 10 days notice to the board of trustees of the Pension Fund, to the affected individual or entity, and to the Secretary, the Independent Special Counsel may petition the Court for appropriate orders to compel co-operation by the Pension Fund and any administrator, fiduciary, officer, trustee, custodian, counsel, agent, employee, adviser, provider of goods or services, consultant, repre-sentative in any capacity, or person who serves in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund.

G.   The Independent Special Counsel shall file quarterly reports with the Court, with copies to the Secretary and the Pension Fund, and any other reports he deems necessary or appropriate.

H.   The Independent Special Counsel shall have such other powers, duties, and responsibilities as the Court may subsequently determine are appropriate.

-20-

The Independent Special Counsel shall not be discharged or terminated during the duration of this Consent Decree except by leave of Court. Upon the termination, discharge, death, incapacity, or resignation of an Independent Special Counsel during the term of this Consent Decree, the Court shall appoint a successor Independent Special Counsel from a list of three individuals recommended by the Pension Fund and agreeable to the Secretary. Recommendations for a successor Independent Special Counsel shall be made within such periods as the Court, by further order, may provide.

No attorney-client or other privilege shall be applicable to any communication between the Independent Special Counsel and the Pension Fund, or its administrators, fiduciaries, officers, trustees, custodians, counsel, agents, employees, advisers, providers of goods or services, consultants, representatives in any capacity, or persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund.

On a monthly basis, the Pension Fund shall pay the Independent Special Counsel reasonable fees and expenses reasonably and actually incurred by the Independent Special Counsel in the exercise of his powers, duties, and responsibilities.

-21-

Nothing herein shall be construed (1) to limit the powers and responsibilities of any officer or employee of the United States under ERISA or any other law, (2) to relieve the Pension Fund or any of its administrators, fiduciaries, officers, trustees, custodians, counsel, agents, employees, advisers, providers of goods or services, consultants, representatives in any capacity, or persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund of any duty or responsibility under ERISA or any other law, or (3) to confer on the Independent Special Counsel any fiduciary responsibility under part 4 of title I of ERISA or otherwise.

## VI.    COOPERATION WITH THE SECRETARY

In recognition of the terms and rationale of the Court's order herein on June 8, 1981, which determined that the attorney-client and work product privileges are not available with respect to certain Pension Fund documents, the Pension Fund shall cooperate fully with the Secretary, both in the prosecution of this action and in the exercise of his other enforcement responsibilities under ERISA, by promptly providing such documents, information, and persons under its control as the Secretary from time to time may request.

-22-

Nothing herein shall be construed to limit the rights the
Secretary otherwise enjoys of access to documents, informa-
tion, or persons; to preclude the Pension Fund from seeking
appropriate orders from this Court protecting against the
Secretary's unauthorized dissemination of documents or infor-
mation; or to waive or restrict the exercise by any individ-
ual of his or her constitutional rights.

### VII.  RETENTION OF JURISDICTION

This Court shall retain jurisdiction over the parties
and subject matter of this action for the purpose of enforc-
ing the terms of this Consent Decree.  After a period of 10
years from the entry hereof, the Pension Fund, after notice
to the Secretary, may petition the Court to dissolve the
Consent Decree for good cause shown.  After a period of 15
years from the entry hereof, the Pension Fund, after notice
to the Secretary, may petition the Court to dissolve the
Consent Decree and, absent good cause shown by the Secretary
establishing a need for continuing this Consent Decree, the
Consent Decree shall be dissolved.

### VIII.  NOTICE

Provisions of this Consent Decree requiring notice to
the board of trustees of the Pension Fund shall be satisfied
by delivering it in writing to the Pension Fund in care of:

-23-

> Executive Director
> Central States, Southeast and Southwest
>   Areas Pension Fund
> 8550 W. Bryn Mawr Avenue
> Chicago, Illinois  60631.

Provisions of this Consent Decree requiring notice to the Secretary shall be satisfied by delivering it in writing to:

> The Administrator
> Pension and Welfare Benefit Programs
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Room S-4516
> Washington, D.C.  20210;

with a duplicate delivered to:

> The Solicitor of Labor
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Room S-2002
> Washington, D.C.  20210.

Provisions of this Consent Decree requiring notice to the Independent Special Counsel shall be satisfied by delivering it in writing to him at such address as he designates with the Court.

The parties to this Consent Decree and the Independent Special Counsel may, as they deem necessary, change from time to time the designation of persons to receive notice on their behalf by filing with the Court notification of such change and serving a copy thereof on the other party or par-

-24-

ties to this Consent Decree and on the Independent Special
Counsel, as the case may be.

## IX.    ENTRY OF JUDGMENT

There being no just reason for delay, the Clerk of the
Court is hereby expressly directed to enter this Consent
Decree forthwith in accordance with the provisions of Rule
54(b) of the Federal Rules of Civil Procedure.

Entered:    _September 29, 1982_

_James B. Moran_
James B. Moran
United States District Judge

-25-

The undersigned consent to the
entry of the foregoing decree:


_Raymond J. Donovan_
RAYMOND J. DONOVAN,
SECRETARY OF LABOR, Plaintiff


_T. Timothy Ryan_
T. Timothy Ryan, Jr.
Solicitor of Labor


_David H. Feldman_
David H. Feldman
Associate Solicitor for
    Special Litigation

Office of the Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C.  20210

Attorneys for Plaintiff


CENTRAL STATES, SOUTHEAST AND SOUTHWEST
AREAS PENSION FUND, Defendant

By: _Loran W. Robbins_
    Loran W. Robbins

_Marion M. Winstead_
Marion M. Winstead


- 26 -

Harold J. Yates

Earl L. Jennings, Jr.

EMPLOYEE TRUSTEES

Howard McDougall

Robert J. Baker

R. V. Pulliam, Sr.

EMPLOYER TRUSTEES

George W. Lehr

EXECUTIVE DIRECTOR

James G. Walsh, Jr.
8550 W. Bryn Mawr Avenue
Chicago, Illinois   60631

Attorney for Defendant,
Central States, Southeast and
Southwest Areas Pension Fund

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS E. WHITFIELD,                )
Deputy Secretary of Labor,          )
U.S. Department of Labor,           )
                                    )
                      Plaintiff,    )
                                    )        No. 78 C 342
        v.                          )
                                    )        (Moran, J.)
FRANK E. FITZSIMMONS, et al.,       )
                                    )
                      Defendants.   )

AGREED ORDER AMENDING
SEPTEMBER 22, 1982, CONSENT DECREE

On September 22, 1982, Raymond J. Donovan, then-Secretary of
Labor and the plaintiff in this action, and the defendant Central
States, Southeast and Southwest Areas Pension Fund (the Pension
Fund), with the approval of the Court, entered into a consent
decree respecting the future management of the Pension Fund (the
1982 Consent Decree). Due to a vacancy in the office of Secretary
of Labor, the duties of that office have been delegated to Dennis
E. Whitfield, Deputy Secretary of Labor (the Secretary). The
parties now have agreed that amendments to the 1982 Consent Decree
would be appropriate.

The Court has retained jurisdiction over the Pension Fund and
the subject matter of this action, pursuant to section VII of the
1982 Consent Decree, and the Court is empowered for the good cause

that has been shown to provide the equitable and remedial relief that follows.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the 1982 Consent Decree hereby is amended as follows:

1.  Section VII - All sentences following the first sentence are deleted and are replaced with the following:

> After September 22, 2002, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree for good cause shown. After September 22, 2007, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree and, absent good cause shown by the Secretary establishing a need for continuing this Consent Decree, the Consent Decree shall be dissolved.

2.  Sections VIII and IX shall be renumbered as Sections IX and X, respectively.

3.  New Section VIII - A new section VIII, entitled "APPOINTMENT OF NEW TRUSTEES," shall be made a part of the Consent Decree and will provide as follows:

> At least 60 days before the proposed effective date of the appointment of any individual who currently is not a trustee of the Pension Fund to so serve as a trustee, the Pension Fund shall request the Court's approval of the appointment and give the Secretary notice of the request for approval. The Secretary shall have the right to present any objection to or comment on the proposed appointment within 30 days of the filing of the Pension Fund's request for approval. The individual's appointment shall not become effective until the Court expressly approves the appointment.

IT IS FURTHER ORDERED, there being no just reason for delay, that the Clerk of the Court is hereby directed to enter this Agreed Order Amending September 22, 1982, Consent Decree forth-

2

with, in accordance with the provisions of Rule 54(b) of the

Federal Rules of Civil Procedure.

Entered: _November 10, 1987_

James B. Moran
JAMES B. MORAN
United States District Judge

The undersigned consent to the
entry of the foregoing agreed
order amending September 22,
1982, consent decree, as is
shown by their signatures on
this page:

Plaintiff:

DENNIS E. WHITFIELD
Deputy Secretary of Labor
U.S. Department of Labor

By: _____
GEORGE R. SALEM
Solicitor of Labor

Defendant:

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND

By: _____
GEORGE W. LEHR
Executive Director

FRED D. THOMPSON
Acting General Counsel

3

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MICHAEL RUBIN, | : | **08 Civ. 02233 (VM)** |
| | : | |
| Plaintiff(s), | : | **DECLARATION OF** |
| | : | **JAMES P. CONDON** |
| v. | : | |
| | : | **ELECTRONICALLY FILED** |
| MF GLOBAL, LTD., ET AL., | : | |
| | : | |
| Defendants. | : | |

### DECLARATION OF JAMES P. CONDON
### IN FURTHER SUPPORT OF THE MOTION OF THE
### MF GLOBAL INSTITUTIONAL INVESTOR GROUP
### FOR APPOINTMENT AS LEAD PLAINTIFF

JAMES P. CONDON declares as follows:

1.    I am the Deputy General Counsel of the Central States, Southeast and Southwest Areas Pension Fund ("Central States"). I make this Declaration in further support of the MF Global Institutional Investor Group's Motion for Appointment as lead plaintiffs and in response to certain assertions concerning Central States made by competing plaintiffs seeking lead plaintiff status.

2.    Central States is one of the nation's largest Taft-Hartley Funds, with approximately 100,000 active participants and more than $26 billion in assets at year-end 2007. Recognizing Central States' ability to serve in a lead plaintiff capacity, the United States District Court for the Northern District of California found that Central States was more than capable of adequately fulfilling the duties of lead plaintiff and, accordingly, appointed Central States as lead plaintiff and later certified Central States as a class representative in *In re Cisco Sys., Inc., Sec. Litig.*, No. C-01-20418-JW(PVT), 2004 WL 5326262 (N.D. Cal. 2004). In *Cisco* the court observed:

-1-

> The deposition testimony of Central States' Deputy General Counsel, James Condon,
> confirms that Central States is aware of the responsibilities of a class representative
> and has been meeting those responsibilities.

2004 WL 5326262 at *4. Central States' efforts and documented ability as a court-appointed lead

plaintiff in *Cisco*, where it recently obtained a recovery of nearly $100 million for the class, stands

in stark contrast to the suggestion that Central States is incapable of serving as a lead plaintiff.

      3.      The May 27, 2008 Memorandum of Law in Further Support of the Motion of the

South Shore Investment Group for Appointment as Lead Plaintiff ("South Shore Memo") discusses

a February 27, 2007 Order issued by Judge Crotty in the *SafeNet* case:

> "[G]iven the checkered past of the Central States' behavior; and the fact that at least
> some portion of Central States is still subject to a court appointed monitor's
> oversight, there are reasonable doubts as to whether Central States...can be an
> adequate representative." *SafeNet*, 06-cv-5797 slip op. at 6-7 (Weiss Decl. Ex. D).
> Judge Crotty was referring to the fact that Central States, which was a wellspring of
> corruption, operates under a "Consent Decree," which mandates that "special counsel
> [is] to overlook future management of the Fund," and "set[s] forth detailed
> requirements for the continued professional management of the Fund," including
> "continuing oversight of the Fund by both the Secretary of Labor and this court."
> *Chao v. Estate of Fitzsimmons*, 349 F.Supp. 2d 1082, 1083 (N.D. Ill. 2004). The
> oversight duties of the Northern District of Illinois "include[] the appointment of an
> Independent Special Counsel (ISC), with broad powers to examine the future
> activities of the Fund and to oversee and report to the court on compliance with the
> Consent Decree." *Id.*

South Shore Memo at 6-7.

      4.      The "Consent Decree" case was filed in 1978. *Donovan v. Fitzsimmons*, 78 C 342

(U.S. Dist., N.D. Ill.). The "checkered past of the Central States' behavior" referred to above relates

to allegations concerning loans made by Central States to racketeers during the 1960's or 1970's. The

fact that the Consent Decree has remained in effect, despite the lack of any whiff of organized crime

influence or other corruption after the passage of a quarter century, is largely the result of Central

States' own choice, and does not reflect that the "court system [does not] trust" Central States, as

the South Shore Memo (at 7) suggests. Pursuant to an Order entered on November 10, 1987. the

Consent Decree was amended to provide:

> After September 22, 2002, the Pension Fund, after notice to the Secretary, may
> petition the Court to dissolve the Consent Decree for good cause shown. *After
> September 22, 2007, the Pension Fund, after notice to the Secretary, may petition the
> Court to dissolve the Consent Decree and, absent good cause shown by the Secretary
> establishing a need for continuing this Consent Decree, the Consent Decree shall be
> dissolved.*

Agreed Order Amending Consent Decree (Nov. 10, 1987), Ex. A hereto, p. 2 (emphasis added).

5.    At the time Judge Crotty handed down this February 21, 2007 Order in *SafeNet*,

Central States could not so easily terminate the Consent Decree. However, *since September 22,*

*2007*, as the above-quoted Amendment indicates, Central States can seek to terminate the Consent

Decree simply by giving notice of its intent to do so to the Department of Labor. At that point, the

burden would shift to the Department of Labor to show cause why the Consent Decree should

continue.

6.    In my experience, Central States has chosen not to seek to terminate the Consent

Decree because it welcomes the opportunity the Decree provides for an exchange of information

with the Department of Labor and with the Court. In addition, continued jurisdiction of the Northern

District of Illinois over the Consent Decree provides a forum that is familiar with the federal pension

law issues confronting Central States. *See, e.g., Sprague v. Central States*, No. 99-cv-07726

(Reassignment Order, 4/21/00) (reassigning action brought by a Central States participant alleging

breach of ERISA duties to Judge James Moran, who has jurisdiction over the Consent Decree

action); *see also, Sprague v. Central States*, 269 F.3d 811 (7th Cir. 2001) (affirming District Court's

ruling that Central States and its Trustees had not breached ERISA duties).

7.    Moreover, since Judge Cotty entered his ruling in *SafeNet* on February 21, 2007, the Consent Decree has been further amended to place a larger portion of Central States' assets in accounts for which Central States' Trustees have a more direct role without recourse to"named fiduciaries" selected by the Trustees and approved by the Court. As indicated in the May 1, 2008 Report of the Independent Special Counsel under the Consent Decree (Ex. B hereto at 2), in late 2007, the Court approved the establishment of a Passive Equity Index Account comprising 20% of Central States' total assets; this account is managed by Mellon Bank, N.A. ("Mellon"), but there is no "named fiduciary" interposed between Mellon and Central States itself. This Passive Equity Index Account complements the Lehman Aggregate Fixed Income Account that was established under the Consent Decree in 2003. As a result, at this time 40% of the Fund's total assets are in accounts that are not subject to a named fiduciaries' control and for which Central States has direct relationships with the applicable account managers. *See* Ex. B hereto, p. 2.

8.    More important, the Consent Decree has never detracted in any way from the ability of Central States and its Trustees to control *litigation*. The South Shore Memo observes that under the Consent Decree the Court has been called upon to approve:

new trustees, *changes in investment policies*, minor modifications to the Consent Decree. *reallocation of assets*, and changes in named fiduciaries, investment managers and real estate investment managers.

South Shore Memo at 7 (emphasis added in Memo), *quoting Chao v. Fitzsimmons*, 349 F.Supp. 1082, 1084 (N.D. Ill. 2004). Notably absent from this list of items for which Court approval must be sought is any reference to a requirement for Court approval of decisions made by Central States' Trustees or legal counsel concerning the conduct of litigation or the pursuit or resolution of Central States' legal claims. To be sure, the Independent Special Counsel appointed under the Consent Decree occasionally *reports* to the Court concerning significant settlements (*see, e.g.*, Ex. C at 10,

reporting that Central States had achieved a significant settlement in its securities fraud claim against

AOL-Time Warner, Inc.), but there is no requirement under the Consent Decree that litigation

settlements (or the commencement of litigation) be approved by the Court. Indeed, "the Department

of Labor has stated that an employee benefit plan has an affirmative duty [under ERISA] to consider

serving as lead plaintiff or initiating [securities] litigation" Thomas P. Lemke and Gerald T. Lins,

Regulation of Investment Advisers, § 2:34 (2008). Therefore, the Consent Decree, which was

intended to help ensure Central States' continued compliance with ERISA, should not be interpreted

as an *obstacle* to Central States' service as a securities fraud lead plaintiff.

9.      In short, Central States is, and always has been, a "'free agent'" (South Shore Memo

at 8) with respect to the conduct and resolution of securities fraud claims. The Consent Decree does

place limitations on the discretion of the Trustees with respect to *investment* decisions, but in recent

years the Consent Decree has been amended to give more control  in this area to the Central States

Trustees (as opposed to Central States' named fiduciaries) as well. Finally, the continued existence

of the Consent Decree at this time is largely within the control of Central States itself, and this too

was a circumstance that did not obtain at the time of the *SafeNet* and *Baker v. Arnold* (South Shore

Memo at 8) decisions cited by the South Shore Group.

10.     The South Shore Memo also asserts:

> Moreover, as set forth in a May 1, 2008 report to the Court by the Independent
> Special Counsel to Central States, "on March 24, 2008, the Fund's actuary certified
> the Pension Fund to be in critical status." (Weiss Decl. Ex. F). Accordingly, Central
> States stands in jeopardy of violating the Consent Decree, which would occur if it
> became insolvent.

South Shore Memo at 8. Central States has indeed been certified by its actuary to be in "critical

status" within the meaning of the Pension Protection Act of 2006 ("PPA"). However, as reflected

in the report of the Independent Special Counsel cited by the South Shore Memo, this certification

was based upon a determination by the actuary "that if the Pension Fund's amortization extension granted by the IRS [in July 2005] were to be disregarded, the Pension Fund would face a statutory funding deficiency." Ex. B hereto at 3; *see also* ERISA § 305(b)(2)(B) (one test for "critical status" is whether the plan has a funding deficiency "*not* taking into account any extensions of amortization periods") (emphasis added). The "critical status" determination under the PPA is highly technical and unique, and is not at all indicative that the Pension Fund is "insolvent" (South Shore Memo at 8) or in danger of becoming so. In fact, for purposes *other than* the critical status determination, the amortization extension granted by the IRS to Central States on July 13, 2005 *remains* in effect and prevents Central States from incurring a statutory funding deficiency. *See* 7/13/05 IRS Amortization Extension attached hereto as Ex. D.

11.   The practical reality is that largely due to losses suffered in the general market downturn during the 2000-2002 period, Central States' assets declined, but its assets have rebounded in more recent years. Although Central States' assets declined to just over $15 billion at the end of 2002, by the end of 2006 they had grown to almost $21 billion, and by the end of 2007 (aided by a cash settlement of $6.1 billion with United Parcel Service, Inc.) the assets had grown to over $26 billion. As a result, the Central States' funded ratio is currently approximately 73%. This is well above the 59% funded ratio currently required as a condition for the continuation of the July 2005 amortization extension granted to Central States by the IRS. See Ex. D hereto at 1. As noted, as long as the conditions of the amortization extension are satisfied, Central States is not in danger of incurring a statutory funding deficiency.

12.   Although Central States is in "critical status" under the PPA, as recorded in the May 1, 2008 report of the Independent Special Counsel, the Central States Trustees have approved a "rehabilitation plan" designed (1) to meet the PPA requirements for a "critical" plan and (2) to build

-6-

upon the funding improvements that Central States began to experience even before the PPA became

effective on January 1, 2008:

> Under the PPA, trustees of a plan in critical status must develop a "rehabilitation
> plan" designed to improve the funded status of the plan in accordance with PPA
> guidelines...... The plan approved by the Trustees attempts to build upon and
> incorporate the funding improvement program instituted prior to the January 1, 2008
> effective date of the PPA, and designed to ensure compliance with the conditions
> imposed by the pre-PPA amortization extension. In broad outline, the Rehabilitation
> Plan approved by the Trustees contains a "Primary Schedule," which will require
> each contributing employer to agree to five years of 8% annual contribution increases
> (7% if the increases began in 2006) in order to maintain current benefit levels for the
> affected bargaining unit.
>
> * * *
>
> Staff has also reported to the Board of Trustees that the National Master Freight
> Agreement ("NMFA") employers, who account for approximately 48% of the
> Pension Fund's contribution revenue, have agreed under the new NMFA that
> became effective this year to pension contribution rate increases conforming to the
> requirements of the Fund's Primary Schedule [*i.e.*, 8% annual pension contribution
> increases] under its Rehabilitation Plan. Staff has also reported that a high
> percentage of the contributing employers whose labor agreements expired in 2006
> and 2007 have agreed to provide follow-on agreements in compliance with the
> Fund's pre-PPA funding improvement program (requiring 7% annual increases for
> employers with agreements expiring in 2006 and 8% increases for employers with
> contracts expiring in 2007). As a result, Staff has informed the Trustees that it
> anticipates that most contributing employers will elect to agree to the 8%
> contribution increase required under the Fund's Rehabilitation Plan Primary [8%
> annual increase] Schedule.

(Ex. B hereto at 4-5.)

Pursuant to 28 U.S.C. § 2286, I declare under penalty of perjury that the foregoing is true and

correct.

Executed this 5th day of June, 2008 in Rosemont, Illinois.

_____

James P. Condon

# EXHIBIT A

# AGREED ORDER AMENDING SEPTEMBER 22, 1982 CONSENT DECREE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS E. WHITFIELD,              )
Deputy Secretary of Labor,        )
U.S. Department of Labor,         )
                                  )
                Plaintiff,        )
                                  )        No. 78 C 342
          v.                      )
                                  )        (Moran, J.)
FRANK E. FITZSIMMONS, et al.,     )
                                  )
                Defendants.       )

AGREED ORDER AMENDING
SEPTEMBER 22, 1982, CONSENT DECREE

On September 22, 1982, Raymond J. Donovan, then-Secretary of
Labor and the plaintiff in this action, and the defendant Central
States, Southeast and Southwest Areas Pension Fund (the Pension
Fund), with the approval of the Court, entered into a consent
decree respecting the future management of the Pension Fund (the
1982 Consent Decree). Due to a vacancy in the office of Secretary
of Labor, the duties of that office have been delegated to Dennis
E. Whitfield, Deputy Secretary of Labor (the Secretary). The
parties now have agreed that amendments to the 1982 Consent Decree
would be appropriate.

The Court has retained jurisdiction over the Pension Fund and
the subject matter of this action, pursuant to section VII of the
1982 Consent Decree, and the Court is empowered for the good cause

that has been shown to provide the equitable and remedial relief that follows.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the 1982 Consent Decree hereby is amended as follows:

1. Section VII - All sentences following the first sentence are deleted and are replaced with the following:

> After September 22, 2002, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree for good cause shown. After September 22, 2007, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree and, absent good cause shown by the Secretary establishing a need for continuing this Consent Decree, the Consent Decree shall be dissolved.

2. Sections VIII and IX shall be renumbered as Sections IX and X, respectively.

3. New Section VIII - A new section VIII, entitled "APPOINTMENT OF NEW TRUSTEES," shall be made a part of the Consent Decree and will provide as follows:

> At least 60 days before the proposed effective date of the appointment of any individual who currently is not a trustee of the Pension Fund to so serve as a trustee, the Pension Fund shall request the Court's approval of the appointment and give the Secretary notice of the request for approval. The Secretary shall have the right to present any objection to or comment on the proposed appointment within 30 days of the filing of the Pension Fund's request for approval. The individual's appointment shall not become effective until the Court expressly approves the appointment.

IT IS FURTHER ORDERED, there being no just reason for delay, that the Clerk of the Court is hereby directed to enter this Agreed Order Amending September 22, 1982, Consent Decree forth-

2

with, in accordance with the provisions of Rule 54(b) of the Federal Rules of Civil Procedure.

Entered: _Novembe 10, 1987_

James B. Moran
JAMES B. MORAN
United States District Judge

The undersigned consent to the entry of the foregoing agreed order amending September 22, 1982, consent decree, as is shown by their signatures on this page:

Plaintiff:

DENNIS E. WHITFIELD
Deputy Secretary of Labor
U.S. Department of Labor

By: _____
GEORGE R. SALEM
Solicitor of Labor

Defendant:

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND

By: _____
GEORGE W. LEHR
Executive Director

FRED D. THOMPSON
Acting General Counsel

3

# EXHIBIT B

# MAY 1, 2008 INDEPENDENT SPECIAL COUNSEL REPORT

**FRANK J. McGARR, Esq.**
**Arbitration and Mediation**

**4146 South Venard Road**                              **Phone 630.960.0985**
**Downers Grove, IL 60515**                             **Fax    630.960.0904**


                              May 1, 2008


The Honorable James B. Moran                  **Via UPS Next Day**
United States District Judge
United States District Court
Northern District of Illinois
Eastern Division
219 South Dearborn Street
Chicago, Illinois 60604

Re:  Quarterly Report of Independent Special Counsel, <u>Chao</u>
     <u>v. Estate of Frank E. Fitzsimmons, et al.</u>, No. 78 C 342
     (N.D. Ill., E.D.); <u>Chao v. Robbins, et al.</u>, No. 78 C 4075
     (N.D. Ill., E.D.); and <u>Chao v. Dorfman, et al.</u>, No. 82 C
     7951 (N.D. Ill., E.D.)

Dear Judge Moran:

     This is to report on my activities during the first quarter of
2008 as Independent Special Counsel appointed pursuant to the
<u>Fitzimmons</u> (Pension Fund) and <u>Robbins</u> and <u>Dorfman</u> (Health and
Welfare Fund) consent decrees.

                <u>General Pension and Health and Welfare Fund Matters</u>

     I have attended full Board of Trustees meetings, now held
every other month (with additional meetings as noted in my
reports), and consulted regularly with Fund executives.

<u>Allocation of UPS Withdrawal Liability Settlement Proceeds</u>

     As discussed in my February 1 report covering the fourth
quarter of 2007, on December 26, 2007, the Pension Fund received a
wire transfer from United Parcel Service, Inc. ("UPS") of $6.1
billion pursuant to a withdrawal liability settlement agreement
previously approved by the Pension Fund's Board of Trustees.  As
the Court is aware, and as also discussed in my February 1 report,
in anticipation of the receipt of this $6.1 billion payment from
UPS, the Court approved certain modifications to the consent decree
and to the related investment procedures and authorizations.  These
modifications included the establishment of a new Passive Equity
Index Account to be funded in part by UPS settlement proceeds.

The Honorable James B. Moran
May 1, 2008
Page 2


_____At the January 15, 2008 Meeting of the Board of Trustees, the Pension Fund's financial department reported that the $6.1 billion UPS settlement payment received on December 26, 2007 had been allocated as follows:

| | | |
|---|---|---|
| Passive Equity Index Account | - | $4.2 billion |
| Lehman Aggregate Fixed Income Account | - | 0.9 billion |
| Northern Trust Global Advisors | | |
| ("Northern Trust") | - | 1.0 billion |
| Total | | $6.1 billion |

This allocation of the UPS settlement proceeds was in accordance with the Court's order dated December 20, 2007. As also authorized under the December 20 order, the financial department reported that Goldman Sachs Asset Management ("Goldman") transferred $1.2 billion in investment assets to the newly established Passive Equity Index Account. Finally, as authorized under the Court's January 23, 2008 Order, the control, authority and responsibility for Fund assets in the amount of approximately $2.480 billion has been transferred from Goldman to Northern Trust as court-approved Named Fiduciary. Accordingly, pursuant to these court-approved allocations made in the wake of the receipt of the UPS settlement proceeds, the financial department reported that as of February 1, 2008, the Fund's total investment assets were allocated in the following percentages:

| | |
|---|---|
| Goldman Sachs | 30% |
| Northern Trust | 30% |
| Lehman Aggregate Fixed Income Account | 20% |
| Passive Equity Index Account | 20% |
| Total | 100% |

## Pension Fund

### Funding Status and PPA Certification Process

As previously reported, in July 2005 the Internal Revenue Service approved the Fund's request for a 10-year extension for amortizing unfunded liabilities. This extension is believed likely to defer for the near term a statutory funding deficiency. The IRS granted the request subject to certain conditions. In general terms, these IRS conditions require the Pension Fund to maintain its existing ratio of assets to liabilities through 2011, and in subsequent years to show moderate annual improvements in that funding ratio.

The Honorable James B. Moran
May 1, 2008
Page 3

To meet these IRS imposed conditions, the Board of Trustees determined based on actuarial and legal advice that the Pension Fund needs increased employer contributions. At their November 8, 2005 meeting, the Board accordingly amended the Pension Plan to require such increased contributions (at a rate the Board sets) in collective bargaining agreement renewals as a condition of continued participation, and approved specific rates reflecting 7% annual increases for contracts renewing by December 31, 2006. The Fund so notified all locals and employers participating in the Fund by special bulletin dated November 28, 2005 and held extensive meetings explaining the changes to local unions and employers.

At their November 8, 2006 meeting, again as recommended by the Pension Fund's actuaries to enable the Fund to comply with the funding ratio conditions imposed by the IRS, the Board of Trustees approved 8% per year as the required contribution rate increase for all collective bargaining agreements expiring in 2007. Local unions and participating employers were notified of this rate increase in December 2006.

The Pension Fund's Board of Trustees also asked the negotiators of the United Parcel Service, National Master Freight Agreement and Carhaul agreements to allocate to the Pension Fund fringe benefit contribution increases scheduled for 2006. The negotiators agreed to that allocation. Allocations of increased fringe benefit contributions to the Pension Fund were also made in 2007.

Throughout much of 2007 and at their Meetings held in January, February and March of this year, the Trustees received advice from the Fund's staff, legal counsel and actuaries with respect to the requirements of the Pension Protection Act of 2006 ("PPA"). As the Court is aware, beginning this year, the PPA establishes categories for multiemployer pension plans that correspond to each plan's funded status. The categories are: critical status ("red zone"), endangered status ("yellow zone"), or fully-funded status ("green zone"). Under the PPA, the plan's actuary must certify the plan's status. Although in recent years the Pension Fund's assets have grown and its funded ratios have improved to a certain extent, the actuary determined that if the Pension Fund's amortization extension granted by the IRS were to be disregarded, the Pension Fund would face a statutory funding deficiency. Largely based upon this consideration, and upon the advice of Fund counsel concerning the legal impact under the PPA of an amortization extension granted prior to the January 1, 2008 effective date of that

The Honorable James B. Moran
May 1, 2008
Page 4

statute, on March 24, 2008, the Fund's actuary certified the Pension Fund to be in critical status.

Under the PPA, trustees of a plan in critical status must develop a "rehabilitation plan" designed to improve the funded status of the plan in accordance with PPA guidelines. Following the PPA-related briefings presented by staff, actuaries and legal counsel during 2007 and the first quarter of 2008, at the March 25, 2008 Meeting, the Board of Trustees approved a rehabilitation plan ("Rehabilitation Plan") as required by the PPA. The plan approved by the Trustees attempts to build upon and incorporate the funding improvement program instituted prior to the January 1, 2008 effective date of the PPA, and designed to ensure compliance with the conditions imposed by the pre-PPA amortization extension. In broad outline, the Rehabilitation Plan approved by the Trustees contains a "Primary Schedule," which will require each contributing employer to agree to five years of 8% annual contribution increases (7% if the increases began in 2006) in order to maintain current benefit levels for the affected bargaining unit. The PPA also requires that a rehabilitation plan contain a "Default Schedule," which must provide for the reduction in what the PPA terms "adjustable benefits." ("Adjustable benefits" under the PPA generally include all benefits other than a contribution based retirement benefit payable at age 65.) Accordingly, the Pension Fund's Rehabilitation Plan includes a Default Schedule providing for 4% annual contribution rate increases and for the loss or reduction of adjustable benefits for bargaining units electing that Schedule. The PPA also provides that if the bargaining parties have not chosen any of the schedules established by a rehabilitation plan (*i.e.*, the Primary or Default Schedule) within 180 days following the expiration of the parties' last labor agreement, the Default Schedule will be imposed as a matter of law.

The PPA requires that the Pension Fund notify the plan participants, bargaining parties and the Department of Labor that it has been certified to be in critical status. The Pension Fund's staff has reported that the required critical status notices were mailed on or before April 8, 2008. The PPA also requires that the unions and employers who are parties to labor agreements requiring contributions to the Pension Fund be provided with the Schedules (Primary and Default) of contributions and benefits approved by the Trustees as part of the Fund's Rehabilitation Plan. Staff has reported that the Pension Fund provided these Schedules to the bargaining parties on or before April 1, 2008.

The Honorable James B. Moran
May 1, 2008
Page 5


        Staff has also reported to the Board of Trustees that the
National Master Freight Agreement ("NMFA") employers, who account
for approximately 48% of the Pension Fund's contribution revenue,
have agreed under the new  NMFA that became effective this year to
pension contribution rate increases conforming to the requirements
of the Fund's Primary Schedule under its  Rehabilitation Plan.
Staff has also reported that a high percentage of the contributing
employers whose labor agreements expired in 2006 and 2007 have
agreed to provide follow-on agreements in compliance with the Fund's
pre-PPA funding improvement program (requiring 7% annual increases
for employers with agreements expiring in 2006 and 8% increases for
employers with contracts expiring in 2007).  As a result, Staff has
informed the Trustees that it anticipates that most contributing
employers will elect to agree to the 8% contribution increase
required under the Fund's Rehabilitation Plan Primary Schedule.

Financial Information - Investment Returns

        The Pension Fund's investment return for  the first quarter
2008 was (6.44)%.

        The Fund's financial group prepared for the Trustees a
comparison of the Pension Fund's performance to the TUCS[1] universe
results published for the fourth quarter of 2007.  This comparison
(showing percent returns on investment) is summarized in the
following tables:

### Pension Fund's Composite Return

|  | 4th Quarter Ended Dec. 31, 2007 | One Year Period Ending Dec. 31, 2007 | Three Year Period Ending Dec. 31, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | 0.09 | 10.23 | 11.92 |
| TUCS Median | (0.58) | 8.55 | 10.41 |
| TUCS Third Quartile | (1.08) | 7.64 | 9.41 |

---

        [1]"TUCS" is the Trust Universe Comparison Service. Its Custom
Large Funds Universe is composed of plans with assets exceeding
$3 billion.


F:260170 / AD092500 / 6/4/08

The Honorable James B. Moran
May 1, 2008
Page 6

| Fund's Composite Return | (1.58) | 6.55 | 10.42 |
|---|---|---|---|

## Pension Fund's Total Equity Return

|  | 4th Quarter Ended Dec. 31, 2007 | One Year Period Ending Dec. 31, 2007 | Three Year Period Ending Dec. 31, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | (1.74) | 10.06 | 13.51 |
| TUCS Median | (2.55) | 8.62 | 12.17 |
| TUCS Third Quartile | (3.02) | 5.14 | 10.54 |
| Fund's Total Equity Return | (3.02) | 6.90 | 12.97 |

## Pension Fund's Fixed Income Return

|  | 4th Quarter Ended Dec. 31, 2007 | One Year Period Ending Dec. 31, 2007 | Three Year Period Ending Dec. 31, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | 3.34 | 7.99 | 5.25 |
| TUCS Median | 2.87 | 7.13 | 4.89 |
| TUCS Third Quartile | 2.31 | 6.46 | 4.69 |
| Fund's Fixed Income Return | 2.85 | 7.12 | 4.83 |

The Fund's named fiduciaries (Goldman Sachs Asset Management and Northern Trust Global Advisors, Inc.) submit monthly investment reports to the Trustees, summarized below (showing percent returns on investment:

## Goldman Sachs Asset Management

|  | Year Ended Dec. 31, 2007 | First Quarter 2008 | Jan. 2008 | Feb. 2008 | Mar. 2008 |
|---|---|---|---|---|---|
| Goldman-Sach's Composite Return | 6.07 | (8.34) | (6.48) | (0.50) | (1.49) |

The Honorable James B. Moran
May 1, 2008
Page 7

| | | | | | |
|---|---|---|---|---|---|
| Benchmark Composite Return | 6.08 | (7.91) | (6.29) | (0.81) | (0.92) |
| Goldman Sach's Total Fixed Income Return | 6.91 | 1.21 | 1.70 | (0.23) | (0.25) |
| Benchmark Fixed Income Return | 5.62 | 0.66 | 0.75 | (0.26) | 0.17 |

Goldman Sach's first quarter 2008 composite return included a (11.19)% return on U.S. equities ((10.91)% large cap and (12.04)% on small cap U.S. equities), (11.59)% on international equities and 1.59% on real estate.

### Northern Trust Global Advisors, Inc.

| | Year Ended Dec. 31, 2007 | First Quarter 2008 | Jan. 2008 | Feb. 2008 | Mar. 2008 |
|---|---|---|---|---|---|
| Northern Trust's Composite Return | 6.48 | (9.02) | (5.42) | (2.19) | (1.66) |
| Benchmark Composite Return | 6.99 | (8.50) | (6.44) | (1.51) | (0.71) |
| Northern Trust's Total Fixed Income Return | 5.02 | (4.28) | (0.81) | (0.57) | (2.95) |

Northern Trust's first quarter 2008 composite return included a (11.71)% return on U.S. equities ((10.99)% large cap and (15.47)% on small cap U.S. equities), 9.63% on international equities and 2.58% on real estate.

The Fund's financial group reported asset allocation of the Pension Fund as whole as of March 31, 2008 as follows: 66% equity, 30% fixed income, 2% other and 2% cash. The financial group also reported that for the first quarter of 2008 the return on the indexed fixed income account was 2.42%. The passive equity account was funded on December 26, 2007; performance for the first quarter of 2008 was (8.12)%.

Financial Information - Net Assets
(Dollars shown in thousands and do not include final year end adjustments.)

The Honorable James B. Moran
May 1, 2008
Page 8

The financial report prepared by Fund staff for the three months ending March 31, 2008 shows net assets as of that date of $24,565,801, compared to $26,805,666 at December 31, 2007, a decrease of $2,239,865 compared to an increase of $107,088 for the same period last year. The $2,346,953 difference is due to $2,188,311 less investment income combined with $158,642 more net operating loss.

The Fund's staff report further notes that for the three months ended March 31, 2008, the Fund's net asset decrease from operations (before investment income) was $465,314 compared to a decrease of $306,672 for the same period in 2007, or a $158,642 unfavorable change. This change in net assets from operations (before investment income) was attributable to:

a) ($144,455) less contributions, primarily due to the UPS withdrawal,

b) ($14,352) more benefits paid, due to increase in pensioners, beneficiaries and average monthly benefits and

c) $165 less general and administrative expenses.

During the three months ended March 31, 2008 and 2007, the Fund withdrew $404,899 and $479,419, respectively, from investment assets to fund the cash operating deficit.

Financial Information - Participant Population

The March 31, 2008 report prepared by Fund staff further notes that the two-month average number of Full-Time Equivalent (FTE) memberships decreased 36.0% from February 2007 to February 2008 (going from 143,284 to 91,681). During that period, the average number of retirees increased by 0.2% (from 211,945 to 212,437).

Named Fiduciaries

Officers of the Named Fiduciaries, Goldman Sachs Asset Management and Northern Trust Global Advisors, Inc. met with the Board of Trustees during this quarter to discuss portfolio matters including asset allocation.

The Fund's financial group reported to the Board of Trustees at their March 25, 2008 meeting on investment expenses incurred through the fourth quarter of 2007. These investment expenses (fiduciary, custodial and investment management fees) totaled

The Honorable James B. Moran
May 1, 2008
Page 9


$78,707,545 through the fourth quarter of 2007 compared to
$82,929,794 for the same period in 2006, a 5.1% decrease.

Bankruptcies and Litigation

     The Fund's Executive Director continued to report to the
Trustees on employer bankruptcies, including interim recoveries
collected in the Funds' ongoing pursuit of claims for contributions
and withdrawal liability against Consolidated Freightways
Corporation and related entities. Approximately $59.5 million has
been collected to date from Consolidated Freightways companies.

Health and Welfare Fund
Financial Information
(Dollars in thousands and do not
include final year end adjustments.)

     The Health and Welfare Fund's financial summary for the first
quarter of 2008 is compared below with interim financial information
for the same periods of 2007:

|  | 1st Quarter Ended Mar. 31, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| Contributions | $  287,777 | 280,519 |
| Benefits | (251,478) | (268,410) |
| TeamCare administrative expenses | (7,460) | (7,189) |
| General and administrative expenses | (9,593) | (9,540) |
| Net operating income (loss) | 19,246 | (4,620) |
| Investment income (loss) | (5,198) | 13,027 |

The Honorable James B. Moran
May 1, 2008
Page 10

| Increase (Decrease) in net assets | 14,048 | 8,407 |
|---|---|---|
| Net assets, end of period | 1,101,244 | 916,386 |
| Two-month average participants (FTEs) | 94,879 | 94,333 |

For the three months ended March 31, 2008, the Health and Welfare Fund's net asset increase from operations (before investment income) was as follows:

    (a) $7,258 more contributions,

    (b) $16,932 less benefits,

    (c) ($271) more TeamCare administrative fees, and

    (d) ($53) more general and administrative expenses.

Net investment income for the three months ended March 31, 2008 was $18,225 less than for the same period last year. This decrease resulted primarily from $19,176 unfavorable change in realized/unrealized gain (loss) offset by $971 more interest and dividend income.

During the three months ended March 31, 2008 and 2007, the Fund transferred $26,407 and $6,107, respectively, to investments (Mellon Bank) as the operations generated positive cash flows for those periods.

The enclosed report entitled "Central States Funds Financial and Analytical Information" prepared by the Fund's financial group as of March 31, 2008 shows the investment asset allocation as 76% fixed income and 24% equity.

This report also notes that the two month average number of Full-Time Equivalents (FTE) memberships increased 0.6% from February 2007 to February 2008 (going from 94,333 to 94,879). During that period, the average number of retirees covered by the Health and Welfare Fund decreased by 12.1% (from 16,938 to 14,894).

F:260170 / AD092500 / 6/4/08

The Honorable James B. Moran
May 1, 2008
Page 11

Article V (H)

As required by Article V(H) of the Health and Welfare Fund
Consent Decree, the Health and Welfare Fund has paid during the
first quarter of 2008 the following for professional services and
expenses for the Independent Special Counsel:

| | |
|---|---|
| January | $276 |
| February | $0 |
| March | $0 |

I will be glad to provide additional details regarding any
aspect of my activities as Independent Special Counsel. Should you
have any questions or comments, please do not hesitate to contact
me.

Sincerely,

/FRANK J. MCGARR,

Enclosure

cc: Mr. Gregory F. Jacob (w/encl.) Via UPS Next Day
    Mr. Michael Schloss (w/encl.) Via UPS Next Day
    Mr. Thomas Nyhan
    Mr. William Nellis

F:260170 / AD092500 / 6/4/08

# EXHIBIT C

# FEBRUARY 1, 2008 INDEPENDENT SPECIAL COUNSEL REPORT

**FRANK J. McGARR, Esq.**
**Arbitration and Mediation**

**4146 South Venard Road**                         **Phone 630.960.0985**
**Downers Grove, IL 60515**                         **Fax    630.960.0904**

February 1, 2008

The Honorable James B. Moran            **Via UPS Next Day**
United States District Judge            **1Z3951X92210096802**
United States District Court
Northern District of Illinois
Eastern Division
219 South Dearborn Street
Chicago, Illinois 60604

Re:  Quarterly Report of Independent Special Counsel, <u>Chao</u>
     <u>v. Estate of Frank E. Fitzsimmons, et al.</u>, No. 78 C 342
     (N.D. Ill., E.D.); <u>Chao v. Robbins, et al.</u>, No. 78 C 4075
     (N.D. Ill., E.D.); and <u>Chao v. Dorfman, et al.</u>, No. 82 C
     7951 (N.D. Ill., E.D.)

Dear Judge Moran:

     This is to report on my activities during the fourth quarter
of 2007 as Independent Special Counsel appointed pursuant to the
<u>Fitzimmons</u> (Pension Fund) and <u>Robbins</u> and <u>Dorfman</u> (Health and
Welfare Fund) consent decrees.

          <u>General Pension and Health and Welfare Fund Matters</u>

     I have attended full Board of Trustees meetings, now held
every other month (with additional meetings as noted in my
reports), and consulted regularly with Fund executives.

<u>Board Composition</u>

     As previously reported, in view of the proposal of United
Parcel Services, Inc. ("UPS") to withdraw from the Pension Fund
(discussed below), on July 16, 2007, Mr. Chris Langan, the Trustee
appointed by UPS, resigned his position as Trustee of both the
Pension Fund and the Health and Welfare Fund. As also previously
reported, Mr. Phil Young – who had served as a union (employee)–
appointed Trustee – resigned his position as a Trustee of both
Funds in early 2007. Therefore, there are currently four employer-
appointed Trustees and four union (employee)-appointed Trustees on
the Board of each Fund.

F:250249 / AD092500 / 6/4/08

The Honorable James B. Moran
February 1, 2008
Page 2


In addition, at the December 13, 2007 meeting of the Board of
Trustees, the Trustees approved an amendment to the Trust
Agreements of both Funds that formally reduced the prescribed
number of Trustees from ten to eight, eliminated the Power of UPS
to appoint an employer Trustee, and reduced the number of employee
Trustees selected by the Central Trustees Appointment Board from 4
to 3.

UPS Withdrawal from the Pension Fund

In April 2007, the Pension Fund learned that UPS was
considering making a proposal in its negotiations with the
International Brotherhood of Teamsters ("IBT") whereby UPS would
cease contributions to the Central States Pension Fund, incur a
withdrawal and pay withdrawal liability to the Pension Fund. UPS
has been a significant contributing employer to the Pension Fund,
and the Board of Trustees discussed this issue at a special meeting
held on May 3, 2007, and again at the Board's Meetings on May 15
and June 13.

Extensive negotiations ensued in June and July in which
Pension Fund's Staff attempted to dissuade UPS from withdrawing
from the Fund. However, when it became clear that UPS was likely
in any event to secure an agreement with the IBT permitting the
company to end its participation in the Pension Fund, the Pension
Fund's staff reached a tentative agreement with UPS relating to a
UPS withdrawal from the Fund. This tentative agreement provided
that UPS would be allowed to completely withdraw from participation
in the Pension Fund as of December 26, 2007 (subject to the IBT and
UPS finalizing and ratifying their separate labor agreement
permitting this withdrawal), in exchange for a lump sum payment to
the Pension Fund of $6.1 billion and UPS's assumption of certain
pension liabilities related to its employees' participation in the
Fund. At the September 10, 2007 Board Meeting, the Trustees
authorized Staff to enter into a final agreement confirming the
tentative agreement relating to the UPS withdrawal. On September
29, 2007, the Pension Fund executed a final agreement with UPS,
pursuant to the Board's authorization. On October 11, 2007, the
IBT announced that it had negotiated a new collective bargaining
agreement with UPS – subject to ratification by the members – under
which UPS would end its participation in the Pension Fund effective
December 26, 2007 (but continue its participation in the Health and
Welfare Fund for at least five more years). On December 19, 2007
UPS sent a letter to the Pension Fund certifying that the labor
agreements relating to the termination of its obligation to

The Honorable James B. Moran
February 1, 2008
Page 3

contribute to the Pension Fund had been validly ratified by the membership of the affected international and local unions.

As a result, on December 26, 2007, the Pension Fund received a wire transfer from UPS of $6.1 billion pursuant to the withdrawal liability settlement agreement previously approved by the Pension Fund's Board of Trustees. As discussed below, in anticipation of the receipt of this $6.1 billion payment from UPS, the Pension Fund sought, and the Court approved, certain modifications to the consent decree and to the investment procedures and authorizations previously approved by the Court.

The UPS withdrawal liability settlement also provides that effective January 1, 2008, the Pension Fund's responsibility to provide pre-age 65 retirement benefits, and all pre-retirement disability and death benefits, to the UPS participants has been transferred pursuant to ERISA § 4232 to the newly formed UPS/IBT Full-Time Pension Plan ("UPS Full-Time Plan"). The withdrawal liability settlement provides for a similar transfer of liability to the new UPS Full-Time Plan with respect to the responsibility of the Central States Pension Fund to pay partial pensions (both pre- and past-age 65) to the UPS participants resulting from the reciprocal pension agreement between the UPS Part-Time Pension Plan and the Central States Pension Fund. Retired UPS pensioners already in pension payout status as of January 1, 2008 are not affected by these liability transfer provisions. It should also be noted that the transfer of liability provisions of the withdrawal liability settlement agreement state that no participant's pension benefit will be reduced as a result of the transfer of liabilities from the Central States Pension Fund to the new UPS Full-Time Plan.

Recent Modifications of the Pension Fund's Consent Decree

As the Court is aware, the Pension Fund (as authorized by the Trustees) has recently requested, and the Court has granted, certain modifications to the consent decree in the *Fitzimmons* case, and of the investment procedures and authorizations related to the consent decree.

On November 20, 2007, upon the Pension Fund's motion, the Court entered an order modifying the *Fitzimmons* consent decree:

    (1)   to permit the establishment of equity index account;

    (2)   to streamline procedures for the appointment of multiple named fiduciaries (or a single named fiduciary) and for the transfer of assets between them;

The Honorable James B. Moran
February 1, 2008
Page 4

    (3)    to provide for Court approval of the Named Fiduciaries'
           Investment Policy Statements; and
    (4)    to transfer authority to appoint the Pension Fund's
           custodian from the Named Fiduciaries to the Trustees.

On December 20, 2007, upon the Pension Fund's motion, the
Court entered an order approving and authorizing:

    (1)    an allocation of the $6.1 billion UPS settlement payment
           [$900 million to the Fund's passive fixed income account,
           $4.2 billion to the Passive Equity Index Account, and $1
           billion to Northern Trust Global Advisors ("Northern
           Trust"), as Named Fiduciary];
    (2)    an allocation of 20% of all investment assets of the Fund
           to the Passive Equity Account;
    (3)    the appointment of Mellon Bank, N.A. as manager with
           responsibility for the Fund's Passive Equity Account;
    (4)    approval of an Investment Policy applicable to the
           Passive Equity Index Account;
    (5)    the allocation of $1.2 billion in investment assets from
           Goldman Sachs Asset Management ("Goldman Sachs"), as
           Named Fiduciary, to the Passive Equity Index Account; and
    (6)    the appointment of Mellon Bank, N.A. to serve as
           custodian for all assets of the Pension Fund under
           Section II of the consent decree.

On January 23, 2008, the Court also entered an Order, again
upon the Pension Fund's motion, approving and authorizing the
transfer of management control, authority and responsibility for
Fund assets in the amount of $2,480,017,083 from Goldman Sachs to
Northern Trust as a court-approved Named Fiduciary on February 1,
2008.

The Court concluded that these modifications of the consent
decree, and the related investment procedures authorizations, were
reasonable, protective of the interests of the Pension Fund and
consistent with the purposes of the consent decree.

The Honorable James B. Moran
February 1, 2008
Page 5

Audit

At the November 13, 2007 meeting of the Board of Trustees, the
Fund's Internal Audit Department presented a report concerning its
audit of 2006 Pension Processing.  The overall conclusion of the
audit was that adequate administrative and internal accounting
controls surrounding pension application processing were operating
during the testing period.  Internal Audit also concluded that the
controls provide a basis for reliance that applications are
processed in accordance with Fund policies and procedures.

Pension Fund

Funding Status

As previously reported, in July 2005 the Internal Revenue
Service approved the Fund's request for a 10-year extension for
amortizing unfunded liabilities. This extension is believed likely
to defer for the near term a statutory funding deficiency.  The IRS
granted the request subject to certain conditions. In general
terms, these IRS conditions require the Pension Fund to maintain
its existing ratio of assets to liabilities through 2011, and in
subsequent years to show moderate annual improvements in that
funding ratio.

To meet these IRS imposed conditions, the Board of Trustees
determined based on actuarial and legal advice that the Pension
Fund needs increased employer contributions. At their November 8,
2005 meeting, the Board accordingly amended the Pension Plan to
require such increased contributions (at a rate the Board sets) in
collective bargaining agreement renewals as a condition of
continued participation, and approved specific rates reflecting 7%
annual increases for contracts renewing by December 31, 2006.  The
Fund so notified all locals and employers participating in the Fund
by special bulletin dated November 28, 2005 and held extensive
meetings explaining the changes to local unions and employers.

At their November 8, 2006 meeting, again as recommended by the
Pension Fund's actuaries to enable the Fund to comply with the
funding ratio conditions imposed by the IRS, the Board of Trustees
approved 8% per year as the required contribution rate increase for
all collective bargaining agreements expiring in 2007. Local unions
and participating employers were notified of this rate increase in
December 2006.

The Honorable James B. Moran
February 1, 2008
Page 6

The Pension Fund's Board of Trustees also asked the negotiators of the United Parcel Service, National Master Freight Agreement and Carhaul agreements to allocate to the Pension Fund fringe benefit contribution increases scheduled for 2006. The negotiators agreed to that allocation. Allocations of increased fringe benefit contributions to the Pension Fund were also made in 2007.

The Fund's Trustees and Executive Director have also monitored legislative activity and are reviewing the Pension Protection Act of 2006, which was enacted in August 2006 and includes provisions concerning multi-employer plan funding. The Trustees have received advice from the Fund's legal counsel and actuaries with respect to the requirements of the PPA.

Financial Information - Investment Returns

The Pension Fund's investment return for the full year 2007 was 6.55% as reported to the trustees at their January board meeting by the Fund's chief financial officer.

The Fund's financial group prepared for the Trustees a comparison of the Pension Fund's performance to the TUCS[1] universe results published for the third quarter of 2007. This comparison (showing percent returns on investment) is summarized in the following tables:

### Pension Fund's Composite Return

|  | 3rd Quarter Ended Sept. 30, 2007 | One Year Period Ending Sept. 30, 2007 | Three Year Period Ending Sept. 30, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | 2.81 | 17.69 | 15.10 |
| TUCS Median | 2.47 | 15.98 | 13.83 |
| TUCS Third Quartile | 1.93 | 14.49 | 12.77 |

---

[1]"TUCS" is the Trust Universe Comparison Service. Its Custom Large Funds Universe is composed of plans with assets exceeding $3 billion.

The Honorable James B. Moran
February 1, 2008
Page 7

| Fund's Composite Return | 1.61 | 15.19 | 14.12 |
|---|---|---|---|

## Pension Fund's Total Equity Return

| | 3rd Quarter Ended Sept.30, 2007 | One Year Period Ending Sept. 30, 2007 | Three Year Period Ending Sept. 30, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | 2.53 | 21.59 | 18.11 |
| TUCS Median | 1.80 | 19.55 | 16.76 |
| TUCS Third Quartile | 0.90 | 17.31 | 14.87 |
| Fund's Total Equity Return | 0.90 | 19.55 | 18.36 |

## Pension Fund's Fixed Income Return

| | 3rd Quarter Ended Sept. 30, 2007 | One Year Period Ending Sept. 30, 2007 | Three Year Period Ending Sept. 30, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | 3.46 | 6.23 | 5.03 |
| TUCS Median | 3.09 | 5.63 | 4.63 |
| TUCS Third Quartile | 2.81 | 5.00 | 4.35 |
| Fund's Fixed Income Return | 2.96 | 5.72 | 4.29 |

The Fund's named fiduciaries (Goldman Sachs Asset Management and Northern Trust Global Advisors, Inc.) submit monthly investment reports to the Trustees, summarized below (showing percent returns on investment, with the full year 2007 results based on preliminary numbers):

The Honorable James B. Moran
February 1, 2008
Page 8

## Goldman Sachs Asset Management

|  | Year ended Dec. 31, 2007 | Fourth Quarter 2007 | Oct. 2007 | Nov. 2007 | Dec. 2007 |
|---|---|---|---|---|---|
| Goldman-Sach's Composite Return | 6.07 | (2.70) | 2.68 | (4.71) | (0.55) |
| Benchmark Composite Return | 6.08 | (2.43) | 2.50 | (4.01) | (0.84) |
| Goldman Sach's Total Fixed Income Return | 6.91 | 2.43 | 0.74 | 1.22 | 0.45 |
| Benchmark Fixed Income Return | 5.62 | 1.81 | 0.83 | 0.66 | 0.31 |

Goldman Sach's fourth quarter 2007 composite return included a
(3.89)% return on U.S. equities ((4.15)% large cap and (3.21)% on
small cap U.S. equities), (2.30)% on international equities and
(13.29)% on real estate.

## Northern Trust Global Advisors, Inc.

|  | Year ended Dec. 31, 2007 | Fourth Quarter 2007 | Oct. 2007 | Nov. 2007 | Dec. 2007 |
|---|---|---|---|---|---|
| Northern Trust's Composite Return | 6.48 | (3.46) | 3.08 | (5.51) | (0.87) |
| Benchmark Composite Return | 6.99 | (2.94) | 2.60 | (4.53) | (0.91) |
| Northern Trust's Total Fixed Income Return | 5.02 | (0.50) | (0.02) | (1.43) | 0.96 |
| Benchmark Fixed Income Return | 3.19 | (1.16) | 0.61 | (2.05) | 0.29 |

Northern Trust's fourth quarter 2007 composite return included a
(4.42)% return on U.S. equities ((4.36)% large cap and (6.18)% on
small cap U.S. equities), 0.38% on international equities and
(13.32)% on real estate.

    The Fund's financial group reported asset allocation of the
Pension Fund as whole as of December 31, 2007 as follows: 66%
equity, 26% fixed income, 2% other and 6% cash.  The financial
group also reported that for the fourth quarter of 2007 the return

The Honorable James B. Moran
February 1, 2008
Page 9

on the indexed fixed income account was 3.13%, and 7.24% for the
full year ended December 31, 2007.  The passive equity account was
funded on December 26, 2007; performance through December 31, 2007
was (1.33)% with a benchmark of (1.88)%.

Financial Information – Net Assets
(Dollars shown in thousands and do not include final year end
adjustments.)

     The financial report prepared by Fund staff for the twelve
months ending December 31, 2007 shows net assets as of that date of
$26,806,267, compared to $20,672,748 at December 31, 2006, an
increase of $6,133,519 compared to an increase of $1,376,419 for
the same period last year.  The $4,757,100 difference is due to
$1,414,148 less investment income offset by $71,248 less net
operating loss and the $6,100,000 payment from UPS.

     The Fund's staff report notes that for the twelve
months ended December 31, 2007, the Fund's net asset increase from
operations (before investment income) was $4,951,288 compared to a
decrease $1,219,960 for the same period in 2006, or a $6,171,248
favorable change.   This change in net assets from operations
(before investment income) was attributable to:

     a) $6,222,395 more contributions, due to $6.1 billion
withdrawal liability receipt from UPS and increase in contribution
rates, offset by a decrease in FTEs,

     b) ($52,594) more benefits paid, due to increase in
pensioners, beneficiaries and average monthly benefits and

     c) $1,447 less general and administrative expenses.

     During the twelve months ended December 31, 2007 and 2006, the
Fund withdrew $1,148,676 (not including UPS funds) and $1,223,550,
respectively, from investment assets to fund the cash operating
deficit.

Financial Information – Participant Population

     The December 31, 2007 report prepared by Fund staff further
notes that the eleven-month average number of Full-Time Equivalent
(FTE) memberships decreased 2.2% from November 2006 to November
2007 (going from 148,678 to 145,347).  During that period, the
average number of retirees increased by 0.4% (from 211,351 to
212,181).

The Honorable James B. Moran
February 1, 2008
Page 10

Named Fiduciary

Officers of the Named Fiduciaries, Goldman Sachs Asset
Management and Northern Trust Global Advisors, Inc. met with the
Board of Trustees during this quarter to discuss portfolio matters
including asset allocation.

The Fund's financial group reported to the Board of Trustees
at their November 13, 2007 meeting on investment expenses incurred
through the third quarter of 2007. These investment expenses
(fiduciary, custodial and investment management fees) totaled
$61,626,815 through the third quarter of 2007 compared to
$59,667,288 for the same period in 2006, a 3.3% increase.

Bankruptcies and Litigation

The Fund's Executive Director continued to report to the
Trustees on employer bankruptcies, including interim recoveries
collected in the Funds' ongoing pursuit of claims for contributions
and withdrawal liability against Consolidated Freightways
Corporation and related entities. Approximately $59.5 million has
been collected to date from Consolidated Freightways companies.

The Pension Fund has also pursued recovery of losses incurred
on investments as a result of violations by various corporations of
federal securities law. As previously reported, at its March 20,
2007 meeting, the Board of Trustees approved a settlement of the
Fund's claims arising from various misrepresentations involving
AOL-Time Warner, Inc. ("AOL-TW") in connection with the January
2001 merger that formed that company. The Fund opted out of a
proposed class action settlement of its claim against AOL-TW that
would have netted the Fund a recovery of only a few hundred
thousand dollars. After opting out of the class action, the Fund,
along with approximately 120 other large institutional investors,
filed a separate federal court action against AOL-TW. Under the
settlement of this separate action approved by the Trustees at
their March 2007 meeting, the Fund has now received a net recovery
of $5,306,516. In addition, at the Board's August 14, 2007
meeting, the Board approved a settlement with Ernst & Young for
matters arising out of audits of AOL-TW, and the Fund has now
received all the settlement proceeds – comprising $87,508.90 –
promised by Ernst & Young under this settlement.

Health and Welfare Fund
Financial Information

The Honorable James B. Moran
February 1, 2008
Page 11


(Dollars in thousands and do not include final year end
adjustments.)

    The Health and Welfare Fund's financial summary for the fourth
quarter of 2007 is compared below with interim financial
information for the same periods of 2006:

|  | 4th Quarter Ended Dec. 31, | |
| --- | --- | --- |
|  | 2007 | 2006 |
| Contributions | $  301,651 | 283,981 |
| Benefits | (245,732) | (225,600) |
| TeamCare administrative expenses | (7,480) | (7,063) |
| General and administrative expenses | (9,799) | (9,659) |
| Net operating income (loss) | 38,640 | 41,659 |
| Investment income (loss) | 12,017 | 23,995 |
| Increase (Decrease) in net assets | $  50,657 | 65,654 |
| Net assets, end of period | $1,082,632 | 907,979 |
| Eleven-month average participants (FTEs) | 96,763 | 93,209 |

    For the twelve months ended December 31, 2007, the Health and
Welfare Fund's net asset increase from operations (before in-
vestment income) was as follows:

    (a) $51,200 more contributions, primarily due to increased
FTEs,

F:250249 / AD092500 / 6/4/08

The Honorable James B. Moran
February 1, 2008
Page 12

(b) ($66,601) more benefits, primarily due to increased FTEs and health care costs,

(c) ($1,986) more TeamCare administrative fees, as the Fund continues to build the TeamCare provider network to obtain greater billed charge discounts, and

(d) ($354) more general and administrative expenses.

Net investment income for the twelve months ended December 31, 2007 was $5,288 more than for the same period last year. This increase resulted primarily from $9,494 more interest and dividend income offset by $4,132 unfavorable change in realized/unrealized gain (loss).

During the twelve months ended December 31, 2007 and 2006, the Fund transferred $88,924 and $106,236, respectively, to investments (Mellon Bank) as the operations generated positive cash flows for those periods.

The enclosed report entitled "Central States Funds Financial and Analytical Information" prepared by the Fund's financial group as of December 31, 2007 shows the investment asset allocation as 76% fixed income and 24% equity.

This report also notes that the eleven month average number of Full-Time Equivalents (FTE) memberships increased 3.8% from 2006 to 2007 (going from 93,209 to 96,763). During that period, the average number of retirees covered by the Health and Welfare Fund decreased by 12.2% (from 18,370 to 16,121).

Article V (H)

As required by Article V(H) of the Health and Welfare Fund Consent Decree, the Health and Welfare Fund has paid during the fourth quarter of 2007 the following for professional services and expenses for the Independent Special Counsel:

|          |     |
|----------|-----|
| October  | $0  |
| November | $0  |
| December | $0  |

The Honorable James B. Moran
February 1, 2008
Page 13

I will be glad to provide additional details regarding any
aspect of my activities as Independent Special Counsel. Should you
have any questions or comments, please do not hesitate to contact
me.

Sincerely,

/FRANK J. MCGARR,

Enclosure

cc: Mr. Jonathan L. Snare(w/encl.) **Via UPS Next Day 1Z3951X92210096820**
    Mr. Michael Schloss (w/encl.)**Via UPS Next Day 1Z3951X92210096811**
    Mr. Thomas Nyhan
    Mr. William Nellis

# EXHIBIT D

# AMORTIZATION EXTENSION GRANTED BY THE IRS TO CENTRAL STATES ON JULY 13, 2005



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

TAX EXEMPT AND
GOVERNMENT ENTITIES
DIVISION

JUL 1 3 2005



Mr. Thomas C. Nyhan
Executive Director
Central States, Southeast and Southwest Areas Pension Fund
9377 W. Higgins Road
Rosemont, IL 60018

In re:  Central States, Southeast and Southwest Areas Pension Plan (Plan No. 001)
        ("Plan")
        EIN: 36-6044243

        Fund = Central States, Southeast and Southwest Areas Pension Fund

        Industry = Less-than-truckload trucking industry

Dear Mr. Nyhan:

This letter constitutes notice that your request for a 10-year extension for amortizing the
unfunded liabilities described in section 412(b)(2)(B) of the Internal Revenue Code
("Code") and section 302(b)(2)(B) of the Employee Retirement Income Security Act of
1974 ("ERISA"), has been approved subject to the following conditions:

   (1)  A credit balance is maintained such that the credit balance is at least as large
        as the accumulation (at the plan's valuation rate) of the amortized (at the Plan's
        valuation rate over a period of 15 years) differences between the amortization
        payments of the extended bases (amortized at the section 6621(b) rate) and the
        amortization payments of such bases had such bases been extended and
        amortized at the Plan's valuation rate;

   (2)  The Plan's funded ratio, calculated by dividing the market value of Plan assets
        as of the Plan's valuation date by the Plan's actuarial accrued liability
        (computed using the unit credit method and the Plan assumptions as of
        January 1, 2004), is:

     (a)   no less than 59% for each valuation date from January 1, 2005, through
          January 1, 2011, inclusive;
     (b)   no less than 60% as of January 1, 2012 and as of January 1, 2013;
     (c)   no less than 61% as of January 1, 2014, and as of January 1, 2015;
     (d)   no less than 62% as of January 1, 2016;

2

    (e)    for each valuation date subsequent to January 1, 2016, no less than 1%
          greater than the floor funded ratio as of the previous valuation date. (For
          example, because the floor funded ratio as of January 1, 2016, is 62%, the
          funded ratio must be at least 63% as of January 1, 2017, and 64% as of
          January 1, 2018.); and

    (3)  For each plan year that the extension remains in effect, starting with the plan
        year beginning January 1, 2004, a copy of the actuarial valuation report for
        each plan year will be provided to this office by September 15 of the following
        calendar year at the address below:

> Internal Revenue Service
> Attn: John C. Heil, SE:T:EP:RA:T:A2
> 1111 Constitution Avenue, N.W., PE-4E4
> Washington, DC 20224

Your authorized representative agreed to these conditions in a letter dated
July 13, 2005. If any one of these conditions is not satisfied, the approval to extend the
amortization periods for amortizing the unfunded liabilities would be retroactively null
and void. However, the Service will consider modifications of these conditions
especially in the event that unforeseen circumstances beyond the control of the Fund
cause the actual experience of the Plan to fail the funded ratio condition. An example of
such an unforeseen circumstance would include a market fluctuation affecting the value
of the Plan's assets. Of course, any request for a modification is considered another
ruling request and would be subject to an additional user fee.

The extensions of the amortization periods of the unfunded liabilities of the Plan have
been granted in accordance with section 412(e) of the Code and section 304(a) of
ERISA. Section 412(e) of the Code and section 304(a) of ERISA authorize the
Secretary to extend the period of time required to amortize any unfunded liability
(described in section 412(b)(2)(B) of the Code and section 302(b)(2)B) of ERISA) of a
plan for a period of time (not in excess of 10 years) if the Secretary determines that
such extension would carry out the purposes of ERISA and would provide adequate
protection for participants under the plan and their beneficiaries and if the Secretary
determines that the failure to permit such extension would (1) result in (A) a substantial
risk to the voluntary continuation of the plan, or (B) a substantial curtailment of pension
benefit levels or employee compensation, and (2) be adverse to the interests of plan
participants in the aggregate.

Section 101 of Reorganization Plan No. 4 of 1978, 1979-1 C.B. 480, transferred the
authority for issuing rulings under section 304(a) of ERISA from the Secretary of Labor
to the Secretary of the Treasury. Accordingly, the amortization periods for the unfunded

3

liabilities of the Plan are extended as described above under section 412(e) of the Code and section 304(a) of ERISA.

The Plan is a multiemployer defined benefit plan. The interest rate applicable for the remaining amortization periods of the amortization bases for which extensions would be granted is the rate determined under section 6621(b) of the Code.

As of January 1, 2003, the value of the assets of the Plan was approximately equal to 51.2% of the present value of accrued benefits under the Plan. The Plan's funded status has substantially deteriorated in recent years, primarily as a result of severe investment losses over the period 2000 through 2002. The actuarial losses amounted to approximately $7.6 billion on a market value basis. In addition, in September 2002, one of the Plan's major contributing employers, commenced liquidation under Chapter 11 of the U.S. Bankruptcy Code. This resulted in a loss of 6500 active participants in the Plan. In view of these severe losses, employer contribution levels, fixed by collective bargaining agreements, are expected to be inadequate to meet the Plan's anticipated minimum funding requirements.

The Plan has enjoyed markedly improved returns on investments from 2003 to date, which has resulted in asset increases. However, investment returns are not projected to be able to overcome the investment losses from 2000 through 2002 and the bankruptcy of a major contributing employer.

To deal with the funding problems, the following steps have been taken:

(1)  Fund trustees adopted a plan amendment as of January 1, 2004, substantially reducing the rate of future benefit accruals, while protecting past benefit accruals at the levels earned prior to January 1, 2004. Under this amendment, there will be no further accruals under the Plan's fully subsidized early retirement provisions, and the rate of future benefit accruals under the Plan's contribution-based pension provisions will be reduced 50% (from 2% to 1%) effective January 1, 2004. The annual savings from these benefit cuts will increase over time and further strengthen the Plan's funded position in the long term.

(2)  Midterm agreements were reached between the union representing certain participants and certain contributing employers for the Fund to reallocate $0.60 per hour contribution increases for at least 2 years (and possibly 3 years). Under those agreements, scheduled increases in the amount of $0.60 that were to be made to the Health and Welfare Fund in 2004 will instead be made to Fund. This amount will increase to $1.20 per hour in August 2005 (and possibly $1.80 per hour in 2006 and thereafter).

4

According to information submitted with the request, if the extension is not granted, the potential increases in employer contributions necessary to avoid funding deficiencies, and the excise taxes that would result if funding deficiencies are not avoided, would severely harm the majority of the contributing employers to the Plan. The authorized representative of the Fund represents that in many cases, the additional expenses would wipe out the net income of the employers and potentially force them into bankruptcy. The additional expense and cash outflows would likely cause many employers to violate debt covenants or hamper their access to credit markets, further straining their financial condition.

The authorized representatives of the Fund have represented that if the extension is not granted, the situation could force the bankruptcy of nearly all of the Industry in the U.S. If the employers within the Industry fail, a large segment of the Fund's active participants would become unemployed, and the effects would negatively impact the economy as a whole.

Furthermore, if the extension is not granted, it is likely that new employers would be discouraged from participating and current contributing employers would be encouraged to withdraw from the Plan. This would result in a substantial risk to the voluntary continuation of the Plan. Also, it would be adverse to the interest of Plan participants because the curtailment of pension accruals and other drastic measures would need to be implemented to correct the situation.

Accordingly, extensions would not be adverse to the participants in the aggregate. Moreover, the Fund's authorized representative has submitted a scenario which incorporates 10 year amortization extensions and 15 years to amortize the decreases that occur each year in the minimum contribution requirements resulting solely from differences between the valuation rate and the 6621(b) rate. This scenario meets the conditions provided above. However, because the prospects for recovery are uncertain and because the Plan is under-funded, we are granting these extensions subject to the conditions provided above.

Your attention is called to section 412(f) of the Code and section 304(b) of ERISA which describe the consequences that would result in the event the plan is amended to increase benefits, change the rate in the accrual of benefits or to change the rate of vesting, while any portion of the waived funding deficiency remains unamortized. Please note that any amendment to a profit sharing plan or any other retirement plans (covering employees covered by this plan) maintained by the trustees of this Plan, to increase the liabilities of those plans would be considered an amendment for purposes of section 412(f) of the Code and section 304(b) of ERISA. Similarly, the establishment of a new profit sharing plan or any other retirement plan by the trustees of this Plan (covering employees covered by this plan) would be considered an amendment for purposes of section 412(f) of the Code and section 304(b) of ERISA.

5

We have sent a copy of this letter to the Manager, EP Classification in Baltimore, Maryland, to the Manager, EP Compliance Unit in Chicago, Illinois, and to your authorized representative pursuant to a power of attorney on file in this office.

If you require further assistance in this matter, please contact Mr. Heil (ID# 50-03208) at (202) 283-9694.

Sincerely yours,

James E. Holland, Jr.
Manager, Employee Plans Technical

# EXHIBIT E

FILED

2005 Jul-08  PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION, | ) ) ) | MASTER FILE Consolidated Case No. CV-03-BE-1500-S |
| This Document Relates to: All Actions | ) ) | |

| | | |
|---|---|---|
| In re HEALTHSOUTH CORPORATION STOCKHOLDER LITIGATION, | ) ) ) ) | Consolidated Case No. CV-03-BE-1501-S |
| This Document Relates to: All Actions | | |

MEMORANDUM OPINION AND ORDER

I. PROCEDURAL HISTORY AND INTRODUCTION

On October 4, 2004, Oracle Partners, LP, the lead plaintiffs in this action since January 28, 2004,[1] moved to be relieved of that responsibility. In response, four entities or groups of entities originally petitioned the court to be appointed as lead plaintiffs. After extensive briefing, a hearing on the appointment of lead counsel for the stockholder class was held on January 14, 2005. Both during and after the hearing, some shifting of alignment occurred. Initially, the parties seeking to become lead plaintiffs claimed losses were as follows:

(1) The group with the largest total, cumulative losses is the Public Pension Funds,[2]

---

[1] On June 24, 2003, the court consolidated the 1998, 2002, and 2003 cases (consolidated securities class action) and appointed Orbitex and Oracle as lead plaintiffs for the Stockholder class. Approximately seven months later on January 28, 2004, the court removed Orbitex as co-lead plaintiff on the motion of Orbitex.

[2] The Public Pension Fund is composed of (1) The Retirement Systems of Alabama; (2) The Arkansas Teacher Retirement System; (3) the Public Employees' Retirement System of Mississippi; (4) The Louisiana Municipal Police Employees' Retirement System. The parties would ask the Public

consisting of five total entities, who allege that they collectively lost approximately

$56,389,084.83 in stocks and bonds.

(2) The entity with the next largest loss is the State Treasurer of Michigan,[3] who claims a

collective loss of approximately $32,844,146 dollars.

(3) The entity with the third largest loss is the New Mexico State Funds[4] with total

estimated losses of $14,207,965.

(4) The group with the fourth largest loss is the Pension Fund Group (Central States

Group),[5] which are comprised of five entities and one individual.

Immediately before the January 14, 2005 hearing, the Public Pension Funds entered into a

stipulation with the State Treasurer of Michigan wherein the two agreed that Michigan and the

Retirement Systems of Alabama ("RSA") would serve as co-lead plaintiffs with the Arkansas

Teacher Retirement Systems, the Public Employees' Retirement System of Mississippi, the

Louisiana Municipal Police Employees' Retirement System, and the Public Employees'

Retirement Association of Colorado serving as designated class representatives.

After the court discussed the claims of the three reorganized groups and took a lunch

---

Employees' Retirement Association of Colorado to serve as the designated class representative.

[3]The Treasurer has the authority to manage the following retirement programs: (1) Michigan Public School Employees Retirement System; (2) Michigan State Police Retirement System; (3) Michigan Judges Retirement System.

[4]This entity is composed of the New Mexico State Investment Council and the Educational Retirement Board of New Mexico.

[5]This group of pension funds will be referred to as the "Central States Group" to avoid confusion with the Public Pension Funds groups. These funds are collectively composed of Central States, Southeast and SouthWest Areas Pension Fund, Plumbers & Pipefitters National Pension Fund, Employer Teamsters Local Nos. 175 & 505 Pension Trust Fund, National Asbestos Workers Pension Fund, and Julius McQueen, one of the original plaintiffs in the 1998 case.

break, the petitioners morphed into two groups. New Mexico joined with the Central States

Group to oppose the appointment of the Public Pension Funds Group as lead plaintiffs on

conflict grounds, and to offer continuity of representation. This change of lead plaintiffs marks

the third such transition since the 1998, 2002, and 2003 securities class actions were

consolidated.

## II. DISCUSSION

Under the PSLRA, the "most adequate," or lead plaintiff is presumptively the plaintiff

who (1) filed an initial complaint or timely moved for appointment as lead plaintiff; (2) has the

largest financial interest in the case; and (3) otherwise satisfies the requirements of Rule 23,

describing the requirements for class actions generally. *See* 15 U.S.C. § 78u-

4(a)(3)(B)(iii)(I)(aa)-(cc).

The PSLRA also sets up a rebuttable presumption that the plaintiff with the largest stake

in the controversy will be the person with the largest financial interest and the person most

capable of serving as lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii). That the presumption is

rebuttable does not mean that it may be set aside for any reason that the court may deem

sufficient. Rather, the statute provides that the presumption "may be rebutted only upon proof . .

. that the presumptively most adequate plaintiff" does not satisfy the adequacy or typicality

requirements of Rule 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Typicality is satisfied where the claims arise from the same conduct from which the other

class members' claims and injuries arise. *See generally, In re Healthsouth Corp. Sec. Litig.*, 213

F.R.D. 447, 458 (N.D. Ala. 2003) (describing the general criterion within the context of R. 23).

The adequacy requirement is satisfied where (1) class counsel is qualified, experienced, and

3

generally able to conduct the litigation; (2) the class members' interests are not antagonistic to

one another; and (3) the class has a sufficient interest in the outcome of the case to ensure

vigorous advocacy. *Id.,* at 460-461.

However, the PSLRA is entirely silent on the proper procedure for substituting a new lead

plaintiff when the one previously certified withdraws. *See In re Initial Public Offering Sec.*

*Litig.,* 214 F.R.D. 117, 120 (S.D.N.Y. 2002) (commenting on the statutory deficiency). While

some have advocated that the court need not be constrained by the PSLRA in appointing

replacement lead plaintiffs, and instead should take a pragmatic approach that focuses on

continuity and the best interest of the class,[6] the court can find no authority to depart from the

statutory factors established for selection of lead plaintiff. Thus, the court recognizes that the

*presumptive* lead plaintiff would be the Public Pension Fund Group, joined by Michigan, based

on the amount of loss sustained by these institutional investors. The Central States/New Mexico

Group, thus, falls in second place.

The court previously stated its concerns -- concerns that have been prevalent since the

class action certification hearing in the 1998 cases -- about conflicts of interest among the various

groups of class members who have suffered losses at various times because of different factual

and legal theories.[7] Those concerns, which are unique to the facts of this case, led the court to

designate different counsel to represent the various groups who may have competing interests in

the consolidated case.[8] Concerns about different legal bases and potential competing claims led

---

[6]*See* Briefs submitted by the Central States Group, docs. #305-#307, & #322.

[7]*See In re Healthsouth Corp. Sec. Litig.,* 213 F.R.D. 447, 458-463 (N.D. Ala. 2003).

[8]*See* doc. #1, entered by the court on June 24, 2003.

4

the court to keep the bondholders class action separate from the stockholders cases, but consolidated for discovery purposes. The Retirement System of Alabama serves as lead plaintiff of the bondholders suit.[9]

Counsel for RSA repeatedly urged that RSA would have no conflict of interest in serving as lead plaintiff of the bondholder suit and co-lead plaintiff of the stockholder suit with its counsel serving as lead counsel of both. To allay the court's concerns, RSA sought out Michigan to join with it, and presumably the other Public Pension Funds,[10] with a representation that should a conflict arise, Michigan would "have the final say" and be "first among equals."[11] The court remains unconvinced that such an arrangement meets the requirements of Fed. R. Civ. P. 23.

While counsel for RSA has been involved at every stage of the 2003 bondholder cases (but not with the 1998 and 2002 stockholder cases) and could provide some continuity in representation, a seamless transition to new lead plaintiff cannot be this court's primary concern. If it were, the Central States Group alone would have been the proper lead plaintiff. The court foresees a very real tension between the interests of the bondholder class and stockholder class, with their differing legal and factual theories. The court also has concerns that domination of both class actions by the same lead plaintiff does not best serve the interests of the class as a whole. Therefore, the court rejects the application of RSA to be lead, or co-lead plaintiff with Michigan, based on the backing of the Public Pension Funds Group.

---

[9]*Id.*

[10]New Mexico is not a member of the Public Pension Funds group, but seeks appointment as co-lead plaintiff with the Central States Group.

[11]January 14, 2005 Hearing Transcript, p. 26.

The court owes a fiduciary duty to the class as a whole to see that the interests of all groups receive adequate representation. The court, therefore, cannot ignore what it perceives as serious potential conflicts with the simple representation that "everything will work itself out in the end," or that such concerns are "red herrings." At the hearing, various alignments were discussed, but counsel speaking for RSA and Michigan vehemently protested against any "forced marriage" of co-lead plaintiffs.

While the court might prefer to rearrange the members of the competing groups to create a lead plaintiff group that could qualify as presumptive lead plaintiff under PSLRA based on loss amount *and* meet the adequacy and typicality requirements of Rule 23, it will heed the admonishment to avoid a forced marriage. Because the presumptive lead plaintiffs fail to comply with the standards of Rule 23, and the Central States/New Mexico Group can meet those requirements as well as demonstrate a substantial loss, the court finds that the Central States and The New Mexico Group are the appropriate lead plaintiffs for the stockholders class action. Therefore, the court hereby APPOINTS Central States/New Mexico Group as co-lead plaintiffs for the stockholder class action.

The new co-lead Plaintiffs are hereby ORDERED to report to the court concerning the following by **July 18, 2005**:

(1) designation of lead counsel and local counsel;

(2) fee arrangement for lead counsel and other counsel participating in the stockholder class action;

(3) designation of any members of the Group as class representatives; and

(4) whether they will adopt the amended complaint and supporting briefs filed by the

prior lead plaintiff, which the court encourages.  If co-lead Plaintiffs adopt the amended

complaint, upon such designation, the Defendants will have 10 days in which to file their reply

briefs.[12]

     DONE and ORDERED this 8th day of July, 2005.



KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

[12]*See* doc. # 320.

7

# EXHIBIT F

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ALAN SELBST,** | ) | Hon. Blanche M. Manning |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 2422 |
| **MCDONALD'S CORP., et al.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| **GARY BOSIAKI,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 3635 |
| **MCDONALD'S CORP., et al.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| **MAURICE SLIVNICK,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 3661 |
| **MCDONALD'S CORP., et al.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DOCKETED**
**JUL 21 2004**

### ORDER

Pending before this Court are three related securities class action suits ("the Class

Actions") filed on behalf of purchasers of stock in Defendant McDonald's Corporation

(McDonald's).  The Class Actions allege that McDonald's violated the  Securities Exchange Act

of 1934 as well as rules promulgated by the Securities and Exchange Commission.  Currently

before the Court is an unopposed motion by several pension funds which are proposed class

16

members ("the Pension Funds") to consolidate these actions and for appointment as lead plaintiff and approval of lead counsel and liaison counsel. For the reasons set forth below, this Court GRANTS the unopposed motion.

Federal Rule of Civil Procedure 42(a) governs consolidation of actions and provides, in pertinent part, that:

> When actions involving a common question of law or fact are pending before the Court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning the proceedings therein as may tend to avoid unnecessary costs or delay.

In applying this rule, courts stress that the purpose of joining actions is to promote convenience and judicial economy. Johnson v. Manhattan Railway Co., 289 U.S. 479, 496-497 (1973). Rule 42 is designed to encourage consolidation where common questions of law or fact are present, 9 Wright & Miller's Federal Practice and Procedure, § 2383 at 260-261 (1971). In securities cases, courts generally hold that consolidation is proper where the alleged misstatements and omissions are the same type and result in similar damages – e.g., inflated stock prices. See In re Royal Ahold N.V. Sec. Litig., 219 F.R.D. 343, (D. Md. 2003); Pinkowitz v. Elan Corp., 2002 WL 1822118, at *2 (S.D.N.Y. July 28, 2002); In re MicroStrategy Sec. Litig., 110 F. Supp. 2d 427, 431 (E.D.Va. 2000).

Here, all three Class Actions seek relief under the Securities Exchange Act of 1934 and stem from the same occurrence, namely that from 2001 to 2003 McDonald's and its executives failed to disclose material facts (e.g., that hundreds of McDonald's franchises had declining sales and performance) which resulted in the release of false and misleading information which artificially inflated the price of McDonald's stock. Accordingly, this Court finds that the Class

-2-

Actions involve the same questions of fact and law and that consolidation will promote convenience and judicial economy. The Court thus GRANTS the motion for consolidation.

The Pension Funds have also moved for appointment as lead plaintiff and approval of their lead counsel and liaison counsel. Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), "[t]he court ... shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 77u-4(a)(3)(B)(i). To guide this inquiry the PSLRA (15 U.S.C. § 77u-4(a)(3)(B)(iii)(I)) provides for a rebuttable presumption that the most adequate plaintiff is the "person or group of persons" that

> (aa) has either filed the complaint or made a motion in response to a notice ...;
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

See also Johnson v. Tellabs, Inc., 214 F.R.D. 225, 227 (N.D. Ill. 2002).

Here, after reviewing the Pension Funds' uncontested submissions, this Court finds that all three of the above requirements are met. First, as required by 15 U.S.C. 77u-4(a)(3)(A)(i)(II), the Pension Funds timely filed their motion for lead plaintiff within 60 days from the time notice of this action was published. Second, the Pension Funds have by far the largest financial interest in this action. Its total loss allegedly is $7,467,513.

Finally, this Court finds that the Pension Funds meet the Rule 23 requirements. Under the PSLRA, the proposed lead plaintiff need only show that it meets Rule 23's requirement of "typicality" and "adequacy of representation." Johnson, 214 F.R.D. at 227. To meet the typicality requirement, the lead plaintiff must assert claims which arise from the same conduct

-3-

from which the other class members' claims and injuries arise. Id.  The adequacy requirement is satisfied where: (1) the class counsel is qualified, experienced, and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the class has a sufficient interest in the outcome of the case to ensure vigorous advocacy. Id.

Here, as explained above, the claims and alleged injuries of all three Class Actions stem from the same omissions and misstatements.  Based on its large financial stake, the Pension Funds are presumed to have a sufficient interest in the litigation to vigorously pursue the case.  Moreover, the law firms chosen to represent the Pension Funds appear qualified to conduct the current litigation. This Court thus finds that the Pension Funds have, at this stage of the litigation, made the preliminary showing necessary to satisfy the adequacy and typicality requirements.

Having granted the Pension Fund's selection as lead plaintiff, the Court must next address the adequacy of their selection of lead counsel and liaison counsel. 15 U.S.C. § 78u-4(a)(3)(B)(v).  Having reviewed the resumes of the Pension Fund's selection of lead counsel and liaison counsel, this Court finds both firms qualified.

## CONCLUSION

For the reasons discussed above, this Court GRANTS the unopposed motion to consolidate and the for appointment as lead plaintiff.

ENTER:

BLANCHE M. MANNING
U.S. DISTRICT COURT JUDGE

DATE: *7-21-04*

-5-

# EXHIBIT G



# Public Fund Survey
# Summary of Findings
# for FY 2006

**Prepared by Keith Brainard**
**Research Director**
**National Association of State Retirement Administrators**
**October 2007**

# Table of Contents

Overview of the Public Fund Survey    *i*

The Meaning and Implications of Actuarial Funding Ratios    1

Past and Current Funding Levels    2

Changes in Membership    4

Asset Allocation and Investment Expenses    5

Assets, Benefits, and Contributions    6

Retirement Multipliers    7

Assumptions for Inflation and Investment Return    7

System Summary    Appendix A

Actuarial Funding Summary    Appendix B

## Overview of the Public Fund Survey

The Public Fund Survey is an online compendium of key characteristics of most of the nation's largest public retirement systems. The Survey is sponsored by the National Association of State Retirement Administrators and the National Council on Teacher Retirement.

Beginning with fiscal year 2001, the Survey presents data on public retirement systems that provide pension and other benefits for a combined 13.1 million active (working) members and 6.3 million annuitants (those receiving a regular benefit—retirees, disabilitants and beneficiaries). Combined, based on the latest information published in annual financial reports, systems in the Survey hold in trust $2.46 trillion. These assets are invested in diversified portfolios of public and private equities, corporate and government bonds, real estate, private equities, cash, and other asset classes. The membership and assets of systems included in the Survey represent in excess of 85 percent of the entire state and local government retirement system community.

According to the U.S. Census Bureau, employees of state and local government comprise more than ten percent of the nation's full-time workforce. These are public school teachers and administrators, firefighters, judges, police officers, public health officials, correctional officers, and many others who provide myriad public services.

The source of Survey data is primarily public retirement system annual financial reports. Data is also taken from actuarial valuations, benefits guides, system websites, and input from system representatives. The Survey is updated continuously as new information, particularly annual financial reports, becomes available. This report of findings focuses on fiscal year 2006, which is the most recent available data for most systems. As new information becomes available for FY 06, the results presented in this report may change slightly.

A key objective of the Survey is to increase the transparency of the public pension community and pension funding levels, providing a factual and objective basis on which to discuss many issues related to retirement benefits for public employees.

The Public Fund Survey is accessible online at www.publicfundsurvey.org.

*1*

## The Meaning and Implications of Actuarial Funding Ratios

The most recognized measure of a public retirement plan's health is its actuarial funding ratio, derived by dividing the actuarial value of plan assets by the value of its liabilities. Most pension benefits for public employees are pre-funded, meaning that all or some of the assets needed to fund pension liabilities are accumulated during an employee's working life, then paid out in the form of retirement benefits.

Pre-funding is one way of financing a pension benefit. The opposite of pre-funding is pay-as-you-go, in which current obligations are paid with current receipts. In most cases, a pay-as-you-go pension plan eventually becomes too expensive to support with only tax receipts and contributions. Investment earnings account for most revenue generated by a pre-funded pension plan, reducing the need for contributions from employees and employers (taxpayers).

A pension plan whose assets equal its liabilities is funded at 100% and is *fully funded*. A plan with assets less than its accrued liabilities is considered *underfunded*.

Underfunding is a matter of degree, not of kind. That is, underfunding is not necessarily a sign of fiscal or actuarial distress; many pension plans remain underfunded for decades with no detrimental consequences.

As an illustration, the status of a plan whose funding level declines from 101 percent in year one to 99 percent in year two, has changed from overfunded to underfunded. Although the nomenclature describing the plan's funding condition has changed completely, the financial reality of its funding condition has changed little.

*The critical factor in assessing the current and future health of a pension plan is not so much the plan's actuarial funding level, as whether or not funding the plan's liabilities creates fiscal stress for the pension plan sponsor.*

Other factors held equal, a pension plan that is fully funded is preferable to one that is underfunded. Yet a plan's funded status is simply a snapshot in an ongoing pre-funding process. It is a single frame of a movie that spans decades. There is nothing magic about a pension plan being fully funded, nor is an

underfunded plan necessarily inferior. Even with no changes to funding policies or plan design, most underfunded plans will be able to pay promised benefits for decades. Public pension liabilities typically extend years into the future; during this period, a pension fund can accumulate the assets it needs to fund its future liabilities.

All plans, underfunded and fully funded alike, that are open to newly hired workers, rely on future contributions and investment returns. A key difference between underfunded and fully funded plans is that underfunded plans require income to eliminate, or amortize, the shortfall between their assets and their accrued liabilities. The degree of underfunding is a major, but not exclusive, factor in assessing the plan's overall condition.

In addition to the actuarial funding ratio, other factors of a pension plan's health include:

- the length of the funding amortization period
- required current and future contribution rates
- plan demographics
- the sustainability and suitability of the plan design
- the plan's governance structure
- the fiscal health of the plan sponsor
- the plan sponsor's commitment to funding the plan

Much of this information is available in annual reports and other material published by most public retirement systems.

Attaining full funding of a pension plan has been likened to a mortgage, in which the homeowner has thirty years to resolve the obligation. At the end of the 30-year period, when it is paid off, the mortgage would be considered fully funded. Although at any point during the thirty-year period, the outstanding mortgage may be considered an unfunded liability, more relevant considerations are a) whether the homeowner has the resources to continue making mortgage payments until the obligation is resolved; and b) whether the obligation is being amortized.

Likewise, more pertinent considerations with regard to funding a public pension plan are the ability of the plan sponsor to continue to pay promised benefits and to make required contributions without causing fiscal stress; and whether the plan's unfunded liability is being amortized.

Public Fund Survey Summary of Findings FY 06

## Past and Current Funding Levels

Figure A summarizes aggregate assets and liabilities and the resulting actuarial funding ratio for plans in the Public Fund Survey. The bar graph reflects assets and liabilities for only the 112 plans in the Survey for which all six years of data are available; the line graph reflects all plans, whether or not they have updated information for FY 06 or prior years. As the figure shows, the aggregate public pension funding level is slightly lower than the prior year.



Figure A: Change in aggregate actuarial assets, liabilities, and funding levels, FY 01 to FY 06

After declining sharply from FY 01 to FY 04, the rate of decline in the aggregate funding ratio has slowed markedly since, and was lower by just 0.6 percent from FY 05 to FY 06. The aggregate funding ratio is projected to be higher in FY 07 as growth in the actuarial value of assets is expected to exceed growth in the actuarial value of liabilities.

Figure B plots funding levels of the 118 individual plans in the Survey that do not use the aggregate cost actuarial valuation method (which does not identify an unfunded liability; plans that use this method are always funded at 100 percent.) On the chart, the size of each circle is roughly proportionate to the plan's size: larger plans are indicated by larger bubbles; smaller plans, by smaller bubbles.

Seventy of the 118 plans (59 percent) are funded at 80 percent or higher. The median funding level for the 118 plans is 83.5 percent.



Figure B: Actuarial funding ratios for 118 public pension plans

Figure C compares the median annual change from the prior year in the actuarial values of assets and liabilities for plans in the Survey. For both individual plans and in the aggregate, when liability growth exceeds growth in assets, funding levels decline. When asset growth exceeds liability growth, funding levels rise.



Figure C: Median change from prior year in actuarial value of assets and liabilities

The average implicit assumption for liability growth is approximately 8.0 percent. As Figure C indicates, median liability growth has been well below this figure for several years, an experience attributable chiefly to four factors:

Public Fund Survey Summary of Findings FY 06

- Fewer benefit enhancements
- Fewer early retirement incentives
- Lower inflation assumptions
- Fewer discretionary cost-of-living adjustments

These factors reduce plan costs, but are offset somewhat by mortality improvements, meaning that annuitants are living longer and thereby collecting a retirement benefit for a longer period. Mortality improvements increase plan liability growth and costs.

Lower liability growth is a positive actuarial development for at least two reasons. First, funding levels will improve only when growth in the actuarial value of assets exceeds liability growth, a feat made easier when liability growth slows. Also, lower liability growth affirms that funding levels can be affected, if not controlled, by plan sponsor (i.e., legislatures, city councils, public retirement boards, etc.), actions.

Fewer Benefit Enhancements
During the late 1990's and in the early part of this decade, retirement benefits at some plans were improved, usually through a higher retirement multiplier, lower retirement age, or fewer years of service needed to qualify for a retirement benefit. In response to public sector fiscal constraints and declining actuarial funding levels, benefit enhancements have slowed considerably during the last several years.

Fewer Early Retirement Incentives
In contrast to the early part of this decade, early retirement incentives have been less prevalent more recently. Early retirement incentives typically are intended to generate cost savings for employers by encouraging more experienced (and higher-paid) workers to retire, who then either are replaced with employees at lower salaries or whose position is held temporarily or permanently vacant. Although incentives to retire can reduce employer costs in the short run, they also can (and often do) result in higher long-term costs that take the form of higher retirement contributions.

Lower Inflation Assumptions
Figure O illustrates that many plans have reduced their inflation assumption in recent years. A key actuarial effect of a lower inflation assumption is to reduce projected salary growth, which in turn reduces pension liabilities by projecting lower retirement benefit levels.

Fewer Discretionary Cost-of-Living Adjustments
Roughly two-thirds of plans in the Public Fund Survey provide an automatic cost-of-living adjustment (COLA). These typically are tied to the Consumer Price Index. Most plans that do not provide an automatic COLA have a discretionary COLA. Due to reduced funding levels and higher costs, many plan sponsors have elected to not provide a discretionary COLA to their plan annuitants.

Some plans provide or permit a COLA on the basis of other factors, such as the fund's investment performance or the plan's actuarial condition. For example, the Arizona State Retirement System provides a COLA tied to the plan's actuarial investment return. When that return exceeds the plan's 8.0 percent assumption, a portion of the "excess" earnings are set aside to fund a permanent COLA. Also, the Texas state constitution permits the legislature to fund a COLA for ERS and TRS annuitants only when the plans' amortization period is below 31 years.

**Higher Funding Levels are on the Horizon**

In addition to relatively modest liability growth, another indication that funding levels will rise is the positive investment returns public pension funds have generated in recent years.

Figure D presents median annual public pension fund investment returns for years ended June 30 (the fiscal year-end date for most funds). Because most plans phase in investment gains and losses over several years, many of the investment gains since March 2003 have yet to be actuarially recognized.

Moreover, the most recent actuarial valuation date for nearly one-half of all plans in the Survey is prior to 6/30/05. As investment gains from FY 04 to FY06 are more fully recognized and as the effects of the losses from FY 01 and FY 02 are phased out of actuarial calculations, the actuarial value of assets will increase markedly.

Public Fund Survey Summary of Findings FY 06

**Figure D: Median annual public pension fund investment returns for years ended 6/30, 2001 to 2006**



FY01 FY02 FY03 FY04 FY05 FY06 FY07

*Source: Callan Associates*

Figure E plots the distribution of plan market values as a percentage of their actuarial value. This reflects most plans' use of an actuarial smoothing period, which is the period when investment gains and losses are phased in. As plans incorporate more of the investment gains generated since equity markets began rising in March 2003, actuarial asset values will continue to increase at a faster rate, continuing a trend in place since FY 04. Based on strong investment returns in recent years, the rate of growth in actuarial asset values is expected to improve sharply in FY 07, which is projected to result in an increase in aggregate funding levels for the first time in several years.

**Figure E: Distribution of plan market value of assets as a percentage of actuarial value of assets**



In the aggregate, the market value of assets exceeds funds' actuarial value by 6.0 percent, or more than $125 billion. This does not include any FY 07 investment experience.

(Most plans in Figure E whose actuarial value of assets equals 100 percent of their market value of assets, are those that use the market value to determine the actuarial value of their assets; they do not phase in investment gains and losses.)

## Changes in Membership

The Survey tracks two classes of members: actives, who are working and currently receiving service credit in their retirement plan; and annuitants, which includes any member receiving a regular benefit from the system: retirees, beneficiaries and disabilitants.

Figure F summarizes changes in these membership groups from FY 01 to FY 06. A notable trend affecting state and local government pension plans in recent years has been the rate of growth among annuitants that significantly exceeds the rate of growth among actives.

**Figure F: Change in active members and annuitants, FY 01 to FY 06**



FY01 FY02 FY03 FY04 FY05 FY06     Total

As the chart shows, the ratio of actives to annuitants has declined from 2.45 in FY 01 to 2.08 in FY 06. By itself, a declining ratio of actives to annuitants does not pose a problem, because most public pensions are largely pre-funded. However, to the extent that a plan is underfunded, a low or declining ratio of

Public Fund Survey Summary of Findings FY 06

actives to annuitants can challenge the plan's ability to move toward full funding. This is because fewer active, contributing workers (on a relative basis) are available to amortize the plan's unfunded liability.

A declining ratio of actives to annuitants also can have financial and operational effects. For example, fewer active members creates a larger negative cash flow (contributions minus benefit payments and administrative expenses). This can require a pension fund to maintain a larger percentage of its assets in more liquid securities, or to make other adjustments to its asset allocation which may reduce long-term investment returns. In addition, as a group, annuitants tend to require more time than actives from the retirement system staff.

Figure G plots the median external cash flow among systems in the Public Fund Survey. This declining cash flow trend is a direct result of faster growth among annuitants compared to growth among actives. The trend of public pension fund external cash flows becoming increasingly negative is a normal development and is likely to continue.

**Figure G: Median external cash flow, FY 01 to FY 06**



Of the 89 plans whose external cash flow was measured in FY 06, 81, or 91 percent, had a negative external cash flow.

The FY 06 cash flow figure was affected by rising asset values and higher employer contributions, both of which serve to temper the ratio. In the absence of sustained, dramatic investment returns or sharply higher employer contributions, cash flows for funds in the Survey are expected to continue to steadily decline.

## Asset Allocation and Investment Expenses

Figure H presents average asset allocations for the 90 systems for which this data is available. The effective date for most of these funds is either 6/30/06 or 12/31/06. The most significant changes from the prior year were a reduction in equities, from 60.3 percent, and an increase in Alternatives, from 3.8 percent, and Real Estate from 4.5 percent.

**Figure H: Average Asset Allocation, 90 Funds**



Figure I presents median investment expense data, by quartile, for the 84 funds in the Survey for which this data is available. Larger funds generally are able to use their size to negotiate lower asset management fees than smaller funds and individual investors.

Expenses for the largest quartile are higher than those for the third quartile of funds. The likely reason for this is that more funds in the largest quartile invest in higher-cost asset classes, such as real estate and alternatives, which includes private equity and hedge funds.

Public Fund Survey Summary of Findings FY 06



Figure I: FY 06 Median Investment Management Expense, by Quartile, 84 Funds

## Asset Values, Benefits, and Contributions

The market value of system assets in the Survey grew by 9.2 percent over FY 05. This marks the fourth consecutive year of growth following the decline in FY 02. The data presented in Figure K is for the 94 systems that have reported asset values for all six fiscal years. The value of all assets represented in the Public Fund Survey is $2.46 trillion.



Figure K: Combined Market Value of Assets of Systems in the Public Fund Survey and Change From Prior Year, FY 01 to FY 06, 92 Systems

Benefits paid by systems in the Survey continue to grow, but at a slower pace than in some prior years. Figure L plots pension benefits paid by the 91 systems for which six years of data are available, and the annual percentage change from the prior year. Slower growth in benefit payments is consistent with anecdotal observations of fewer cost-of-living adjustments and benefit enhancements approved by legislatures and retirement boards in recent years.

Growth in benefits is driven chiefly by a) increases in the number of annuitants, a group that has been growing each year by around four percent, as shown in Figure F; b) higher benefits earned by new annuitants (whose benefits usually are higher than their predecessors due to inflation); and c) cost-of-living adjustments for annuitants.



Figure L: Pension Benefits Paid and Change in Payments From Prior Year, FY 01 to FY 06 86 Systems

Contribution rates also are rising, as shown in Figure M. Rates are rising for employers or employees, or both, at many, but not all plans. The rates shown in Figure N pertain only to public school teachers and general employee, and do not include public safety personnel such as firefighters and police officers.

Public Fund Survey Summary of Findings FY 06

Figure M: Median Contribution Rates, FY 01 to FY 06



Approximately one-fourth of all employees of state and local government do not participate in Social Security, including nearly one-half of all public school teachers and most or substantially all public employees in Alaska, Colorado, Louisiana, Maine, Massachusetts, Ohio, and Nevada. Contribution rates usually are higher for non-Social Security eligible employers and workers, because benefits are usually higher to compensate for the absence of Social Security.

Employers and employees participating in non-Social Security plans each save the 6.2 percent FICA tax used to fund Social Security.

## Retirement Multipliers

Retirement multipliers are used by most public retirement systems to determine pension benefits. Typically, a pension benefit is determined by multiplying an employee's final average salary (usually averaged over the final three or five years of service) by the years of service, by the retirement multiplier. For example, an employee who retires with 20 years of service and a final average salary of $55,000 from a plan with a multiplier of 2.0% will receive an annual benefit of $22,000:

$$\$55,000 \times 20 \times 2.0\% = \$22,000$$

Figure N illustrates median retirement multipliers for plans whose employees are Social Security-eligible and –ineligible. The figures are unchanged from the previous year.

Figure N: Median Retirement Multipliers, FY 06



## Assumptions for Inflation and Investment Return

Among the many actuarial assumptions used in the calculation of a plan's long-term liabilities, two are particularly important: rates of inflation and investment return. Many plans in recent years have adjusted their inflation assumption, and, as shown in Figure O, most adjustments have been downward. As the chart shows, nearly one-half of plans that use an inflation assumption (not all plans specify one) have changed their assumption since FY 01, and nearly all plans that have made a change have reduced their assumption.

Figure O: Distribution of Plans Changing Inflation Assumption, FY 01 to FY 06



Public Fund Survey Summary of Findings FY 06

Figure P summarizes the distribution of inflation assumptions among plans in the Public Fund Survey. As the chart shows, the median inflation assumption is now 3.5%, down from 4.0% in FY 01.

**Figure P: Distribution of Inflation Assumptions, FY 06**



Figure Q illustrates the number of plans that have adjusted their assumed nominal (non-inflation-adjusted) investment return assumption. As shown in Figure R, the most popular assumption remains 8.0 percent, but the number of plans using that assumption has declined, and the number of plans using an assumption of lower than 8.0 percent has increased. The predominant and median assumption remains 8.0 percent.

**Figure Q: Changes Made to Inflation Assumptions, FY 01 to FY 06**



As many plans have reduced their nominal inflation assumption, the median assumption for the real rate

of return has increased from 4.0 percent in FY 01 to 4.50 percent in FY 06.

Because a majority of revenue for most public pension funds comes from investment earnings, the nominal and real rate of return assumptions can have a dramatic effect on a plan's funding level and required contributions.

**Figure R: Distribution of Investment Return Assumptions, FY 06**



**Appendix A**
**System Summary**

| State | System | Asset Market Value ($000s) | Active Members | Annuitants | As of |
|---|---|---:|---:|---:|---|
| AK | Alaska Public Employees Retirement System | 6,568,150 | 34,660 | 21,852 | 6/30/2006 |
| AK | Alaska Teachers Retirement System | 3,422,923 | 9,835 | 9,349 | 6/30/2006 |
| AL | Retirement Systems of Alabama | 28,456,092 | 208,685 | 75,498 | 9/30/2006 |
| AR | Arkansas Teachers Retirement System | 9,868,312 | 85,916 | 24,050 | 6/30/2006 |
| AR | Arkansas Public Employees Retirement System | 5,135,503 | 43,453 | 22,234 | 6/30/2006 |
| AZ | Arizona State Retirement System | 23,415,648 | 217,961 | 85,097 | 6/30/2006 |
| AZ | Arizona Public Safety Personnel Retirement System | 4,906,399 | 17,324 | 6,974 | 6/30/2006 |
| AZ | Phoenix Employees' Retirement System | 1,670,553 | 9,260 | 4,113 | 6/30/2006 |
| CA | California Public Employees Retirement System | 211,564,338 | 809,690 | 443,341 | 6/30/2006 |
| CA | California State Teachers Retirement System | 144,212,376 | 453,365 | 207,846 | 6/30/2006 |
| CA | Los Angeles County Employees Retirement Association | 35,185,589 | 88,631 | 50,858 | 6/30/2006 |
| CA | San Francisco City and County Retirement System | 14,497,022 | 29,164 | 20,093 | 6/30/2006 |
| CA | San Diego County Employees Retirement Association | 7,113,599 | 17,451 | 12,049 | 6/30/2006 |
| CA | Contra Costa County Employees' Retirement Association | 4,871,010 | 9,210 | 6,856 | 12/31/2006 |
| CO | Colorado Public Employees Retirement Association | 38,649,951 | 182,404 | 75,024 | 12/31/2006 |
| CO | Denver Public Schools Retirement System | 2,854,304 | 7,130 | 6,069 | 12/31/2006 |
| CO | Denver Employees Retirement Plan | 1,895,046 | 8,988 | 6,396 | 12/31/2006 |
| CT | Connecticut Teachers Retirement Board | 12,227,995 | 52,579 | 25,221 | 6/30/2006 |
| CT | Connecticut State Employees Retirement System | 8,146,302 | 48,919 | 36,705 | 6/30/2005 |
| DC | District of Columbia Retirement Board | 3,589,350 | 10,344 | 2,859 | 9/30/2006 |
| DE | Delaware Public Employees Retirement System | 6,527,015 | 41,544 | 21,149 | 6/30/2006 |
| FL | Florida Retirement System | 116,340,049 | 664,819 | 282,184 | 6/30/2006 |
| GA | Georgia Teachers Retirement System | 47,246,347 | 209,349 | 70,239 | 6/30/2006 |
| GA | Georgia Employees Retirement System | 15,930,531 | 139,668 | 45,878 | 6/30/2006 |
| HI | Hawaii Employees Retirement System | 9,932,411 | 64,069 | 34,304 | 6/30/2006 |
| IA | Iowa Public Employees Retirement System | 20,404,871 | 163,091 | 82,204 | 6/30/2006 |
| ID | Idaho Public Employee Retirement System | 9,444,217 | 64,762 | 28,438 | 6/30/2006 |
| IL | Illinois Teachers Retirement System | 36,584,889 | 159,272 | 85,103 | 6/30/2006 |
| IL | Illinois Municipal Retirement Fund | 22,907,609 | 174,008 | 84,704 | 12/31/2006 |
| IL | Illinois State Universities Retirement System | 14,175,147 | 71,759 | 41,638 | 6/30/2006 |
| IL | Chicago Public School Teachers Pension & Retirement Fund | 11,387,461 | 34,682 | 22,105 | 6/30/2006 |
| IL | Illinois State Employees Retirement System | 10,899,853 | 68,075 | 54,868 | 6/30/2006 |
| IN | Indiana Public Employees Retirement Fund | 14,661,806 | 153,664 | 59,468 | 6/30/2006 |
| IN | Indiana State Teachers Retirement Fund | 7,791,424 | 73,350 | 39,849 | 6/30/2006 |
| KS | Kansas Public Employees Retirement System | 12,352,890 | 149,073 | 63,348 | 6/30/2006 |
| KY | Kentucky Teachers Retirement System | 13,851,411 | 73,740 | 38,497 | 6/30/2006 |
| KY | Kentucky Retirement Systems | 12,950,226 | 144,356 | 71,934 | 6/30/2006 |
| LA | Louisiana Teachers Retirement System | 14,007,613 | 78,456 | 57,512 | 6/30/2006 |
| LA | Louisiana State Employees Retirement System | 8,008,508 | 57,811 | 38,132 | 6/30/2006 |
| MA | Massachusetts State Employees' Retirement System | 16,489,206 | 82,152 | 48,766 | 12/31/2005 |
| MA | Massachusetts Teachers Retirement Board | 15,973,000 | 84,255 | 39,755 | 12/31/2003 |
| MD | Maryland State Retirement and Pension System | 34,370,819 | 191,273 | 103,831 | 6/30/2006 |
| ME | Maine State Retirement System | 9,572,783 | 52,282 | 32,918 | 6/30/2006 |
| MI | Michigan Public School Employees Retirement System | 42,995,406 | 305,445 | 157,163 | 9/30/2006 |
| MI | Michigan State Employees Retirement System | 10,889,925 | 32,575 | 45,980 | 9/30/2006 |
| MI | Municipal Employees' Retirement System of Michigan | 5,590,043 | 37,826 | 21,505 | 12/31/2006 |
| MN | Minnesota Teachers Retirement Association | 17,764,526 | 79,164 | 44,683 | 6/30/2006 |
| MN | Minnesota Public Employees Retirement Association | 16,718,662 | 158,368 | 66,102 | 6/30/2006 |
| MN | Minnesota State Retirement System | 9,495,641 | 53,140 | 27,020 | 6/30/2006 |
| MN | Minneapolis Employees Retirement Fund | 1,282,717 | 552 | 4,981 | 6/30/2004 |
| MN | St. Paul Teachers' Retirement Fund Association | 1,005,745 | 4,202 | 2,624 | 6/30/2006 |
| MN | Duluth Teachers Retirement Fund Association | 281,950 | 1,174 | 1,190 | 6/30/2006 |

## Appendix A
## System Summary

| State | System | Asset Market Value ($000s) | Active Members | Annuitants | As of |
|---|---|---|---|---|---|
| MO | Missouri Public Schools Retirement System | 27,890,508 | 123,727 | 54,870 | 6/30/2006 |
| MO | Missouri State Employees Retirement System | 7,041,467 | 54,887 | 27,450 | 6/30/2006 |
| MO | Missouri Local Government Employees Retirement System | 3,468,901 | 34,172 | 11,994 | 6/30/2006 |
| MO | MoDOT & Patrol Employees' Retirement System | 1,597,920 | 9,010 | 6,971 | 6/30/2006 |
| MO | St. Louis Public School Retirement System | 1,124,465 | 5,156 | 4,026 | 12/31/2006 |
| MS | Mississippi Public Employees Retirement System | 18,819,197 | 158,893 | 69,729 | 6/30/2006 |
| MT | Montana Public Employees Retirement Board | 4,258,338 | 33,825 | 18,544 | 6/30/2006 |
| MT | Montana Teachers Retirement System | 2,745,771 | 18,108 | 10,637 | 6/30/2006 |
| NC | North Carolina Retirement Systems | 66,665,317 | 549,797 | 177,599 | 6/30/2006 |
| ND | North Dakota Teachers Fund for Retirement | 1,720,325 | 9,585 | 5,893 | 6/30/2006 |
| ND | North Dakota Public Employees Retirement System | 1,638,868 | 18,229 | 6,335 | 6/30/2006 |
| NE | Nebraska Retirement Systems | 6,866,409 | 51,237 | 14,604 | 6/30/2006 |
| NH | New Hampshire Retirement System | 4,666,396 | 51,738 | 19,711 | 6/30/2006 |
| NJ | New Jersey Division of Pension and Benefits | 79,260,515 | 514,219 | 223,372 | 6/30/2006 |
| NM | New Mexico Public Employees Retirement Association | 11,369,196 | 60,904 | 23,187 | 6/30/2006 |
| NM | New Mexico Educational Retirement Board | 7,451,138 | 63,362 | 26,100 | 6/30/2005 |
| NV | Nevada Public Employees Retirement System | 19,542,884 | 98,187 | 33,262 | 6/30/2006 |
| NY | New York State and Local Retirement Systems | 142,620,092 | 595,736 | 334,251 | 3/31/2006 |
| NY | New York State Teachers Retirement System | 91,492,245 | 260,041 | 129,587 | 6/30/2006 |
| NY | New York City Employees Retirement System | 37,288,164 | 174,997 | 127,345 | 6/30/2006 |
| NY | New York City Teachers Retirement System | 30,492,170 | 105,391 | 62,728 | 6/30/2005 |
| OH | Ohio Public Employees Retirement System | 65,369,853 | 381,464 | 156,745 | 12/31/2006 |
| OH | Ohio State Teachers Retirement System | 62,126,074 | 175,065 | 119,184 | 6/30/2006 |
| OH | Ohio Police & Fire Pension Fund | 9,994,404 | 27,879 | 24,564 | 12/31/2005 |
| OH | Ohio School Employees Retirement System | 9,833,949 | 123,266 | 62,521 | 6/30/2006 |
| OK | Oklahoma Teachers Retirement System | 7,858,937 | 87,194 | 41,782 | 6/30/2006 |
| OK | Oklahoma Public Employees Retirement System | 5,817,166 | 45,472 | 24,372 | 6/30/2006 |
| OR | Oregon Employees Retirement System | 54,343,197 | 140,752 | 101,519 | 6/30/2006 |
| PA | Pennsylvania Public School Employees Retirement System | 57,235,667 | 255,000 | 157,000 | 6/30/2006 |
| PA | Pennsylvania State Employees Retirement System | 32,852,030 | 110,972 | 102,060 | 12/31/2006 |
| RI | Rhode Island Employees Retirement System | 6,749,822 | 36,006 | 21,621 | 6/30/2005 |
| SC | South Carolina Retirement Systems | 25,381,948 | 208,012 | 107,471 | 6/30/2006 |
| SD | South Dakota Retirement System | 6,844,630 | 36,074 | 18,076 | 6/30/2006 |
| TN | Tennessee Consolidated Retirement System | 28,820,635 | 204,735 | 89,772 | 6/30/2006 |
| TX | Teacher Retirement System of Texas | 100,701,949 | 782,679 | 257,144 | 8/31/2006 |
| TX | Texas Employees Retirement System | 22,442,493 | 132,952 | 68,171 | 8/31/2006 |
| TX | Texas County & District Retirement System | 15,510,819 | 110,791 | 32,440 | 12/31/2006 |
| TX | Texas Municipal Retirement System | 13,508,840 | 95,583 | 32,175 | 12/31/2006 |
| TX | Houston Firefighters Relief and Retirement Fund | 2,573,884 | 3,796 | 2,243 | 6/30/2006 |
| TX | Austin Employees' Retirement System | 1,608,958 | 8,055 | 3,467 | 12/31/2006 |
| UT | Utah Retirement Systems | 19,829,629 | 99,589 | 38,868 | 12/31/2006 |
| VA | Virginia Retirement System | 47,626,713 | 332,916 | 124,639 | 6/30/2006 |
| VA | Educational Ees' Supp. Retirement System of Fairfax County | 1,766,535 | 19,081 | 7,710 | 6/30/2006 |
| VT | Vermont Teachers Retirement System | 1,430,822 | 10,696 | 4,879 | 6/30/2006 |
| VT | Vermont State Employees Retirement System | 1,219,617 | 8,288 | 4,173 | 6/30/2006 |
| WA | Washington Department of Retirement Systems | 52,705,819 | 290,124 | 117,723 | 6/30/2006 |
| WI | Wisconsin Retirement System | 67,883,042 | 262,085 | 126,445 | 12/31/2004 |
| WV | West Virginia Consolidated Public Retirement Board | 6,522,020 | 55,892 | 48,303 | 6/30/2006 |
| WY | Wyoming Retirement System | 6,247,433 | 39,619 | 18,788 | 12/31/2006 |
| | | $2,458,912,734 | 13,088,163 | 6,262,606 | |

**Appendix B**
**Actuarial Funding Summary**

| State | Plan | Actuarial Funding Ratio | Actuarial Value of Assets ($000s) | Actuarial Value of Liabilities ($000s) | Unfunded Liability (Surplus) ($000s) | Actuarial Valuation Date | As of |
|-------|------|------------------------|-----------------------------------|----------------------------------------|--------------------------------------|--------------------------|-------|
| AK | Alaska PERS | 65.7 | 4,658,413 | 7,087,191 | 2,428,778 | 6/30/2005 | 6/30/2006 |
| AK | Alaska Teachers | 60.9 | 2,640,642 | 4,334,585 | 1,693,943 | 6/30/2005 | 6/30/2006 |
| AL | Alabama Teachers | 83.6 | 19,248,207 | 23,027,338 | 3,779,131 | 9/30/2005 | 9/30/2006 |
| AL | Alabama ERS | 84.0 | 8,935,358 | 10,634,976 | 1,699,618 | 9/30/2005 | 9/30/2006 |
| AR | Arkansas Teachers | 80.3 | 9,332,000 | 11,623,000 | 2,291,000 | 6/30/2006 | 6/30/2006 |
| AR | Arkansas PERS | 83.4 | 4,949,000 | 5,936,000 | 987,000 | 6/30/2006 | 6/30/2006 |
| AZ | Arizona SRS | 84.9 | 22,973,000 | 27,063,000 | 1,847,000 | 6/30/2006 | 6/30/2006 |
| AZ | Arizona Public Safety Personnel | 77.0 | 4,999,911 | 6,495,012 | 1,495,101 | 6/30/2006 | 6/30/2006 |
| AZ | Phoenix ERS | 81.3 | 1,626,741 | 2,000,346 | 373,605 | 6/30/2006 | 6/30/2006 |
| CA | California PERF | 87.3 | 183,680,000 | 210,310,000 | 26,630,000 | 6/30/2006 | 6/30/2006 |
| CA | California Teachers | 87.0 | 131,237,000 | 150,872,000 | 19,635,000 | 6/30/2006 | 6/30/2006 |
| CA | LA County ERS | 85.8 | 29,497,485 | 34,375,949 | 4,878,464 | 6/30/2006 | 6/30/2006 |
| CA | San Francisco City & County | 107.6 | 12,659,698 | 11,765,737 | (893,961) | 7/1/2005 | 6/30/2006 |
| CA | San Diego County | 83.6 | 6,263,019 | 7,495,294 | 1,232,275 | 6/30/2006 | 6/30/2006 |
| CA | Contra Costa County | 84.8 | 4,062,057 | 4,792,428 | 730,371 | 12/31/2005 | 12/31/2006 |
| CO | Colorado State & School | 72.9 | 31,721,141 | 43,505,716 | 11,784,575 | 12/31/2005 | 12/31/2006 |
| CO | Colorado School | 74.1 | 20,535,733 | 27,708,682 | 7,172,949 | 12/31/2005 | 12/31/2006 |
| CO | Colorado State | 73.0 | 13,327,290 | 18,246,010 | 4,918,720 | 12/31/2005 | 12/31/2006 |
| CO | Colorado Municipal | 79.5 | 2,613,386 | 3,288,421 | 675,035 | 12/31/2005 | 12/31/2006 |
| CO | Denver Schools | 87.6 | 2,798,981 | 3,193,881 | 394,900 | 1/1/2007 | 12/31/2006 |
| CO | Denver Employees | 97.3 | 1,735,209 | 1,782,505 | 47,296 | 12/31/2006 | 12/31/2006 |
| CT | Connecticut Teachers | 63.0 | 11,781,338 | 18,703,793 | 6,922,455 | 6/30/2006 | 6/30/2006 |
| CT | Connecticut SERS | 53.3 | 8,517,677 | 15,987,547 | 7,469,870 | 6/30/2005 | 6/30/2005 |
| DC | DC Police & Fire* | 100.0 | 2,252,600 | 2,252,600 | 0 | 10/1/2006 | 9/30/2006 |
| DC | DC Teachers* | 100.0 | 1,230,000 | 1,230,000 | 0 | 10/1/2006 | 9/30/2006 |
| DE | Delaware State Employees | 101.7 | 5,998,746 | 5,901,172 | (97,574) | 6/30/2006 | 6/30/2006 |
| FL | Florida RS | 105.6 | 117,159,615 | 110,977,831 | (6,181,784) | 7/1/2006 | 6/30/2006 |
| GA | Georgia Teachers | 98.0 | 46,836,895 | 47,811,214 | 974,319 | 6/30/2005 | 6/30/2006 |
| GA | Georgia ERS | 97.2 | 13,134,472 | 13,512,773 | 378,301 | 6/30/2005 | 6/30/2006 |
| HI | Hawaii ERS | 65.0 | 9,529,371 | 14,661,399 | 5,132,028 | 6/30/2006 | 6/30/2006 |
| IA | Iowa PERS | 88.4 | 19,144,037 | 21,651,122 | 2,507,085 | 6/30/2006 | 6/30/2006 |
| ID | Idaho PERS | 95.2 | 9,177,100 | 9,638,800 | 461,700 | 7/1/2006 | 6/30/2006 |
| IL | Illinois Teachers | 62.0 | 36,584,889 | 58,996,913 | 22,412,024 | 7/1/2006 | 6/30/2006 |
| IL | Illinois Municipal | 95.3 | 21,427,139 | 22,488,185 | 1,061,046 | 12/31/2006 | 12/31/2006 |
| IL | Illinois Universities | 65.4 | 14,175,100 | 21,688,900 | 7,513,800 | 6/30/2006 | 6/30/2006 |
| IL | Illinois SERS | 52.2 | 10,899,853 | 20,874,541 | 9,974,688 | 6/30/2006 | 6/30/2006 |
| IL | Chicago Teachers | 78.0 | 10,947,998 | 14,035,627 | 3,087,629 | 6/30/2006 | 6/30/2006 |
| IN | Indiana Teachers | 44.3 | 7,686,688 | 17,365,572 | 9,199,594 | 6/30/2006 | 6/30/2006 |
| IN | Indiana PERF | 96.4 | 10,471,937 | 10,858,322 | 386,385 | 7/1/2005 | 6/30/2006 |
| KS | Kansas PERS | 68.8 | 11,339,293 | 16,491,762 | 5,152,469 | 12/31/2005 | 6/30/2006 |
| KY | Kentucky Teachers | 73.1 | 14,857,600 | 20,324,700 | 5,467,100 | 6/30/2006 | 6/30/2006 |
| KY | Kentucky ERS | 61.3 | 5,822,071 | 9,503,482 | 3,681,411 | 6/30/2006 | 6/30/2006 |
| KY | Kentucky County | 81.4 | 6,677,969 | 8,199,712 | 1,521,743 | 6/30/2006 | 6/30/2006 |
| LA | Louisiana Teachers | 67.5 | 13,088,358 | 19,390,781 | 6,302,423 | 6/30/2006 | 6/30/2006 |
| LA | Louisiana SERS | 64.3 | 7,430,784 | 11,548,680 | 4,117,896 | 6/30/2006 | 6/30/2006 |
| MA | Massachusetts Teachers | 69.6 | 17,074,000 | 24,519,000 | 7,445,000 | 1/1/2002 | 12/31/2003 |
| MA | Massachusetts SERS | 82.8 | 16,210,981 | 19,575,338 | 3,364,357 | 12/31/2003 | 12/31/2005 |
| MD | Maryland Teachers | 84.2 | 21,575,451 | 25,617,484 | 4,042,033 | 6/30/2006 | 6/30/2006 |
| MD | Maryland PERS | 80.4 | 12,287,942 | 15,291,091 | 3,003,149 | 6/30/2006 | 6/30/2006 |
| ME | Maine State and Teacher | 69.7 | 6,964,597 | 9,999,250 | 3,034,653 | 6/30/2006 | 6/30/2006 |
| ME | Maine Local | 109.2 | 1,726,776 | 1,581,198 | (145,578) | 6/30/2006 | 6/30/2006 |
| MI | Michigan Public Schools | 79.3 | 38,211,000 | 48,206,000 | 9,995,000 | 9/30/2005 | 9/30/2006 |
| MI | Michigan SERS | 79.8 | 9,897,000 | 12,400,000 | 2,503,000 | 9/30/2005 | 9/30/2006 |
| MI | Michigan Municipal | 76.0 | 5,026,100 | 6,609,100 | 1,583,000 | 12/31/2005 | 12/31/2006 |
| MN | Minnesota Teachers | 92.1 | 19,035,612 | 20,679,111 | 1,643,499 | 6/30/2006 | 6/30/2006 |
| MN | Minnesota PERF | 74.7 | 12,495,207 | 16,737,757 | 4,242,550 | 6/30/2006 | 6/30/2006 |
| MN | Minnesota State Employees | 96.2 | 8,486,756 | 8,819,161 | 332,405 | 6/30/2006 | 6/30/2006 |
| MN | Minneapolis ERF | 92.1 | 1,513,389 | 1,643,140 | 129,751 | 7/1/2004 | 6/30/2004 |
| MN | St. Paul Teachers | 69.1 | 938,919 | 1,358,620 | 419,701 | 6/30/2006 | 6/30/2006 |
| MN | Duluth Teachers | 84.1 | 270,926 | 322,229 | 42,443 | 7/1/2006 | 6/30/2006 |
| MO | Missouri Teachers | 82.6 | 24,801,644 | 30,037,130 | 5,235,486 | 6/30/2006 | 6/30/2006 |
| MO | Missouri State Employees | 85.3 | 6,836,567 | 8,013,205 | 1,142,684 | 6/30/2006 | 6/30/2006 |
| MO | Missouri Local | 95.3 | 3,224,174 | 3,383,153 | 158,979 | 2/28/2006 | 6/30/2006 |
| MO | Missouri Public Education | 80.5 | 2,218,638 | 2,756,833 | 538,195 | 6/30/2006 | 6/30/2006 |
| MO | Missouri DOT and Highway Patrol | 55.5 | 1,521,143 | 2,740,438 | 1,219,295 | 6/30/2006 | 6/30/2006 |

**Appendix B**
**Actuarial Funding Summary**

| State | Plan | Actuarial Funding Ratio | Actuarial Value of Assets ($000s) | Actuarial Value of Liabilities ($000s) | Unfunded Liability (Surplus) ($000s) | Actuarial Valuation Date | As of |
|---|---|---|---|---|---|---|---|
| MO | St. Louis School Employees | 87.6 | 983,800 | 1,122,600 | 138,800 | 1/1/2006 | 12/31/2006 |
| MS | Mississippi PERS | 73.5 | 18,321,063 | 24,928,464 | 6,607,401 | 6/30/2006 | 6/30/2006 |
| MT | Montana PERS | 88.3 | 3,459,084 | 3,919,313 | 460,229 | 6/30/2006 | 6/30/2006 |
| MT | Montana Teachers | 76.1 | 2,745,800 | 3,608,900 | 863,100 | 7/1/2006 | 6/30/2006 |
| NC | North Carolina Teachers and State | 106.5 | 49,670,182 | 46,624,668 | (3,045,514) | 12/31/2005 | 6/30/2006 |
| NC | North Carolina Local Government | 99.4 | 14,395,849 | 14,480,208 | 84,359 | 12/31/2005 | 6/30/2006 |
| ND | North Dakota Teachers | 75.4 | 1,564,000 | 2,073,900 | 509,900 | 7/1/2006 | 6/30/2006 |
| ND | North Dakota PERS | 88.8 | 1,314,500 | 1,480,500 | 166,000 | 6/30/2006 | 6/30/2006 |
| NE | Nebraska Schools | 87.2 | 5,739,049 | 6,584,275 | 845,226 | 7/1/2006 | 6/30/2006 |
| NH | New Hampshire Retirement System | 61.4 | 3,928,270 | 6,402,875 | 2,474,605 | 6/30/2005 | 6/30/2006 |
| NJ | New Jersey Teachers | 78.0 | 35,422,800 | 45,439,278 | 10,016,478 | 6/30/2006 | 6/30/2006 |
| NJ | New Jersey PERS | 78.0 | 27,368,472 | 35,071,664 | 7,703,192 | 6/30/2006 | 6/30/2006 |
| NJ | New Jersey Police & Fire | 78.4 | 20,364,246 | 25,989,699 | 5,625,453 | 6/30/2006 | 6/30/2006 |
| NM | New Mexico PERF | 92.1 | 10,863,895 | 11,800,861 | 936,966 | 6/30/2006 | 6/30/2006 |
| NM | New Mexico Teachers | 70.4 | 7,457,500 | 10,591,800 | 3,134,300 | 6/30/2005 | 6/30/2005 |
| NV | Nevada Regular Employees | 76.5 | 15,566,606 | 20,344,635 | 4,778,029 | 6/30/2006 | 6/30/2006 |
| NV | Nevada Police Officer and Firefighter | 68.9 | 3,715,422 | 5,394,511 | 1,679,089 | 6/30/2006 | 6/30/2006 |
| NY | NY State & Local ERS* | 100.0 | 118,197,000 | 118,197,000 | 0 | 4/1/2006 | 3/31/2006 |
| NY | New York State Teachers | 98.8 | 74,074,300 | 74,961,100 | 886,800 | 6/30/2005 | 6/30/2006 |
| NY | New York City ERS | 99.6 | 40,638,628 | 40,786,673 | 148,045 | 6/30/2004 | 6/30/2006 |
| NY | New York City Teachers | 100.0 | 32,817,102 | 32,827,541 | 10,439 | 6/30/2004 | 6/30/2005 |
| NY | NY State & Local Police & Fire* | 100.0 | 21,953,000 | 21,953,000 | 0 | 4/1/2006 | 3/31/2006 |
| OH | Ohio Teachers | 75.0 | 58,008,050 | 77,371,024 | 19,362,974 | 6/30/2006 | 6/30/2006 |
| OH | Ohio PERS | 89.1 | 54,473,000 | 61,146,000 | 6,673,000 | 12/31/2005 | 12/31/2006 |
| OH | Ohio School Employees | 75.6 | 9,542,000 | 12,627,000 | 3,085,000 | 6/30/2006 | 6/30/2006 |
| OH | Ohio Police & Fire | 80.9 | 9,337,462 | 11,545,050 | 2,207,588 | 1/1/2004 | 12/31/2005 |
| OK | Oklahoma Teachers | 49.3 | 7,470,400 | 15,143,400 | 7,673,000 | 6/30/2006 | 6/30/2006 |
| OK | Oklahoma PERS | 71.4 | 5,654,276 | 7,914,658 | 2,260,382 | 7/1/2006 | 6/30/2006 |
| OR | Oregon PERS | 104.2 | 51,382,600 | 49,294,000 | (2,088,600) | 12/31/2005 | 6/30/2006 |
| PA | Pennsylvania School Employees | 83.6 | 51,122,100 | 61,129,400 | 5,028,500 | 6/30/2005 | 6/30/2006 |
| PA | Pennsylvania State ERS | 92.7 | 28,149,000 | 30,365,000 | 2,216,000 | 12/31/2005 | 12/31/2006 |
| RI | Rhode Island ERS | 55.8 | 5,444,368 | 9,762,675 | 4,318,307 | 6/30/2004 | 6/30/2006 |
| RI | Rhode Island Municipal | 87.2 | 886,965 | 1,017,254 | 130,289 | 6/30/2003 | 6/30/2005 |
| SC | South Carolina RS | 71.6 | 21,625,510 | 30,217,471 | 8,591,961 | 7/1/2005 | 6/30/2006 |
| SC | South Carolina Police | 87.4 | 2,774,606 | 3,173,930 | 399,324 | 7/1/2005 | 6/30/2006 |
| SD | South Dakota PERS | 96.7 | 5,668,500 | 5,859,900 | 191,400 | 6/30/2006 | 6/30/2006 |
| TN | TN State and Teachers | 99.8 | 23,627,160 | 23,666,967 | 39,807 | 7/1/2005 | 6/30/2006 |
| TN | TN Political Subdivisions | 92.7 | 4,124,013 | 4,450,127 | 326,114 | 7/1/2005 | 6/30/2006 |
| TX | Texas Teachers | 87.3 | 94,218,000 | 107,911,000 | 13,693,000 | 8/31/2006 | 8/31/2006 |
| TX | Texas ERS | 95.2 | 21,780,437 | 22,884,917 | 1,104,480 | 8/31/2006 | 8/31/2006 |
| TX | Texas Municipal | 82.1 | 13,312,700 | 16,219,700 | 2,907,000 | 12/31/2006 | 12/31/2006 |
| TX | Texas County & District | 110.2 | 15,470,001 | 14,035,200 | (1,434,801) | 12/31/2006 | 12/31/2006 |
| TX | Houston Firefighters | 86.1 | 2,119,000 | 2,461,000 | 342,000 | 7/1/2005 | 6/30/2006 |
| TX | City of Austin ERS | 75.9 | 1,497,784 | 1,974,011 | 476,227 | 12/31/2006 | 12/31/2006 |
| TX | Texas LECOS | 101.7 | 720,307 | 708,437 | (11,870) | 8/31/2006 | 8/31/2006 |
| UT | Utah Noncontributory | 96.4 | 14,438,278 | 14,980,827 | 542,549 | 12/31/2005 | 12/31/2006 |
| VA | Virginia Retirement System | 81.3 | 40,372,000 | 49,628,000 | 9,256,000 | 6/30/2005 | 6/30/2006 |
| VA | Fairfax County Schools | 84.9 | 1,718,399 | 2,022,962 | 304,563 | 12/31/2005 | 6/30/2006 |
| VT | Vermont Teachers | 84.6 | 1,427,393 | 1,686,502 | 259,109 | 6/30/2006 | 6/30/2006 |
| VT | Vermont State Employees | 99.3 | 1,223,323 | 1,232,367 | 9,044 | 6/30/2006 | 6/30/2006 |
| WA | Washington PERS 1 | 70.8 | 9,707,000 | 13,704,000 | 3,997,000 | 9/30/2005 | 6/30/2006 |
| WA | Washington PERS 2/3* | 100.0 | 12,274,100 | 12,274,100 | 0 | 9/30/2004 | 6/30/2006 |
| WA | Washington Teachers Plan 1 | 77.6 | 8,450,000 | 10,894,000 | 2,444,000 | 9/30/2005 | 6/30/2006 |
| WA | Washington Teachers Plan 2/3* | 100.0 | 4,411,200 | 4,411,200 | 0 | 9/30/2004 | 6/30/2006 |
| WA | Washington LEOFF Plan 1 | 113.1 | 4,800,000 | 4,243,000 | (400,000) | 9/30/2005 | 6/30/2006 |
| WA | Washington LEOFF Plan 2* | 100.0 | 3,329,100 | 3,329,100 | 0 | 9/30/2005 | 6/30/2006 |
| WA | Washington School EEs Plan 2/3* | 100.0 | 1,747,400 | 1,747,400 | 0 | 9/30/2005 | 6/30/2006 |
| WI | Wisconsin Retirement System | 99.4 | 66,209,400 | 66,622,300 | 412,900 | 12/31/2004 | 12/31/2004 |
| WV | West Virginia Teachers | 31.6 | 2,174,464 | 6,877,872 | 4,703,408 | 6/30/2006 | 6/30/2006 |
| WV | West Virginia PERS | 86.8 | 3,700,186 | 4,264,700 | 564,514 | 7/1/2006 | 6/30/2006 |
| WY | Wyoming Public Employees | 94.4 | 5,160,602 | 5,468,229 | 307,627 | 1/1/2007 | 12/31/2006 |
| | | 85.6 | $2,326,094,275 | $2,718,770,882 | $385,089,703 | | |

\* Plans using the aggregate cost actuarial valuation method do not identify an unfunded liability

# EXHIBIT H

**FRANK J. McGARR, Esq.**
**Arbitration and Mediation**

4146 South Venard Road                                    Phone 630.960.0985
Downers Grove, IL 60515                                   Fax    630.960.0904

May 1, 2008

The Honorable James B. Moran                **Via UPS Next Day**
United States District Judge
United States District Court
Northern District of Illinois
Eastern Division
219 South Dearborn Street
Chicago, Illinois 60604

Re:  Quarterly Report of Independent Special Counsel, <u>Chao</u>
     <u>v. Estate of Frank E. Fitzsimmons, et al.</u>, No. 78 C 342
     (N.D. Ill., E.D.); <u>Chao v. Robbins, et al.</u>, No. 78 C 4075
     (N.D. Ill., E.D.); and <u>Chao v. Dorfman, et al.</u>, No. 82 C
     7951 (N.D. Ill., E.D.)

Dear Judge Moran:

     This is to report on my activities during the first quarter of
2008 as Independent Special Counsel appointed pursuant to the
<u>Fitzimmons</u> (Pension Fund) and <u>Robbins</u> and <u>Dorfman</u> (Health and
Welfare Fund) consent decrees.

               <u>General Pension and Health and Welfare Fund Matters</u>

     I have attended full Board of Trustees meetings, now held
every other month (with additional meetings as noted in my
reports), and consulted regularly with Fund executives.

<u>Allocation of UPS Withdrawal Liability Settlement Proceeds</u>

     As discussed in my February 1 report covering the fourth
quarter of 2007, on December 26, 2007, the Pension Fund received a
wire transfer from United Parcel Service, Inc. ("UPS") of $6.1
billion pursuant to a withdrawal liability settlement agreement
previously approved by the Pension Fund's Board of Trustees.  As
the Court is aware, and as also discussed in my February 1 report,
in anticipation of the receipt of this $6.1 billion payment from
UPS, the Court approved certain modifications to the consent decree
and to the related investment procedures and authorizations.  These
modifications included the establishment of a new Passive Equity
Index Account to be funded in part by UPS settlement proceeds.

The Honorable James B. Moran
May 1, 2008
Page 2


_____At the January 15, 2008 Meeting of the Board of Trustees, the Pension Fund's financial department reported that the $6.1 billion UPS settlement payment received on December 26, 2007 had been allocated as follows:

| | | |
|---|---|---|
| Passive Equity Index Account | – | $4.2 billion |
| Lehman Aggregate Fixed Income Account | – | 0.9 billion |
| Northern Trust Global Advisors ("Northern Trust") | – | 1.0 billion |
| Total | | $6.1 billion |

This allocation of the UPS settlement proceeds was in accordance with the Court's order dated December 20, 2007. As also authorized under the December 20 order, the financial department reported that Goldman Sachs Asset Management ("Goldman") transferred $1.2 billion in investment assets to the newly established Passive Equity Index Account. Finally, as authorized under the Court's January 23, 2008 Order, the control, authority and responsibility for Fund assets in the amount of approximately $2.480 billion has been transferred from Goldman to Northern Trust as court-approved Named Fiduciary. Accordingly, pursuant to these court-approved allocations made in the wake of the receipt of the UPS settlement proceeds, the financial department reported that as of February 1, 2008, the Fund's total investment assets were allocated in the following percentages:

| | |
|---|---|
| Goldman Sachs | 30% |
| Northern Trust | 30% |
| Lehman Aggregate Fixed Income Account | 20% |
| Passive Equity Index Account | 20% |
| Total | 100% |

Pension Fund

Funding Status and PPA Certification Process

As previously reported, in July 2005 the Internal Revenue Service approved the Fund's request for a 10-year extension for amortizing unfunded liabilities. This extension is believed likely to defer for the near term a statutory funding deficiency. The IRS granted the request subject to certain conditions. In general terms, these IRS conditions require the Pension Fund to maintain its existing ratio of assets to liabilities through 2011, and in subsequent years to show moderate annual improvements in that funding ratio.

The Honorable James B. Moran
May 1, 2008
Page 3

To meet these IRS imposed conditions, the Board of Trustees determined based on actuarial and legal advice that the Pension Fund needs increased employer contributions. At their November 8, 2005 meeting, the Board accordingly amended the Pension Plan to require such increased contributions (at a rate the Board sets) in collective bargaining agreement renewals as a condition of continued participation, and approved specific rates reflecting 7% annual increases for contracts renewing by December 31, 2006. The Fund so notified all locals and employers participating in the Fund by special bulletin dated November 28, 2005 and held extensive meetings explaining the changes to local unions and employers.

At their November 8, 2006 meeting, again as recommended by the Pension Fund's actuaries to enable the Fund to comply with the funding ratio conditions imposed by the IRS, the Board of Trustees approved 8% per year as the required contribution rate increase for all collective bargaining agreements expiring in 2007. Local unions and participating employers were notified of this rate increase in December 2006.

The Pension Fund's Board of Trustees also asked the negotiators of the United Parcel Service, National Master Freight Agreement and Carhaul agreements to allocate to the Pension Fund fringe benefit contribution increases scheduled for 2006. The negotiators agreed to that allocation. Allocations of increased fringe benefit contributions to the Pension Fund were also made in 2007.

Throughout much of 2007 and at their Meetings held in January, February and March of this year, the Trustees received advice from the Fund's staff, legal counsel and actuaries with respect to the requirements of the Pension Protection Act of 2006 ("PPA"). As the Court is aware, beginning this year, the PPA establishes categories for multiemployer pension plans that correspond to each plan's funded status. The categories are: critical status ("red zone"), endangered status ("yellow zone"), or fully-funded status ("green zone"). Under the PPA, the plan's actuary must certify the plan's status. Although in recent years the Pension Fund's assets have grown and its funded ratios have improved to a certain extent, the actuary determined that if the Pension Fund's amortization extension granted by the IRS were to be disregarded, the Pension Fund would face a statutory funding deficiency. Largely based upon this consideration, and upon the advice of Fund counsel concerning the legal impact under the PPA of an amortization extension granted prior to the January 1, 2008 effective date of that

The Honorable James B. Moran
May 1, 2008
Page 4

statute, on March 24, 2008, the Fund's actuary certified the
Pension Fund to be in critical status.

Under the PPA, trustees of a plan in critical status must
develop a "rehabilitation plan" designed to improve the funded
status of the plan in accordance with PPA guidelines.  Following
the PPA-related briefings presented by staff, actuaries and legal
counsel during 2007 and the first quarter of 2008, at the March 25,
2008 Meeting, the Board of Trustees approved a rehabilitation plan
("Rehabilitation Plan") as required by the PPA.  The plan approved
by the Trustees attempts to build upon and incorporate the funding
improvement program instituted prior to the January 1, 2008
effective date of the PPA, and designed to ensure compliance with
the conditions imposed by the pre-PPA amortization extension.  In
broad outline, the Rehabilitation Plan approved by the Trustees
contains a "Primary Schedule," which will require each contributing
employer to agree to five years of 8% annual contribution increases
(7% if the increases began in 2006) in order to maintain current
benefit levels for the affected bargaining unit.  The PPA also
requires that a rehabilitation plan contain a "Default Schedule,"
which     must provide for the reduction in what the PPA terms
"adjustable benefits."  ("Adjustable benefits" under the PPA
generally include all benefits other than a contribution based
retirement benefit payable at age 65.)  Accordingly, the Pension
Fund's Rehabilitation Plan includes a Default Schedule providing
for 4% annual contribution rate increases and for the loss or
reduction of adjustable benefits for bargaining units electing that
Schedule.  The PPA also provides that if the bargaining parties
have   not   chosen   any   of   the   schedules   established   by   a
rehabilitation plan (i.e., the Primary or Default Schedule) within
180 days following the expiration of the parties' last labor
agreement, the Default Schedule will be imposed as a matter of law.

The PPA requires that the Pension Fund notify the plan
participants, bargaining parties and the Department of Labor that
it has been certified to be in critical status.  The Pension Fund's
staff has reported that the required critical status notices were
mailed on or before April 8, 2008.  The PPA also requires that the
unions and employers who are parties to labor agreements requiring
contributions to the Pension Fund be provided with the Schedules
(Primary and Default) of contributions and benefits approved by the
Trustees as part of the Fund's Rehabilitation Plan.  Staff has
reported that the Pension Fund provided these Schedules to the
bargaining parties on or before April 1, 2008.

The Honorable James B. Moran
May 1, 2008
Page 5

     Staff has also reported to the Board of Trustees that the
National Master Freight Agreement ("NMFA") employers, who account
for approximately 48% of the Pension Fund's contribution revenue,
have agreed under the new NMFA that became effective this year to
pension contribution rate increases conforming to the requirements
of the Fund's Primary Schedule under its  Rehabilitation Plan.
Staff has also reported that a high percentage of the contributing
employers whose labor agreements expired in 2006 and 2007 have
agreed to provide follow-on agreements in compliance with the Fund's
pre-PPA funding improvement program (requiring 7% annual increases
for employers with agreements expiring in 2006 and 8% increases for
employers with contracts expiring in 2007).  As a result, Staff has
informed the Trustees that it anticipates that most contributing
employers will elect to agree to the 8% contribution increase
required under the Fund's Rehabilitation Plan Primary Schedule.

<u>Financial Information - Investment Returns</u>

     The Pension Fund's investment return for  the first quarter
2008 was (6.44)%.

     The Fund's financial group prepared for the Trustees a
comparison of the Pension Fund's performance to the TUCS[1] universe
results published for the fourth quarter of 2007.  This comparison
(showing percent returns on investment) is summarized in the
following tables:

### Pension Fund's Composite Return

| | 4th Quarter Ended Dec. 31, 2007 | One Year Period Ending Dec. 31, 2007 | Three Year Period Ending Dec. 31, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | 0.09 | 10.23 | 11.92 |
| TUCS Median | (0.58) | 8.55 | 10.41 |
| TUCS Third Quartile | (1.08) | 7.64 | 9.41 |

---

     [1]"TUCS" is the Trust Universe Comparison Service. Its Custom
Large Funds Universe is composed of plans with assets exceeding
$3 billion.

F:260170 / AD092500 / 6/4/08

The Honorable James B. Moran
May 1, 2008
Page 6

| Fund's Composite Return | | | |
|---|---|---|---|
| | (1.58) | 6.55 | 10.42 |

## Pension Fund's Total Equity Return

| | 4th Quarter Ended Dec. 31, 2007 | One Year Period Ending Dec. 31, 2007 | Three Year Period Ending Dec. 31, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | (1.74) | 10.06 | 13.51 |
| TUCS Median | (2.55) | 8.62 | 12.17 |
| TUCS Third Quartile | (3.02) | 5.14 | 10.54 |
| Fund's Total Equity Return | (3.02) | 6.90 | 12.97 |

## Pension Fund's Fixed Income Return

| | 4th Quarter Ended Dec. 31, 2007 | One Year Period Ending Dec. 31, 2007 | Three Year Period Ending Dec. 31, 2007 |
|---|---|---|---|
| TUCS 1st Quartile | 3.34 | 7.99 | 5.25 |
| TUCS Median | 2.87 | 7.13 | 4.89 |
| TUCS Third Quartile | 2.31 | 6.46 | 4.69 |
| Fund's Fixed Income Return | 2.85 | 7.12 | 4.83 |

The Fund's named fiduciaries (Goldman Sachs Asset Management and Northern Trust Global Advisors, Inc.) submit monthly investment reports to the Trustees, summarized below (showing percent returns on investment:

## Goldman Sachs Asset Management

| | Year Ended Dec. 31, 2007 | First Quarter 2008 | Jan. 2008 | Feb. 2008 | Mar. 2008 |
|---|---|---|---|---|---|
| Goldman-Sach's Composite Return | 6.07 | (8.34) | (6.48) | (0.50) | (1.49) |

The Honorable James B. Moran
May 1, 2008
Page 7

| | | | | | |
|---|---|---|---|---|---|
| Benchmark<br>Composite Return | 6.08 | (7.91) | (6.29) | (0.81) | (0.92) |
| Goldman Sach's<br>Total Fixed<br>Income Return | 6.91 | 1.21 | 1.70 | (0.23) | (0.25) |
| Benchmark<br>Fixed Income<br>Return | 5.62 | 0.66 | 0.75 | (0.26) | 0.17 |

Goldman Sach's first quarter 2008 composite return included a (11.19)% return on U.S. equities ((10.91)% large cap and (12.04)% on small cap U.S. equities), (11.59)% on international equities and 1.59% on real estate.

## Northern Trust Global Advisors, Inc.

| | Year Ended<br>Dec. 31, 2007 | First Quarter<br>2008 | Jan.<br>2008 | Feb.<br>2008 | Mar.<br>2008 |
|---|---|---|---|---|---|
| Northern Trust's<br>Composite Return | 6.48 | (9.02) | (5.42) | (2.19) | (1.66) |
| Benchmark<br>Composite Return | 6.99 | (8.50) | (6.44) | (1.51) | (0.71) |
| Northern Trust's<br>Total Fixed<br>Income Return | 5.02 | (4.28) | (0.81) | (0.57) | (2.95) |

Northern Trust's first quarter 2008 composite return included a (11.71)% return on U.S. equities ((10.99)% large cap and (15.47)% on small cap U.S. equities), 9.63% on international equities and 2.58% on real estate.

The Fund's financial group reported asset allocation of the Pension Fund as whole as of March 31, 2008 as follows: 66% equity, 30% fixed income, 2% other and 2% cash. The financial group also reported that for the first quarter of 2008 the return on the indexed fixed income account was 2.42%. The passive equity account was funded on December 26, 2007; performance for the first quarter of 2008 was (8.12)%.

Financial Information - Net Assets
(Dollars shown in thousands and do not include final year end adjustments.)

The Honorable James B. Moran
May 1, 2008
Page 8


The financial report prepared by Fund staff for the three months ending March 31, 2008 shows net assets as of that date of $24,565,801, compared to $26,805,666 at December 31, 2007, a decrease of $2,239,865 compared to an increase of $107,088 for the same period last year. The $2,346,953 difference is due to $2,188,311 less investment income combined with $158,642 more net operating loss.

The Fund's staff report further notes that for the three months ended March 31, 2008, the Fund's net asset decrease from operations (before investment income) was $465,314 compared to a decrease of $306,672 for the same period in 2007, or a $158,642 unfavorable change. This change in net assets from operations (before investment income) was attributable to:

a) ($144,455) less contributions, primarily due to the UPS withdrawal,

b) ($14,352) more benefits paid, due to increase in pensioners, beneficiaries and average monthly benefits and

c) $165 less general and administrative expenses.

During the three months ended March 31, 2008 and 2007, the Fund withdrew $404,899 and $479,419, respectively, from investment assets to fund the cash operating deficit.

Financial Information - Participant Population

The March 31, 2008 report prepared by Fund staff further notes that the two-month average number of Full-Time Equivalent (FTE) memberships decreased 36.0% from February 2007 to February 2008 (going from 143,284 to 91,681). During that period, the average number of retirees increased by 0.2% (from 211,945 to 212,437).

Named Fiduciaries

Officers of the Named Fiduciaries, Goldman Sachs Asset Management and Northern Trust Global Advisors, Inc. met with the Board of Trustees during this quarter to discuss portfolio matters including asset allocation.

The Fund's financial group reported to the Board of Trustees at their March 25, 2008 meeting on investment expenses incurred through the fourth quarter of 2007. These investment expenses (fiduciary, custodial and investment management fees) totaled

The Honorable James B. Moran
May 1, 2008
Page 9


$78,707,545 through the fourth quarter of 2007 compared to
$82,929,794 for the same period in 2006, a 5.1% decrease.

Bankruptcies and Litigation

     The Fund's Executive Director continued to report to the
Trustees on employer bankruptcies, including interim recoveries
collected in the Funds' ongoing pursuit of claims for contributions
and withdrawal liability against Consolidated Freightways
Corporation and related entities. Approximately $59.5 million has
been collected to date from Consolidated Freightways companies.

Health and Welfare Fund
Financial Information
(Dollars in thousands and do not
include final year end adjustments.)

     The Health and Welfare Fund's financial summary for the first
quarter of 2008 is compared below with interim financial information
for the same periods of 2007:

|                                        | 1st Quarter Ended Mar. 31, | |
| --- | --- | --- |
|                                        | 2008 | 2007 |
| Contributions                          | $  287,777 | 280,519 |
| Benefits                               | (251,478) | (268,410) |
| TeamCare admin-istrative ex-penses     | (7,460) | (7,189) |
| General and ad-ministrative expenses   | (9,593) | (9,540) |
| Net operating income (loss)            | 19,246 | (4,620) |
| Investment in-come (loss)              | (5,198) | 13,027 |

The Honorable James B. Moran
May 1, 2008
Page 10

| | | |
|---|---|---|
| **Increase (Decrease) in net assets** | 14,048 | 8,407 |
| **Net assets, end of period** | 1,101,244 | 916,386 |
| **Two-month average participants (FTEs)** | 94,879 | 94,333 |

For the three months ended March 31, 2008, the Health and Welfare Fund's net asset increase from operations (before investment income) was as follows:

(a) $7,258 more contributions,

(b) $16,932 less benefits,

(c) ($271) more TeamCare administrative fees, and

(d) ($53) more general and administrative expenses.

Net investment income for the three months ended March 31, 2008 was $18,225 less than for the same period last year. This decrease resulted primarily from $19,176 unfavorable change in realized/unrealized gain (loss) offset by $971 more interest and dividend income.

During the three months ended March 31, 2008 and 2007, the Fund transferred $26,407 and $6,107, respectively, to investments (Mellon Bank) as the operations generated positive cash flows for those periods.

The enclosed report entitled "Central States Funds Financial and Analytical Information" prepared by the Fund's financial group as of March 31, 2008 shows the investment asset allocation as 76% fixed income and 24% equity.

This report also notes that the two month average number of Full-Time Equivalents (FTE) memberships increased 0.6% from February 2007 to February 2008 (going from 94,333 to 94,879). During that period, the average number of retirees covered by the Health and Welfare Fund decreased by 12.1% (from 16,938 to 14,894).

The Honorable James B. Moran
May 1, 2008
Page 11


Article V (H)

       As required by Article V(H) of the Health and Welfare Fund
Consent Decree, the Health and Welfare Fund has paid during the
first quarter of 2008 the following for professional services and
expenses for the Independent Special Counsel:

|          |        |
|----------|--------|
| January  | $276   |
| February | $0     |
| March    | $0     |

       I will be glad to provide additional details regarding any
aspect of my activities as Independent Special Counsel. Should you
have any questions or comments, please do not hesitate to contact
me.

                              Sincerely,


                              Frank J McGarr

                              /FRANK J. McGARR,


Enclosure

cc: Mr. Gregory F. Jacob (w/encl.) **Via UPS Next Day**
    Mr. Michael Schloss (w/encl.) **Via UPS Next Day**
    Mr. Thomas Nyhan
    Mr. William Nellis

F:260170 / AD092500 / 6/4/08

# EXHIBIT I

## Retirement Board

The mission of the State-Boston Retirement System (SBRS) is to ensure the City has sufficient financial resources to meet its retirement obligations to City employees, and to provide active employees with accurate, timely member services.

*Robert E. Tierney, Executive Officer*

The Boston Retirement Board Members:

Sally Glora, *City Auditor*
Lawrence Curran, *Chairman*
Edward Welch, *Elected Member*
John J. Perkins, *Elected by Board Members*
Mitchell Weiss, *Appointed by Mayor*

The board consists of two (2) members elected by active and retired members of the system; the city auditor (ex officio); one (1) member appointed by the Mayor of Boston; and one (1) member who is elected by the other four members of the board. The City of Boston Retirement Board serves members and retirees of all city line departments and agencies, as well as, the School Department, the Boston Redevelopment Authority, the Boston Housing Authority, the Public Health Commission, and the Boston Water & Sewer Commission.

### Some Facts & Figures

- There are 14,000+ retired members of the system
- There are 20,000+ active employee members of the system
- The present value of the system's assets is approximately $3.1 billion dollars
- Presently in Massachusetts there are 106 mandatory contributory retirement systems

### 2008 Pension Payroll - Mailing & Deposit Dates

Monthly pension checks will be mailed on the last Tuesday of each month. Direct deposit funds will be credited to accounts on the last Tuesday of the month, as well. November & December benefits will be issued earlier in the month to accommodate the holidays.

- January 29, 2008
- February 26, 2008
- March 25, 2008
- April 29, 2008
- May 27, 2008
- June 24, 2008
- July 29, 2008
- August 26, 2008
- September 30, 2008
- October 30, 2008
- November 25, 2008
- December 23, 2008

### Forms & Applications

Change of Address ⊡

View All Forms »

### Age Factor Chart

| Age | Group 1 | Group 2 | Group 4 |
|---|---|---|---|
| 65 + | 2.5 | 2.5 | 2.5 |
| 64 | 2.4 | 2.5 | 2.5 |
| 63 | 2.3 | 2.5 | 2.5 |
| 62 | 2.2 | 2.5 | 2.5 |
| 61 | 2.1 | 2.5 | 2.5 |
| 60 | 2.0 | 2.5 | 2.5 |