**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL RUBIN, | Case No. 08 Civ. 2233 (VM) |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| MF GLOBAL, LTD., et al., | CLASS ACTION |
| Defendants. | |

# FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

RECEIVED 10 NOV -5 PM 5:10 USDC SDNY CASHIERS

# TABLE OF CONTENTS

NATURE OF THE ACTION ......................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 7

PARTIES ....................................................................................................................... 8

    Plaintiffs ................................................................................................................. 8

    The Company and Individual Defendants ............................................................. 9

    The Underwriters ................................................................................................. 12

CLASS ACTION ALLEGATIONS ............................................................................ 18

FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ..................................... 20

    The Trading of Futures ....................................................................................... 20

    Confidential Witnesses ....................................................................................... 21

    The Historical and Continuing Relationship Between Man Group and MF
    Global ................................................................................................................. 23

    The Culture of MF Global ................................................................................... 27

    Risk Control at MF Global .................................................................................. 30

    Dooley's Trades .................................................................................................. 34

THE UNTRUE OR MISLEADING REGISTRATION STATEMENT AND
PROSPECTUS ............................................................................................................. 36

    Disciplined Approach to Risk ............................................................................. 44

THE TRUTH BEGINS TO BE REVEALED .............................................................. 49

FIRST CLAIM VIOLATION OF SECTION 11 OF THE SECURITIES ACT
AGAINST ALL DEFENDANTS .................................................................................. 69

SECOND CLAIM VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES
ACT AGAINST ALL DEFENDANTS ......................................................................... 72

THIRD CLAIM VIOLATION OF SECTION 15 OF THE SECURITIES ACT
AGAINST MAN GROUP, MAN GROUP UK, AND THE INDIVIDUAL
DEFENDANTS ARISING FROM VIOLATIONS OF SECTION 11 OF THE
SECURITIES ACT ....................................................................................................... 74

FOURTH CLAIM VIOLATION OF SECTION 15 OF THE SECURITIES ACT
AGAINST MAN GROUP, MAN GROUP UK, AND THE INDIVIDUAL
DEFENDANTS ARISING FROM VIOLATIONS OF SECTION 12(A)(2) OF
THE SECURITIES ACT ................................................................................................ 75

JURY DEMAND ............................................................................................................. 76

The MF Global Institutional Investors Group, consisting of the Iowa Public Employees'

Retirement System, the Policemen's Annuity & Benefit Fund of Chicago, the Central States,

Southeast and Southwest Areas Pension Fund and the State-Boston Retirement System, as Court-

appointed Lead Plaintiffs (collectively "Lead Plaintiffs"), brings this federal securities law class

action on behalf of all purchasers of common stock of MF Global, Ltd. ("MF Global" or the

"Company") pursuant or traceable to the Registration Statement and Prospectus issued in

connection with the Company's Initial Public Offering (the "IPO") on or about July 19, 2007

(the "Class").  The allegations herein are based upon the investigation of Lead Plaintiffs'

counsel, which included, among other things, a review of United States Securities and Exchange

Commission ("SEC"), Commodities Futures Trading Commission ("CFTC") and other

regulatory filings, securities analysts' reports, public statements, media reports, court records and

confidential witness interviews.

## NATURE OF THE ACTION

1.      Lead Plaintiffs bring this securities class action individually and on behalf of all

members of the Class seeking redress under Sections 11, 12(a)(2), and 15 of the Securities Act of

1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l, and 77o, which imposes strict liability for

material misstatements or omissions in a registration statement or prospectus.

2.      The Registration Statement and Prospectus issued in connection with the IPO

contained untrue statements of material facts or omitted material information required to be

stated therein or necessary to make the statements made therein not misleading.  In asserting the

claims set forth herein, Lead Plaintiffs are not contending, and expressly disclaim, any

suggestion that these allegations sound in fraud.

3.      On March 30, 2007, defendant Man Group, PLC ("Man Group") announced that

it intended to spin-off its brokerage business, then known as "Man Financial." The separation,

subject to approval of Man Group's shareholders, would be accomplished by an initial public offering on the New York Stock Exchange ("NYSE") of a majority interest in the new company, which would be known as "MF Global." The spin-off was targeted for the third quarter of 2007 and the initial registration statement for the IPO was filed thereafter on May 31, 2007.

4.      On July 18, 2007, MF Global announced that the IPO of approximately 97.4 million shares of its common stock had been priced at $30 per share – for anticipated gross proceeds of more than $2.92 billion – and that the shares would begin trading the following day, July 19, 2007.  Prior to the IPO, no public market existed for trading of the Company's securities.

5.      On July 20, 2007, defendants filed the Prospectus with the SEC pursuant to SEC Form 424(b)4.  The IPO Prospectus and the amended Registration Statement, which became effective as of the offering, are substantively identical.

6.      The Registration Statement and Prospectus purported to describe MF Global's operations and its *pro forma* financial results and also elaborated on the nature of the spin-off transaction and the relationship, both past and ongoing, that existed between MF Global and its former parent, Man Group.

7.      Key to the potential success of the Company was its need to manage the enormous potential risks attendant to its high volume brokerage and clearing operations. Accordingly, the Registration Statement and Prospectus sought to assure prospective shareholders and the investing public that the Company had in place and rigorously and consistently applied "a robust, globally integrated risk-management" system.  This risk management system purportedly included elaborate and time-tested systems and procedures, including continuous oversight and monitoring on a "real time" basis.

8.      Specifically, the risk management system at MF Global was billed as a "Disciplined Approach to Risk" and the Company was lauded in the Registration Statement and Prospectus as heir to the 200 year-old tradition of excellence and accomplished risk management employed by MF Global's former corporate parent, Man Group.  Defendants touted that the Company had entered into a "Group Risk Services Agreement" with its former corporate parent to ensure the continuity of that tradition of risk control and risk aversion, and, thereby, the existing system of controls in place at the time of the IPO.

9.      In addition, the Registration Statement and Prospectus pointed to other factors designed to assure the market of the Company's conservatism and precautions taken to minimize risk.  The Registration Statement and Prospectus described or referenced potential risks with statements suggesting that the risks were already effectively addressed by extant procedures, and that any residual risks, if and when realized, would result in liabilities that were insubstantial and immaterial to the Company's operations, its ability to do business or its profitability.

10.      The Registration Statement and Prospectus also painted a picture of a risk management system and procedures purportedly employed at MF Global that were more than adequate to allow the Company to operate in a predictable manner with controlled risk.  In fact, the Registration Statement and Prospectus repeatedly emphasized that a "core" value of the Company's management was careful and thorough attention to risk management.

11.      In truth, the actual risk management procedures employed in the Company's day-to-day operations prior to and at the time of the IPO and thereafter bore little or no resemblance to the highly touted risk management system described in the Registration Statement and Prospectus.  In particular:

(a)      prior to and at the time of the IPO, and continuing at least through February 28, 2008, the Company's brokers both engaged in trading in their own accounts and executed trades for clients for which MF Global assumed the risk but did not monitor, and for which margin requirements were removed.  Prior to and at the time of the IPO and continuing at least through February 28, 2008 – when the Company discovered that one of its brokers had traded over 15,000 wheat futures, or more than $750 million worth of wheat, well in excess of his margin limits and in violation of CTFC limits on the accumulation of positions for a single month's futures contracts, CFTC Rule 150.2, 17 C.F.R. § 150.2, costing the Company more than $141 million – the Company failed to enforce margin requirements and compliance with CFTC regulations, and disabled controls on brokers trading in their own accounts and controls on brokers executing customer trade orders, so that trades could occur more quickly; and,

(b)      prior to and at the time of the IPO and continuing at least through February 28, 2008, the Company's "back office" – its primary risk management apparatus – was wholly inadequate and unable to monitor the Company's large volume of trades, much less on a "real time" basis.  The "back office" was further overwhelmed as a result of the Company's 2005 acquisition of substantially all of the assets of Refco – a company that itself had been penalized 140 times by the CFTC for violations that included filing false trading reports, inadequate record-keeping, and inadequate supervision of its brokers.

12.      As a result, at the time of the IPO it was not true that there was merely a "risk" that the Company's risk management system might fail at some point in the future.  *On the contrary, the Company's risk management system at that time was fatally undermined by the glaring flaws in controls with regard to brokers' own accounts and  brokers' execution of customer orders.*  These controls had been disabled, ignored and/or readily bypassed where the

4

Company faced the greatest risk, all unbeknownst to investors and contrary to the disclosures in the Registration Statement and Prospectus.

13.     The fundamental weaknesses in the Company's risk management system with respect to the lack of limits on trading in broker accounts or on the execution of customer orders by brokers should have been apparent to anyone who engaged in meaningful due diligence at the time of the IPO.  However, the first public disclosure of the true state of the Company's risk management system came on February 28, 2008 when the Company announced that Evan "Brent" Dooley ("Dooley"), one of its employee brokers (also known as associated persons or "APs"), working from a computer at home, had engaged in unauthorized trading of wheat futures.  Dooley had run up an astounding trading loss amounting to some *$141 million* reportedly in the brief span of a few hours overnight and early in the morning before the commodities markets officially opened.  Upon disclosure that the Company would have to clear the unauthorized trading and absorb the $141 million loss, the stock market, predictably, reacted sharply to the spectacular revelations regarding the Company's astounding lack of risk management and management's explanation that controls were simply allowed to be "turned off" on some computers.  This constituted the first disclosure to the investing public that MF Global's internal risk controls were not applied to brokers trading for their own accounts or executing client orders and that MF Global deactivated controls that should have limited its exposure to market risks in brokerage accounts by restricting trading and by managing margin credit with collateral and other requirements in order to speed transactions.

14.     In response to the February 28, 2008 disclosure and the massive risk management failure it exposed, the Company's management initially sought to deflect criticism by characterizing the matter as a fluke and unconvincingly stated that the Company's risk

management system had not, in fact, "failed" but that it had simply been "turned off" on a few computers "to allow for speedier transactions by brokers at the firm who traded for themselves or took customer orders by phone."[1]   However, the magnitude of the drop in the Company's stock price, from $29.28 at the close of trading on the day before to a low of $20.70 that day, corresponding to a loss of equity of $1.14 billion, was far in excess of the $141 million lost through the Dooley trades.  The magnitude of the drop in MF Global's stock price, and the resulting loss of $1.14 billion in equity, reflected the fact that the market considered the disclosure to be an admission that the Company had, and continued to have, a highly deficient risk management system that materially diverged from the purported conservative, "robust" risk management system, with "real time" monitoring of transactions that Defendants claimed to employ in the Registration Statement and Prospectus.  Further, this was not simply an isolated and never-to-be-repeated incident caused by a single "rogue" employee, but rather was indicative of a highly deficient system of controls.  According to Mark Williams, a finance professor at Boston University who was quoted in a Bloomberg article dated March 6, 2008, "[Defendants] are sophisticated, smart people who should have known better."  Mr. Williams stated, "There's no question when you have a loss of this magnitude that there's a breakdown in controls."

15.     Knowledgeable industry observers, securities analysts, and ratings agencies, moreover, discerned that there were other facts which remained undisclosed in the Company's explanation, including that MF Global's control system in place prior to and at the time of the IPO and used following the IPO was commonly "turned off" and/or bypassed by employees to facilitate trades in their own accounts or when executing trade orders for customers.  The purported explanation by the Company of the Dooley wheat futures trading event was not viewed as completely credible by securities analysts, ratings agencies and others. These market

---

[1]        *See* February 29, 2008 *Wall Street Journal* article and February 28, 2008 conference call transcript.

commentators and agencies revised their ratings and recommendations for the Company and repeatedly commented that the event was an indication of a fundamentally flawed risk management system rather than a single "incident" costing the Company more than $141 million.

16.     In the days and months that followed, however, further revelations made clear that despite the purported elaborate risk management safeguards employed by the Company and management's purported dedication and commitment to managing risk in the Company's operations as described in the Registration Statement and Prospectus, the Company simply did not have the protections the Registration Statement and Prospectus claimed existed against operating risks.  Controls over key risk areas such as broker trading and broker execution of trades requested by customers were either nonexistent or, at best, ineffective – not only was the overstretched risk management back office understaffed, the Company failed to require its brokers to adhere to its own margin requirements and CFTC regulations when trading for their own accounts or when executing trades requested by customers. Thus, where controls were most needed and required to comply with the Company's legal obligations, there were virtually no controls at all.

17.     This action was filed on March 6, 2008.  On that date, the Company's share price hit a low of $17.90 before closing at $18.50.  This was dramatically lower than the Company's IPO price of $30.00 per share.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).

20.     Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). Pursuant to 28 U.S.C. § 1391(d), MF Global, Man Group and Man Group U.K. may properly be sued in any District in the United States, including the Southern District of New York.  Moreover, MF Global's principal executive offices are located in New York City and its common stock trades on the NYSE, which is located in this District.  Thus, venue is proper in this District.

21.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

### Plaintiffs

22.     Lead Plaintiff, the Iowa Public Employees' Retirement System ("IPERS"), was founded on July 4, 1953, to provide a dependable and economical retirement plan for Iowa's public employees.  IPERS manages over $23 billion in assets for the benefit of over 250,000 active members and retirees and is the 62nd largest pension fund in the United States.  As set forth in the attached certification, IPERS purchased shares of MF Global pursuant and/or traceable to the untrue and/or materially misleading Registration Statement and Prospectus and was damaged thereby.

23.     Lead Plaintiff, the Policemen's Annuity & Benefit Fund of Chicago ("PABF"), was established in 1921 with the mission of providing retirement benefits to the members of the Chicago Police Department and their spouses.  As of December 31, 2006, PABF serviced 26,370

members, including active employees and retirees.  In 2006, PABF's net asset base was $4.19

billion.  As set forth in the attached certification, PABF purchased shares of MF Global pursuant

and/or traceable to the untrue and/or materially misleading Registration Statement and

Prospectus and was damaged thereby.

       24.     Lead Plaintiff, the Central States, Southeast and Southwest Areas Pension Fund

("Central States"), is a multiemployer, collectively bargained pension fund, established in 1955,

which administers benefits for hundreds of thousands of participants, dependents and retirees.

Most of the labor agreements under which contributions are paid to Central States are negotiated

by affiliates of the International Brotherhood of Teamsters.  Central States has approximately

100,000 active participants and makes benefit payments to more than 200,000 retirees and

surviving spouses each month.  Benefit payments in 2007 exceeded $2.63 billion.  The Central

States' assets as of December 31, 2007 were in excess of $26 billion.  As set forth in the attached

certification, Central States purchased shares of MF Global pursuant and/or traceable to the

untrue and/or materially misleading Registration Statement and Prospectus and was damaged

thereby.

       25.     Lead Plaintiff, The State-Boston Retirement System ("State-Boston"), provides

retirement benefits for the employees of the City of Boston, Massachusetts.  It has more than

34,000 active and retired members, representing 106 mandatory retirement systems, and more

than $3.1 billion in assets.  As set forth in the attached certification, State-Boston purchased

shares of MF Global pursuant and/or traceable to the untrue and/or materially misleading

Registration Statement and Prospectus and was damaged thereby.

**The Company and Individual Defendants**

       26.     At the time of the commencement of this action and until January 4, 2010,

Defendant MF Global was a Bermuda-registered company.  It is currently a corporation

organized under the laws of Delaware, with its principal executive offices located at 717 Fifth Avenue, New York, New York 10022.  The Company was formerly known as Man Financial, the brokerage arm of Man Group, a British hedge fund, and was spun-off to form its own publicly-traded company via the IPO.  MF Global, through its wholly-owned subsidiaries, reportedly is the world's leading broker of exchange-listed futures and options.  It provides execution and clearing services for exchange-traded and over-the-counter ("OTC") derivative products, as well as for non-derivative foreign exchange products and securities in the cash market.  MF Global is a "specialty" broker, whose focus is on providing both brokerage execution and clearing services to its clients.  At the time this action was commenced, MF Global did not engage in non-brokerage businesses, such as investment banking, asset management or principal investments.  MF Global's common stock trades on the NYSE under the ticker symbol "MF."

27.    Defendant Man Group is the former parent of MF Global.  Man Group received almost $3 billion in proceeds from the IPO and still retains an 18.6% stake in the Company. Through its ownership and control of the Company, Man Group is a controlling person of MF Global within the meaning of the Securities Act.

28.    Defendant Man Group UK Ltd. ("Man Group UK"), a wholly-owned special purpose subsidiary of Man Group, was the "principal selling shareholder" of the common stock offered though MF Global's IPO and sold all of the MF Global common stock offered to the public in the IPO.  Man Group UK was incorporated in the U.K. on June 23, 2006, and formed specifically for purposes of facilitating MF Global's IPO.  Man Group UK was distinct from Man Group only as a legal formality and there is complete identity of interest between them. They have the same address, the same officers and all proceeds from the IPO were passed

through Man Group UK to Man Group.  Man Group UK is not prejudiced by its addition as a defendant.

29.    Defendant Kevin R. Davis ("Davis") was at all relevant times herein the Company's Chief Executive Officer and a Director and in such capacity signed or authorized the signing of the Registration Statement and thereby approved issuance of the Prospectus. Defendant Davis resigned his positions with the Company as of October 28, 2008.

30.    Defendant Amy S. Butte ("Butte") was the Company's Chief Financial Officer and a Director at the time of the IPO, and in such capacity signed or authorized the signing of the Registration Statement and thereby approved issuance of the Prospectus.  Defendant Butte resigned her positions with the Company effective January 3, 2008.

31.    Defendant Alison J. Carnwath ("Carnwath") was at all relevant times herein the Company's Non-Executive Chairman of the Board of Directors and in such capacity signed or authorized the signing of the Registration Statement and thereby approved issuance of the Prospectus.  Carnwath is no longer Chairman of the Board of Directors but remained a director of the Company until August 12, 2010.

32.    Defendant Christopher J. Smith ("Smith") was at all relevant times herein the Company's Chief Operating Officer, Deputy Chief Executive Officer and a Director and in such capacity signed or authorized the signing of the Registration Statement and thereby approved issuance of the Prospectus.

33.    Defendant Christopher Bates ("Bates") was at all relevant times herein the Company's Group Controller and in such capacity signed or authorized the signing of the Registration Statement and thereby approved issuance of the Prospectus.

34.     Defendant Henri J. Steenkamp ("Steenkamp") was at all relevant times herein the Company's Vice President of Corporate Financial Reporting – MF Global's Principal Accounting Officer – and in such capacity signed or authorized the signing of the Registration Statement and thereby approved issuance of the Prospectus.

35.     Defendant Edward L. Goldberg ("Goldberg") was at all relevant times herein a member of the Company's Board of Directors and signed the Registration Statement in that capacity via delegation of authority to defendants Davis and Butte and thereby approved issuance of the Prospectus.

36.     Davis, Butte, Carnwath, Smith, Bates, Steenkamp and Goldberg are collectively referred to hereinafter as the "Individual Defendants."

### The Underwriters

37.     The following were underwriters for the MF Global IPO and are listed with their principal business addresses and the number of shares of MF Global they obtained and sold in the IPO:

| LEAD BOOK-RUNNING UNDERWRITER DEFENDANTS | Number of Shares |
| --- | --- |
| Citigroup Global Markets Inc.<br>388 Greenwich Street<br>New York, NY 10013 | 12,827,962 |
| J.P. Morgan Securities Inc.<br>277 Park Avenue<br>New York, NY 10172 | 12,827,959 |
| Merrill Lynch, Pierce, Fenner & Smith Inc.<br>4 World Financial Center<br>New York, NY 10080 | 12,827,959 |
| UBS Securities LLC<br>299 Park Avenue<br>New York, NY 10171 | 12,827,959 |

| **ADDITIONAL LEAD**<br>**UNDERWRITER DEFENDANTS** | **Number**<br>**of Shares** |
|---|---|
| Credit Suisse Securities (USA) LLC<br>Eleven Madison Avenue<br>New York, NY 10010 | 4,581,414 |
| Deutsche Bank Securities Inc.<br>60 Wall Street<br>New York, NY 10005 | 4,581,414 |
| Goldman, Sachs & Co.<br>85 Broad Street<br>New York, NY 10004 | 4,581,414 |
| Morgan Stanley & Co. Inc.<br>1585 Broadway<br>New York, NY 10036 | 4,581,414 |
| ABN AMRO Rothschild LLC<br>6th Floor, Park Avenue Plaza<br>55 East 52nd Street<br>New York, NY 10055 | 4,581,414 |
| Banc of America Securities LLC<br>9 West 57th Street<br>New York, NY 10019 | 1,308,975 |
| BMO Capital Markets Corp.<br>3 Times Square<br>New York, NY 10036 | 1,308,975 |
| HSBC Securities (USA) Inc.<br>452 Fifth Avenue<br>New York, NY 10018 | 1,308,975 |
| Keefe, Bruyette & Woods, Inc.<br>787 Seventh Avenue<br>New York, NY 10019 | 1,308,975 |
| Sandler O'Neill & Partners, L.P.<br>919 Third Avenue<br>6th Floor<br>New York, NY 10022 | 1,308,975 |

Wachovia Capital Markets, LLC                1,308,975
375 Park Avenue
New York, NY 10152

Total for Lead Underwriter Defendants        83,774,429

| **ADDITIONAL**<br>**UNDERWRITER DEFENDANTS** | **Number**<br>**of Shares** |
|---|---|
| Blaylock & Co., Inc.<br>399 Park Avenue #F15<br>New York, NY 10022 | 213,018 |
| Calyon Securities (USA) Inc.<br>1301 Avenue of the Americas<br>New York, NY 10019 | 213,018 |
| Chatsworth Securities LLC<br>95 East Putnam Avenue<br>Greenwich, CT 06830 | 213,018 |
| CL King & Associates, Inc.<br>551 Madison Avenue, 8th Floor<br>New York, NY 10022 | 213,018 |
| Dowling & Partners Securities, LLC<br>190 Farmington Avenue<br>Farmington, CT 06032-1713 | 213,018 |
| E*TRADE Securities LLC<br>135 E. 57th Street 31St Floor<br>New York, NY 10022 | 213,018 |
| Fortis Securities LLC<br>520 Madison Avenue, 3rd Floor<br>New York, NY 10022 | 213,018 |
| Guzman & Co.<br>One Guzman Plaza<br>101 Aragon Avenue<br>Coral Gables, FL 33134 | 213,018 |
| ING Financial Markets, LLC<br>1235 Avenue of the Americas<br>New York, NY 10019 | 213,018 |

14

Jefferies & Co., Inc.                                  213,018
520 Madison Avenue, 12th Floor
New York, NY 10022

Lazard Capital Markets LLC                             213,018
30 Rockefeller Plaza
New York, NY 10020

M.R. Beal & Co.                                        213,018
110 Wall Street, 6th Floor
New York, NY 10005

Mizuho Securities USA Inc.                             213,018
1251 Avenue of the Americas, 33rd Floor
New York, NY 10020

Muriel Siebert & Co., Inc.                             213,018
885 Third Avenue, 17th Floor
New York, NY 10022

Oppenheimer & Co. Inc.                                 213,018
125 Broad Street
14th Floor
New York, NY 10004

Piper Jaffray & Co.                                    213,018
800 Nicollet Mall, Suite 800
Minneapolis, MN 55402

Raymond James & Associates, Inc.                       213,018
880 Carillon Parkway
St. Petersburg, FL 33716

RBC Capital Markets Corp.                              213,018
One Liberty Plaza
165 Broadway
New York, NY 10006

Robert W. Baird & Co. Inc.                             213,018
777 East Wisconsin Avenue
P.O. Box 0672
Milwaukee, WI 53201

Samuel A. Ramirez & Co., Inc.                          213,018
61 Broadway, 29th Floor
New York, NY 10006

| | |
|---|---|
| SMH Capital Inc.<br>527 Madison Ave, #14<br>New York, NY 10022 | 213,018 |
| Stifel, Nicolaus & Co., Inc.<br>One Financial Plaza<br>501 North Broadway<br>St. Louis, MO 63102 | 213,018 |
| Sun Trust Capital Markets, Inc.<br>3333 Peachtree Street NE<br>Atlanta, GA 30326 | 213,018 |
| The Williams Capital Group, L.P.<br>650 5th Avenue, 11th Floor<br>New York, NY 10019 | 213,018 |
| Utendahl Capital Partners, L.P.<br>30 Broad Street, 21st Floor<br>New York, NY 10004 | 213,018 |
| Wells Fargo Securities, LLC<br>600 California Street, Suite 1600<br>San Francisco, CA 94108 | 213,018 |
| William Blair & Co., LLC<br>222 West Adams Street<br>Chicago, IL 60606 | 213,018 |
| **Total for Additional Underwriter Defendants** | 13,605,336 |
| **UNNAMED LEAD BOOK-<br>RUNNING UNDERWRITER** | |
| Lehman Brothers Inc.<br>745 Seventh Avenue<br>New York, NY 10019 | 12,827,959 |
| **TOTAL FOR ALL UNDERWRITERS** | **97,379,765** |

38.     The Underwriters were at all relevant times entities engaged in the business of investment banking, underwriting and selling securities to the investing public.  Lehman Brothers Inc. ("Lehman"), in light of its bankruptcy, is not named as a defendant.  The

16

Underwriter Defendants, however, are jointly and severally liable for Lehman's conduct pursuant to 15 U.S.C. § 77k(f)(1).

39.     In connection with the MF Global IPO in July 2007, the Underwriters were paid over $96,405,000 in gross fees – funds paid indirectly by purchasers of the Company's shares. The Underwriters were paid at least $0.90 per share in connection with the sale of 107,116,000 shares (including 97,379,765 shares and additional shares sold pursuant to the exercise of the underwriter's over-subscription option) as follows:

|  | **Per Share** | **Without Option** | **With Option** |
|---|---|---|---|
| Public offering price | $30.00 | $2,921,392,950.00 | $3,213,532,260.00 |
| Underwriting discount | $0.90 | $87,641,788.50 | $96,405,967.80 |
| Proceeds before expenses | $29.10 | $2,833,751,161.50 | $3,117,126,292.20 |

(*Prospectus*, p. 208)

40.     Shareholders paid over $96.40 million in combined fees to compensate the Underwriters for conducting their "due diligence" investigation into MF Global in connection with the IPO.  The Underwriters' due diligence investigation was a critical component of the IPO that was supposed to provide investors with important safeguards and protections.

41.     The due diligence investigation that the Underwriters performed should have encompassed a detailed investigation into MF Global sales, accounting, controls and procedures and also required the Underwriters to test the Company's assumptions to the extent a reasonable investor with access to such confidential corporate information would.  A reasonable due diligence investigation should have extended well beyond a cursory review of MF Global's books and records, and its accounting, financial reports, operational, financial and risk management controls.  The Underwriters, however, failed to conduct an adequate due diligence investigation prior to the IPO.  The failure of the Underwriters to conduct an adequate due

diligence investigation was a substantial contributing factor leading to the harm complained of herein.

## CLASS ACTION ALLEGATIONS

42.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased shares of MF Global common stock pursuant or traceable to the Registration Statement and Prospectus issued in connection with MF Global's IPO.  Excluded from the Class are: defendants; the officers and directors of the Company, of Man Group, Man U.K. and of the Underwriter Defendants at all relevant times; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which any defendant has or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  After the IPO, MF Global's shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MF Global or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' violations of the securities laws complained of herein.

45.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the defendants violated the federal securities laws as alleged herein;

(b)     whether the Registration Statement and Prospectus contained untrue statements of material facts about MF Global and its risk management policies, procedures and systems or failed to include material facts necessary to make the statements made not misleading;

(c)     whether Man Group and the Individual Defendants are controlling persons of MF Global within the meaning of § 15 of the Securities Act;

(d)     whether defendants performed appropriate due diligence in advance of the IPO; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### The Trading of Futures

48.     A *futures contract* is a standardized contract to buy or sell a specified commodity of a standardized quality at a certain date in the future, at a price determined by the market.  A futures contract gives the holder the obligation to make or take delivery under the terms of the contract.  The parties to a futures contract must fulfill the contract on the settlement date.  The seller must deliver the underlying asset to the buyer, unless the parties exit their commitments prior to the settlement date with a matching transaction by buying back a short position or selling a long position, thereby closing out the futures position and its contract obligations.  An investor who holds a short position will benefit if the value of the futures contract declines; conversely, an investor who holds a long position will benefit if the value of the futures contract rises.

49.     *Futures* are traded on an exchange.  The exchange acts as the counterparty (the party on the opposite side of a transaction) on all contracts, sets margin requirements, and provides a mechanism for settlement.  Different exchanges trade different types of futures.  The Chicago Mercantile Exchange (the "CME," formerly the Chicago Board of Trade ("CBOT")) trades, among other things: currencies; interest rate derivatives; agricultural commodities including corn, soybeans, wheat, pork, cattle, butter, and milk; and metals, including gold and silver.  Trading is conducted on the exchange by two methods: open outcry (trading during regular business hours in a trading pit) and electronically (around-the-clock trading via an online trading platform (*e.g.*, Globex)).

50.     *Margin* is collateral that the holder of a futures position must deposit to cover the risk to the counterparty, *i.e.*, the exchange, or default on the transaction.  A margin is typically 5%-15% of the contract's value and is determined by the exchange based on contract value and market risk.  Members of the exchange (*e.g.*, MF Global) are responsible for monitoring their

customers' margin accounts.  According to the CME, margins "help[] to ensure the financial integrity of brokers, clearing members and the exchange as a whole."

51.     The *first notice day* is the first day that a notice of intent to deliver a commodity can be made by a clearinghouse to a buyer in fulfillment of a given month's futures contract. This day varies by contract and exchange rules.  Only a registered Futures Clearing Merchant (FCM) that has proven its capability to receive and deliver the physical commodity may do so. Rather than taking delivery, a buyer may, alternatively, roll the contract over to the next contract period.  The roll over period begins eight days prior to the date the contract expires and is often marked by a high volume of trading as contracts are rolled over to the next contract period.

52.     *Real-time* in connection with financial transactions means during the actual time that the transaction is taking place, that is, current as opposed to delayed.  Accordingly, when defendants state that the Company engages in "real-time" monitoring of trading as part of its risk management system, this indicates that they are checking proposed transactions for compliance at the same time (*i.e.*, simultaneously) that the transactions are to be executed, rather than some later time after the transactions have already been consummated.

53.     *Robust* in connection with a risk management system means that the system is capable of performing well under exceptional circumstances despite the occurrence of disruptive events or variations in market conditions.

### Confidential Witnesses

54.     CW 1 was a licensed broker who worked on MF Global's global trading desk in Chicago.  CW 1 joined MF Global when it purchased Refco and remained at MF Global until late Spring 2008.  CW 1 was employed by the Company at the time of the IPO.  CW 1 traded on behalf of MF Global customers, who would contact CW 1 directly with their trade orders.  CW 1

reported to a supervisor on the trading desk, who in turn reported to the manager of the global trading desk.

55.     CW 2 was a senior credit analyst at MF Global in New York from 2006 until late 2007.  CW 2 was employed by the Company at the time of the IPO.  CW 2 was part of a group of senior credit analysts in New York who approved credit lines and counter-party lines for institutional customers of MF Global such as hedge funds and mutual funds.  CW 2 reported to the vice president of credit, who in turn reported to the head of market risk at MF Global.  CW 2's group was physically located next to the risk department in MF Global's New York office.

56.     CW 3 was a commodities retail broker at Lind-Waldock, a division of MF Global, who worked in its Chicago office at the Chicago Board of Trade ("CBOT") around or shortly after the time of the Company's IPO and for five months following the IPO.  CW 3 traded in currencies, grains, energies, metals and financials for Lind-Waldock, which used the same hardware and software computer and trading systems as MF Global.  CW 3 dealt with clients by phone and reported to a director who headed the global trading desk.

57.     CW 4 was a junior commodities broker for MF Global from 2005 until March 2008.  CW 4 was employed by the Company at the time of the IPO.  CW 4 worked in MF Global's Kansas City Office, assisting with the execution of commodities trades and options trades in a variety of commodity and equity markets.  CW 4 also managed CBOT arbitration hotline and electronic platform, and relayed quotes and executed inter-market orders between commodity exchanges via telephone and Internet.

58.     CW 5 was a senior futures and options broker in MF Global's Chicago office from Spring 2001 until Spring 2007, three and one-half months before the Company's IPO.  CW 5 reported to the head of Treasury at MF Global in New York, who in turn reported to Davis.

CW 5 supervised two brokers on the Company's Treasury bond trading desk in Chicago and was a member of the CME and CBOT.

59.     CW 6 was an accounts manager who reported to Steve Grady, the CEO of MF Global Chicago, who in turn reported to Davis.  CW 6 was employed by Man Group and then MF Global from 1996 until Fall 2008.

60.     CW 7 was an accounts supervisor who worked for Man Group and then MF Global from 1999 through 2009.  CW 7 reported to a supervisor who, in turn, reported to Steve Grady.

**The Historical and Continuing Relationship Between Man Group and MF Global**

61.     The historical and continuing relationship between Man Group and MF Global was described in the Registration Statement and Prospectus in part as follows:

**The Reorganization and Separation Transactions**

***The Reorganization***

> Prior to the Reorganization, Man Group conducted our business – its brokerage division – and its asset management business through numerous direct and indirect subsidiaries, and each division operated autonomously from one another.  In recent months, through a series of transactions, Man Group reorganized its corporate structure to separate its brokerage division from its asset management division.  The brokerage division, which Man Group historically operated under the name Man Financial, consists of all of our business, comprised of execution and clearing services for derivatives and cash products in financial markets throughout Europe, North America and the Asia/Pacific region.

(*Prospectus*, p. 47)

62.     The Registration Statement and Prospectus further described "The Separation" of MF Global from its parent, Man Group, in part, as follows:

**The Separation**

* * *

> *... we and several of our subsidiaries have entered into several transitional services agreement and other agreements with Man Group, which govern.... the ongoing business relationships between us.* The principal agreements include the following... .
> Group Risk Services Agreement

(*Prospectus*, pp. 47-48) [Emphasis added.]

63.     In describing MF Global's separation from Man Group, defendants represented that MF Global had secured adequate and effective corporate-level support services from its former parent which purportedly provided MF Global with enhanced "risk management" controls and procedures.  The Registration Statement and Prospectus described the purported benefits of these procedures as follows:

### Group Risk Service Agreement

> *We have historically relied on Man Group to provide us with enterprise-level oversight of our global risk-management operations.*  Following this offering, we intend to manage our global risk-management activities on stand-alone basis with our own personnel.  To this end, we have entered into a group risk services agreement with Man Group pursuant to which Man Group has agreed to provide us with a license to use its global risk-management systems and processes it has used historically to provide us with these services.  These systems and processes will allow us, among other things to:
>
> calculate the economic capital required for various risk categories associated with our business at specified confidence levels, as well as the overall level of economic capital of our business;
>
> carry out and produce a report relating to stress-testing of our business as part of the Internal Capital Adequacy Assessment Process documentation requirements;
>
> prepare reports supporting Internal Capital Adequacy Assessment Process;
>
> prepare annual liquidity scenarios and test our liquidity contingency plan; and
>
> provide training in respect of credit aggregation and limit monitoring systems.

> Pursuant to the group risk services agreement, *Man Group will also agree to provide ongoing risk-management support and consulting services to us for a period of 12 months following this offering*.  We have agreed to pay Man Group an annual fee of $120,000 plus an aggregate fee of $160,000 per month, plus any interest for late payments, for the group risk services.  In fiscal 2007, we paid Man Group approximately $3.5 million in the aggregate for global risk management services provided to us.

(*Prospectus*, p. 183) [Emphasis added.]

## The IPO

64.     The Prospectus defines "Man Group" as follows:

> "Man Group" refers to Man Group plc, a U.K. public limited company, and its subsidiaries (which following reorganization and separation, exclude MF Global and its subsidiaries.)  Prior to this offering, Man Group owned all of our issued and outstanding share capital.

(*Prospectus*, p. 1).

65.     In addition, the Prospectus, which became effective on July 18, 2007, states on its cover "Proceeds [from the IPO], before expenses, to Man Group."

66.     Man Group, through its wholly owned, special purpose subsidiary, Man Group UK, was the real owner of 100% of the MF Global common shares being offered, and was named in the Prospectus as the "Principal and Selling Shareholder."   Man Group UK is identified only once in the 215-page Prospectus, in a paragraph entitled "Use of Proceeds," as "the Man Group selling shareholder," and in Ex. 1.1 to the Registration Statement.   Man Group UK was incorporated in the United Kingdom on June 23, 2006, less than a year before Man Group announced the IPO in a press release and conference call on March 30, 2007.  To date, Man Group UK has made only six SEC filings.   The first two SEC documents were filed on July 18 and July 20, 2007 (in conjunction with the effective date of the IPO on July 18, 2007); the

third SEC document was a Schedule 13G filed on February 11, 2008.  All three filings concern

the beneficial ownership of MF Global shares.[2]

67.     The reporting person on the first two filings was Peter Clarke, who also was the

CEO of Man Group at the time of the IPO.  Another Man Group executive officer, Barry John

Wakefield, signed the February 11, 2008 Schedule 13G – jointly filed by both Man Group and

Man Group UK – as both Deputy Secretary of Man Group and Secretary of Man Group UK.

Man Group UK shares the same business address as Man Group:  Sugar Quay, Lower Thames

Street, London EC3R 6DU.

68.     As the sole shareholder, Man Group retained control over MF Global's business

policies until such time as it could sell more than 80% of its MF Global stock.   Specific control

provisions were drafted into the Registration Statement, which provided that

> In the event that Man Group continues to own 20% or more of
> [MF Global's] issued and outstanding shares following the
> completion of this offering, Man Group will be required under
> U.K. capital regulations to continue to consolidate our business
> with its own for regulatory capital purposes and, as a result, its
> own regulatory capital obligations will continue to be affected by
> our business. Consequently, Man Group will retain the right to
> continue to monitor and exercise a degree of control over the
> management of our business until such time as it ceases to own
> 20% of our common shares.

(*Registration Statement*, p. 180).

69.     The Prospectus further stated that  Man Group possessed "enterprise-level

oversight of [MF Global's] global risk-management operations" at the time of the IPO.

(*Prospectus*, p. 183.)

---

[2]      The remaining three SEC documents concern the sale of Man Group UK's MF Global stock to an unidentified, unaffiliated third party buyer.  As of May 26, 2010, Man Group UK no longer owned any MF Global stock.  The SEC filings do not indicate the type of business, if any, run by Man Group UK.

70.     Through Man Group UK, Man Group also was a signatory to the Form of Purchase Agreement, together with the professional Underwriters of the IPO and MF Global, the issuer.  This Agreement governed the sale by the Selling Shareholder (Man Group, through Man Group UK) of MF Global common shares to the Underwriters, including an option for the Underwriters to purchase additional common shares in the event of overallotments.  As the Selling Shareholder, Man Group stood to receive all net proceeds from the IPO, earning almost $3 billion.

### The Culture of MF Global

71.     MF Global's IPO was announced on July 18, 2007, and its shares began trading on July 19, 2007.  At the time of its IPO, MF Global was the largest executor of off-hour trades of Chicago-traded futures.

72.     Organizationally, the Company was an aggregation of disparate units that had developed, over time, as a consequence of MF Global's acquisitions of various lines of business. Each of the Company's units – even after it became part of MF Global – had its own culture, and, notably, its own approach to risk controls.  Notwithstanding that they were now part of one company, these groups continued to operate as separate units.  Accordingly, at the time of the IPO, there was not merely a *risk* that MF Global's acquisitions would undermine the Company's existing mechanisms for ensuring risk compliance and supervising employees; rather, recent acquisitions including, in particular, the Refco acquisition, had in fact *already* rendered risk compliance and supervision of employees impossible.

73.     For example, when CW 5 began working at the Company in 2001, CW 5's division was an autonomous entity under the auspices of Man Financial.  In 2004, MF Global "bought out" the division where CW 5 worked, but the division still retained its own profit and loss statements and, as one of MF Global's profit centers, quarterly bonuses were calculated

27

based on the division's earnings rather than corporate earnings.  Other divisions of MF Global had their own relationship to the Company and their own degree of autonomy; according to CW 5, "each group had a different deal." CW 5 stated, "Each group was looking out for itself and not for the firm," and that "Everyone was competing against each other."

74.     MF Global's business depended on execution of trades.   MF Global made money by taking trades that no one else would take and enabling trades to be executed as rapidly as possible, including trade orders received by brokers from customers.  As early as 2005, according to CW 5, senior management (*i.e.*, Davis and others) authorized removal of controls due to the need to maintain competitive viability that depended on the seconds or fractions of seconds required to execute large volume trades in real time.  The Company's brokers were paid on commission, and, accordingly, their interests aligned with those of the Company to maximize trades and, thereby, their commissions.  The brokers, in turn, paid floor fees and firm fees out of their commissions.

75.     A history of regulatory violations reveals that MF Global had problems supervising its employees' trading activities around the time of the IPO.  Contained in the National Futures Association's listing of regulatory actions taken against MF Global for the period between July 2006 and February 2008 are two CFTC administrative actions, three violations for improper trade practices, three "general conduct" violations, fourteen floor recordkeeping violations and two financial position and reporting violations, for a total of twenty-four different regulatory actions.  Over the twenty-month period, MF Global and its divisions were fined $2,297,250 and ordered to pay $75,196,900.44 in restitution and settlements.  These regulatory actions included, *inter alia*, a finding by CBOT that the Company had "fail[ed] to properly supervise employees," who were found to have improperly "crossed

orders" (*i.e.*, stood on both sides of a floor transaction without following the rules of the exchange) on "a number of occasions in 2006 and 2007."  This infraction resulted in a $400,000 fine.  Additionally, after the IPO, the CFTC settled with MF Global for $77 million in December 2007, finding that it "failed to have sufficient internal controls, policies and procedures concerning external communications with third parties," "failed to institute sufficient internal controls, policies, and procedures to detect and deter possible wrongdoing," and "failed to comply with order taking and recordkeeping requirements."  MF Global Canada was also ordered by Canadian regulatory authorities to pay $800,000 in penalties after admitting that it had failed to adequately meet its obligations to ensure that it had an appropriate and effective supervisory system in place, that the policies and procedures in place were insufficient relative to supervision, compliance, and reporting requirements and that there was "confusion" with regard to who was responsible for compliance and supervisory activities.

76.     The Company's acquisition of substantially all of the assets of Refco occurred in 2005 and resulted in the Company's already insufficient risk management office being overwhelmed.  Several thousand Refco employees, including Dooley, joined MF Global after the acquisition, straining the Company's ability to properly supervise its employees.

77.     Refco itself had an insufficient risk management system, reflected in a history of legal violations and improprieties.  From 1983 until 2005, the CFTC penalized Refco at least 140 times for violations that included filing false trading reports, inadequate record-keeping, and inadequate supervision of its brokers – the worst record in the industry.  According to a former Refco officer referenced in litigation involving that company, the accounting department at the former officer's unit of Refco was overworked and understaffed, with the result that "the Accounts Department was an absolute shambles."  The former officer further stated that, in or

about 2003-2004, it was apparent to him that Refco had "absolutely no financial controls or reporting systems"; that the former officer had "never seen an operation run anywhere like [he] witnessed at Refco"; and that there was a "very, very *laissez faire* attitude toward risk management and compliance in general."[3]  Despite this fact, Davis admitted, in the Company's conference call on February 28, 2008, that MF Global had continued using certain of Refco's flawed risk control systems.  MF Global's acquisition of Refco's assets stretched the Company's already inadequate risk management department (the "back office") to the breaking point.  Thus, prior to and at the time of its IPO, MF Global did not have adequate personnel to provide the "real-time" monitoring it claimed in its Registration Statement and Prospectus.

## Risk Control at MF Global

78.     Risk control at MF Global was an impediment to trading prior to and at the time of the IPO.  The Company responded to this by placing a priority on revenue generation and speed over risk monitoring, since the latter would slow down trading and cause it to potentially lose business especially when executing customer orders received by brokers.  Consistent with this priority, the Company had a practice of taking shortcuts to increase the number of trades.  According to CW 5, the Company's motto was to "get [trades] done at all costs – we don't care."  Similarly, brokers had no incentive to tolerate any control mechanism that could tend to slow their trades for customers, or for their own accounts.  Generally, according to CW 5, MF Global "did not police itself" by tracking or noticing violations by its brokers.  Rather "it waited until the exchange called" and the exchange records were made public."  Accordingly, CW 1 stated that at the time of the Company's IPO, risk controls "were not activated for certain clients."  Brokers requested, and management agreed, to *disable* the controls on the Company's automated trading

---

[3]     *See* First Amended Consolidated Class Action Complaint filed in *In re Refco , Inc. Sec. Litig.*, 05 Civ. 8628 (GEL) in the Southern District of New York, ¶¶576, 581.

platforms. When MF Global first began to utilize electronic trading, for example, a box would appear on a broker's computer screen for transactions over a certain monetary threshold which would ask the broker, prior to executing the trade, to confirm his or her intent. This mechanism was disabled in an effort to speed trades especially when brokers were trading for their own account or when executing customer orders.

79.     At MF Global, brokers could set up their own personal trading accounts by submitting a Customer Account Application.[4] According to CW 7, all MF Global accounts – including brokers' personal trading accounts – began with a three-digit code and ended with a five-digit code known as the "customer number." MF Global assigned a particular customer account number to each broker and that account number would be transmitted along with the terms of a particular order entered by the broker. CW 7 stated that the Customer Account Application filled out by brokers for their personal accounts was the same paperwork that an MF Global customer would be asked to complete. The only difference CW 7 observed was that brokers needed their branch manager to "sign-off" on the broker's personal account application. CW 5 confirmed that MF Global's senior management, Davis and others, gave brokers permission to trade for their own accounts and that the Company's back office was responsible for setting them up.

80.     At the time of the IPO, where risk-management controls *were* in place at MF Global, they were ignored. In order to trade, for example, clients were required to meet certain margin requirements, *i.e.*, they were required to have adequate capital in their accounts. Margin requirements, however, were often overlooked, which could have allowed, and did allow, brokers to trade well in excess of their margin limits, whether trading for themselves or when executing orders received from customers. CW 6 observed that there were "not many controls in

---

[4] *See United States v. Dooley,* No. 10-cr-0335, Indictment ¶¶1(h), 4-6 (N.D. Ill. filed Apr. 27, 2010).

place on broker accounts," especially when it came to capital requirements.  CW 6 would

regularly receive calls from personnel in the department charged with margin control who could

not understand how brokers had bypassed the capital requirements for trading in their own

accounts.  It became obvious to CW 6, as well as to those employees dealing with margin

controls, that the supposed controls on trading were easily bypassed.  According to CW 4, it was

not until after the February 28, 2008 wheat futures trading event that margin requirements were

enforced and trades were blocked such that brokers (whether trading for themselves or for

clients) "were not able to execute orders unless they were within margin."  Thus, the very control

that MF Global touted in its July 18, 2007 Registration Statement and Prospectus was not

implemented until after the catastrophic trading losses of February 27, 2008 caused by the lack

of the very risk management system the Company supposedly already had in place.

      81.     MF Global's back office, which was the Company's primary risk-management

apparatus, was wholly inadequate.  It did not have sufficient personnel to adequately monitor the

Company's employees, particularly after the Company's acquisition of Refco in 2005, which,

according to CW 2, resulted in "a company twice the size of what it was before."  "Back office

systems didn't increase," and "were not all they were cracked up to be."  There was "no way the

systems could stay up to date."  According to CW 5, the Company's back office systems were a

"complete joke."  They were "underpaid and unmotivated" and "did the bare minimum."  They

were viewed "as an expense and not a safety net," and, accordingly, "accounts were wrong and

trades weren't reconciled properly."  According to CW4, at the time of the Company's IPO

trades could be, and were, executed well in excess of their margins and such trading frequently

went unnoticed.

82.     Moreover, following the Refco acquisition, the risk management systems for the different parts of the Company were never properly integrated and, as a result, it was impossible to identify and thereby monitor trading in broker accounts.  CW 6 and CW 7 both personally observed that accounts belonging to brokers or employees who had previously been at Refco were coded differently from the broker or employee accounts that had originated with Man Group.  As a result, accounts of former Refco personnel were not properly coded in the Company's Sungard GMI system[5] and the Company could not readily generate a comprehensive listing of all accounts belonging to its brokers or employees in order to monitor their trading activities.[6]  Further, CW 6 explained that because the broker accounts were not properly coded they were "not supervised properly," since the company's risk management or compliance departments could not possibly have possessed a comprehensive list of broker accounts.

83.     MF Global's ability to meaningfully monitor its brokers was so deficient that it failed to detect Dooley's massive positions in wheat futures during the overnight hours between February 26-27, 2008.  By approximately 6:00 a.m. on February 27, Dooley was short 16,174 contracts for May 2008 wheat futures, more than *three times* the CFTC's position limit for a single month's contract – a regulatory limit that MF Global, as a brokerage firm subject to CFTC authority, was responsible for enforcing.[7]  At that time, the notional value of Dooley's short position for May 2008 wheat futures was approximately $872 million.  MF Global further failed to detect Dooley's established positions in other wheat futures contracts during the same

---

[5]     Sungard GMI is a back-office clearing and accounting software solution used by futures commission merchants (FCMs), banks and brokerage firms.

[6]     According to CW 7, brokers' personal trading accounts were supposed to be assigned one office code ("88"), and the brokers' accounts should also have been coded "with a specific class of H in GMI."

[7]     Pursuant to authority granted in the Commodity Exchange Act, the CFTC promulgated regulations that set position limits to protect against the burdens of excessive speculation, including those caused by large concentrated positions.  7 U.S.C. § 6a.  CFTC Regulation 150.2 prohibited any person from holding or controlling a position, separately or in combination, net long or net short, for the purchase or sale of a single month's CBOT wheat futures in excess of 5,000 contracts or 6,500 contracts in all months combined.  17 C.F.R. § 150.2.

overnight trading session, including the CBOT's March, July and December 2008 wheat futures, which caused Dooley's overall position to exceed the CFTC's position limit for all months combined.

84.     MF Global's lack of trading controls and/or disabling of and failure to employ such controls, as well as its failure to monitor or enforce compliance with trading limitations governing the number of contracts a single person could hold or control in a single or coordinated position before, during and after the IPO resulted in findings of wrongdoing by at least two regulatory agencies – the CFTC and CBOT – as well as the subsequent loss of $141 million associated with Dooley's trading.  Notably, MF Global did not alter its deficient and nonfunctional risk control policies at any point between the IPO and the Dooley wheat futures trading event in late February 2008.

### Dooley's Trades

85.     Dooley was an MF Global broker located in Memphis, Tennessee.  According to Diana DeSocio, a "firm spokeswoman" quoted in a February 28, 2008 Bloomberg article, Dooley joined MF Global in November 2005 (MF Global acquired Refco on November 25, 2005 and several thousand legacy Refco employees, including Dooley, became employees of MF Global).  Dooley traded in wheat futures and other commodities.  CW 5 stated that, like other MF Global brokers in various profit centers, Dooley had a personal trading account.  Dooley traded futures contracts on his own personal account at MF Global and transmitted orders from a computer located at the Memphis office, as well as from a laptop with an internet connection located in his home in Olive Branch, Mississippi.

86.     CBOT wheat futures contracts were traded on an electronic trading platform, known as Globex, which electronically matched orders submitted by registered customers to sell or to purchase futures contracts.  To trade on Globex, a customer was required to have a

relationship with a clearing futures commission merchant ("FCM"), who would act as the financial guarantor to the CBOT's clearing house for losses resulting from trades executed by the customer.

87.     MF Global was an FCM and the financial guarantor to the CBOT's clearing house for losses resulting from trades executed by its customers, including its brokers.  For MF Global to act as the financial guarantor for one of its brokers, MF Global required the broker to present accurate and complete financial information on a Customer Account Application, including but not limited to assets, liabilities, liquid net worth and total net worth.

88.     MF Global provided access to Globex through its own proprietary trading and order entry system, known as OrderXpress.  MF Global provided its brokers a front-end application which was installed and operated on a computer with a connection to the internet.[8] When a broker entered an order, that order would be transmitted electronically over the internet to MF Global's server, or back-end application, which was located in Chicago, Illinois.  MF Global's back-end application would then transmit the order electronically to Globex, where the order would be processed for execution.

89.     When Dooley began accumulating wheat futures in late February 2008, he was in a so-called "roll over" period, during which the front contract for wheat was transferred to the next quarterly period.  February 29 was the "first notice" date, pursuant to which it was exchange protocol for CBOT to contact holders of wheat futures and request that they state their intent whether to take delivery.  Dooley's trades took place on the night before the first notice date. Dooley stood to make money if the price of wheat declined between the time he bought the futures and the time he was required to make delivery, since satisfying delivery would then be cheaper.  The opposite happened, however; the price of wheat kept rising, as demand from

---

[8]     *See United States v. Dooley,* No. 10-cr-0335, Indictment ¶1(i) (N.D. Ill. filed Apr. 27, 2010).

countries such as China continued to grow and crops withered in Europe, North America and Australia; the price of wheat surged, rendering the futures unprofitable and causing massive losses to Dooley's account.  By 6 a.m. on February 27, 2008 Dooley was short 16,174 contracts for May 2008 wheat futures, more than three times the CFTC's position limit for a single month's contract, yet his trading went unnoticed by the Company's back office – despite the Company's representation of "real time monitoring" of client accounts.  *Dooley's trading – a risk management catastrophe which immediately cost the Company $141 million – was completely overlooked.*  According to CW 1, "a $5.00 per hour clerk could have seen it happening, if he was looking."  Thus, where controls were most needed, they were essentially nonexistent.

90.     Dooley's trades could not possibly have occurred had MF Global possessed the risk controls it represented were in place in the Prospectus.  Indeed, the Company overlooked and failed to monitor or enforce compliance with respect to the failure of brokers, like Dooley, to meet margin requirements, which would have required that he have more than $40 million in his account in order to trade; and failed to monitor and enforce compliance with Company and regulatory requirements for trading in brokers' personal accounts or brokers' execution of trades requested by customers on a "continuous" and "real time" basis, as the Company claimed it did in the Prospectus and Registration Statement.  This was far from being the "robust, globally integrated risk-management" system described in the Company's Prospectus and Registration Statement.

**THE UNTRUE OR MISLEADING REGISTRATION STATEMENT AND PROSPECTUS**

91.     By improperly portraying the Company's risk management and trading control procedures in the Registration Statement and Prospectus, the defendants presented an untrue or materially misleading image of the safety and quality of MF Global's business operations.  The

Registration Statement and Prospectus repeatedly stated that the Company applied its risk

management protocols to control its diverse trading positions.  It also represented that the

Company had already established, installed, and was adhering to the systems and procedures

necessary to accomplish these important tasks.[9]  The Registration Statement and Prospectus

further acknowledged that the Company, as a registered FCM and broker-dealer, was subject to

CFTC regulations (including the CFTC positional limits that Dooley violated):

> The Company's principal subsidiaries operate as registered futures
> commission merchants and as broker-dealers, or the local
> equivalent and maintain futures, options and securities accounts for
> customers.  The Company's subsidiaries are members of various
> commodities, futures, and securities exchanges in the United
> States, Europe, and the Asia/Pacific region and accordingly are
> subject to local regulatory requirements including those of the U.S.
> Commodity Futures Trading Commission ("CFTC"), the U.S.
> Securities and Exchange Commission ("SEC"), and the U.K.
> Financial Services Authority ("FSA"), among others.

[*Prospectus*, p. F-8]

The Registration Statement and Prospectus also represented that as a former operating

unit within Man Group, MF Global had experienced minimal costs and expenses resulting from

potential risks in its operations.

92.     These untrue or materially misleading representations in the Registration

Statement and Prospectus caused MF Global's common stock to be overpriced at the time of the

IPO and thereafter.

93.     The truth about the Company's deficient risk management system began to

become public on February 28, 2008 when the trading incident revealed to the public that MF

Global's internal risk controls had not been applied to brokers' trading for their own accounts or

to brokers' execution of client orders.  MF Global claimed that it had controls for limiting its risk

---

[9]        *See Prospectus*, p. 136.

exposure in brokerage accounts by restricting trading and by managing margin credit with collateral and other requirements.  But MF Global sometimes deactivated the controls (as with Dooley) to speed transactions.

94.    On February 28, 2008, investors, securities analysts and ratings agencies, *i.e.*, the market as a whole, first began to discern that the Company did not have an adequate risk management system or procedures in place, particularly with respect to brokers trading in their own accounts or brokers' execution of customer orders. This failure allowed at least one broker – Dooley – to take massive, unhedged and undercapitalized trading positions in his account.

95.    As the market learned on February 28, 2008, the problems at MF Global went far beyond a single "incident" involving one lone rogue trader; rather, the risk management problems were systemic.  In the actual day-to-day operations at many of MF Global's facilities, the risk management system and trading control procedures described in the Registration Statement and Prospectus were, in reality, ineffective and/or nonexistent with respect to brokers trading in their own accounts or brokers' execution of customer orders.  Permitting brokers to simply "turn off" the risk control system on "some computers," as described by CEO Davis on February 28, 2008, rendered trading security at MF Global completely ineffective.  As a result, the Registration Statement and Prospectus contained numerous statements that were untrue or materially misleading or omitted to state material facts that rendered the statements made misleading.  The web of specific material untrue statements and omissions woven throughout the Registration Statement and Prospectus includes those set forth below.

96.    In addition to purporting to describe the Company's internal risk management environment as the beneficiary of Man Group's tradition of solid management and historical aversion to risk as set forth above in ¶8, the Registration Statement and Prospectus repeatedly

described the Company's own purportedly effective and comprehensive attention to potential

operational risk and represented in pertinent part:

> Our risk-management methods focus on monitoring each client's potential exposure at default - that is, our potential exposure to loss in the event that the client defaults - and adjusting that client's margin requirements accordingly in an effort to ensure that their collateral is sufficient to secure their performance obligations on their open positions.
>
> This function requires, among other things, that we properly record and verify hundreds of thousands of transactions and events each day, *and that we continuously monitor and evaluate the size and nature of our clients' positions and the associated risks* . . . . Our risk-management methods are based on internally developed controls, observed historical market behavior and what we believe to be industry practices.

(*Prospectus*, p. 28) [Emphasis added.]

                              * * *

> Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation.  *We have an active program for monitoring and verifying that our employees and introducing brokers comply with specified procedures....*

(*Prospectus*, p. 32) [Emphasis added.]

                              * * *

> We are exposed to numerous risks in the ordinary course of our business.  Management believes that effective risk management is critical to the success of our business.  *We have a comprehensive risk management structure and processes to monitor, evaluate and manage the principal risks we assume in conducting our business.*

(*Prospectus*, p. 94) [Emphasis added.]

    97.    Viewing these statements holistically and in context, the statements contained in

the Registration Statement and Prospectus, in ¶96 above, were untrue or materially misleading

when made.  They created the untrue or materially misleading impression that the Company was

taking all feasible steps to reduce or manage risks and that the Company had created, implemented, and enforced, in "real time," an active and "robust, globally integrated" risk management system with a Company-wide commitment to reducing risks to a manageable level. In particular, the Company's statements misstated and/or failed to disclose that the following were true at the time of the Company's IPO:

(a)     It was common at MF Global for brokers to trade for their own accounts. Brokers routinely bypassed the "controls" by simply "turning off" the controls, and the Company's risk management system was incapable of detecting brokers' improper trading, even when brokers traded in gross excess of their margin limits and violated CFTC positional requirements.

(b)     The Company did not "continuously monitor and evaluate the size and nature of clients' positions and the associated risks" and had no "comprehensive risk management structure."  According to CW 1, MF Global's risk controls "were not activated for certain clients," and clients were regularly allowed to trade without meeting margin requirements.  In November 2007, for example, according to the same witness, a client with only $5,000 in his account mistakenly traded one hundred lots of futures contracts rather than one lot; the transaction not only was allowed to go through, it went unnoticed by the Company, and was only discovered when the Company received a call from the client disclosing what had happened and requesting that the transaction be reversed.  Similarly, CW 2 stated that MF Global's back office was "not all it was cracked up to be" and there was "no way the systems could stay up-to-date."  MF Global's organizational structure as disparate units lacking cohesion and the acquisition of Refco further complicated risk monitoring and made a comprehensive risk management system impossible.

(c)     The Company had no program for monitoring and verifying that its employees and brokers complied with specified procedures.  CW 6, for example, had repeatedly warned superiors prior to the IPO that the inability to generate a complete list of all employee or broker accounts interfered with the ability of the risk management or compliance personnel to monitor trading in employee or broker accounts.

(d)     Indeed, the Company's misstatements in ¶96 above with respect to the existence and adequacy of a risk management system are particularly misleading in light of the fact that at about the time the Registration Statement and Prospectus was issued, various regulatory agencies were investigating whether the Company had failed to adequately supervise its employees in connection with conduct occurring before the IPO, and these agencies in turn found risk management and control failures, including the Company's inability to supervise its employees' trading activities.  This included:

1.     That CBOT fined MF Global $400,000 for "fail[ing] to properly supervise its employees," who "crossed orders" in 2006 and 2007.  The CBOT settlement in December 2008 ordered MF Global to develop a "training program covering trading practices for all employees engaged in the entry of orders for electronic and open outcry [floor] execution" and "immediately enhance its supervisory procedures that shall include regular on-site reviews of electronic trading practices at its New York and Chicago locations."

2.     That in December 2007, MF Global and one of its brokers, paid over $77 million to settle a CFTC action for involvement in a massive hedge fund fraud in 2004 and 2005 where  the Company "failed to have sufficient internal controls, policies and procedures concerning external communications with third parties," "failed to institute sufficient

internal controls, policies, and procedures to detect and deter possible wrongdoing," and "failed to comply with order taking and recordkeeping requirements."

3.     That, in February 2007, the CFTC found that a Chicago-based futures commission merchant working at Man Group had fraudulently solicited customers to open commodity futures and options on futures accounts with Man Group and that Man Group had failed to adequately supervise the employee and had not detected the fraud.  Man Group paid civil penalties and restitution of $316,900.44 and was ordered to strengthen its supervisory system.

4.     That MF Global Canada, was also sanctioned by ICE Futures Canada for violations that occurred from March 2005 to February 2006 when its brokers had "repeatedly and regularly engage[ed] in pre-execution communications, disclos[ed] confidential client information, disclos[ed] limit order information, engage[ed] in pre-arranged trading, enter[ed] into matched trades in a manner contrary to the Rules and trad[ed] on non-public material information." MF Global admitted the violations,  and that the policies and procedures in place were insufficient relative to supervision, compliance, and reporting requirements.  MF Global admitted there was "confusion" with regard to who was responsible for compliance and supervisory activities and  had failed to take disciplinary action. MF Global Canada paid $800,000 in penalties.

(e)     On December 17, 2009 the CFTC fined MF Global an additional $10 million, finding that in a five-year period encompassing the IPO, "[i]n four separate instances on various days during the period 2003 to 2008, MF Global failed to ensure that significant aspects of its risk management, supervision and compliance programs comported with its obligations to

supervise diligently its business as a Commission registrant."  With regard to the February 28,

2008 unauthorized trading event in particular, the CFTC found:

> [Dooley's] excessive overnight trading went undetected by MF
> Global.  MF Global designated *a single employee* in New York to
> monitor risk for MF Global's U.S. operations between the hours of
> 6:00 p.m. and 11:00 p.m. (EST) on February 26, 2008 but that
> person did not detect [Dooley's] evening trading.  The trading
> continued to be undetected overnight by personnel in MF Global's
> Risk Departments in Singapore and London.

[Emphasis added].  The CFTC also found that Dooley's "position limit control was

misconfigured and was not effective to limit [his] trading."

 (f) The Dooley trading incident also resulted in an investigation of the

Company by CBOT.  On December 8, 2009 a Panel of the CBOT Business Conduct Committee

found:

> [O]n February 26-27, 2008, a MF Global associated person in one
> of its branch offices engaged in undetected overnight trading in
> wheat futures and other CBOT futures contracts.  The associated
> person accumulated an extremely large short position in the May
> 2008 CBOT wheat futures contract despite the fact that he entered
> the trading session with a debit balance in his account.  MF Global
> personnel failed to detect or prevent the associated person's
> excessive trading.  In addition, MF Global failed to provide
> appropriate supervisory training to its branch office and to
> adequately enforce its own supervisory and risk management
> policies and procedures by its branch office supervisors.  MF
> Global's personnel failed to enforce its supervisory and risk
> management policies and procedures, as well as detect or prevent
> excessive trading during that time period.

> CBOT further fined the Company $495,000.

 (g) On April 27, 2010 a federal grand jury indictment against Dooley was

filed in the United States District Court for the Northern District of Illinois, Eastern Division.

Among other things, the indictment charged that Dooley held massive positions in wheat futures

that went undetected by MF Global, even *after* Dooley had contacted the MF Global night desk

in Chicago by telephone "on a number of occasions and requested information concerning the size of the positions that he had established during the overnight trading session."

98.     According to defendants, paramount among the Company's strengths was its ability to manage and control the risks encountered in its business operations, and under a separate heading, the Registration Statement and Prospectus touted the Company's purportedly active and adequate risk control environment and represented:

### Disciplined Approach to Risk

*We actively manage risk on a global basis* with a centralized, hands-on approach.  Our senior executives play a leading role in managing our risk exposure on a day-to-day basis.  *We monitor our clients' open positions -- which represent our principal risk exposure -- and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight from our highly experienced risk managers.*  Client positions are reviewed and margin levels adjusted both during and at the end of each trading day.  We do not rely primarily on conventional value-at-risk methodology to test our clients' exposures, as that methodology attempts to measure risk under relatively "normal" market conditions during a relatively brief period and may not always reflect significant "shock" events that may have occurred over a longer time frame.  Rather, we stress-test client positions under hypothetical "worst-case" conditions that reflect actual historical data from periods extending back a decade or longer. We believe this approach enables us to measure risk in light of a broader range of historical experience that includes more extreme conditions.  Equally important, *we believe that effective risk-management requires a willingness to be selective about our clients, in particular in terms of credit and risk analysis, and in some cases to limit our clients' trading activities.*  We believe that our value-added services and deep liquidity enable us to exercise a more disciplined approach to risk-management than would otherwise been the case if our client services were not as attractive to the market.  We also believe that our primary focus on brokerage services and standardized products, and the fact that our trading markets tend to be relatively liquid with readily available pricing information, enable us to effectively evaluate and manage the risk posed by our clients' positions.  *In each of our last four fiscal years, our losses due to trading errors and client defaults have represented less than 2.0% of our revenues, net of interest*

> *and transaction-based expenses, with losses due solely to client*
> *defaults representing less than 0.5%.*

(*Prospectus*, p. 117; *see also Prospectus*, p. 4) [Emphasis added.]

99.     The statements contained in the Registration Statement and Prospectus, in ¶98 above, were untrue or materially misleading when made.  In particular, the Company's statements misrepresented and/or failed to disclose the following conditions, which were all verifiably true at the time of the Company's IPO:

(a)     The Company did not "monitor [its] clients' open positions ... and margin levels" at all, much less monitor them "on a real-time basis," and certainly did not engage in such monitoring with "continuous oversight from… highly experienced risk managers."  As described above in ¶¶11, 16, 80, 81, 90, 93, 97, clients and brokers were regularly allowed to trade without meeting margin requirements and the practice often either was expressly permitted or went unnoticed.  Moreover, the back office, which constituted MF Global's primary risk management team, was "understaffed," "a complete joke," and "did the bare minimum," according to CW 5.  There simply were not enough personnel in the back office to catch mistakes and keep up with the Company's volume of trading.  "When the back office is viewed as an expense and not a safety net," CW 5 said, "this kind of thing happens."

(b)     The Company did not perform credit and risk analyses on clients or brokers who traded in their own accounts using the Company's Globex platform, nor did it "limit… clients' trading activities" on this basis.  On the contrary, the Company and its brokers, who were paid on commission, had one priority: to maximize the number of trades they executed.  MF Global made money by executing trades for clients as rapidly as possible; indeed, in 2004, certain controls were taken off the Company's systems to speed trading, including one control that asked brokers to confirm large transactions.  According to CW 5, the Company

45

adopted an "anything goes" approach to trading; its only instruction to brokers was to "get [the trade] done." Thus, there were no viable controls on client orders received and executed by brokers, nor were there any viable controls on brokers who traded in their own accounts on Globex.

100.    The Registration Statement and Prospectus further represented that, "[c]onsistent with our disciplined approach to risk-management, we monitor each client's open positions and related risk of default closely and, where we believe it is appropriate, adjust our clients' margin requirements ... in an effort to ensure that each client's collateral is sufficient, in our view, to support their open positions." (*See* Prospectus, p. 127)

101.    The Company's representation in ¶100 above was untrue or materially misleading when made because, as described in ¶¶11, 16, 80, 81, 90, 93, 97 and 99 above, margin requirements were regularly overlooked or ignored at the time of the IPO.  Indeed, Dooley – who traded in his own account on the same Globex platform used by the Company's clients, and was required to submit the same paperwork as a client would to open an account – was required to have collateral of approximately $44 million, which he did not have, in order to purchase some 16,000 wheat futures.  Instead, he was able to make his trades, which resulted in the Company's $141 million loss, even though he had a net negative balance in his account.  According to CW 4, it was not until *after* the Dooley trading incident that margin requirements were enforced. After the Dooley wheat futures trading event, customers, brokers trading in their own accounts and brokers who executed customers' trade requests "were not able to execute orders unless they were within margin," according to CW 4, whereas, beforehand, they "let[] the house cover that margin .... as a goodwill kind of thing."  Thus, the very control that MF Global touted in its July

18, 2007 Registration Statement and Prospectus was not implemented until at least February 28, 2008.

102.     Similarly, the Registration Statement and Prospectus emphasized the importance of its purportedly robust and effective risk management system to the Company's business strategy:

### Risk Management

> We believe that effective risk-management is critical to the success of our business.  Consequently, we devote significant resources (including investments in employees and technology) to the measurement, analysis and management of risk.  We employ 125 professionals in our compliance, risk management and credit risk operations worldwide.

> We have established a robust, globally integrated risk-management infrastructure to monitor, evaluate and manage the principal risks we assume in conducting our business around the world.  While Man Group has historically provided us with corporate-level oversight of our global risk-management operations, following this offering, we intend to manage our global risk-management activities on stand-alone basis with our own personnel....

> As part of this transition, we employ a dedicated Chief Risk Officer who is responsible for overseeing all aspects of our risk-management infrastructure and who reports directly to our Chief Operating Officer and Deputy CEO.  On a day to day basis, he manages and oversees specialist teams that continuously monitor our risk exposures around the world ....  The Key Risk Indicator reporting process, together with our other reporting processes, are designed to enable us to assess the levels of risk present throughout our operating environment on a real-time basis and to take any necessary remedial action in a timely manner.

(*Prospectus*, p. 136) [Emphasis added.]

103.     The statements contained in the Registration Statement and Prospectus, in ¶102 above, were untrue or materially misleading when made, for the reasons given in ¶¶99 and 101 above.  In particular, there was no "robust globally integrated risk-management infrastructure"

that monitored risk on a "real-time basis." On the contrary, brokers were regularly allowed to trade without meeting margin requirements when trading in their own accounts and also when executing trades requested by customers, and MF Global's back office was wholly inadequate to prevent this. At the time of the IPO, the Company had no effective means of monitoring its employees' execution of trades either in their own accounts or when executing trades requested by customers. In the areas of the Company where controls were most needed, they were turned off.

104.     In addition, unbeknownst to investors, the Registration Statement and Prospectus issued in connection with the IPO was untrue or materially misleading because it omitted to state that, at the time of the IPO, MF Global's acquisition of Refco led to twice as large a volume of trades at MF Global. The acquisition exceeded what the Company's risk management structure could reasonably handle – a risk management structure which, as detailed above, was already stretched thin. The Company failed to retain sufficient personnel to accommodate the new employees. According to CW 5, Refco's employees had been paid at the lower end of the industry average, did not have exposure to the type of trading in which MF Global engaged, and consequently, when placed in positions throughout the Company, posed even greater risks of trading improperly and in violation of the rules of the exchange.

105.     Moreover, MF Global did not screen Refco employees, but, rather, brought them into the Company wholesale. It is therefore not surprising that Dooley – who epitomized the risks the Company professed it could prevent, but failed to prevent – was a former Refco employee. Indeed, Refco had been investigated and fined by the CFTC for some of the very same types of regulatory violations as MF Global. Between 1983 and 2005, the CFTC penalized Refco 140 times for violations that included filing false trading reports, inadequate record-

keeping and inadequate supervision of its brokers.  Thus, there was not merely a *risk* that

acquisitions of Refco and other entities could undermine risk management and employee

supervision.  Rather, such acquisitions had rendered any meaningful risk management and

employee supervision impossible – including supervision and controls over brokers trading in

their own accounts, and controls over brokers executing trades requested by customers.  Indeed,

at the time of the IPO, such systems were effectively nonexistent.

<u>**THE TRUTH BEGINS TO BE REVEALED**</u>

106.    On February 28, 2008, MF Global issued a press release before the market opened

announcing that a "failure" in one of the Company's retail order entry systems permitted a

"registered representative" to establish significant positions in his own account that were

liquidated by the Company later that morning.  The reportedly "unauthorized" activity resulted in

the "representative" incurring *a loss of $141 million*, which the Company, as a clearing member,

was responsible to settle.  As a result, the Company was required to record a bad debt provision

for the full amount of the loss.  The loss represented approximately six percent of the Company's

equity.

107.    The "registered representative" was a broker later identified as Dooley.  He was

quoted by *The Wall Street Journal* on February 28, 2008 criticizing the Company's risk

management procedures saying that "[t]he computer system failed on a lot of things," adding that

it had problems in "setting limits."

108.    The Company hosted an investor conference call later that day.  On the call,

defendant Davis provided more details explaining that the Company was taking a *$141.5 million*

allowance for bad debts asserting that in a period of only six or seven hours the previous

morning, a day-trading MF Global broker logged onto his personal computer at home in Olive

Branch, Mississippi and speculated in wheat futures in his personal account at the Company,

buying approximately 15,000 to 20,000 futures contracts (the equivalent of approximately 10%
of the market for these contracts for any given month), in violation of his authorized trading limit
and without having the necessary collateral or capital "to support even a fraction of his
positions."  This also constituted a violation of CFTC regulations limiting the number of
speculative investment contracts that any single investor could acquire.  17 C.F.R. § 150.2.

109.    The lack of adequate and effective risk management, technical controls and
human oversight, as well as the elimination of credit and risk analysis and buying power limits
and controls that were supposed to be part of the Company's order entry system enabled the
broker to make more than 100 trades and place a massive bet on more than $800 million to $1
billion worth of wheat, which, as Davis stated, involved "significant positions in his own account
which were liquidated later that morning.  The unauthorized activity resulted in him incurring a
loss of $141.5 million, which the Company, as a clearing member, is responsible to settle at the
clearinghouse."

110.    As reported by *The Wall Street Journal* on February 29, 2008 and reflected in the
February 28, 2008 conference call transcript, defendant Davis claimed that *"existing internal
controls could have stopped Mr. Dooley's trades from being processed – but were turned off in a
few cases to allow for speedier transactions by brokers at the firm who traded for themselves or
took customer orders by phone."*  In other words, he claimed that the internal controls did not
fail; rather, they were deactivated.  During the call, Davis further stated that Dooley had just one
"historic customer," who had not done any trading business in "some time."  Accordingly, the
fact that the controls were deactivated could not be excused on the spurious ground that Dooley
had responsibility for executing numerous customer trading orders or required speedier
transactions.

111.    Davis, who observed that "this is an absolutely awful event," stated that "*Dooley had not circumvented any risk management procedures ...* [and] *that in order to speed trades the Company had allowed some internal terminals to not have the buying power control.*"  He went on to say that the policy clearly was "a mistake." MF Global had sacrificed security for efficiency and in so doing placed all of MF Global's assets at risk.

112.    The market reacted strongly to the news that MF Global's statements in its Registration Statement and Prospectus regarding its "robust" risk management and internal controls were untrue and/or materially misleading.  Following the Company's announcement, Fitch Ratings issued a "Rating Watch Negative" on MF Global, stating that the $141.5 million "loss questions the robustness of risk measurement systems and represents a substantial portion of net income level."  Eileen Fahey, a managing director at Fitch Ratings, observed: "This does open the view that their customers are taking more risk than we thought."  Similarly, Standard & Poor's also lowered its long term counter party credit rating for MF Global and placed its rating on "Credit Watch Negative," stating, "We expect the bad debt provision to result in a material reduction in the Company's capital position."  In addition, numerous analysts also expressed reservations and concerns regarding the Company's risk management practices, with Banc of America's analyst stating "the questions raised around the company's risk-management practices are likely to keep the stock depressed for quite some time," and a Credit Suisse analyst stating that the "magnitude of the loss is clearly disconcerting to us and calls into question the degree of risk taking and risk management at the franchise."

113.    MF Global's stock closed down 28% that day from previous trading levels. However, the very next day, Friday, February 29, 2008, MF Global's shares sank an additional

17%, to close at $17.55, after trading as low as $14.27 per share, completing *a two-day plunge of approximately 40%*, and representing a loss to shareholders of *more than $1,142,000,000*.

114.    The following chart shows the history of MF Global's stock price from the time of the IPO and demonstrates the precipitous drop following the February 28, 2008 disclosure:





115.    Indeed, that MF Global's surprise revelations about its lack of adequate risk management controls caused this catastrophic loss in market capitalization, rather than the news of the $141 million trading loss itself, was explained in *The Wall Street Journal* on March 1, 2008:

> *The stock's two day plunge of 40% showed that many investors are worried that plugging holes in MF Global's risk management procedures won't be enough to restore customer confidence.*
>
> Clients who make trades through MF Global because of its longtime reputation as a savvy player in the topsy-turvy futures industry might take that business elsewhere, though there is no sign of a customer exodus ....
>
> Analysts and investors are concerned that more bad trades could surface at MF Global, further depleting the firm's capital .... The trading loss also could complicate MF Global's plans to borrow money later this year.  Standard & Poor's lowered its long-term counter-party credit rating on MF Global to triple-B, down one notch from triple-B-plus, noting that the brokerage firm had borrowed $150 million under its $1.5 billion, five-year, revolving credit facility to bolster its regulatory capital.

[Emphasis added.]

116.    On March 2, 2008, MF Global wrote a letter to its clients concerning the "disappointing and embarrassing development in the history of MF Global."  The letter, written by Davis, said "We have always prided ourselves on our strong risk management approach, as it is at the heart of our business model.  An occurrence such as this is not acceptable."

117.    On March 5, 2008, *The Wall Street Journal* reported that federal law enforcement authorities had commenced an investigation of the futures trades made by Dooley.  Investigations were also being conducted by the CME and the CFTC.

118.    The market continued to react to disclosure of MF Global's spectacular risk management failures and concerns about the ramifications of the attendant loss of reputation.  On

March 17, 2008, shares of MF Global began trading at $16.11 and, by noon, traded as low as $3.64 per share, nearly 80% below the previous day's closing price of $17.35.

119.    On April 18, 2008, MF Global announced its Fourth Quarter 2008 results and reported that "The company expects a pre-tax loss on a GAAP basis for the fourth fiscal quarter to range from $55 million to $65 million primarily attributable to the recently expected bad debt provision." The Company's press release also announced that the Company launched two separate reviews into its risk management controls:

<div align="center">Review of Unauthorized Trading and Risk Controls</div>

> Following MF Global's announcement on February 28 that it was taking a bad debt provision of $141.5 million as a result of unauthorized trading by a broker operating out of a branch office in Memphis, Tenn., MF Global's Nominating and Corporate Governance Committee commissioned *two independent reviews by outside firms* highly regarded in their fields of expertise.

> The first of these reviews, conducted by FTI Consulting, a technology specialist firm, assessed the proprietary order entry system used by the broker, Order Express, as well as the technology involved in the risk monitoring system employed to monitor trading activity and analyze the risk in customer accounts. The second review, conducted by Promontory Financial Group, a risk management specialist firm, is examining MF Global's overall risk management and control infrastructure.

> Both independent reviews are continuing and will include a thorough evaluation of other appropriate order entry systems used by MF Global, the vast majority of which are off-the-shelf third party vendor systems used throughout the industry. In addition, a thorough evaluation of risk management policies and procedures and trading operations globally is underway to assure MF Global utilizes industry best practices.

> FTI and Promontory have provided MF Global with preliminary results and recommendations.

<div align="center">Order Entry Systems</div>

> Since February 28, MF Global has learned that *an aspect of the Order Express entry system .... was not configured properly and*

<div align="center">54</div>

*therefore permitted the broker to trade through the system in excess of applicable limits*.  MF Global has remedied this by imposing buying power controls for brokers using this system....

"FTI conducted an in-depth analysis and rigorous testing of the trading controls in the Order Express system at MF Global.  We are highly confident that *the buying power controls.... are now being applied to all... brokers trading through the system*," said Robert L. Brunner, senior managing director, FTI Consulting.

<u>Risk Monitoring Process</u>

To enhance its risk management policies and procedures, including those in the risk monitoring area, MF Global engaged Promontory to review firm-wide practices and to benchmark the company against industry best practices.  Promontory has provided a list of preliminary recommendations to strengthen MF Global's existing risk management monitoring and staffing, which the company has adopted and begun to implement.

*Since the incident, the company had increased access, improved information and otherwise upgraded its risk monitoring systems and its alert notification systems.  Additionally, MF Global has increased the number of on-site risk specialists in every company center around the world, assigning additional staff to duty in each center overnight and ensuring that all centers operating in daytime hours back up nighttime centers.*

In addition, the risk management department at MF Global will be restructured.  The company is actively recruiting a new chief risk officer to be in charge of all risk areas of the company and to report directly to MF Global's CEO.

[Emphasis added.]

120.   On May 20, 2008, the Company held a teleconference with analysts and media during which the Company reported the status of its attempts to correct its risk management failures which, according to *The Wall Street Journal*, included the news that:

MF Global Ltd. is shutting the branch-office network that left the futures brokerage vulnerable to a trading scandal in February.

Kevin Davis, the firm's chief executive, is expected to announce the move and an update in its capital-raising plans when the firm

> reports earnings Tuesday.  In addition, *MF is close to hiring a global chief risk officer, he said ...*
>
> *The Memphis office already has been closed, along with roughly half of the other U.S. branches.*  MF Global said the closing would have a minimal impact on revenue and make it easier to manage risk at is main U.S. offices.  MF Global also has hired two teams of consultants to review its risk management systems.  The company is continuing to pursue the sale of $200 million or more in capital, likely through convertible securities that blend characteristics of stocks and bonds.

[Emphasis added.]

121.    Providing further evidence that MF Global's risk management system was severely deficient and that the Company was unable to properly supervise its employees' trading activities, various regulatory agencies issued findings and orders describing instances in which the Company had failed to adequately supervise its brokers' trading, including the Company's failure to supervise Dooley and/or detect his positional trading, that resulted in numerous regulatory violations as described below.

122.    On June 12, 2008, MF Global filed its annual report on Form 10-K for its fiscal year 2008 (ended March 31, 2008) (the "2008 10-K") with the SEC.  The 2008 10-K repeated the previously reported fourth quarter and fiscal 2008 year-end financial results and also described various Legal Proceedings involving the Company and disclosed that the Company had "established an accrual of $10.0 million to cover potential CFTC cited monthly penalties" in the matter of the unauthorized wheat futures trades by the now former MF Global broker as well as for two other matters that were subject to CFTC investigations, including a CFTC "potential" action previously disclosed in the Registration Statement and Prospectus concerning two trades executed by the Company in 2004 that were misreported to NYME and which "falsely represented the dates on which the trades in question occurred."  The Company also disclosed

the following, which is further evidence of the lack of controls over trading activities by its

brokers as well as its inability to meaningfully supervise them:

> ### CFTC Natural Gas Price Information Investigation
>
> We have been cooperating in an investigation conducted by a New York County Grand Jury in conjunction with the U.S. Attorney's Office in the Southern District of New York.  The CFTC and the SEC have also been involved in the investigation.  The investigation centers around trading by a market making energy trader at *Bank of Montreal (BMO) who allegedly mismarked his book*.  One of our brokers did business with the BMO trader, and used bid and offer prices for forward OTC trades the BMO trader sent to him as a basis for prices which our broker disseminated to our customers, including BMO, as price indications that reflected a consensus.

[Emphasis added.]

123.    On June 13, 2008, the Bloomberg News Service summarized the disclosures of

CFTC investigations in the 2008 10-K as follows:

> The company today disclosed two investigations into natural-gas trades it helped facilitate.  The U.S. Attorney's Office in New York is probing over-the-counter gas trades of a customer, the Bank of Montreal.  In addition, the <u>Commodity Futures Trading Commission</u> sent a so-called Wells notice in May, saying it may recommend legal action over two natural-gas trades in 2004, according to MF Global's regulatory filing.

124.    On June 13, 2008, the Bloomberg News Service described the disclosures of the

CFTC investigations in the 2008 10-K and reported the reaction of Prof. Bruce Weber, a finance

professor at the London Business School, who underscored that the problems MF Global was

continuing to experience were due to its failure to employ or maintain adequate controls over its

brokers' trading:

> "*It seems like MF Global didn't have good control systems, they're getting burned more than once*.  It wasn't just the wheat trades ... [the $10 million set aside] is a material amount.  They're not a giant broker that can absorb something like that easily."

[Emphasis added.]

125.     On December 17, 2009, following its investigation, the CFTC issued an Order

Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act and

Making Findings and Imposing Remedial Sanctions, finding that in a five-year period

encompassing the IPO, "[i]n four separate instances on various days during the period 2003 to

2008, *MF Global failed to ensure that significant aspects of its risk management, supervision*

*and compliance programs comported with its obligations to supervise diligently its business* as a

Commission registrant" (emphasis added).  The CFTC fined MF Global $10 million for its

violating Commission Regulation 166.3.

(a)     With regard to the Dooley trading incident, the CFTC further found that

MF Global had failed "to Supervise Diligently the Trading Activities of [Dooley] and [failed] to

Provide Supervisory Training to the Memphis Branch Office Supervisors."  In particular, the

CFTC made the following findings of fact:

> In August 2006, MF Global hired the AP [associated person, i.e.,
> Dooley] in MF Global's Memphis Branch Office.  [Dooley]
> was authorized by MF Global to solicit customers, accept orders, and
> enter orders for the accounts of his customers through MF Global's
> proprietary trading and order entry system, OrderXpress.  [Dooley]
> also was permitted to trade futures contracts for his personal
> trading account through OrderXpress.  The OrderXpress system
> had an internal control that could be manually configured to limit a
> user's futures trading based on the account's "purchasing power" or
> net equity.  For users based on "purchasing power," OrderXpress
> would reject an order for a futures contract where the account did
> not have sufficient equity to establish the position.  Customers'
> trading limits on OrderXpress were set based on purchasing power.
> The OrderXpress system also had an internal control that could be
> manually configured to limit a user's futures trading based on the
> aggregate number of open contracts ordered by the user.  For users
> on "position limits," OrderXpress would reject an order for a
> futures contract that would cause the user's aggregate position to
> exceed the specified position limit number.  *Associated persons'*
> *trading limits on OrderXpress were set based on position limits.*

*The position limit control was misconfigured and was not effective to limit [Dooley's] trading.*

Between August 2006 and February 27, 2008, [Dooley] introduced one customer account to MF Global.  [Dooley's] activities at MF Global included trading commodity futures contracts for his own account.  [Dooley's] personal trading resulted in MF Global issuing numerous margin calls.  MF Global permitted [Dooley] to continue trading his personal account because [Dooley] met his margin calls and MF Global believed that appropriate position limits were in place.

In a separate arrangement between [Dooley] and his supervisor, which was not disclosed to anyone in management or compliance at MF Global, [Dooley] funded his personal trading account with a loan from his supervisor.  [Dooley] repaid a portion of the loan by generating commissions on his trading.  Thus, the supervisor's financial interests conflicted with his supervisory responsibility to monitor [Dooley's] trading activities.

On the evening of January 27 and morning of January 28, 2008, [Dooley] traded well beyond his financial ability to trade.  Trading from his home,[Dooley] executed 1,594 round turn trades while his account had a net equity of approximately $400 entering the trading session.  This venture proved profitable.  [Dooley] made approximately $37,000, before commissions and fees.  The supervisor stated, in an email to [Dooley], that the volume of trading for the amount of equity involved was "out of line," and forwarded the email to the Memphis Branch Office Manager.  The supervisor also discussed the incident with [Dooley].  The supervisor and the Branch Office Manager took no further action concerning the incident and did not escalate the issue to MF Global's Compliance Department or management.  [Dooley] continued to use the electronic trading platform and kept the trading profits.  Moreover, a portion of the commissions generated by the trading was used to repay a part of the loan to the supervisor.  The trading episode was not flagged for further review independent of the Branch Office review.  MF Global's compliance procedures in place at the time did not catch this trading episode.

On February 26, 2008, [Dooley] again conducted overnight trading from his home.  At that time, his account had a debit balance of $3,004.  [Dooley] entered all of his trades that night through MF Global's OrderXpress.  Between 6:00 pm on February 26 and 6:00 am (CT) on February 27, [Dooley] sold May 2008 CBOT wheat futures contracts and accumulated a net position that exceeded the Commission's speculative trading limit of 5,000 contracts.  By

approximately 5:10 am (CT) on February 27, 2008, as [Dooley's] short position began to exceed 10,000 contracts short, the price of the May 2008 CBOT wheat contract declined the full extent permitted under the exchange rules-*i.e.*, "limit down."

[Dooley's] excessive overnight trading went undetected by MF Global. *MF Global designated a single employee in New York to monitor risk for MF Global's U.S. operations between the hours of 6:00 pm and 11:00 pm (EST) on February 26, 2008 but that person did not detect [Dooley's] evening trading. The trading continued to be undetected overnight by personnel in MF Global's Risk Departments in Singapore and London. By 6:00 am (CT) on February 27, when the overnight trading session ended, [Dooley] held an open short position of 16,174 May 2008 CBOT wheat futures contracts, and he held a short position in all wheat futures months combined totaling 16,428 contracts. MF Global had not detected and was unaware of his position at this time.*

When the market re-opened at 9:30 am (CT), [Dooley] initially purchased May 2008 CBOT wheat contracts which offset a portion of the short position. At approximately 9:59 am (CT), [Dooley] began selling the May 2008 wheat futures contracts, and by approximately 10:11 am (CT) his short position had increased to 17,181 May 2008 wheat futures contracts.  At approximately 10:14 am (CT), [Dooley] began to exit his positions.  By 10:29 am (CT), the market had risen "limit up"-rising the full extent permitted under the exchange rules-to $13,495 per bushel.  [Dooley's] remaining short position at the time the market was limit up was 9,499 contracts.  [Dooley] ultimately offset his 17,181 contract short position in May 2008 wheat futures by buying 7,800 contracts at prices above $13.00 per bushel, 5,114 contracts at prices between $12.50 and $13.00 per bushel, and the remainder at lower prices. [Dooley's] overall trading losses were $141,020,850.

A staff member of MF Global's Risk Department became aware of [Dooley's] position by 10:40 am (CT) on February 27, and, after [Dooley's] positions were confirmed by MFG personnel, MF Global management ordered that [Dooley's] access to the trading system be shut off, which was effected by 11:18 am (CT).  That action halted his trading.  However, by that point, [Dooley] had offset most of his overall position.  MF Global paid the trading losses to the clearinghouse that day, but [Dooley] did not, and does not, have the ability to pay MF Global for his overnight trading losses of over $141 million.

[Emphasis added.]

(b)     The CFTC also found that MF Global [failed] "to Enforce Supervisory

Policies in the Memphis Branch Office," and made the following findings of fact regarding the

Company's risk management system at that time:

> MF Global provided its Futures Compliance and Supervisory
> Manual, which contained MF Global's policies regarding
> compliance and supervision of associated persons and other
> employees, to the Memphis Branch Office Manager and the
> associated persons in the Memphis Branch Office.  *However, MF
> Global did not provide training on its company policies to
> employees or supervisors in the Memphis Branch Office and failed
> to diligently enforce compliance with these policies within the
> Memphis Branch Office.*  As a result, a supervisory failure
> occurred in the Memphis Branch Office.

> MF Global maintained company policies prohibiting loans to
> employees except in cases of emergency and at management's
> discretion, and requiring any employees with trading accounts to
> meet MF Global's minimum financial requirements.  However,
> [Dooley] funded his personal trading account with a personal loan
> from his supervisor.  Under the terms of the loan, [Dooley] would
> repay the loan through commissions generated by his trading.
> Thus, the supervisor had a direct financial interest in allowing
> [Dooley] to trade, which conflicted with his supervisory
> responsibility to monitor [Dooley's] trading and ensure that
> [Dooley] was not trading excessively.  In fact, as a result of
> [Dooley's] trading on January 28, 2008, and the substantial
> commissions generated in the course of this trading, [Dooley's]
> supervisor received a substantial payment on his outstanding loan
> to the AP.

> MF Global also maintained a company policy requiring that any
> violation of company policies be reported to the Compliance
> Department.  As noted above, *the supervisor and Branch Office
> Manager in the Memphis Branch Office did not notify anyone in
> MF Global's Compliance Department about [Dooley's] January
> 28 trading.  The AP's January 28 trading violated MF Global's
> policies, and should have subjected [Dooley]'s account to
> management review for excessive activity.*

(c)     As further evidence that MF Global's risk controls had glaring flaws,

including a lack of controls on broker trading and a lack of meaningful employee supervision,

the CFTC found that the Company "[failed] to Maintain In Its Files Appropriate Written

Authorization." Between January and March 2006, MF Global effected approximately 20 transactions in a customer's account after receiving telephonic instructions from the customer's introducing broker, but did not have in its files the customer's authorization to effect these transactions.

(d)      Providing yet more evidence of the Company's lack of meaningful employee supervision and trading controls, the CFTC also found that MF Global had "[failed] to Implement Procedures to ensure Appropriate Transmission of Price Indications of Certain Natural Gas Option Positions":

> From approximately May 2003 until April 2007, MF Global brokers provided a customer with voice brokerage services in its natural gas derivatives trading business, which generated commissions for MF Global. During the relevant period, at least one MF Global broker sent price indications to the MF Global customer. That MF Global broker attached a disclaimer to the price indications he transmitted to the customer. Specifically, that disclaimer stated:

> Those Numbers Are Price Indications On The Corresponding Terms Of The NYMEX Natural Gas Contract Lookalike, Financially Settled Options And Calendar Spreads, Quoted On The Date And Time Shown Below, These Are Not Tradable Markets. They Are Numbers That Reflect A Consensus Taken On That Date And Time, From Different Sources In The Market Place.

> MF Global failed to implement procedures to ensure that the price indications transmitted by its broker did, in fact, "reflect a consensus taken on <a particular> date and time," and were derived "from different sources in the market place."

(e)      In yet another indication that MF Global was incapable of supervising its employees and lacked trading controls, the CFTC described risk control violations prior to the IPO, finding that MF Global "[failed] to Diligently Supervise the Proper and Accurate Preparation of Trading Cards":

> On two occasions in August and September, 2004, a MF Global customer entered into certain natural gas EFS trades. A MF Global

floor broker executed the trades for the customer and was required to properly prepare trading cards. Each of the trading cards the MF Global broker prepared purportedly reflected EFS trades called to the NYMEX floor during the time period allowed under the trading rules for the natural gas futures contracts. However, on both of the trading dates at issue, the trades took place outside of the permitted time period and the trading cards did not accurately reflect the actual trade dates. Specifically, the trading cards reflected that the trades had been made prior to the expiration of the natural gas futures contract. MF Global failed to implement procedures to ensure that its employees recorded and submitted accurate trade information in connection with the evaluation and processing of these two late trades.

(f)      MF Global's failure to properly supervise its brokers and their trading

activities was reflected in the CFTC's conclusions based on its findings of fact:

*MF Global failed to monitor supervisory procedures and failed to supervise diligently activities in its Memphis Branch Office and associated persons in that office*.  MF Global failed to adequately test the pre-trade risk control on OrderXpress to ensure that it was properly configured and the controls functioned as designed.  MF Global failed to provide compliance training to its registered Memphis Branch Office Manager and other MF Global Memphis Branch Office' employees.  *MF Global failed in particular to enforce compliance with its own policies regarding futures trading in [Dooley's] personal account*.  Due to MF Global's failure to properly monitor supervisory procedures, and failure to supervise diligently commodity interest trading activity in its Memphis Branch office, MF Global violated Regulation 166.3.

Included with the price indications sent to a MF Global customer was a disclaimer that the price indications are "not tradable markets. They are numbers that reflect a consensus taken on <a particular> date and time, from different sources in the market place." Because MF Global failed to implement procedures to ensure that the statements contained in its broker's disclaimer were accurate, *MF Global failed to diligently supervise the handling by its employees and agents of all of its commodity interest accounts* and therefore violated Regulation 166.3.

In addition, a MF Global floor broker failed to prepare trading cards properly ensuring that trading occurred in a timely manner and was documented as such.  *Because MF Global failed to employ any supervisory system to detect such violations*, MF Global violated Regulation 166.3.

63

> *MF Global also failed, in violation of Regulation 166.3, to ensure that supervisory systems were followed by its personnel regarding confirmation of authorizations for customer trading.*

[Emphasis added].

126.     The CFTC order further stated that "[n]either MF Global nor any of its agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any finding in this Order, or creating, or tending to create, the impression that this Order is without a factual basis…."

127.     As further support that MF Global previously lacked basic trading controls and had failed to properly supervise its employee brokers and their trading activities, whether for their own accounts or when executing trades requested by customers, the CFTC formally ordered MF Global to "put into effect, to the extent not already in place, the following":

> Policies and Procedures
>
> MF Global undertakes to
>
> a. Enhanced risk monitoring procedures regarding supervision of any Branch Office Manager designed to notify senior management of potentially unlawful or excessive trading by Branch Office associated persons or other employees;
>
> b. Policies requiring training for Branch Office employees on MF Global's margin, credit and risk policies;
>
> c. Either a "purchasing power" or "position" limit or other best practices risk mitigation system on all MF Global electronic order entry systems and the documentation (including the name of the approving person and the effective dates) of the processes and procedures by which any such limits are placed on electronic order systems and changes to any such limits;
>
> d. Procedures regarding assessment and monitoring of risks posed by accounts/customer/employees with electronic direct market access capability;
>
> e. Updating and strengthening the supervision of desks more effectively to deter and detect potential illegal or manipulative

trading practices, including, but not limited to, procedures directed to market on close orders;

f. Updating and enhancing procedures requiring periodic compliance review of live and taped telephonic conversations to include requiring such review to occur periodically during the opening and closing periods of markets, and expiration of trading on futures contracts;

g. Policies and procedures to develop and implement an enhanced compliance audit program to ensure that each trading desk is audited on an annual basis and that the audit is designed to detect and deter potential violations of the Act and Regulations, including potential illegal or manipulative trading practices. The enhanced compliance audits procedures shall include (1) documentation that pre-office visit procedures have been followed and work-papers for the pre-office visit procedures are maintained; (2) review of a sampling of accounts of each desk by type, size and activity level for purposes of seeking to deter and detect trading patterns reflecting possible manipulative trading or other abusive or illegal trading practices; and (3) requirement that each desk head be interviewed.

h. Effective communications policies to all MF Global directors, officers, employees, agents and, to the extent applicable, consultants, so that they are aware of MF Global's compliance policies and procedures regarding compliance with the CEA and Regulations;

i. A clearly articulated corporate policy that requires any director, officer, employee, agent or, to the extent applicable, consultant who is aware of any violation of law or any unethical conduct, which has not been reported to an appropriate federal, state or municipal agency having jurisdiction over the matter, to either (i) report such violation or conduct to any MF Global Compliance officer, who may bring the matter to the MF Global General Counsel for a legal determination of appropriate action, or (ii) report such violation or conduct through MF Global's whistle blower policy, if the person wishes to remain anonymous;

j. A clearly articulated corporate policy that requires the MF Global Compliance and/or Legal Department affirmatively to investigate and document violations of the CEA or Regulations, or alternatively that requires an investigation under MF Global's whistle blower policy;

k. Enforcement of appropriate disciplinary and investigative procedures to address matters involving violations or suspected violations of the CEA, Regulations, the MF Global risk monitoring program or MF Global's compliance manuals;

l. Policies and procedures to require updating of policies and procedures to address recent events or issues in the industry, including case law concerning acts and practices violative of the CEA and Regulations, as appropriate.

m. Establishment of both a physical and electronic centralized location or source of information that contains all then current processes, policies and procedures related to compliance with the CEA and Regulations;

n. A clearly stated and uniform corporate policy articulating that adherence to MF Global's compliance policies and procedures will be a component in the compensation calculus for all employees, including managers and senior managers;

o. A training program on an annual basis concerning the requirements of the CEA and Regulations to be given to MF Global professional staff, including all directors, officers, risk managers, compliance personnel, and employees involved in any aspect of MF Global and/or the MF Global Entities' commodity and/or commodity derivatives businesses, including, but not limited to, associated persons, brokers, traders and sales assistants. MF Global's training program will be updated at least annually to address any recent events or issues in the industry, including recent case law concerning acts and practices violative of the CEA and Regulations, as appropriate. Such training program shall include:

(i) Mandatory training for all directors, officers, risk managers, compliance personnel, legal personnel, and the head of each subsidiary business, division and/or group, to be completed within one hundred and twenty (120) days of the employee's start date in one of the aforementioned positions, regarding corporate and compliance policies, and procedures involving the CEA and Regulations;

(ii) Annual training for all MF Global professional staff, including directors, officers, risk managers, compliance personnel, legal personnel, brokers, traders, sales assistants and associated persons regarding corporate and compliance policies, and procedures involving the CEA and Regulations, including but not limited to training and education concerning abusive and manipulative trading practices and the indicators of such practices.

(iii) The creation and maintenance of documentation that the required individuals noted above have fulfilled their compliance training; and

p. A policy requiring the approval by the MF Global Compliance Department of any MF Global employee's outside employment.

This extensive enumeration of risk management polices illustrates some of the severe risk management deficiencies identified by the CFTC that existed at MF Global at least from the time of the IPO.

128.     On December 10, 2009 CBOT also released its findings in a Notice of Disciplinary Action following an investigation of the Company.  CBOT fined MF Global $495,000 for violating CBOT Rules 432.W, 432.Y, and 576.  Rule 432.W states that "[i]t shall be an offense for a member to fail to diligently supervise its employees and agents in the conduct of their business relating to the Exchange."  Rule 432.Y states that "[i]t shall be an offense to improperly use the Globex [trading] platform or permit the unauthorized use of the Globex platform."  Rule 576 states that:

Each Globex terminal operator shall be identified to the Exchange, in the manner prescribed by the Exchange, and shall be subject to Exchange rules.  If user IDs are required to be registered with the Exchange, it is the duty of the clearing member to ensure that registration is current and accurate at all times.  Each individual must use a unique user ID to access Globex.  In no event may a person enter an order or permit the entry of an order by an individual using a user ID other than the individual's own unique user ID.

129.     During its investigation, CBOT made the following findings of fact:

[O]n February 26-27, 2008, a MF Global associated person [Dooley] in one of its branch offices engaged in undetected overnight trading in wheat futures and other CBOT futures contracts.  The associated person accumulated an extremely large short position in the May 2008 CBOT wheat futures contract despite the fact that he entered the trading session with a debit balance in his account.  MF Global personnel failed to detect or prevent the associated person's excessive trading.  In addition, MF

Global failed to provide appropriate supervisory training to its branch office and to adequately enforce its own supervisory and risk management policies and procedures by its branch office supervisors. *MF Global's personnel failed to enforce its supervisory and risk management policies and procedures, as well as detect or prevent excessive trading during that time period*.

[Emphasis added.]

130. The April 27, 2010 federal grand jury indictment against Dooley also alleged:

[O]n February 26, 2008, defendant DOOLEY executed a series of large buy and sell orders for approximately 31,964 futures contracts, including 24,231 contracts for May 2008 wheat futures, knowing that he did not have the financial ability to pay for potential trading losses resulting from such trades. At the start of this trading session, defendant knew that he had a negative balance of approximately $3,000 in his account at MF Global and intentionally shifted the risks associated with his trading activity onto MF Global.

It was further part of the scheme that during the overnight trading session starting on February 26, 2008, defendant DOOLEY executed a series of large sell orders for wheat futures and thereby established a substantial short position in May 2008 wheat futures contracts. At approximately 5:17 a.m. on February 27, 2008, the price for May 2008 wheat futures contract had gone "limit down" to approximately $10.795 per bushel. By approximately 6:00 a.m. on February 27, 2008, defendant was short 16,174 contracts for May 2008 wheat futures, *more than three times the CFTC's position limit for a single month's contract*. At that time, the notional value of defendant's short position for May 2008 wheat futures was approximately $872 million. Further, defendant established positions in other wheat futures contracts during the same overnight trading session, including the CBOT's March, July and December 2008 wheat futures, causing the defendant's overall position to exceed the CFTC's position limit for all months combined.

It was further part of the scheme that on the morning of February 27, 2008, when the price for May 2008 wheat futures contracts rose rapidly as defendant attempted to liquidate his short position, defendant DOOLEY once again executed a series of sell orders. At approximately 10:11 a.m. on February 27, 2008, defendant was short 17,181 contracts for May 2008 wheat futures. By approximately 10:29 a.m., the price for May 2008 wheat futures contracts had gone "limit up" to approximately $13.495 per bushel.

*It was further part of the scheme that on or about February 27, 2010, defendant DOOLEY contacted by telephone the MF Global night desk on a number of occasions and requested information concerning the size of the positions that he had established during the overnight trading session.*

On or about February 27, 2008, MF Global authorities learned of defendant's overnight trading, deactivated defendant's account and then liquidated the remainder of defendant's position.  A loss of $141,021,489 was realized.  Defendant was financially unable to cover the losses created by his trading.

As a result of the scheme, defendant DOOLEY caused an actual loss of approximately $141,024,494 to MF Global.

[Emphasis added.]

## FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

131.    Lead Plaintiffs repeat and reallege each and every allegation of ¶¶1-130 as if fully set forth herein.

132.    Pursuant to Regulation S-K, 17 C.F.R. § 229, MF Global was required to include in its Registration Statement and Prospectus, *inter alia*, "a discussion of the most significant factors that make the offering speculative or risky."  *See* 17 C.F.R. § 229.503.  In particular, the Company was required to "[e]xplain how the risk affects the issuer or the securities being offered."  *Id.*

133.    Defendant MF Global, as issuer of its shares in the IPO, is strictly liable to the purchasers and holders of the shares obtained in the IPO for the material misstatements and omissions in the Registration Statement and Prospectus.  MF Global owed to the purchasers and holders of the shares obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained there to ensure that such

statements were true and correct, and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

134.    Defendants Man Group and Man Group UK, as the former corporate parent of MF Global, a controlling shareholder thereof, and the principal beneficiary of the IPO, receiving almost $3 billion of proceeds therefrom, constitute an underwriter of the shares and are strictly liable to the purchasers and holders of the shares obtained in the IPO for the misstatements and omissions in the Registration Statement and Prospectus.  Man Group and Man Group UK owed to the purchasers and holders of the shares obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus to ensure that such statements were true and correct, and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

135.    The Individual Defendants as signatories of the Registration Statement, directors and/or officers of MF Global, and controlling persons of the issuer, are strictly liable to and owed to the purchasers and holders of the shares obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained therein to ensure that such statements were true and correct, and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

136.    The Underwriter Defendants acted as underwriters for the IPO.  As such, the Underwriter Defendants were responsible for the contents of the Registration Statement and Prospectus and they are strictly liable to and owed to the purchasers and holders of the shares obtained through the Registration Statement and Prospectus the duty to make a reasonable and

diligent investigation of the statements contained therein to ensure that such statements were true and correct, and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

137.    None of the defendants conducted an adequate investigation or otherwise possessed any reasonable ground to support the challenged statements contained in the Registration Statement and Prospectus as true or that there were no omissions of material facts necessary to make the challenged statements made therein not misleading.

138.    Had defendants exercised reasonable care, they would have known of the material misstatements and omissions contained in or omitted from the Registration Statement and Prospectus as set forth herein.  As such, defendants are liable to the Class.

139.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of material misstatements to the investing public which were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

140.    As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of MF Global's shares sold in the IPO was artificially inflated, and Lead Plaintiffs and the Class suffered substantial damage in connection with their ownership of MF Global's shares purchased pursuant to and/or traceable to the Registration Statement and Prospectus.

141.    At the times they obtained their shares of MF Global, Lead Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

142.     This action was brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement.

143.     By virtue of the foregoing, Lead Plaintiffs and the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from all defendants, and each of them, jointly and severally.

<div align="center">

**SECOND CLAIM**
**Violation of Section 12(a)(2) of**
**The Securities Act Against All Defendants**

</div>

144.     Lead Plaintiffs repeat and reallege each and every allegation of ¶¶1-143 as if fully set forth herein.

145.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of Lead Plaintiffs and the Class, against all defendants.

146.     Defendants were sellers, offerors and/or solicitors of purchasers of the shares offered pursuant to the Registration Statement and Prospectus.

147.     The Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other material facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Individual Defendants' actions of solicitation included participating in the preparation of the untruthful and/or materially misleading Registration Statement and Prospectus.

148.     Defendants owed to the purchasers of MF Global's shares, including Lead Plaintiffs and other members of the Class, the duty to conduct a reasonable and diligent investigation of the statements contained in the IPO materials, including the Registration Statement and Prospectus, to ensure that such statements were true and that there was no

omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Had defendants conducted a reasonable and diligent investigation, they would have known of the misstatements and omissions contained in the IPO materials as set forth above.

149.    Lead Plaintiffs and other members of the Class purchased or otherwise acquired MF Global's shares pursuant to and/or traceable to the defective Registration Statement and Prospectus.  Lead Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and material omissions contained in the Registration Statement and Prospectus.

150.    Lead Plaintiffs, individually and representatively, each hereby offer to tender to defendants those shares which Lead Plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own such shares, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their MF Global shares are entitled to rescissory damages.

151.    By reason of the conduct alleged herein, defendants have violated Section 12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiffs and members of the Class who hold MF Global's shares purchased in the IPO have the right to rescind and recover the consideration paid for their MF Global shares, and hereby elect to rescind and tender their MF Global shares to defendants sued herein.  Lead Plaintiffs and Class members who have sold their MF Global shares are entitled to rescissory damages.

152.    This action was brought within three years from the time that the shares upon which this Count is brought were sold to the public, and within one year from the time when

Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
**Violation of Section 15 of The Securities Act
Against Man Group, Man Group UK, and the
Individual Defendants Arising from Violations of Section 11 of the Securities Act**

153.    Lead Plaintiffs repeat and reallege each and every allegation of ¶¶1-152 as if fully set forth herein.

154.    This count is asserted against Man Group, Man Group UK, and the Individual Defendants and is based upon their liability under Section 15 of the Securities Act for the Company's primary violations of Section 11 of the Securities Act.

155.    Man Group, by reason of the ownership of all of the shares of the Company at the time of the IPO and the retention of 18.6% of shares, through its wholly-owned special purpose subsidiary Man Group UK, following the IPO and at all relevant times; Man Group UK by virtue of its role as the "principal selling shareholder" of the common stock offered through the IPO; and the Individual Defendants, by virtue of their offices, directorships and specific acts were each, at the time of the IPO as set forth herein, controlling persons of MF Global within the meaning of Section 15 of the Securities Act.  Man Group, Man Group UK, and the Individual Defendants had the power and influence and exercised the same to cause MF Global to engage in the acts described herein which give rise to defendant MF Global's liability under Section 11 of the Securities Act as alleged herein.

156.    By virtue of the conduct alleged herein, Man Group, Man Group UK, and the Individual Defendants are each liable for the aforesaid wrongful conduct and are liable to Lead Plaintiffs and the Class for damages suffered.

**FOURTH CLAIM**
**Violation of Section 15 of The Securities Act**
**Against Man Group, Man Group UK, and the Individual Defendants**
**Arising From Violations of Section 12(a)(2) of the Securities Act**

157.   Lead Plaintiffs repeat and reallege each and every allegation of ¶¶1-156 as if fully set forth herein.

158.   This count is asserted against Man Group, Man Group UK, and the Individual Defendants based upon their liability under Section 15 of the Securities Act for the Company's primary violations of Section 12(a)(2) of the Securities Act as alleged herein.

159.   Man Group, by reason of the ownership of all of the shares of the Company at the time of the IPO and the retention of 18.6% of shares, through its wholly-owned special purpose subsidiary Man Group UK, following the IPO and at all relevant times; Man Group UK, by virtue of its role as the "principal selling shareholder" of the common stock offered through MF Global's IPO; and the Individual Defendants, by virtue of their offices, directorships and specific acts were each, at the time of the IPO, controlling persons of MF Global within the meaning of Section 15 of the Securities Act.  Man Group, Man Group UK, and the Individual Defendants had the power and influence and exercised the same to cause MF Global to engage in the acts described herein as giving rise to defendant MF Global's liability under Section 12(a)(2) of the Securities Act as alleged herein.

160.   By virtue of the conduct alleged herein, Man Group, Man Group UK, and the Individual Defendants are each liable for the aforesaid wrongful conduct and are liable to Lead Plaintiffs and the Class for damages suffered under Section 12(a)(2).

WHEREFORE, Lead Plaintiffs, on behalf of themselves and the Class, respectfully request judgment as follows:

A.      declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.      appointing Lead Plaintiffs as class representatives and their counsel as lead class counsel;

C.      awarding Lead Plaintiffs and other members of the Class damages together with pre-judgment interest thereon;

D.      awarding Lead Plaintiffs and other members of the Class rescission or rescissory damages and their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.      awarding Lead Plaintiffs and other members of the Class such additional or different relief as the interests of justice or equity may require under the circumstances.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated: November 5, 2010

**BARRACK, RODOS & BACINE**

A. Arnold Gershon (AG-3809)
William J. Ban (WB-0382)
425 Park Avenue, 31st Floor
New York, NY 10022
Phone: (212) 688-0782
Fax: (212) 688-0783

**BARRACK RODOS & BACINE**
Leonard Barrack
Mark R. Rosen (*admitted pro hac vice*)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Phone: (215) 963-0600
Fax: (215) 963-0838

**COHEN MILSTEIN SELLERS
& TOLL PLLC**

Carol V. Gilden (*admitted pro hac vice*)
190 S. LaSalle Street, Suite 1705
Chicago, IL 60603
Phone: (312) 357-0370
Fax: (312) 357-0369

**COHEN MILSTEIN SELLERS &
TOLL PLLC**
Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch (SB-3028)
1100 New York Avenue, N.W.
Suite 500 West Tower
Washington, DC 20005-3964
Phone: (202) 408-4600
Fax: (202) 408-4699

*Co-Lead Counsel for Lead Plaintiffs and the Class*

Christopher J. Keller (CK-2347)
Jonathan Gardner (JG-8512)
Angelina Nguyen (AN-8929)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Phone: (212) 907-0700
Fax: (212) 818-0477

*Additional Counsel for Plaintiff
State-Boston Retirement System*

**BARRACK, RODOS & BACINE**
Attorneys at Law

## SWORN CERTIFICATION OF GREGG A. SCHOCHENMAIER
## ON BEHALF OF
## THE IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM

I, Gregg A. Schochenmaier, Esquire, hereby certify as follows:

1.      I am general counsel of the Iowa Public Employees' Retirement System ("IPERS") and am authorized to submit this certification on its behalf.

2.      On behalf of IPERS, I have reviewed a complaint filed against MF Global Ltd. ("MF Global") and others alleging violations of the federal securities laws.

3.      IPERS did not purchase the MF Global securities that are the subject of this action at the direction of its counsel, Barrack, Rodos & Bacine, or to participate in any private action under the federal securities laws.

4.      IPERS is willing to serve as a lead plaintiff and representative party on behalf of the class in this action, including providing testimony at deposition and trial, if necessary.

5.      IPERS' transactions in MF Global Ltd. securities that are the subject of this action, as reported by IPERS' custodian, are set forth in the chart attached hereto as Exhibit A.

6.      IPERS is currently serving as a lead plaintiff on behalf of a class in the following action brought within the last three years under the federal securities laws:

*In re The Mills Corp. Securities Litigation*, Civil Action No. 1:06-cv-00077 (N.D.Va.)

7.      In addition, within the last three years, IPERS has served and/or sought to serve as a representative party in the following action brought under the federal securities laws:

*In re Bridgestone Securities Litigation*, Master File No. 3:01-cv-00017 (M.D.Tenn.)

*OCM High Yield Trust et al. v. PricewaterhouseCoopers LLP*, Civil Action No. 3:05-cv-00606-JFA (D.S.C.) (SafetyKleen bondholders litigation)

8.      IPERS will not accept any payment for serving as a representative party on behalf of a class beyond its pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May. 1, 2008

Gregg A. Schochenmaier

EXHIBIT A

Exhibit A

Iowa Public Employees' Retirement System
MF Global Ltd.
Ticker:  MF; Cusip:  G60642108
Class Period:  7/19/07-2/28/08

| Date | Transaction | No. of Shares | Price |
|---|---|---|---|
| 7/19/2007 | BUY | 109,400 | 30.0000 |
| 7/20/2007 | BUY | 52,900 | 26.0610 |
| 7/31/2007 | BUY | 15,400 | 25.1250 |
| 8/10/2007 | BUY | 11,500 | 24.6440 |
| 8/10/2007 | BUY | 3,000 | 24.4410 |
| 8/31/2007 | SELL | 55,400 | 26.8919 |
| 12/28/2007 | BUY | 9,700 | 31.0530 |
| 12/31/2007 | BUY | 6,700 | 31.2990 |
| 12/31/2007 | BUY | 3,600 | 30.9950 |

# Loss Chart

Iowa Public Employees' Retirement System
MF Global
Class Period: 07/19/2007 through 02/28/2008

| PURCHASES/ACQUISITIONS | | | | SALES | | | | PROFIT/(LOSS) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| DATE | SHARES | PRICE/SH | AMOUNT | DATE | SHARES | PRICE/SH | AMOUNT | | |
| 06/18/2008(PENDING) | | | | | | | | | |
| 7/19/2007 | 55,400 | 30.0000 | 1,662,000 | 8/31/2007 | 55,400 | 26.8919 | 1,489,811 | (172,189) | |
| 7/19/2007 | 54,000 | 30.0000 | 1,620,000 | Retained | 54,000 | 18.3900 [1] | 993,080 | (626,940) | |
| 7/20/2007 | 52,900 | 26.0610 | 1,378,627 | Retained | 52,900 | 18.3900 [1] | 972,831 | (405,796) | |
| 7/31/2007 | 15,400 | 25.1250 | 386,925 | Retained | 15,400 | 18.3900 [1] | 283,206 | (103,719) | |
| 8/10/2007 | 11,500 | 24.6440 | 283,406 | Retained | 11,500 | 18.3900 [1] | 211,485 | (71,921) | |
| 8/10/2007 | 3,000 | 24.4410 | 73,323 | Retained | 3,000 | 18.3900 [1] | 55,170 | (18,153) | |
| 12/28/2007 | 9,700 | 31.0530 | 301,214 | Retained | 9,700 | 18.3900 [1] | 178,383 | (112,617) [2] | |
| 12/31/2007 | 6,700 | 31.2990 | 209,703 | Retained | 6,700 | 18.3900 [1] | 123,213 | (77,787) [2] | |
| 12/31/2007 | 3,600 | 30.9950 | 111,582 | Retained | 3,600 | 18.3900 [1] | 66,204 | (41,796) [2] | |
| | 212,200 | | 6,026,780 | | 212,200 | | 4,373,363 | (1,630,918) | (1,630,918) |
| | | | | | | | | Grand Total: | (1,630,918) |

1. In accordance with the provisions of the Securities Act of 1933, the retention value is the closing price on March 5, 2008, the date that the first complaint was filed against MF Global Ltd.
2. In accordance with the provisions of the Securities Act of 1933, the loss amount for this transaction was calculated by subtituting the offering price of $30 per share for the purchase price paid in excess of the offering price.

**BARRACK, RODOS & BACINE**
Attorneys at Law

### SWORN CERTIFICATION OF JOHN J. GALLAGHER, JR.
### ON BEHALF OF
### THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO

I, John J. Gallagher, Jr., hereby certify as follows:

1.      I am the Executive Director of the Policemen's Annuity and Benefit Fund of Chicago ("PABF") and am authorized to submit this certification on its behalf.

2.      On behalf of the PABF, I have reviewed a complaint alleging violations of the federal securities laws filed against MF Global Ltd. ("MF Global") and others.

3.      The PABF did not purchase the MF Global securities that are the subject of this action at the direction of its counsel, Barrack, Rodos & Bacine, or to participate in any private action under the federal securities laws.

4.      The PABF is willing to serve as a lead plaintiff and representative party on behalf of the class in this action, including providing testimony at deposition and trial, if necessary.

5.      The PABF's transactions in MF Global securities that are the subject of this action, as reported by the PABF's custodian, are set forth in a chart attached hereto as Exhibit A.

6.      The PABF is currently serving as a lead plaintiff on behalf of a class in the following actions brought within the last three years under the federal securities laws:

*In re Telik Inc. Securities Litigation,* Case No. 1:07-cv-04819-CM (S.D.N.Y.)

*Eastwood Enterprises, LLC v. Farha,* Case No. 8:07-cv-1940 (M.D.Fla.)

7.      In addition, the PABF has sought to serve as a lead plaintiff in the following cases brought within the last three years under the federal securities laws:

*In re Delphi Corp. Securities Litigation,* Master Case No. 05-md-1725 (E.D.Mich) (transferred from S.D.N.Y., Case No. 1:05-cv-02637-NRB) (PABF not appointed lead plaintiff)

*In re Dell, Inc. Securities Litigation,* Case No. 1:06-cv-00726-SS (W.D.Tex.) (lead plaintiff motion withdrawn)

*In re Cosmetics Corp. Securities Litigation*, Case No. 3:07-cv-02940-SI (N.D.Cal.) (transferred from S.D.N.Y., Case No. 1:06-cv-11496-SWK) (PABF not appointed lead plaintiff)

*In re Schering-Plough Corporation/Enhance Securities Litigation*, Lead Case No. 2:08-397 (DMC) (MF) (D.N.J.) (PABF not appointed lead plaintiff)

8.      In addition, within the last three years, PABF has served as a lead plaintiff in the following actions brought under the federal securities laws:

*In re Siebel Systems, Inc. Securities Litigation*, Master File No. 3:04-cv-00983-CRB (N.D.Cal) (case dismissed in December 2005)

*In re Apollo Group Inc. Securities Litigation*, Lead Case No. 2:04-cv-02147-PHX-JAT (D.Ariz.) (jury verdict in favor of plaintiff in January 2008)

*Rabbach, et al. v. ICG Communications, et al.*, Case No. 1:00-cv-01864-REB-BNB (D. Col.) (settlement approved in January 2007)

9.      The PABF will not accept any payment for serving as a representative party on behalf of a class beyond its pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April __, 2008

John J. Gallagher, Jr.
Executive Director
Policemen's Annuity and Benefit Fund of Chicago

# EXHIBIT A

Exhibit A

Policemens' Annuity and Benefit Fund of Chicago
MF Global Ltd.
Ticker: MF; Cusip: G60642108
Class Period: 7/19/07-2/28/08

| Date | Transaction | No. of Shares | Price |
|---|---|---|---|
| 9/26/2007 | BUY | 25,700 | 27.4274 |
| 9/26/2007 | BUY | 6,700 | 27.3800 |
| 9/26/2007 | BUY | 2,700 | 27.4050 |
| 9/27/2007 | BUY | 32,500 | 28.4602 |
| 9/27/2007 | BUY | 5,000 | 28.8450 |
| 9/28/2007 | BUY | 25,500 | 28.9034 |
| 9/28/2007 | BUY | 13,460 | 28.8106 |
| 2/29/2008 | SELL | 14,700 | 16.5412 |
| 2/29/2008 | SELL | 72,360 | 16.8641 |
| 2/29/2008 | SELL | 24,500 | 16.5487 |

# Loss Chart

Policemen's Annuity and Benefit Fund of Chicago
MF Global
Class Period: 07/19/2007 through 02/28/2008

| PURCHASES/ACQUISITIONS | | | | SALES | | | | PROFIT/(LOSS) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| DATE | SHARES | PRICE/SH | AMOUNT | DATE | SHARES | PRICE/SH | AMOUNT | | |
| 9/26/2007 | 14,700 | 27.4274 | 403,183 | 2/29/2008 | 14,700 | 16.5412 | 243,156 | (160,027) | |
| 9/26/2007 | 11,000 | 27.4274 | 301,701 | 2/29/2008 | 11,000 | 16.8641 | 185,505 | (116,196) | |
| 9/26/2007 | 6,700 | 27.3800 | 183,446 | 2/29/2008 | 6,700 | 16.8641 | 112,989 | (70,457) | |
| 9/26/2007 | 2,700 | 27.4050 | 73,994 | 2/29/2008 | 2,700 | 16.8641 | 45,533 | (28,460) | |
| 9/27/2007 | 32,500 | 28.4602 | 924,957 | 2/29/2008 | 32,500 | 16.8641 | 548,083 | (376,873) | |
| 9/27/2007 | 5,000 | 28.8450 | 144,225 | 2/29/2008 | 5,000 | 16.8641 | 84,321 | (59,905) | |
| 9/28/2007 | 14,460 | 28.9034 | 417,943 | 2/29/2008 | 14,460 | 16.8641 | 243,855 | (174,088) | |
| 9/28/2007 | 11,040 | 28.9034 | 319,094 | 2/29/2008 | 11,040 | 16.5487 | 182,698 | (136,396) | |
| 9/28/2007 | 13,460 | 28.8106 | 387,791 | 2/29/2008 | 13,460 | 16.5487 | 222,746 | (165,045) | |
| | 111,560 | | 3,156,333 | | 111,560 | | 1,868,885 | (1,287,447) | (1,287,447) |

Grand Total: (1,287,447)

1. In accordance with the provisions of the Securities Act of 1933, the loss amount for this transaction was calculated using the sale price for all sales made before March 6, 2008, the date the first complaint was filed against MF Global.

## CERTIFICATION

James P. Condon, Deputy General Counsel of Central States, Southeast and Southwest Areas
Pension Fund, declares as to the claims asserted under the federal securities laws, that:

1.    I am authorized to make this certification on behalf of Central States, Southeast and
      Southwest Areas Pension Fund ("Plaintiff").

2.    I have reviewed a complaint filed in this matter and wish to join as a plaintiff, retaining
      Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as my counsel.

3.    Plaintiff did not purchase the securities that are the subject of this action at the direction
      of its counsel or to participate in this action.

4.    Plaintiff is willing to serve as a lead plaintiff and class representative on behalf of the
      Class, including providing testimony at deposition, and trial, if necessary.

5.    Plaintiff's transactions in the securities of MF Global, Ltd. that are the subject of this
      action are set forth in the chart attached hereto.

6.    During the three years prior to the date of this Certification, Plaintiff sought to serve as a
      representative party for a class under the federal securities laws but was not appointed in
      the following cases:

          *Showers v. Pfizer, Inc., et al.* (S.D.N.Y. 2004)
          *Finn v. Doral Financial Corp., et al.* (S.D.N.Y. 2005)
          *In re SafeNet, Inc. Sec. Litig.,* (S.D.N.Y. 2006)
          *Pappas v. Countrywide Financial Corp., et al.* (C.D. Cal. 2007)
          *In re Wellcare Health Plans, Inc. Sec. Litig.* (M.D. Fla. 2007)
          *In re Schering-Plough Corp./ Enhance Sec. Litig.* (D.N.J. 2008)

7.    Plaintiff will not accept any payment for serving as a class representative on behalf of
      the class beyond its *pro rata* share of any recovery, except such reasonable costs and
      expenses (including lost wages) relating to the representation of the class as ordered or
      approved by the court.

      I declare under penalty of perjury that the foregoing is true and correct. Executed this
      8th day of May 2008.

                                        _____
                                        James P. Condon
                                        Deputy General Counsel
                                        *Central States, Southeast and Southwest Areas
                                        Pension Fund*

# EXHIBIT A

Transactions

| Trade Date | Transaction Type (Buy/Sell) | # Shares | Share Price ($) |
|---|---|---|---|
| 7/19/2007 | Buy | 5,325.00 | 27.52 |
| 7/19/2007 | Buy | 3,693.00 | 27.51 |
| 7/19/2007 | Buy | 30,782.00 | 27.43 |
| 8/23/2007 | Buy | 22,900.00 | 25.68 |
| 8/29/2007 | Buy | 4,800.00 | 26.83 |
| 8/29/2007 | Buy | 17,900.00 | 26.91 |
| 9/7/2007 | Buy | 500.00 | 26.00 |
| 9/12/2007 | Buy | 1,780.00 | 26.09 |
| 9/19/2007 | Buy | 9,200.00 | 27.36 |
| 9/21/2007 | Buy | 6,000.00 | 27.31 |
| 9/25/2007 | Buy | 3,800.00 | 26.91 |
| 9/25/2007 | Buy | 6,100.00 | 26.93 |
| 9/28/2007 | Buy | 4,520.00 | 28.93 |
| 10/10/2007 | Buy | 1,000.00 | 30.86 |
| 10/10/2007 | Buy | 1,200.00 | 30.76 |
| 10/11/2007 | Buy | 3,200.00 | 30.87 |
| 10/11/2007 | Buy | 2,700.00 | 31.01 |
| 10/12/2007 | Buy | 900.00 | 30.99 |
| 10/12/2007 | Buy | 1,600.00 | 30.94 |
| 10/15/2007 | Buy | 3,000.00 | 30.41 |
| 11/23/2007 | Buy | 5,580.00 | 27.08 |
| 12/10/2007 | Buy | 4,000.00 | 30.00 |
| 12/11/2007 | Buy | 150.00 | 29.97 |
| 12/11/2007 | Buy | 2,400.00 | 29.94 |
| 12/11/2007 | Buy | 2,800.00 | 30.02 |
| 12/12/2007 | Buy | 900.00 | 27.86 |
| 12/12/2007 | Buy | 1,900.00 | 28.30 |
| 12/12/2007 | Buy | 1,900.00 | 28.66 |
| 1/9/2008 | Sell | -24,714.00 | 29.07 |
| 1/9/2008 | Sell | -15,086.00 | 29.20 |
| 1/11/2008 | Buy | 6,900.00 | 29.65 |
| 1/14/2008 | Buy | 1,800.00 | 29.42 |
| 1/15/2008 | Buy | 2,400.00 | 29.54 |
| 1/16/2008 | Buy | 900.00 | 29.79 |
| 1/17/2008 | Buy | 3,500.00 | 29.25 |
| 1/17/2008 | Buy | 1,000.00 | 28.15 |
| 1/18/2008 | Buy | 1,310.00 | 28.32 |
| 1/22/2008 | Buy | 3,500.00 | 28.15 |
| 1/22/2008 | Buy | 5,200.00 | 28.61 |
| 1/23/2008 | Buy | 3,700.00 | 29.05 |
| 1/23/2008 | Buy | 4,780.00 | 28.91 |
| 2/26/2008 | Sell | -3,700.00 | 28.33 |

Section 11

| Trade Date | Transaction Type | # Shares | Share Price ($) | Purchase Price Limited by Offering Price | Post-filing sales | Class Period Purchases | Class Period Sales | Sales on Class Period Purchases | Class Period Net Holdings | Cost | Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/19/2007 | Buy | 5325 | 27.515 | $ 27.52 | | 5325 | 0 | 0 | 5325 | $ 146,517.38 | |
| 7/19/2007 | Buy | 3693 | 27.509 | $ 27.51 | | 3693 | 0 | 0 | 9018 | $ 101,597.04 | |
| 7/19/2007 | Buy | 30782 | 27.4347 | $ 27.43 | | 30782 | 0 | 0 | 39800 | $ 844,494.94 | |
| 8/23/2007 | Buy | 22900 | 25.6796 | $ 25.68 | | 22900 | 0 | 0 | 62700 | $ 588,062.84 | |
| 8/29/2007 | Buy | 4800 | 26.83 | $ 26.83 | | 4800 | 0 | 0 | 67500 | $ 128,784.00 | |
| 8/29/2007 | Buy | 17900 | 26.9111 | $ 26.91 | | 17900 | 0 | 0 | 85400 | $ 481,708.68 | |
| 9/7/2007 | Buy | 500 | 26 | $ 26.00 | | 500 | 0 | 0 | 85900 | $ 13,000.00 | |
| 9/12/2007 | Buy | 1780 | 26.0947 | $ 26.09 | | 1780 | 0 | 0 | 87680 | $ 46,448.57 | |
| 9/19/2007 | Buy | 9200 | 27.3511 | $ 27.36 | | 9200 | 0 | 0 | 96880 | $ 251,722.12 | |
| 9/21/2007 | Buy | 6000 | 27.3058 | $ 27.31 | | 6000 | 0 | 0 | 102880 | $ 163,834.80 | |
| 9/25/2007 | Buy | 3800 | 26.9095 | $ 26.91 | | 3800 | 0 | 0 | 106680 | $ 102,252.30 | |
| 9/25/2007 | Buy | 6100 | 26.927 | $ 26.93 | | 6100 | 0 | 0 | 112780 | $ 164,254.70 | |
| 9/28/2007 | Buy | 4520 | 28.3263 | $ 28.33 | | 4520 | 0 | 0 | 117300 | $ 128,046.68 | |
| 10/10/2007 | Buy | 1000 | 30.8576 | $ 30.00 | | 1000 | 0 | 0 | 118300 | $ 30,000.00 | |
| 10/10/2007 | Buy | 1200 | 30.7635 | $ 30.00 | | 1200 | 0 | 0 | 119500 | $ 36,000.00 | |
| 10/11/2007 | Buy | 3200 | 30.8668 | $ 30.00 | | 3200 | 0 | 0 | 122700 | $ 96,000.00 | |
| 10/12/2007 | Buy | 2700 | 31.0148 | $ 30.00 | | 2700 | 0 | 0 | 125400 | $ 81,000.00 | |
| 10/12/2007 | Buy | 900 | 30.9908 | $ 30.00 | | 900 | 0 | 0 | 126300 | $ 27,000.00 | |
| 10/15/2007 | Buy | 1600 | 30.5448 | $ 30.00 | | 1600 | 0 | 0 | 127900 | $ 48,000.00 | |
| 10/15/2007 | Buy | 3000 | 30.4132 | $ 30.00 | | 3000 | 0 | 0 | 130900 | $ 90,000.00 | |
| 11/23/2007 | Buy | 5580 | 27.0813 | $ 27.00 | | 5580 | 0 | 0 | 136480 | $ 151,113.45 | |
| 12/10/2007 | Buy | 4000 | 29.9985 | $ 30.00 | | 4000 | 0 | 0 | 140480 | $ 119,994.00 | |
| 12/11/2007 | Buy | 150 | 29.5682 | $ 29.97 | | 150 | 0 | 0 | 140630 | $ 4,495.23 | |
| 12/11/2007 | Buy | 2400 | 29.8417 | $ 29.84 | | 2400 | 0 | 0 | 143030 | $ 71,860.08 | |
| 12/12/2007 | Buy | 2800 | 30.015 | $ 30.00 | | 2800 | 0 | 0 | 145830 | $ 84,000.00 | |
| 12/12/2007 | Buy | 900 | 27.86 | $ 27.86 | | 900 | 0 | 0 | 146730 | $ 25,074.00 | |
| 12/12/2007 | Buy | 1900 | 28.3 | $ 28.30 | | 1900 | 0 | 0 | 148630 | $ 53,773.00 | |
| 12/12/2007 | Buy | 1900 | 28.6546 | $ 28.66 | | 1900 | 0 | 0 | 150530 | $ 54,467.74 | |
| 1/9/2008 | Sell | 24714 | 27.07 | | | | -24714 | -24714 | 125816 | | $ (718,435.98) |
| 1/9/2008 | Sell | 15086 | 28.195 | | | | -15086 | -15086 | 110730 | | $ (440,435.77) |
| 1/11/2008 | Buy | 6900 | 29.6451 | $ 29.65 | | 6900 | 0 | 0 | 117630 | $ 204,551.19 | |
| 1/14/2008 | Buy | 1800 | 29.4171 | $ 29.42 | | 1800 | 0 | 0 | 119420 | $ 52,959.78 | |
| 1/15/2008 | Buy | 2400 | 29.5448 | $ 29.54 | | 2400 | 0 | 0 | 121830 | $ 70,907.04 | |
| 1/16/2008 | Buy | 900 | 29.7896 | $ 29.79 | | 900 | 0 | 0 | 122730 | $ 26,810.17 | |
| 1/17/2008 | Buy | 3500 | 29.2528 | $ 29.25 | | 3500 | 0 | 0 | 126230 | $ 102,384.80 | |
| 1/17/2008 | Buy | 1000 | 28.1541 | $ 28.15 | | 1000 | 0 | 0 | 127230 | $ 28,154.10 | |
| 1/18/2008 | Buy | 1310 | 28.3245 | $ 28.32 | | 1310 | 0 | 0 | 128540 | $ 37,105.10 | |
| 1/22/2008 | Buy | 3500 | 28.1484 | $ 28.15 | | 3500 | 0 | 0 | 132040 | $ 98,519.40 | |
| 1/22/2008 | Buy | 5200 | 28.6124 | $ 28.61 | | 5200 | 0 | 0 | 137240 | $ 148,784.45 | |
| 1/23/2008 | Buy | 3700 | 29.0451 | $ 29.05 | | 3700 | 0 | 0 | 140940 | $ 107,466.87 | |
| 1/23/2008 | Buy | 4780 | 28.9129 | $ 28.91 | | 4780 | 0 | 0 | 145720 | $ 138,203.66 | |
| 2/26/2008 | Sell | 3700 | 28.3289 | | | | -3700 | -3700 | 142020 | | $ (104,816.63) |

| | |
|---|---|
| Total Class Period Purchases: | 165500 |
| Total Class Period Sales: | -43500 |
| Total Sales on Class Period Purchases: | 43500 |
| Total Class Period Shares Retained: | 142000 |
| Price on Filing Date $ | 18.39 |
| Total Purchases Limited by Offering $ | 5,152,012.49 |
| Total Sales Proceeds $ | (1,263,668.66) |
| Total Retained Value: $ | 2,611,747.80 |
| Total Loss: $ | 1,276,576.01 |

## CERTIFICATION

I, Robert E. Tierney, as Executive Officer of Boston Retirement Board, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of the State-Boston Retirement System ("Boston"). I have reviewed a complaint prepared against MF Global, Ltd. alleging violations of the federal securities laws;

2.     Boston did not purchase securities of MF Global at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     Boston is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.     Boston's transactions in MF Global during the class period are reflected in Exhibit A, are attached hereto;

5.     Boston has not sought to serve as a lead plaintiff in a class action under the federal securities laws during the last three years, except for the following:

> *In Re Amkor Technology, Inc. Securities Litigation* (**appointed**)
> *Garber v. Juniper Networks, Inc.* (*withdrew*)
> *In re SafeNet, Inc. Securities Litigation* (**appointed**)
> *In re Take-Two Interactive Software Securities Litigation* (*Class Representative*)
> *Ellen Rosenthal Brodsky v. Yahoo! Inc. et al,* (*not appointed*)
> *In re Luminent Mortgage Capital, Inc., Securities Litigation* (*not appointed*)
> *Briarwood Investments, Inc. v. Care Investment Trust, Inc.* (*withdrew*)
> *Steinberg v. Ericsson LM Telephone Co.* (*not appointed*)
> *Hubbard v. BankAtlantic Bancorp, Inc. et al* (**appointed**)
> *Joel Stratte-McClure v. Gary G. Lynch* (*pending*)

6.     Beyond its pro rata share of any recovery, Boston will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _24_ day of March, 2008.

Robert E. Tierney
Executive Officer of Boston Retirement Board

# EXHIBIT A

EXHIBIT A

TRANSACTIONS IN
MF GLOBAL, LTD.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 07/19/07 | 63,200.00 | $ 30.00 | ($1,896,000.00) |
| Purchase | 08/10/07 | 2,300.00 | $ 24.70 | ($56,894.18) |
| Purchase | 08/13/07 | 10,200.00 | $ 24.97 | ($255,129.54) |
| Purchase | 08/14/07 | 5,600.00 | $ 24.24 | ($135,957.36) |
| Purchase | 08/15/07 | 5,700.00 | $ 23.96 | ($136,822.80) |
| Purchase | 11/08/07 | 1,100.00 | $ 28.62 | ($31,523.03) |
| Purchase | 11/15/07 | 2,000.00 | $ 27.64 | ($55,301.62) |
| Sale | 01/24/08 | -1,400.00 | $ 29.86 | $41,747.36 |

Boston Retirement Board

Class Period: 7/19/2007 to 2/28/2008

**MF GLOBAL LTDCOM STK USD1**

| Ticker | CUSIP | SEDOL | ISIN |
|--------|-------|-------|------|
| MF | G60642108 | | BMG606421086 |

| Trans Type | Trade Date | Settle Date | Shares | Price Per Share | Cost/Proceeds | Currency |
|---|---|---|---|---|---|---|
| Open | 07/18/07 | | 0.00 | | $0.00 | |
| *Sales (matched to pre-class period purchases):* | | | 0.00 | | | |
| Purchase | 07/19/07 | 07/24/07 | 63,200.00 $ | 30.00 | ($1,896,000.00) | USD |
| Purchase | 08/10/07 | 08/15/07 | 2,300.00 $ | 24.70 | ($56,894.18) | USD |
| Purchase | 08/13/07 | 08/16/07 | 10,200.00 $ | 24.97 | ($255,129.54) | USD |
| Purchase | 08/14/07 | 08/17/07 | 5,600.00 $ | 24.24 | ($135,757.36) | USD |
| Purchase | 08/15/07 | 08/20/07 | 5,700.00 $ | 23.96 | ($136,822.80) | USD |
| Purchase | 11/08/07 | 11/14/07 | 1,100.00 $ | 28.62 | ($31,523.03) | USD |
| Purchase | 11/15/07 | 11/20/07 | 2,000.00 $ | 27.64 | ($55,301.62) | USD |
| | | *Class period purchases:* | 90,100.00 | | ($2,567,628.53) | |
| Sale | 01/24/08 | 01/29/08 | -1,400.00 $ | 29.86 | $41,747.36 | USD |
| | *Class period sales (matched to class period purchases):* | | -1,400.00 | | $41,747.36 | |
| | | *FIFO Retained purchases:* | 88,700.00 | $18.39 | $1,631,193.00 | |
| | | *LIFO Retained purchases:* | 88,700.00 | $18.39 | $1,631,193.00 | |
| | | | | FIFO Gain/(Loss): | ($894,688.17) | |
| | | | | LIFO Gain/(Loss): | ($894,688.17) | |

NET Gain/(Loss):   ($2,525,881.17)

*Retention value is the closing price on March 6, 2008, the date that the first complaint was filed against MF Global Ltd.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| MICHAEL RUBIN, | : | Case No. 08 Civ. 2233 (VM) |
| Plaintiff, | : |  |
| v. | : |  |
| MF GLOBAL, LTD., et al., | : |  |
| Defendants. | : |  |

## CERTIFICATE OF SERVICE

I, Francisco R. Malonzo, hereby certify that on November 5, 2010, I caused a copy of the First Amended Consolidated Class Action Complaint to be served upon the following counsel for defendants by FedEx:

Marshall H. Fishman
Brendan M. Schulman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for Defendant Amy S. Butte*

Bernard W. Nussbaum
David B. Anders
Elaine P. Golin
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019-6150
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendants MF Global, Kevin R. Davis, Alison J. Carnwath, Christopher J. Smith, Christopher Bates, Henri J. Steenkamp, and Edward L. Goldberg*

David A. Barrett
Marilyn C. Kunstler
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Phone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Defendant Man Group plc*

Stuart J. Baskin
Herbert S. Washer
Adam S. Hakki
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Phone: (212) 848-4000
Fax: (212) 848-7179

*Attorneys for Underwriter Defendants Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith, Incorporated, UBS Securities LLC, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., Morgan Stanley & Co. Incorporated, ABN AMRO Rothschild LLC, Banc of America Securities LLC, BMO Capital Markets Corp., HSBC Securities (USA) Inc., Keefe, Bruyette & Woods, Inc., Sandler O'Neill & Partners, L.P., Wachovia Capital Markets, LLC, Blaylock & Co. Inc., Calyon Securities (USA) Inc., Chatsworth Securities LLC, CL King & Associates, Inc., Dowling & Partners Securities, LLC, E*TRADE Securities LLC, Fortis Securities LLC, Guzman & Co., ING Financial Markets, LLC, Jefferies & Co., Inc., Lazard Capital Markets LLC, M.R. Beal & Co., Mizuho Securities USA Inc., Muriel Siebert & Co., Inc., Oppenheimer & Co. Inc., Piper Jaffray & Co., Raymond James & Associates, Inc., RBC Capital Markets Corp., Robert W. Baird & Co. Inc., Samuel A. Ramirez & Co., Inc., SMH Capital Inc., Stifel, Nicolaus & Co., Inc., SunTrust Capital Markets, Inc. (n/k/a SunTrust Robinson Humphrey, Inc.), The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Wells Fargo Securities, LLC, William Blair & Co., LLC*

*Francisco R. Malonzo*
_____
Francisco R. Malonzo